1

```
1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF TEXAS
2                         MARSHALL DIVISION

3
     REMBRANDT WIRELESS          |  DOCKET NO. 2:13CV213
4    TECHNOLOGIES, LP            |
                                 |  JANUARY 20, 2015
5                                |
     VS.                         |
6                                |  9:05 A.M.
                                 |
7    SAMSUNG ELECTRONICS CO      |
     LTD., ET AL                 |  MARSHALL, TEXAS
8    ------------------------------------------------------

9
                 VOLUME 1 OF 1, PAGES 1 THROUGH 187
10
            REPORTER'S TRANSCRIPT OF PRETRIAL CONFERENCE
11
                 BEFORE THE HONORABLE ROY S. PAYNE
12                 UNITED STATES MAGISTRATE JUDGE

13   ------------------------------------------------------

14   APPEARANCES:

15   FOR THE PLAINTIFF:     DEMETRIOS ANAIPAKOS
                            AMIR ALAVI
16                          JAMIE AYCOCK
                            KYRIL TALANOV
17                          AHMAD, ZAVITSANOS, ANAIPAKOS,
                              ALAVI & MENSING
18                          3460 ONE HOUSTON CENTER
                            1221 MCKINNEY STREET
19                          HOUSTON, TEXAS 77010

20                          MICHAEL HEIM
                            ERIC ENGER
21                          BLAINE LARSON
                            HEIM, PAYNE & CHORUSH
22                          600 TRAVIS, SUITE 6710
                            HOUSTON, TEXAS 77002
23
                            JOHNNY WARD
24                          WARD & SMITH
                            1127 JUDSON ROAD, SUITE 220
25                          LONGVIEW, TEXAS 75606
```

2

```
 1  FOR THE DEFENDANTS:      GABRIELLE HIGGINS
                             REBECCA HERMES
 2                           ROPES & GRAY
                             1900 UNIVERSITY AVENUE
 3                           6TH FLOOR
                             EAST PALO ALTO, CALIFORNIA 94303
 4
                             JESSE JENNER
 5                           ROPES & GRAY
                             1211 AVENUE OF THE AMERICAS
 6                           NEW YORK, NEW YORK 10036

 7                           JEFFREY SHERWOOD
                             DICKSTEIN SHAPIRO
 8                           1825 EYE STREET NW
                             WASHINGTON, DC 20006
 9
                             GERARD HADDAD
10                           JENNIFER BIANROSA
                             DICKSTEIN SHAPIRO
11                           1633 BROADWAY
                             NEW YORK, NEW YORK 10019
12
                             MICHAEL SMITH
13                           SIEBMAN BURG PHILLIPS & SMITH
                             113 EAST AUSTIN STREET
14                           MARSHALL, TEXAS 75671

15

16  COURT REPORTER:          TONYA B. JACKSON, RPR-CRR
                             FEDERAL OFFICIAL REPORTER
17                           300 WILLOW, SUITE 239
                             BEAUMONT, TEXAS  77701
18

19

20     PROCEEDINGS REPORTED USING COMPUTERIZED STENOTYPE;
       TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
21

22

23

24

25
```

Pretrial Conference 1-20-2015

3

```
 1                          INDEX

 2                                              PAGE

 3              PLAINTIFF'S MOTIONS IN LIMINE

 4

 5   MOTION IN LIMINE 1                          29

 6   MOTION IN LIMINE 2                          34

 7   MOTION IN LIMINE 3                          48

 8   MOTION IN LIMINE 4                          53

 9   MOTION IN LIMINE 5                          55

10   MOTION IN LIMINE 6                          59

11   MOTION IN LIMINE 7                          68

12   MOTION IN LIMINE 8                          69

13   MOTION IN LIMINE 9                          71

14   MOTION IN LIMINE 10                         74

15   MOTION IN LIMINE 11                         78

16   MOTION IN LIMINE 12                         80

17   MOTION IN LIMINE 13                         82

18   MOTION IN LIMINE 14                         83

19   MOTION IN LIMINE 15                         85

20   MOTION IN LIMINE 16                         93

21   MOTION IN LIMINE 17                         96

22   MOTION IN LIMINE 18                         98

23   MOTION IN LIMINE 19                        100

24   MOTIONS IN LIMINE 20 AND 21                102

25   MOTION IN LIMINE 22                        106
```

4

1  MOTION IN LIMINE 23                              110

2  MOTION IN LIMINE 24                              111

3  MOTION IN LIMINE 25                              112

4

5


6              DEFENDANTS' MOTIONS IN LIMINE

7

8  MOTION IN LIMINE 14                               33

9  MOTION IN LIMINE 1                               114

10  MOTION IN LIMINE 2                              115

11  MOTION IN LIMINE 3                              126

12  MOTION IN LIMINE 4                              133

13  MOTIONS IN LIMINE 5 AND 6                       140

14  MOTION IN LIMINE 7                              140

15  MOTION IN LIMINE 8                              151

16  MOTION IN LIMINE 9                              160

17  MOTION IN LIMINE 10                             161

18  MOTION IN LIMINE 11                             162

19  MOTION IN LIMINE 12                             175

20  MOTION IN LIMINE 13                             175

21  MOTION IN LIMINE 14                             184

22

23

24

25

Pretrial Conference 1-20-2015

5

```
           1              (OPEN COURT, ALL PARTIES PRESENT.)

           2              THE COURT:  For the record, we're here this

           3    morning for the pretrial conference in *Rembrandt versus*

           4    *Samsung*, which is Case No. 2:13-213 on our docket.

09:05AM    5              Would counsel state their appearances for the

           6    record.

           7              MR. WARD:  Good morning, your Honor.

           8              THE COURT:  Good morning, Mr. Ward.

           9              MR. WARD:  Johnny Ward, along with Eric Enger,

09:05AM   10    Amir Alavi, Demetrios Anaipakos, and Mike Heim with me at

          11    counsel table; Jamie Aycock, Blaine Larson, Alisa Lipski,

          12    Kyril Talanov, and Andrea Caswell who is our legal

          13    assistant with the AZA firm and she's going to be helping

          14    us with computer graphics this morning.

09:06AM   15              THE COURT:  Very good.  Thank you, Mr. Ward.

          16              Good morning, Mr. Smith.

          17              MR. SMITH:  Thank you, your Honor.  For

          18    Samsung, Michael Smith; and with me at counsel table is

          19    Gabrielle Higgins, Jesse Jenner, Jeff Sherwood, Gerry

09:06AM   20    Haddad; and then in the first row, Ms. Rebecca Hermes and

          21    Jennifer BianRosa.  We are ready to proceed.

          22              Oh, and also we have our director of

          23    litigation Ms. Michelle Yang in the gallery.  And we are

          24    ready to proceed, your Honor.

09:06AM   25              THE COURT:  Very well.  Thank you, Mr. Smith.
```

09:06AM

1        Let me start off with just the logistical

2    items.  This case is the first case up on the February 9

3    trial docket for Judge Gilstrap.  There are other cases

4    on that docket; but this is the case that is set first.

5    So, you can count on that.

6        Jury selection will start that morning.  Voir

7    dire is currently at 40 minutes per side, I think is what

8    Judge Gilstrap is going with at this time.  I think that

9    local counsel on both sides are familiar with the -- with

09:07AM 10   Judge Gilstrap's requirements for voir dire; but I'll

11   just repeat that his practice is that the parties can use

12   the first three minutes or so for background and case

13   introduction purposes.  The rest of it should be

14   specifically questioning the jury panel -- in other

09:07AM 15   words, trying to elicit the jury's feelings and

16   experience on matters -- rather than arguing the case to

17   the jury.  And he does occasionally cut people off who

18   wander into argument.  So, counsel should bear that in

19   mind.

09:08AM 20       He will allow four peremptory strikes and seat

21   a jury of eight jurors.  The jury will be presented with

22   jury notebooks once they're seated and will -- I'll get

23   Mr. Walter to send you out an e-mail with more details.

24   I think that the practice on that is well familiar to

09:08AM 25   local counsel as far as what the contents of those jury

7

1   notebooks should be, but obviously the patents at issue

2   and the court's claim construction chart.

3           If you have stipulations -- I don't recall

4   there being any material stipulations in the pretrial

09:09AM   5   order in this case.  If there are any stipulations that

6   you want to present to the jury, then I think the favored

7   way to do that would be by a stipulation that can be

8   included in the jury notebook as opposed to reading those

9   to the jury.

09:09AM   10           And obviously, then, the -- one of the most

11   important features is a witness page for each witness

12   that you'll call to the trial; and that would also

13   include witnesses whose testimony will be presented by

14   deposition, the idea being that there will be a page that

09:09AM   15   the jurors can take notes on that will have the photo of

16   the witness and help them remember during deliberation

17   exactly who that witness was and thereby help them

18   remember, when the parties disagree about what the

19   witnesses said.  They'll be in a better position to

09:10AM   20   evaluate the arguments on those things.  So, that's an

21   important feature that there be such a page for each

22   witness in the book.  Typically those are provided at the

23   time the notebooks are delivered before the trial starts.

24   There are occasions when you're not able to get the photo

09:10AM   25   of a witness before the trial starts; and, so, those can

8

1  be supplemented, as long as the jury gets them before the

2  testimony begins.

3       I think Judge Gilstrap's current practice is

4  to conduct the voir dire and swear the jury in and then

09:11AM  5  break for lunch.  So, the lunch may be a little early or

6  a little late based on just when that completes; but the

7  evidence will start after lunch and typically the

8  openings after lunch as well.

9       I think you can plan on 30 to 35 minutes per

09:11AM  10  side for openings.  Closings, the judge will give you

11  those during the trial.  We'll confirm.  If it's any

12  different, it will be in an e-mail that you'll get as far

13  as the length of the openings.  But it will be in that

14  range, and we'll specify exactly what it is.

09:12AM  15       It's very important that Judge Gilstrap wants

16  to not keep the jury waiting during the time when they're

17  here.  So, he will be available, starting at 7:30 each

18  day, to take up any contested matters before the jury

19  reports for service.  We're going to go over a protocol

09:12AM  20  for you to meet and confer about any issues that come up

21  during the trial, and part of that -- an important part

22  of that protocol will be that you notify the judge's

23  office the evening before if you are going to need time

24  to take something up the next morning.

09:13AM  25       Breaking news on the length of the openings

and closings.  25 minutes for the openings, 35 minutes

for the closings.  That's the latest information.

And I don't recall seeing an agreement of the

parties about that.  Mr. Ward and Mr. Smith, have you

09:13AM 5 discussed that?  Do you have any agreements on how you're

going to notify each other about the order of witnesses

and the exhibits or demonstratives that will be used?

MR. WARD:  We have not discussed that, your

Honor.  We'll do that.  I don't think that will be a

09:14AM 10 problem.  It's fairly pretty standard.  What's the

court's deadline for when he wants to be notified?  Is it

9:00 o'clock?  Is it 8:00 o'clock?  Or is there a

deadline?

THE COURT:  I mean, it's usually by agreement,

09:14AM 15 frankly; but I would think that -- I mean, what we're

asking now is that you notify the law clerk -- in this

case Mr. Walter -- about any disputes the evening before;

and, you know, if you have particular constraints that

set a particular time -- typically it's, you know, by

09:14AM 20 10:00 p.m.; but I don't -- we can vary that.  If there's

a need to be able to contact somebody somewhere and

they're not available until later, I mean, that's

something that can be worked out.

MR. WARD:  Okay.

09:15AM 25 THE COURT:  The hope is that y'all can make an

1    agreement that satisfies your needs.  I mean, as a

2    default, I would -- in terms of the order of witnesses, I

3    would typically say if you don't agree on something

4    different, then you should notify the other side by the

09:15AM  5    end of the trial day who you're going to call.  But if

6    you want to agree on 6:00 or 7:00 or some later time,

7    that's fine.

8                    MR. WARD:  Certainly.

9                    THE COURT:  And I don't know if you have a

09:15AM  10    need to -- or if you want to agree to disclose

11    demonstratives.  That's something you can work in.  Our

12    goal, you know, is just to make sure that if you've got a

13    dispute, that it gets aired before the jury is in the

14    box.  And as long as the system you come up with avoids,

09:15AM  15    you know, disruption of the trial, then you won't have

16    any problem from us.

17                    MR. SMITH:  We'll get together on that, your

18    Honor, and see if we can come up with something by

19    agreement.

09:16AM  20                    THE COURT:  Okay.  I would expect that we're

21    probably going to end up getting back together on

22    exhibits and deposition cuts.  So, we can just make sure

23    this gets resolved by that date.  However, you may

24    surprise me and be ready to take care of all those today,

09:16AM  25    but anyway.

1          MR. WARD:  As usual, I think limines will

2    inform a lot of the exhibits, although there are some

3    categories that we might be able to get some guidance

4    from the court outside of the limines that we're ready to

09:16AM  5    take up on the exhibits, just to kind of give you a

6    heads-up.

7          THE COURT:  Okay.  One thing about witnesses

8    that is I think becoming well known to local counsel at

9    least, it's important that you instruct your team that

09:16AM 10    Judge Gilstrap expects the formality of the proceedings

11    to be maintained in the sense that witnesses are to be

12    referred to only by full names or last names, not just by

13    first names.  And that's something that while you're

14    talking to witnesses you should go over.  So, anyway,

09:17AM 15    thank you.

16          MR. WARD:  One item we didn't discuss -- and

17    it's because we just e-mailed it, and I didn't e-mail it

18    to Mr. Walter.  It was e-mailed to Mr. First -- was the

19    juror questionnaire.  We might be a day late and a dollar

09:17AM 20    short, but we at least agreed on it and e-mailed it to

21    Mr. First.  I e-mailed it at 8:00 o'clock this morning.

22    It's identical with the exception of Samsung's name in

23    rather than Apple's name.  But just to bring that to the

24    court's attention.

09:17AM 25          THE COURT:  It's my understanding that that's

12

1  the same questionnaire that Judge Gilstrap has approved

2  now for the *SmartFlash* trial which is the next week.

3              MR. WARD:  Correct.

4              THE COURT:  And I understand from our jury

09:18AM   5  coordinator that that is timely, that we can use that.

6  Both sides are in agreement with the document that was

7  sent in or not?

8              Have you had a chance to look at that,

9  Mr. Smith?

09:18AM  10              MR. SMITH:  I have, your Honor; and we are in

11  agreement with it.

12              THE COURT:  Okay.  Then we will get that sent

13  out, and it will be available for you on that Thursday

14  afternoon before Monday the 9th.

09:18AM  15              MR. WARD:  And will we get the juror -- in

16  addition to the juror questionnaire, the identities of

17  the jury panel, do we get that on that Thursday before as

18  well?

19              THE COURT:  Yes.

09:18AM  20              MR. WARD:  Okay.  Thank you.

21              THE COURT:  Okay.  Thank you both.

22              It is Judge Gilstrap's practice also that any

23  Rule 50(a) motions should be reserved until the close of

24  all the evidence and that the record will indicate here

09:19AM  25  that you're protected on waiting until the close of all

13

the evidence.  There is no need to urge those motions

when the plaintiff rests as long as they're asserted

after the close of all the evidence, and the judge will

give you an opportunity to do so.

09:19AM 5      There will also be an informal charge

conference after the close of all the evidence.

What is the status of the jury instructions?

Has a joint set been offered or filed by the parties?

Mr. Smith?

09:19AM 10      MR. SMITH:  Interpreting "joint" broadly, yes,

it has, your Honor.

THE COURT:  Okay.

MR. ALAVI:  Your Honor, as a strict

instructionist, I'd say that we have not.  I believe the

09:20AM 15 parties have agreed to try to work through and see if we

can submit a joint instruction for the court to consider,

and we'll take that up again and work on it.

THE COURT:  Okay.  Then, you know, what we

mean by "joint" is a single document that doesn't just

09:20AM 20 have competing paragraphs.  In other words, if y'all are

in agreement on all but a sentence or two of a section,

we would ask that the joint document simply single out

the sentence or two that are not agreed to so that we can

focus the dispute as much as possible.  It's not

09:20AM 25 particularly helpful to the court to have two very

1 similar but materially different offerings.  We want to

2 be able to tell where you agree and disagree, and

3 certainly you're much more likely to get instructions

4 that resemble what you're offering if you focus the

09:21AM  5 dispute as much as possible.  So, that's what we mean by

6 "joint"; and you've got a lot of past instructions to

7 guide you in that regard.  I'm sure that that's something

8 that local counsel on both sides have great access to

9 but -- let's see.

09:21AM  10          Craig, when do we need to get those filed?

11          (Discussion off the record between the court

12 and the law clerk.)

13          THE COURT:  So, what we'd ask in that regard

14 is if you can file your joint set by February the 2nd,

09:21AM  15 the Monday before the Monday of trial.  And whenever I

16 talk about jury instructions, I'm talking about a verdict

17 form as well.  So, to the extent you can agree on the

18 format of a verdict form, that will be helpful.  And

19 certainly you know the court has practices and, you know,

09:22AM  20 to the extent you can get close to what the court has

21 done in the past, again you're more likely to get the

22 things that are important to you.

23          Okay.  I know that you're still working on

24 objections to exhibits; but just to confirm, the practice

09:22AM  25 will be that at the end of this process there will be a

Pretrial Conference 1-20-2015

15

1    list of preadmitted exhibits.  Those exhibits can be used

2    by either side, you know, at any stage of the case

3    without any further foundation or introduction.

4            However, as the trial goes along, we will ask

09:23AM  5    the parties to submit lists at the end of each day or

6    beginning of the next day of the exhibits that have

7    actually been used in front of the jury because it is not

8    all of the preadmitted exhibits that will form part of

9    the record.  It is only the preadmitted exhibits that are

09:23AM  10   used in front of the jury.  And, so, we're going to ask

11   you by either the end of the day, if you can get it done

12   then, or the beginning of the next day to submit to the

13   courtroom deputy clerk a list -- an agreed list of the

14   exhibits that are used; and those will be the exhibits

09:23AM  15   that will be available for the jury to review during

16   deliberation if they want to and will be considered a

17   part of the record for appeal.  But anything that is not

18   on that preadmitted exhibit list will not be available to

19   be used during the trial unless it is truly impeachment.

09:24AM  20           And impeachment is fairly narrowly construed.

21   It's not a matter of rebuttal; it's not a matter of

22   contradiction.  It's a matter of showing that the witness

23   has previously said or done something -- or I guess

24   actually has previously said something that is directly

09:24AM  25   contrary to the testimony offered in court.

16

1          Any questions about those procedures from

2    either side?

3          MR. SMITH:  No, your Honor.

4          MR. ALAVI:  I have one.  And I'll meet and

09:24AM  5    confer with opposing counsel about this.  But I think

6    both sides have conditional exhibits on their list; so, I

7    think both sides want to talk about if we preadmit those

8    and then -- there's an exhibit, for example, that

9    defendants have listed as conditional, they're not going

09:25AM 10    to want us to use them because they're not fully offering

11   them.  So, perhaps we could meet and confer on that and

12   figure out a solution to that.  Both sides have that

13   issue on their exhibit list, unless the court has already

14   dealt with that before and has a proposed solution.

09:25AM 15          THE COURT:  Well, I've dealt with it before;

16   and we don't have a conditional exhibit list.  I mean,

17   there will occasionally be an exhibit that will not be

18   put on the preadmitted list because it needs a foundation

19   that can only be laid in court and those will be

09:25AM 20   specified and, you know, you'll have to lay that

21   foundation before you can use it.  That's a pretty narrow

22   category, given what the federal rules now say about

23   authentication and the like.  So -- but I don't

24   understand -- if what you're describing as conditional is

09:26AM 25   "We're not sure if we want to use it," that is not a

17

1    category of -- well, I guess I'll wait until I hear the

2    argument on just what you mean by that.

3              MR. ALAVI:  This was perfect guidance for us,

4    your Honor.

09:26AM    5              THE COURT:  Okay.

6              MR. ALAVI:  I think most of them fall out

7    based on how motions in limine are resolved.  That was a

8    question that popped up, and your guidance gives us what

9    we need.  Thank you.

09:26AM    10              THE COURT:  Okay.  And with respect to

11    deposition cuts, the same thing.  I mean, we will work it

12    down to where all of the deposition designations are

13    either agreed to or resolved.  You may still -- either

14    side may still decide not to play some deposition based

09:27AM    15    on the decisions that they make at trial, but we're not

16    going to leave it so that there are any objections to

17    those available deposition clips that have not been

18    resolved.

19              When you're working on your protocol regarding

09:27AM    20    notification about order of witnesses and all, you should

21    also decide what protocol you want to develop on exchange

22    of demonstratives.  The court has typically not required

23    any exchange of demonstratives to be used for

24    cross-examination but certainly occasionally the parties

09:28AM    25    agree to it and that's available if you want to.  But the

18

1    goal is to make sure that any objections to

2    demonstratives are aired before the trial starts that day

3    so that there isn't any need to slow things down for

4    them.  So, as long as your protocol takes care of that,

09:28AM  5    then it will be fine.  And if you have any more questions

6    about exactly how that should work, we'll take those up

7    when you've met and conferred and come up with it.

8           All right.  The -- as far as the length, I saw

9    that the parties indicated that they agreed the case

09:28AM  10   could be resolved in five days.  Looking at this and

11   looking at the way Judge Gilstrap has been handling

12   these, I don't see anything in this case that would

13   indicate that the parties need more than ten hours per

14   side; but I'll want to hear any arguments that the

09:29AM  15   parties may have about that.

16          Do you -- Mr. Ward or --

17          MR. WARD:  Ten hours is fine with the

18   plaintiff, your Honor.

19          THE COURT:  Mr. Smith?

09:29AM  20          MR. SMITH:  Your Honor, I think we would ask

21   for 12.  It's to some extent contingent on what the

22   court's rulings are on the pending motions and limine

23   motions.  But if we have to develop a lot of issues

24   through cross-examination, we think that this would be a

09:29AM  25   case where we'd like to have up to 12 hours per side.

                                                                        19

              1       THE COURT:  Okay.  Well, I'll give you a

              2   chance to re-urge that then when we finish the motions in

              3   limine and we'll see.  At this point I'm going to say ten

              4   hours per side, but that's subject to revisiting if

    09:29AM   5   necessary.

              6            One thing I -- I saw in the record that the

              7   parties had agreed to, I believe, and the court had

              8   appointed Judge Michel as the mediator in this matter and

              9   I saw a reference to a mediation that occurred in July.

    09:30AM  10   Has there been any further mediation since then?

             11       MR. ANAIPAKOS:  Good morning, your Honor.

             12   Demetrios Anaipakos.  There has not.  We had the one

             13   session with Judge Michel and none since then.

             14       THE COURT:  All right.  Is there any reason

    09:30AM  15   why there should not be any further effort in that

             16   regard?

             17       MR. ANAIPAKOS:  We wouldn't object to it, your

             18   Honor.

             19       THE COURT:  All right.

    09:30AM  20       MR. SHERWOOD:  Your Honor, Jeff Sherwood for

             21   Samsung.  We don't certainly have any objection to having

             22   further mediation.

             23       THE COURT:  All right.  Well, what -- have

             24   there been any settlement discussions since the mediation

    09:31AM  25   session in July?

20

```
 1              MR. SHERWOOD:  There have not, your Honor.
 2              MR. ANAIPAKOS:  No, your Honor.
 3              MR. SHERWOOD:  The parties were quite far
 4    apart, your Honor.  That's why it didn't seem productive.
 5              THE COURT:  All right.  Well, I may consult
 6    with Judge Michel; and we'll get back to the parties on
 7    that.  Thank you.
 8              MR. ANAIPAKOS:  Your Honor, if I might.
 9    Although we would certainly be happy to go back to
10    Judge Michel, I have found in other cases that he is
11    quite difficult to schedule.  So, we would also -- to the
12    extent it's appropriate, we would agree to a mediator
13    other than Judge Michel for scheduling purposes.
14              THE COURT:  Okay.  All right.
15              Mr. Sherwood.
16              MR. SHERWOOD:  Well, I think in the first
17    instance we ought to find out if Judge Michel can squeeze
18    us into his schedule because he obviously knows the case
19    and knows the history.  That makes the most sense to me,
20    your Honor.
21              THE COURT:  And I'm not hearing anything
22    different from plaintiff's counsel.  Okay.  Thank you.
23              All right.  I know that there is a motion to
24    stay pending IPR review that was filed back last summer.
25    I know that there's been a recent -- or more recent
```

09:31AM (5)
09:31AM (10)
09:31AM (15)
09:31AM (20)
09:32AM (25)

09:32AM

update based on what the PTAB did with that petition.
It's my understanding that the PTAB has not granted
review on a significant number of claims from the '580
and at least one of the asserted claims from the '228,
unless I have those backwards.  But I -- so, my intention
would be to formally deny that motion for stay; but if
the parties have any further argument that they want to
offer not in terms of case law but in terms of why it
would make sense in this case to wait, I'll hear those
arguments.

09:33AM

          MR. SHERWOOD:  Your Honor, Jeff Sherwood for
Samsung.  Just very briefly.  The court is correct that
the PTAB has not instituted trial with respect to all of
the claims; and, in fact, we got an e-mail last night, I
guess, from the plaintiff saying that it has reduced the
scope of its claims to just those that are not instituted
for trial with the PTAB.

          However, with respect to the '580, we strongly
believe that there are certain things that the PTAB
overlooked; and as a consequence of the PTAB's rulings on
the initial petitions, we filed additional petitions,
which was our right to do, about three months ago.  So,
the timing with respect to those is that the statutory
deadline for a decision will not run its course for about
another three months.  Decision could be made sooner;

22

1  but, you know, at this point nobody obviously knows how

2  that's going to go.

3          With respect to the '228 patent, the PTAB

4  instituted trial on every claim except one; and Rembrandt

09:34AM  5  has notified us that it is only going to trial with

6  respect to that one claim on the '228.  We think here

7  again the PTAB overlooked some things with respect to

8  that decision.  We have a pending motion for rehearing

9  with respect to that one, and we have the right and will

09:34AM 10  file sometime this -- or have filed, I guess -- I knew it

11  was going to happen this month -- additional petitions

12  with respect to that patent.

13          So, every one of them remain -- every claim,

14  that is -- remains before the PTAB either for some trial

09:34AM 15  action -- admittedly not with respect to the ones that

16  Rembrandt now asserts -- or, you know, we have asserted

17  additional rights with respect to those.  So, what I'd

18  like to just say to the court -- and I appreciate where

19  we are in the proceedings and how the court may view

09:35AM 20  this; but, nonetheless, I -- Samsung has timely filed

21  these petitions.  It has operated entirely within the

22  ambit of the AIA and the PTAB's rules.  The motion to

23  stay seeks to give Samsung the benefit of those rights

24  and to have this review before the PTAB before the

09:35AM 25  jury -- a jury is required to actually sit and hear these

23

1    issues.

2            I don't think -- and, you know, this is in our

3    papers; so, I'm not going to -- if I understand the

4    court, you're not asking me to reargue the motion; and

09:35AM    5    I'm not going to do that.

6            THE COURT:  That's right.

7            MR. SHERWOOD:  But I don't see that there is

8    any prejudice here, recognizing of course that a lot of

9    work has gone into getting ready to take this case to

09:36AM    10    trial.  So, that's where we stand today, your Honor.

11            THE COURT:  All right.  Thank you,

12    Mr. Sherwood.

13            MR. SHERWOOD:  So, your Honor, just to be

14    totally clear, we are still asking for a stay.

09:36AM    15            THE COURT:  I do understand that, and you're

16    not waiving any position.  I guarantee that.

17            MR. SHERWOOD:  Thank you.

18            THE COURT:  Sure.

19            MR. HEIM:  Your Honor, I'm happy to respond if

09:36AM    20    you'd like to hear a response.

21            THE COURT:  Particularly as to the claims

22    being asserted.  That would be helpful for me to know

23    what your position on that is.

24            MR. HEIM:  Absolutely, your Honor.  So,

09:36AM    25    Samsung has filed ten IPRs with respect to these two

24

1  patents, the '580 patent and the '228 patent.  There were

2  decisions -- the initial decisions were issued by the

3  Patent and Trademark Office in September for the '580 and

4  in December for the '228 patent.  With respect to both of

09:36AM  5  those decisions, there are certain claims that the PTAB

6  has indicated that it is not going to institute an IPR;

7  and with respect to those claims, Rembrandt is going to

8  assert a subset of those claims.  In other words, the

9  only claims that are going to be asserted at trial in

09:37AM  10  this case are claims for which the PTAB has denied

11  instituting an IPR.

12        So, with respect to those claims, if we look

13  at the reasons that the courts typically look at for

14  issuing a stay, absolutely none of those apply here.  The

09:37AM  15  stay is not going to simplify the issues because the PTAB

16  denied instituting IPR on those claims.

17        THE COURT:  And you don't need to address the

18  factors.

19        MR. HEIM:  Okay.

09:37AM  20        THE COURT:  I understand your position on

21  them.  But which of the claims are you still asserting?

22  I guess that's what I'm asking.

23        MR. HEIM:  The claims that we're going to

24  assert at trial, your Honor, are '580 claims 2, 19, 52,

09:37AM  25  and 59 and claim -- '228 patent claim 21.  All of those

1    claims have not been rejected or an IPR instituted on any

2    of those claims.

3            Defendant has filed additional IPRs, three

4    additional IPRs, after the one-year date.  They are

09:38AM  5    seeking to make new arguments, enjoin their previous

6    IPRs.  The PTAB is reviewing that right now.  There has

7    been an opposition to that motion for joinder.  No

8    telling when that's going to be decided.  If it is

9    decided, I'm relatively confident that there are going to

09:38AM 10    be appeals that flow from that joinder decision.

11            THE COURT:  Okay.  Well, I understand that

12    Samsung is within its rights in pursuing all of the

13    appeals and review that the PTAB has to offer; but I am

14    going to deny the motion to stay with respect to the

09:38AM 15    asserted claims and will issue something in writing that

16    formalizes that for the record.  But I just want the

17    parties to know that's coming.

18            MR. SHERWOOD:  Your Honor, just one other

19    thing that I should have mentioned when I was up before.

09:39AM 20    In the e-mail, what Rembrandt says is that it's only

21    asserting these five claims now and reserves the right to

22    assert additional claims in the future, which I would say

23    is sort of a "two bites at the apple" kind of strategy

24    here.  And I think that those claims that they are not

09:39AM 25    asserting that they have said they're going to drop need

26

1    to be dismissed with prejudice.

2             THE COURT:  Well --

3             MR. SHERWOOD:  And if they weren't dismissed

4    with prejudice, your Honor, then it seems to me that's

09:39AM   5    ample basis for a stay.

6             THE COURT:  I tell you, that is an issue that

7    is not before me at the moment and if it needs to be

8    presented by either side, they can do so and we'll take

9    it up on that basis; but I'm not going to address that by

09:40AM  10    the seat of my pants.

11             MR. SHERWOOD:  So, your Honor, I understand

12    then we could file a motion with respect to that?

13             THE COURT:  Absolutely.

14             MR. SHERWOOD:  Thank you, your Honor.

09:40AM  15             THE COURT:  Okay.  And by the "absolutely,"

16    I'm not trying to communicate that I have a particular

17    position on it.  I'm just saying you're free to file one.

18             MR. SHERWOOD:  I understood, your Honor.

19             THE COURT:  Okay.  There was an objection to

09:40AM  20    certain witnesses that I think -- I know the defendant

21    filed an objection to certain of plaintiff's witnesses,

22    and it may be true that there is an objection going the

23    other way.  But if there are objections to witnesses that

24    are not reflected in the motions in limine which we're

09:40AM  25    about to take up, tell me that now.

27

1      Is there some objection beyond the motions

2  in limine?  Mr. Enger?

3      MR. ENGER:  Your Honor, I'll let defense

4  counsel speak for themselves; but I understand that the

09:41AM  5  three witnesses that are the subject of objections are

6  all going to be covered in the motions in limine.

7      THE COURT:  Okay.  That's good.  Everybody is

8  in agreement?

9      MR. SHERWOOD:  Yes, your Honor.

09:41AM 10      THE COURT:  All right.  Then let's turn to the

11  motions in limine.

12      MR. ANAIPAKOS:  Your Honor, might I ask one

13  more housekeeping question?

14      THE COURT:  Yes.

09:41AM 15      MR. ANAIPAKOS:  Is there a particular

16  preference or practice that the court has with respect to

17  publishing exhibits to the jury that have obviously been

18  preadmitted?

19      THE COURT:  All of the exhibits are presented

09:41AM 20  to the jury through the document display system, if

21  that's what you mean, as opposed to being in paper.

22      MR. ANAIPAKOS:  Correct, your Honor.

23      THE COURT:  Yeah.  They're -- you know, I'm

24  not going to say it will never happen; but I have not yet

09:41AM 25  heard of a reason why the court has agreed to give the

28

jury any paper exhibits.  I mean, other than the contents

of the jury notebooks that we've been over, those are the

only things that the jury typically has in paper.  And if

you have a -- an argument you want to present on why we

09:42AM   should vary that on a particular thing, you're free to

make it; but the expectation is that all the exhibits

will be shown to them through the electronic system.  And

that obviously is free for both sides to review that -- I

think everybody -- the local counsel I know are familiar

09:42AM   with it.  There are screens that the jurors have now in

the jury box that they didn't have previously and, so, I

don't know if everybody has worked with the newer

equipment up there, but that's the way it's presented to

the jury.

09:43AM           MR. ANAIPAKOS:  Thank you, your Honor.

          THE COURT:  All right.  Okay.  Who wants to

present the plaintiff's side of its motions in limine?

          MR. ANAIPAKOS:  Your Honor, Demetrios

Anaipakos.  It looks like we've divided that by motion,

09:43AM   if that's appropriate with the court.

          THE COURT:  All right.  Well, let's take them

up in whatever order you want to.

          MR. ANAIPAKOS:  Your Honor, I'll address the

first handful.

09:43AM           THE COURT:  Okay.

29

                    MR. ANAIPAKOS:  On the first motion in limine,

your Honor, I believe that we are largely in agreement.

This is the motion that relates to the use of what we

consider to be disparaging terms, "patent troll," things

09:43AM  like that.  It appears as though Samsung has agreed to

limit its use to the term "patent assertion entity" and

also wants to be able to make the point that Rembrandt

does not make or sell products.

                    Your Honor, in our view, that's acceptable;

09:44AM  but it really is a question of degree.  If the suggestion

is so repetitive with every witness at every turn, as in

other cases we have found that to be, and there is some

suggestion that the fact that the entity asserts patents

is somehow nefarious or immoral, then we would want to

09:44AM  revisit that with the court.  But with that context, sort

of a limitation on the manner in which the terms are

used, we would be in agreement, I believe, on Motion

in Limine No. 1.

                    THE COURT:  All right.  Let me ask you if you

09:44AM  can argue this one in connection with what I think is the

last one of the defendants' motions in limine regarding

the Intellectual Discovery entity.  Because it seems to

me in my mind that those two are somewhat related.

                    MR. ANAIPAKOS:  Your Honor, Mr. Enger can

09:45AM  address that; but you've correctly predicted where we

30

1  would go with that.  At least my sense is that if we did

2  get in -- sort of cross the line that I tried to

3  describe, albeit imperfectly, a moment ago, that that

4  would, in our view, open the door to a discussion of

09:45AM  5  Samsung's investments in nonpracticing entities.  But if

6  Mr. Enger has something material to add, I'll step aside.

7           THE COURT:  All right.

8           MR. ENGER:  Your Honor, my co-counsel

9  Mr. Anaipakos pretty much correctly summarized our

09:45AM 10  position.  If the line is crossed to suggest that

11  Rembrandt as a patent assertion entity is doing something

12  wrong or there's something immoral or improper about that

13  type of entity, there's evidence that Samsung is a major

14  shareholder in a company called "Intellectual Discovery"

09:46AM 15  which does the exact same thing.  What's good for the

16  goose is good for the gander.  If they can make the

17  arguments about us, we should be able to return and make

18  the same arguments about Samsung.

19           THE COURT:  And, so, my understanding is that

09:46AM 20  you're saying that if a line is drawn that gives you

21  whatever protection you think you need on this issue,

22  that you do not intend to pursue the Intellectual

23  Discovery issue?

24           MR. ENGER:  That's correct, your Honor.

09:46AM 25           THE COURT:  Let me hear from counsel for

31

1  defendant.

2          Mr. Sherwood.

3          MR. SHERWOOD:  Thank you, your Honor.

4          So, I think Mr. Anaipakos has fairly stated or

09:46AM  5  understood our position from our brief.  We're not -- we

6  agree not to use all these terms like "patent troll,"

7  "bounty hunter," so forth, that are in their brief.  We

8  do think that we are entitled to inform the jury with

9  respect to what Rembrandt actually is, which is a patent

09:47AM  10  assertion entity, and it's a fine enough term for us to

11  use and to reflect that it doesn't sell products and that

12  sort of thing.

13          If I understand the back and forth that's

14  going on here, what they're saying in effect is that if

09:47AM  15  we open the door -- in other words, we go beyond what

16  we're agreeing to here -- that they would have a right to

17  respond with respect to the Intellectual Discovery, or

18  whatever it's called, investment that Samsung has.  And I

19  understand that; and I don't have any problem with that,

09:47AM  20  your Honor.

21          THE COURT:  I just want to have this line as

22  clearly defined as possible so that hopefully we don't

23  have to get into -- or Judge Gilstrap doesn't have to get

24  into at trial whether it's been crossed.  So, my goal

09:47AM  25  right now is to make sure that both sides are very clear

32

1   and the court is clear on what the line is so that we

2   won't have that problem.  This is not the first time this

3   issue has come up; but in the past when it's come up, it

4   has come up so late in the case, as in late in the trial,

09:48AM   5   that that was the way it was resolved.  And I think it's

6   being raised on a timely basis now; so, I just want to

7   make sure.

8         So, what you're saying is that the court can

9   grant Motion in Limine No. 1 except as to your ability to

09:48AM   10  argue and put on evidence that Rembrandt is a patent

11  assertion entity and that it does not manufacture or sell

12  products in this field.

13        MR. SHERWOOD:  Right, right.  The only other

14  little thing I would add is that to the extent they try

09:48AM   15  to argue commercial success as an indicator of

16  nonobviousness, we could of course say that they have had

17  no commercial success to point to because they have no

18  product that they've sold.

19        THE COURT:  And certainly -- yeah, my -- I

09:49AM   20  wouldn't think that argument would implicate this line

21  but --

22        MR. SHERWOOD:  I'm just trying to be careful

23  here.  That's all, your Honor.

24        THE COURT:  And I appreciate that.

09:49AM   25  MR. SHERWOOD:  And because you asked for that,

33

1  I want to be thorough about this.

2          THE COURT:  And I'm not disagreeing with you.

3  I'm just trying to think through whether that's something

4  I need to further explore on the record, but I don't

09:49AM  5  think I need to.

6          Any other way in which you think we could get

7  close to this line that we ought to take up now?

8          MR. SHERWOOD:  I don't think so, your Honor.

9          THE COURT:  Well, the effect of granting the

09:49AM  10  motion is that if you decide there is something else that

11  you feel is close to it, then you should raise that at a

12  bench conference or out of the presence of the jury.

13          MR. SHERWOOD:  Right, right.  Yes, right.  I

14  understand, your Honor.  That's in limine, in other

09:49AM  15  words.

16          THE COURT:  Yes.

17          MR. SHERWOOD:  Right.  And, so, I think also

18  that would mean that our No. 14 would be granted.

19          THE COURT:  That is where I think we're going.

09:50AM  20  Unless the door was opened because of a violation of this

21  ruling on Motion in Limine No. 1, then they would not be

22  entitled to get into in any way the Intellectual

23  Discovery.

24          MR. SHERWOOD:  Right, right, yes.

09:50AM  25          THE COURT:  Okay.

34

1          MR. SHERWOOD:  That's my understanding, your

2    Honor.

3          THE COURT:  Good.  Is there anything --

4          MR. SHERWOOD:  I guess Mr. Jenner is saying if

09:50AM  5    they attempt to violate this ruling --

6          THE COURT:  Well, I'm going to grant 14 also

7    when we get there so that you will have that protection

8    as well.

9          MR. SHERWOOD:  Okay.  Great.  Thank you, your

09:50AM 10    Honor.

11          THE COURT:  Okay.  Anything else on that,

12    Mr. Anaipakos, that we need to take up?

13          MR. ANAIPAKOS:  No, your Honor.  Thank you.

14          THE COURT:  Okay.  Then we're on to No. 2.

09:51AM 15          MR. ANAIPAKOS:  Your Honor, I would hope that

16    No. 2 is likewise simple to resolve.  It seems like it's

17    really twofold in my mind.  One is that we don't believe

18    there's a need to review or a relevant purpose in

19    reviewing the ownership structure of Rembrandt, what

09:51AM 20    entities own what patent rights, what entities are the

21    parent entities, the subsidiaries, et cetera.  It doesn't

22    seem relevant to any claim or defense.

23          And, also, your Honor, we would request that

24    the court grant the motion in limine as to the term

09:51AM 25    "corporate shell."  It seems to suggest that there's some

35

09:51AM

1    nefarious purpose to having an entity that only holds the

2    patent, which isn't countenanced by the law.  And

3    interestingly enough, your Honor, in defendants'

4    response, in Tab D they included this court's order in

5    the *SSL* case which in Motion in Limine No. 10 explicitly

6    granted the motion in limine as to the phrase "corporate

7    shell."  So, for the same reasons, we would request that

8    the court grant the motion as to that term.

9              THE COURT:  Okay.  Mr. Sherwood, I guess my

09:52AM

10   question would be:  Is there anything within the scope of

11   this motion regarding Rembrandt's corporate structure

12   that you do intend to or need to get into?

13             MR. SHERWOOD:  Well, so, the only thing I was

14   going to say, your Honor, the phrase "corporate shell" I

09:52AM

15   don't think of as being pejorative; but what's behind it,

16   in my view, is the notion that Rembrandt is a company

17   that consists only of investors who are investing in

18   litigation.  So, whether we accomplish that without

19   having used the phrase "corporate shell," I don't have a

09:53AM

20   problem with that *per se*.  All I'm trying to say is,

21   again, we want to be able to make sure the jury

22   understands who the plaintiff is and that the plaintiff

23   doesn't have any products, doesn't have anything else

24   that it does other than acquire intellectual property for

09:53AM

25   the purpose of bringing lawsuits -- or licensing the

36

1    property, I should say.

2              THE COURT:  All right.  Mr. Anaipakos?

3              MR. ANAIPAKOS:  And, your Honor, I think

4    therein lies the problem.  It seems to me that their

5    concern is addressed with the court's prior ruling;

6    namely, they can say that we're a patent assertion

7    entity.  They certainly can make the point that this

8    company holds this patent and no other substantial

9    assets, and I think that that accomplishes what they seek

10   to do.  But we think it would be highly inappropriate and

11   prejudicial to get into investors and what the purpose of

12   an investment in Rembrandt is.  Presumably, as a public

13   company in Samsung, we could look to a variety of nature

14   of their investors and speculate on the reasons for

15   investing there.  So, that doesn't seem relevant to any

16   claim or defense.  So, it seems to me, your Honor, that

17   provided they're allowed to make the point the court has

18   already articulated, that this is a patent assertion

19   entity, doesn't make or sell anything, I think their

20   concern is addressed.

21             THE COURT:  Well, I guess I heard one

22   additional perhaps corollary of "patent assertion entity"

23   that was not made express in the argument a moment ago;

24   and that is that the business of Rembrandt is to license

25   and to litigate.  And I'm assuming that -- from what

37

1  you're saying, that that falls within your understanding

2  of what they're allowed under that ruling to get into.

3        MR. ANAIPAKOS:  I think that the -- the

4  business of Rembrandt to license intellectual property, I

09:55AM  5  think that's fair, your Honor.  I think the suggestion

6  that our business is solely to litigate would be unduly

7  prejudicial and inaccurate, very candidly.

8        THE COURT:  Well, they're not saying, as far

9  as I know, solely to litigate.  But if it is that it is

09:55AM 10  to license and to litigate, is that something that you

11  have an argument against?

12        MR. ANAIPAKOS:  I think we could live with

13  that, your Honor, to be candid about it.  I think --

14  again, it's a question of degree; but there's no doubt

09:55AM 15  that we are asserting these patents and litigating them.

16        THE COURT:  I've handled enough of these

17  trials to know that this is something that we're going to

18  hear early and often; so, I want to make sure that we're

19  addressing it.

09:55AM 20        MR. ANAIPAKOS:  Right.  As Mr. Ward points

21  out, that's precisely the concern.  So, if it in fact is

22  going to be early and often, your Honor, I don't have a

23  problem with the characterization of our company as one

24  that seeks to license its intellectual property.  If the

09:56AM 25  line is that we are a company that exists to file

38

1  lawsuits and that's the early and often mantra we're

2  going to hear, I think that, your Honor, would be unduly

3  prejudicial.

4           THE COURT:  Well, how can the business of

09:56AM  5  Rembrandt be explained if it doesn't include

6  "litigation"?  I mean, that -- I know there are -- the

7  nice word is "to litigate."  The word that we'll hear is

8  "sue people."  But what I'm asking is what kind of

9  reasoned argument is there to prevent that?

09:56AM  10          MR. ANAIPAKOS:  Your Honor, I think they would

11  be entitled to say that part of what Rembrandt does is

12  file lawsuits to enforce the intellectual property it

13  owns.  What I'm objecting to is the characterization that

14  that's the sole purpose of Rembrandt, that that's the

09:57AM  15  only reason we exist.  There's plenty of intellectual

16  property that we can license and have licensed without

17  litigation.

18          THE COURT:  Okay.  All right.

19          Mr. Sherwood, I just -- what I want to do is

09:57AM  20  make sure that this line is, like I say, clear so that we

21  don't get into the matters involved in your Motion

22  in Limine No. 14.  And what we had talked about before

23  was granted except as to the status of Rembrandt as a

24  patent assertion entity and the fact that they don't

09:57AM  25  manufacture or sell products.  You may view it as

39

1    corollary, but I want to be clear about it.

2         Saying that they -- their only business is to

3    sue people is something a little different than what we

4    addressed before, and I just don't want you to think that

09:57AM   5    you can do something that doesn't open the door as to

6    Intellectual Discovery and not be clear about that.

7         MR. SHERWOOD:  So, your Honor, I think I -- I

8    meant to correct myself to say "license" and "as

9    necessary litigate."  That is what I understand their

09:58AM  10    business model to be.  That's what I think Mr. Anaipakos

11    has said they can live with.

12         I do think it's a corollary, your Honor,

13    because I think when you say "patent assertion entity,"

14    well, that's just -- the jury doesn't know what that term

09:58AM  15    means until they come and --

16         THE COURT:  Right.

17         MR. SHERWOOD:  -- sit in the box, right?  And

18    that's what it means.

19         THE COURT:  Well, that's why what I want to --

09:58AM  20    the line I want to draw here, I want it to be as clear as

21    I can.  Let's talk about what the actual arguments are

22    going to be; and if your actual argument is going to be,

23    you know, that their business is to license and sue

24    people, then let's get it out there so that we won't have

09:58AM  25    something come up at the trial that was not discussed

Tonya B. Jackson, RPR-CRR
409.654.2833

40

1    here, is what my concern is.

2         MR. SHERWOOD:  Right, right.  Well, I think

3    I've understood that that is something that we are going

4    to say and that the only issue here is whether we're

09:59AM  5    beating that drum so often that Mr. Anaipakos thinks that

6    it's prejudicial.  I don't intend to do that, but I do

7    believe that we have the right to alert the jury to who

8    the plaintiff is and what their business model is.  And

9    from looking at the cases where this issue has been

09:59AM 10    raised before and -- you know, they're in our pleading --

11    the court has generally agreed with that.  And, so, to

12    the extent it's a matter of degree, I can represent to

13    the court we're not going to, you know, overdo it.

14         THE COURT:  And the reason why I'm being

09:59AM 15    specific about this is you're right, in the past we have

16    generally simply said we deny motions like No. 1.  But

17    now that's being coupled with the issue about

18    Intellectual Discovery for you or in *Apple* cases it's

19    about Rockstar, their investment in an entity that

10:00AM 20    asserts patents.  And, so, the calculus is a little bit

21    different; and that's why I'm spending more time on it

22    now because I think that in return for keeping that issue

23    out of the case -- by "that" I mean the Intellectual

24    Discovery or Rockstar issue out of the case -- we're also

10:00AM 25    regulating a little closer what the defendants can argue

41

1    on the front end.

2         And, so, while I know you've got, I'm sure,

3    lots of cases you could cite where we have not granted

4    the kind of relief that the plaintiff is seeking here,

10:01AM  5    the reason we're getting into it is because the issue is

6    a little different now.  So, I'm -- what I'm encouraging

7    you to do is to be as explicit about what you want to

8    preserve the right to argue as possible.  So, if what

9    you're intending to say is -- you know, whatever the

10:01AM  10   business model is of Rembrandt, whatever it is you want

11   to argue to the jury, let's talk about that now in

12   whatever terms you want to use with the jury so that --

13   otherwise, there's going to be an immediate issue raised

14   to the judge that you've crossed this line and that opens

10:01AM  15   that door and I don't want to go there if possible.

16        MR. SHERWOOD:  I understand, your Honor.

17        THE COURT:  So, you're comfortable with

18   that -- you'll be telling the jury as far as -- what

19   you'll be telling the jury about their business model is

10:02AM  20   that it's to license and litigate, not just litigate.

21        MR. SHERWOOD:  That's right, your Honor.

22        THE COURT:  Okay.  And as I say, I think

23   that's incumbent in the term "patent assertion entity"

24   which everyone has agreed and the court has previously

10:02AM  25   permitted to be used.  The jury is entitled to an

42

1  explanation as to what that actually means and that

2  Rembrandt is such an entity.

3           THE COURT:  Okay.

4           MR. WARD:  Your Honor?

10:02AM  5           MR. SHERWOOD:  If I could just say one other

6  thing while I'm up here.

7           MR. WARD:  I'm sorry.

8           MR. SHERWOOD:  There is also, with respect to

9  the structure more generally, a trail, shall we say, an

10:02AM 10 acquisition trail with respect to these patents that led

11 through a couple of Rembrandt entities.  Summit

12 Technology I think is one of them.  So, we certainly

13 don't want this ruling to somehow prevent us from tracing

14 that path before the jury as well.

10:03AM 15           THE COURT:  I think there's a separate motion

16 that would address that in more detail, but I am not

17 addressing that in this ruling.  I don't think that we're

18 talking about the assignment history of these patents in

19 what we're discussing right now.

10:03AM 20           MR. SHERWOOD:  Thank you, your Honor.

21           MR. WARD:  And, your Honor, very briefly,

22 since we're previewing what arguments might come up and

23 the court is interested in where that line gets crossed,

24 you know, Samsung has to realize this gun kicks as hard

10:03AM 25 as it shoots.  They want to shoot at us and say we file

43

1   lawsuits and we sue people when our intellectual property

2   is trespassed upon; but Samsung has got to be careful

3   about beating this drum because Samsung files lawsuits

4   when its intellectual property is trespassed upon as

10:03AM   5   well.  So, I've -- you know.

6           THE COURT:  That would be another motion that

7   is not in front of me at the moment; but if Samsung wants

8   to prevent you from getting into that, then I expect

9   that's something I'll hear about from Samsung.

10:04AM   10          MR. WARD:  I just -- my point is depending on

11   what they argue and how they argue it -- and I understand

12   there's some trial strategy that goes on that both

13   parties don't say "Here's what I'm going to argue and

14   here's how I'm going to attack you" but I can see a

10:04AM   15   scenario where if they do cross the line, where we will

16   be approaching the court to say, you know, they were

17   permitted to say that we're a patent assertion entity and

18   we filed a lawsuit in this case because they're

19   trespassing on our intellectual property.  But if they do

10:04AM   20   what I typically hear Samsung has done in the past where

21   I've tried lawsuits against them, they say, "This company

22   exists to sue people," which you've heard that very same

23   argument.

24          So, I just want to highlight that there's that

10:04AM   25   issue that they have to be careful what they say because

44

1  they have some of the same -- I don't want to say

2  problems -- but the same activity.

3          THE COURT:  Well, the one issue that is tied

4  to this ruling on your Motion in Limine No. 1 is the

10:05AM  5  Intellectual Discovery issue that's in their Motion

6  No. 14; and, so, what I'm saying is that they'll be -- I

7  mean, you'll be foreclosed from going into Intellectual

8  Discovery as long as they abide by this ruling.  The

9  issue that you presented about whether Samsung itself, as

10:05AM  10  opposed to this other entity Intellectual Discovery, sues

11  people is something that, you know, you can explore with

12  Samsung's witnesses unless that's an issue that gets

13  addressed later.

14          MR. WARD:  All right.  Thank you.

10:05AM  15          THE COURT:  Okay.

16          MR. ANAIPAKOS:  Your Honor, if I could just

17  address the court's question on how specifically we

18  thought that these terms might be used.  I can at least

19  share my concern and at least from my perspective what

10:05AM  20  would not be acceptable; and that is if defense counsel

21  tries to draw the stark contrast and says, "We're

22  Samsung.  We're the largest electronics company in the

23  world.  We employ thousands of engineers.  And on the

24  other hand, you have Rembrandt.  That's a patent

10:06AM  25  assertion entity which by the way, ladies and gentlemen,

45

1    means they sue people.  That's what they do.  That's

2    their business.  They license and sue people."  That to

3    me, your Honor, is the type of contrast that goes too far

4    and at least in our view would invite a discussion of

10:06AM    5    Samsung's investment in that type of an entity.

6            THE COURT:  Well, you're not disputing that

7    Samsung has the right to argue that they have thousands

8    of engineers and sell products everywhere.

9            MR. ANAIPAKOS:  Of course not, your Honor.

10:06AM   10            THE COURT:  And as long as they include that

11    your business is both to license and to litigate, I'm not

12    understanding how the fact that they say those things

13    together would be a potential violation of this.

14            MR. ANAIPAKOS:  I would simply say, your

10:07AM   15    Honor, that if they -- it depends on how it's delivered.

16    If it was delivered as the court just did, I would agree.

17    But if the focus is, "This is a patent assertion entity.

18    That means they're in the business of lawsuits.  These

19    people make money by suing people," things along that

10:07AM   20    line, I think that would open the door to their

21    investment as well.  It's really the focus of the

22    comments.

23            If the focus of the comments is, "Look, these

24    people are just repetitive suers, that's what they're in

10:07AM   25    the business of doing," things along those lines, I think

Pretrial Conference 1-20-2015

46

1    that's qualitatively different.

2              THE COURT:  Well, you can certainly ask the

3    trial judge for whatever relief you think; but I want the

4    record to be clear that my ruling on this motion

10:07AM   5    in limine is only that as long as they put licensing and

6    litigating together, they're free to point out that that

7    is the business model of Rembrandt.

8              MR. ANAIPAKOS:  Thank you, your Honor.

9              THE COURT:  Okay.  As to the corporate

10:08AM   10   structure, which is in No. 2, I don't know that I heard

11   from you, Mr. Sherwood.  Help me out.  Is there something

12   in that that -- aside from the issue about the ownership

13   history of the asserted parties, that you want to be able

14   to go into?

10:08AM   15             MR. SHERWOOD:  Your Honor, the only thing is

16   that there is actually -- and it's actually an exhibit in

17   the deposition of -- well, I'm not sure whose deposition.

18   But there is an exhibit that explains the pathway that

19   these patents traveled essentially through the Rembrandt

10:08AM   20   corporate structure; and this is just simply a matter of

21   being able to explore how they got from Zhone to

22   Rembrandt Wireless.  That's all.  It's a historical,

23   archeological, chronological kind of thing.  There's no

24   intent for there to be some sort of pejorative or

10:09AM   25   negative message with respect to that.

47

1          THE COURT:  But again that relates to the

2    ownership history of these patents?

3          MR. SHERWOOD:  Yes, your Honor.  Yes, your

4    Honor.

10:09AM    5          THE COURT:  Okay.

6          MR. SHERWOOD:  And this drawing, which was

7    obviously hand-drawn at a deposition, is DX 1120, just

8    for the record.

9          THE COURT:  All right.  Mr. Anaipakos, I can

10:09AM   10    tell you that any objection to that specific exhibit

11    we'll take up in connection with the offer of that; but

12    as far as this motion in limine goes, do you have any

13    argument against granting it except as to the ownership

14    history of the asserted patents?

10:10AM   15          MR. ANAIPAKOS:  As to chain of title, your

16    Honor, absolutely not.  We would be fine with a

17    discussion of chain of title.  That is not what is

18    contained in the exhibit which was just shown to your

19    Honor.  I can address that if the court would like.

10:10AM   20          THE COURT:  Well, we can get -- when we get to

21    that exhibit, we can take that up then.

22          MR. ANAIPAKOS:  Very well, your Honor.

23          THE COURT:  But as to this Motion in Limine

24    No. 2, I am granting that except as to the ownership

10:10AM   25    history of the asserted patent.

48

1           MR. ANAIPAKOS:  Thank you, your Honor.

2           MR. SHERWOOD:  And, your Honor, just to be

3   clear, obviously what we've just discussed about license

4   and litigate, I don't know if that's embraced in the

10:10AM  5   ruling on 1 or 2 but --

6           THE COURT:  I think that's just No. 1.  I

7   don't see how that would relate to corporate structure.

8           MR. SHERWOOD:  That's fine, your Honor.

9   That's fine.

10:10AM 10           THE COURT:  Okay.  All right.  No. 3, where do

11  we stand on that?

12           MR. ANAIPAKOS:  Your Honor, candidly, on No. 3

13  I was a little bit confused as to where we stood.  I

14  didn't expect this to be controversial, that evidence

10:11AM 15  regarding unrelated lawsuits on both sides should be at

16  this point limined out.  I read the defendants' response;

17  and it seemed in my mind to create, respectfully, a bit

18  of a straw man.  We are not trying to argue that the

19  defendants cannot make the argument that our

10:11AM 20  specifications do not sufficiently disclose a basis for

21  the claims in the lawsuit.  That is something that we

22  acknowledge they have the right to make, and we will

23  debate.  So, that's simply not what we are trying to do

24  with respect to this motion in limine.  But the existence

10:11AM 25  of other lawsuits and results in other lawsuits is not

Tonya B. Jackson, RPR-CRR
409.654.2833

Pretrial Conference 1-20-2015

49

1    relevant and should be properly granted as a motion

2    in limine.

3              THE COURT:  All right.

4              Ms. Higgins.

10:12AM  5              MS. HIGGINS:  Yes, your Honor.  I think, first

6    and foremost, the problem that we have with this motion

7    is we really don't know what they're getting at.  It's

8    vague; it's overbroad; and, you know, we don't see any

9    lines being drawn here.  And, so, in the first instance,

10:12AM  10   we respectfully request that the motion be denied because

11   it is overbroad; and if there is a specific issue that

12   plaintiff's counsel has, it should be raised on a

13   case-by-case basis.  We were then left, if you see our

14   opposition, your Honor, to quite frankly try to guess at

10:12AM  15   what plaintiffs were getting at; and what we are

16   concerned about is we do not want to be precluded here

17   from presenting relevant, nonprejudicial evidence and I

18   think specifically with respect to damages.

19              We mention in our motion *Georgia-Pacific*

10:13AM  20   Factor No. 5, the relationship between the licensor and

21   licensee, which once again could get into this, you know,

22   specific testimony about Rembrandt's business, license

23   and litigate.  You know, there could also be evidence --

24   there's a pending motion, your Honor, a motion for

10:13AM  25   summary judgment, regarding marking.  There are

50

10:13AM

1  agreements here in this case where, you know, if we get

2  into that -- this is an example.  You know, we believe

3  that Rembrandt has no policy of requiring its licensees

4  to mark.  And of course if something comes up with

5  respect to Rembrandt witness' testimony on the stand, we

6  of course would be entitled to impeach that witness with

7  a statement that was made in another litigation.  So, you

8  know, in summary, it's the overbreadth of this motion

9  that is the main problem for us.

10:14AM

10          THE COURT:  Well, and just to try and flesh

11  this out a little better, I know that there's an issue

12  about the BlackBerry license that I guess we'll get into.

13  Other than other licenses that may have been entered into

14  by Rembrandt, is there any previous litigation involving

10:14AM

15  Rembrandt that Samsung intends to introduce or refer to

16  in this case?

17          MS. HIGGINS:  The specifics that I have in

18  mind, your Honor, are license related.

19          THE COURT:  Okay.  And that's, frankly, an

10:14AM

20  issue that's easy to separate out.

21          And I understand that if you have testimony of

22  a witness that was given in some other case, you can

23  impeach the witness with that without going into the

24  other case.  Certainly you can just ask the witness if

10:15AM

25  they testified previously on such and such a date, such

51

1    and such a way.

2              MS. HIGGINS:  Yes, your Honor.

3              THE COURT:  All right.  So, what I'm hearing

4    is my -- my indication is -- or my inclination is to say

5    that this will be granted except with respect to any

6    licenses that become involved in the case and --

7              MS. HIGGINS:  And, your Honor, there may be

8    related communications that go along with the licenses as

9    well.

10             THE COURT:  Okay.  I understand that and we'll

11   take those up, but I -- I can frame it broadly so that it

12   would be except as to matters that relate to licenses

13   entered into in other litigation.  Okay.

14             MS. HIGGINS:  Thank you, your Honor.

15             THE COURT:  Thank you, Ms. Higgins.

16             Is there anything further I need to hear from

17   plaintiffs on that?

18             MR. ANAIPAKOS:  No, your Honor.

19             THE COURT:  Well, then, I'm going to say

20   that --

21             MR. SMITH:  Your Honor?

22             THE COURT:  Yes, Mr. Smith.

23             MR. SMITH:  I had one clarification on that.

24   When Mr. Anaipakos described the motion, he talked about

25   other lawsuits by both sides limined out.  I was just

52

1  wanting a clarification to the court's order.  Other

2  lawsuits from both sides are limined out with the

3  exception the court stated, or is it just lawsuits by

4  Rembrandt?

10:16AM  5       THE COURT:  Well, I am happy to expand the

6  scope of it along the lines that were issued.  And let me

7  inquire from the other side.  Thank you, Mr. Smith.

8       MR. ALAVI:  Your Honor, if I can address that,

9  because it relates to damages.

10:16AM  10      THE COURT:  All right.  Would you go to the

11  mic.

12      MR. ALAVI:  I think it's a similar caveat as

13  Samsung's counsel pointed out.  In Samsung's damage

14  report, the damage expert is relying on a license that

10:17AM  15  Samsung entered into in another piece of litigation and

16  one of the lines of impeachment with that damage expert

17  is the history of that litigation and what led to the

18  licensing, things that he did not consider about that

19  case when he argued that that is a comparable license

10:17AM  20  that should set the license rate for this case.  So, we

21  think what's good for the goose is good for the gander in

22  terms of we won't talk about Samsung's other litigation

23  with the exception that to the extent their expert is

24  going to stand up and say "Samsung entered into a license

10:17AM  25  in this other case," we're entitled to cross-examine and

53

1   impeach the expert about what he did and did not do with

2   respect to that license and that litigation to determine

3   whether or not it was a comparable license and whether or

4   not his opinions on that license are consistent with his

10:18AM  5   criticisms of our experts about license agreements.

6               THE COURT:  All right.  And what I'm going to

7   do, then, is just say that Motion in Limine No. 3 is

8   granted, that it will apply to both sides, and that it

9   excludes any reference to other litigation involving

10:18AM  10  either party except as to matters relating to licenses

11  from that litigation.  And those are matters we'll take

12  up separately if necessary, but this -- so, all we're

13  talking about here is litigation not relating to licenses

14  that are at issue in the case.

10:18AM  15              MR. ALAVI:  That's fine, your Honor.

16              THE COURT:  Everybody is okay with that?

17              MS. HIGGINS:  Yes, your Honor.

18              THE COURT:  Okay.  No. 4.

19              MR. ANAIPAKOS:  Yes, your Honor.

10:19AM  20              THE COURT:  This is one, frankly, that is new

21  to me.  So, tell me what it is you're concerned about,

22  Mr. Anaipakos.

23              MR. ANAIPAKOS:  Yes, your Honor.  Specifically

24  the concern is that there will be some argument or

10:19AM  25  evidence put on by Samsung that the fact that Rembrandt

54

1  had in its possession the Bluetooth + EDR specification

2  is somehow improper or nefarious and that we did

3  something illegal, improper, or immoral by filing claims

4  with the patent office at the time that we had the

10:19AM  5  Bluetooth specification in hand.  The *Kingsdown* case and

6  others make it quite clear that we're within our legal

7  right, as Samsung does frequently as well, filing

8  continuations and continuations-in-part.  So, the --

9  ultimately the argument is, as the court is well aware,

10:20AM  10  whether there was adequate disclosure in the filings and

11  in the specifications to support the claims.  We're not

12  trying to hamstring that argument.

13      Our concern is that they argue that somehow it

14  was improper, unfair, not right for Samsung to have -- I

10:20AM  15  mean, for Rembrandt -- pardon me -- to have in its

16  possession the Bluetooth specification.  That would be

17  impermissible in that it suggests that activities around

18  a continuation are somehow beneath the pale.

19      THE COURT:  All right.

10:20AM  20      MR. HADDAD:  Your Honor, we want to just be

21  very clear that we can go into the facts of the

22  prosecution history, explain how that prosecution history

23  unfolded.  It goes, as Mr. Anaipakos alluded, to our

24  defenses under Section 112 -- 35 U.S.C., Section 112,

10:21AM  25  with respect to invalidity due to lack of written

55

1  description and invalidity due to enablement.  I don't

2  think Rembrandt opposes that.  I just wanted to make it

3  very clear.

4          It also goes to the issue of willfulness, your

10:21AM  5  Honor, the timing of when the accused feature became

6  public in 2004 and the claims weren't filed until 2009.

7  That's just a fact of the prosecution and the history of

8  this case, and that's -- we still want to be able to

9  raise those factual issues, your Honor.

10:21AM  10          THE COURT:  Okay.  Thank you, Mr. Haddad.

11          MR. ANAIPAKOS:  And, your Honor, the issues

12  that -- the invalidity issues, et cetera, that are being

13  raised, we have no issue with that.  Our issue is really

14  precise.  It's that there be no suggestion that the fact

10:22AM  15  that we had the Bluetooth manual in our possession is

16  somehow improper, that the filing of a continuation was

17  somehow improper.  That's the limited issue on which

18  we're seeking relief from the court.

19          THE COURT:  Well, I'm -- frankly, I -- I think

10:22AM  20  this is a matter that's just going to have to be

21  addressed, if necessary, on jury instructions.  To try

22  and limine out implications is just difficult, and I --

23  this is an issue that I don't think is clearly enough

24  defined.  So, I'm going to deny No. 4.

10:22AM  25          And I understand No. 5.  Let me hear from the

10:23AM

1    defendants as to the limited issues asserted in that,

2    which as I understand the motion is just whether Samsung

3    is going to argue that the patents or claims asserted are

4    limited to modems or do not encompass wireless networks.

5          MR. HADDAD:  Your Honor, we're not going to

6    argue contrary to the claim construction that your Honor

7    has issued in this case.  So, specifically that, we will

8    not be arguing that.

9          We will be arguing, as I mentioned in response

10   to Motion in Limine No. 4, that what's covered in the

11   court's claim construction is not supported by the

12   specification.  So, there will be arguments that --

13   directed to our invalidity defenses with respect to

14   enablement and written description.  In fact, in your

15   Honor's July 10th claim construction order, your Honor

16   recognized that very defense and said, "Defendants'

17   argument in this regard appears better suited to a

18   written description challenge because validity analysis

19   is not a regular part of the claim construction order."

20         THE COURT:  And I understand that.  I am

21   interpreting this Motion in Limine No. 5 as limited to

22   the two specific issues raised there, and that would be

23   any argument that the claims are limited to modems and

24   any argument that the claims do not encompass wireless

25   networks.  I'm not saying I necessarily agree with them.

Pretrial Conference 1-20-2015

57

1    I've got -- if there's an argument about that, I want to

2    hear both sides.

3              MR. HADDAD:  There's no argument, your Honor.

4              THE COURT:  Okay.  So, you're not going to

10:24AM   5    take that position.

6              MR. HADDAD:  Correct, your Honor.

7              THE COURT:  Okay.  Then I am going to note

8    that because Samsung has specifically indicated that

9    they're not taking the positions that are indicated in

10:24AM  10    there, I'm going to make that notation but deny the

11   motion.  Obviously the law is that, you know, you're

12   bound by the claim construction.  I think both sides know

13   that.  I don't issue limine rulings that just say "Follow

14   the law."  So, if there's a specific issue beyond what I

10:25AM  15    just addressed, I want to hear about it; but otherwise,

16   that's what I'm going to do.

17              Mr. Enger, do you have a point you want to

18   make?

19              MR. ENGER:  Yes, your Honor.  I just want to

10:25AM  20    make very clear what the written description argument is

21   that they say they're going to make.  If they're going to

22   argue that the claims are not supported by the

23   specification because the specification only discloses

24   wired modems that do not communicate multilingually with

10:25AM  25    multilingual slaves, that's not proper.

Tonya B. Jackson, RPR-CRR
409.654.2833

58

1          What the argument needs to be framed as is the

2   spec doesn't disclose a master communication device that

3   communicates with so-called "multilingual tribute

4   communication devices."  If they're going to try and, you

10:25AM  5   know, introduce modems and wired networks into that whole

6   discussion, not only is that contrary to the court's

7   claim construction order, it's actually contrary to the

8   representation they made with respect to the motion to

9   strike.

10:26AM  10          In that motion -- it's Docket No. 178 at

11  page 16 -- they represented to the court that (reading)

12  Samsung's wireless transmission written description and

13  enablement arguments will not be presented at trial and

14  Samsung withdraws those sections of Dr. Goodman's report.

10:26AM  15  So, that's a fine-tunement on this MIL that I want to

16  make sure we're crystal-clear on.

17          THE COURT:  I think we have failed the

18  crystal-clear standard.

19          MR. ENGER:  If -- there's more information I

10:26AM  20  can provide or --

21          THE COURT:  Well, let me just say that I'm not

22  going to try and anticipate every argument that Samsung

23  might make and issue a ruling now as to whether or not it

24  runs afoul of the claim construction order.  I mean, I

10:27AM  25  think Samsung is well aware that if they make an argument

1  that's contrary to claim construction, the court is going

2  to tell the jury, you know, what the claim construction

3  is; and that's a very painful thing to have happen.  So,

4  I don't expect them to do that.

10:27AM  5          But the only thing I did want to be clear

6  about was you've made two specific issues in your motion.

7  I wanted to make sure we addressed those.  I think we

8  have.  Whether or not their argument on any other issue

9  or more nuanced version of this runs afoul of it is

10:27AM  10  something we'll just have to wait and see what arguments

11  they make.

12          But I'm going to deny No. 5, pointing out in

13  the ruling that Samsung indicated they're not going to

14  make the two arguments that were at issue in that motion.

10:28AM  15  And as far as the rest of it, you know, the court has the

16  claim construction and will hear if you think specific

17  arguments run afoul of it.

18          MR. ENGER:  Thank you, your Honor.

19          MR. HADDAD:  Thank you, your Honor.

10:28AM  20          THE COURT:  Mr. Haddad, is there anything else

21  you think would be helpful to discuss on that point?

22          MR. HADDAD:  No, your Honor.  Thank you.

23          THE COURT:  Okay.  On No. 6.

24          MR. AYCOCK:  Jamie Aycock for Rembrandt.

10:28AM  25          For No. 6, your Honor, the rights of the

60

1    patents that are asserted here were sold as part of a

2    portfolio for $5 million; and in the purchase agreement,

3    the $5 million was allocated among 74 different patents

4    and patent applications.  What we're asking for is for

10:28AM    5    you to exclude any reference to the pro rata allocation.

6    We think that it's not relevant and it's highly

7    prejudicial.  There's testimony from Rembrandt's

8    corporate representative that no valuation was done as

9    part of that allocation and that the allocation was made

10:29AM    10    to ensure consistent reporting the IRS.

11           And we think this is very similar, your Honor,

12    to an order that you issued just a few months ago in a

13    case that was against Samsung.  We've cited that in our

14    briefing.  But there you said that -- and it involved a

10:29AM    15    filing that was a 10-K filing with the SEC.

16           THE COURT:  I remember the ruling.

17           MR. AYCOCK:  Okay.  And there were a host of

18    different business considerations that went into that

19    allocation, and they were too far removed from the

10:29AM    20    hypothetical negotiation that's to be presented to the

21    jurors.  Samsung, as you know, your Honor, has argued

22    that that's different because it was a 10-K filing as

23    opposed to an agreement between the parties.

24           But here we don't think there's any reason

10:29AM    25    that that should be treated differently.  It was an

1    allocation.  The same considerations that you had then

2    apply here.

3              THE COURT:  What was the date of the

4    transaction at issue?

10:30AM   5              MR. AYCOCK:  The transaction involving the

6    purchase agreement?

7              THE COURT:  Yes.

8              MR. AYCOCK:  It was in 2007.

9              THE COURT:  And it was a transaction between

10:30AM  10   what parties?

11             MR. AYCOCK:  Well, it involved Zhone

12   Technologies and Summit.  Rembrandt I don't believe was a

13   party to this agreement.  Rembrandt is mentioned in the

14   agreement.

10:30AM  15             THE COURT:  Who were the -- it was a sale by

16   which entity to which entity?

17             MR. AYCOCK:  It was from Zhone to Summit, and

18   there were -- there's a subsequent history as well, your

19   Honor, obviously.

10:30AM  20             THE COURT:  And you say it involved 74

21   patents?

22             MR. AYCOCK:  74 patents or patent

23   applications.

24             THE COURT:  All right.  Thank you.  Let me

10:31AM  25   hear from the defense on that.  Then I'll give you a

62

1    chance to respond, Mr. Aycock.

2                MS. HIGGINS:  Your Honor, first I want to make

3    clear that this agreement is between Zhone, who was a

4    practicing entity at the time, and Summit; and while

10:31AM    5    Mr. Aycock said Rembrandt wasn't a party to the

6    agreement, I think it's important to know that Summit is

7    a Rembrandt entity.  It is a commonly-owned partner of

8    other Rembrandt entities.

9                First, with respect to the agreement itself, I

10:31AM    10    think it is also critical here that the allocation clause

11    that we're talking about is an integral clause to the

12    agreements in that this is a clause that was negotiated

13    at arm's length between Zhone and this Rembrandt entity

14    Summit.  The agreement includes specifically patents,

10:32AM    15    including, as part of the portfolio, applications which

16    led to the patents-in-suit.  And, also, I understand that

17    your Honor has in mind the facts from the *MTel* case that

18    was referenced.

19                Here I think it's really important to note

10:32AM    20    that these are the only assets -- patents are the only

21    assets here.  We're not talking about the situation where

22    an entire business, such as that SkyTel business, was

23    being sold.  So, we don't have that same situation as in

24    MTel where we're far removed from the hypothetical

10:33AM    25    negotiation.  In fact, here we actually have a Rembrandt

1  entity in 2007 negotiating a price for these patents.  In

2  fact, 2007 is also the time I think you will hear -- you

3  may hear later from Mr. Jenner, Mr. Weinstein,

4  Rembrandt's expert, is also basing one of his

10:33AM  5  methodologies on chip price data from the late 2006-2007

6  era.  It's very important to note that this is an

7  after-the-fact unilateral allocation and -- excuse me --

8  in the *MTel* case it was an after-the-fact unilateral

9  allocation, and here we don't have that.  This is an

10:33AM  10  express clause within the agreement that explicitly says

11  "purchase price shall be allocated pro rata among all

12  assigned patents"; and that's Exhibit B, Samsung

13  opposition at page 5.  That specific language right in

14  the agreement is cited right there.

10:34AM  15         The agreement is crystal-clear.  It outright

16  says the patents are to be allocated pro rata.  We heard

17  from Rembrandt that, oh, well, this goes to tax purposes;

18  and I submit to you, your Honor, that, you know, the

19  agreement is the agreement and it's crystal-clear and

10:34AM  20  that's an improper use of parole evidence to vary the

21  terms of the agreement.

22         And, also, with respect to Rembrandt's

23  position that this should not come in, this is a critical

24  piece of evidence here.  This is a license that has to do

10:34AM  25  with the patents-in-suit.  It has to do with the very

64

1  party, Summit, who is a Rembrandt entity, who is, you

2  know, sitting at that table at the hypothetical

3  negotiation.  So, we think, both as a matter of relevance

4  and a matter of what the jury should hear about, this is

10:35AM  5  highly relevant to this case.

6          THE COURT:  You said this is a license?

7          MS. HIGGINS:  This is a sale of the patents.

8  There is a license back to the practicing entity, Zhone,

9  in the agreement.

10:35AM  10          THE COURT:  Well, it's hard to say that this

11  constituted any valuation of the 74 patents since they

12  just said they would allocate it pro rata.  How do you

13  think -- why should the court allow that to be offered as

14  some indication of valuation of the patents?

10:35AM  15          I mean, it would be one thing if they went

16  through and discussed the patents separately but --

17          MS. HIGGINS:  Because respectfully, your

18  Honor, that's what the parties agreed to.  If you look

19  at -- it's Exhibit B, and it's also at page 5 of the

10:36AM  20  opposition.

21          In the agreement itself, Zhone and Summit,

22  this Rembrandt entity, agreed -- it says, "In

23  consideration of the assignment of the assigned patents

24  to Summit by company, Summit agrees to pay company the

10:36AM  25  lump sum of $5 million."  And then it goes on to say

65

1   "where the purchase price shall be allocated pro rata

2   among all assigned patents."  So, that's what the parties

3   agreed to, your Honor.  That is what is in the agreement.

4           THE COURT:  I understand.  And my question is:

10:36AM  5   Why should I take that as a valuation of the patent as

6   opposed to what it purports to be, which is just an

7   allocation of the price for whatever consequences that

8   might have?

9           MS. HIGGINS:  Well, it's an allocation of the

10:37AM  10  price of the 60 patents and 14 patent applications that

11  were assigned per this patent sale agreement.

12          THE COURT:  All right.  I understand that

13  argument.  Thank you.

14          MR. AYCOCK:  If I may, your Honor, you're

10:37AM  15  right that this is an allocation, it's not a valuation.

16  I think those are decidedly different terms.  Also -- and

17  that's exactly what your ruling was in that *MTel* case.

18  And I think actually there are reasons that in the *MTel*

19  case the 10-K filing was actually even a more reliable

10:37AM  20  guide for valuation.  It was a public filing.  It was an

21  internal valuation, not between just the parties that

22  were in the confidential agreement --

23          THE COURT:  What's your position, Mr. Aycock,

24  as to the purpose of this allocation?

10:38AM  25          MR. AYCOCK:  There's actually testimony on

66

```
 1  point from Rembrandt's corporate representative who says
 2  that this was to ensure that there was consistent
 3  reporting to the IRS by both parties.  It was easier to
 4  just make a straight pro rata allocation to all of the 74
 5  patents or patent applications.
 6           THE COURT:  Does that have to do with some
 7  basis to be used in the event of a further sale of
 8  particular patents or --
 9           MR. AYCOCK:  I believe so.  It has to do with
10  capital gains and capitalization.  The reference has to
11  do with -- it's for tax purposes.
12           THE COURT:  All right.
13           MS. HIGGINS:  Your Honor, that's obviously
14  Rembrandt's position and the testimony of a Rembrandt
15  witness.  I would submit to you that that's parole
16  evidence that repudiates the terms of the agreement which
17  says that the allocation is pro rata.
18           And in any event, what he's talking about goes
19  to the weight here, not the admissibility of that
20  agreement and the pro rata allocation within the
21  agreement.
22           MR. AYCOCK:  Your Honor, if I may.  The
23  situation is very different from the hypothetical
24  negotiation here.  Samsung's expert doesn't contend
25  otherwise.  Here, there's no -- there is no assumption
```

Pretrial Conference 1-20-2015

67

that the patents are valid, that they infringe.  There's

no knowledge about the extent of the use of the patent.

This was four years before the hypothetical negotiation

took place.  So, for all of those reasons, we also think

10:39AM  that they're not relevant and only likely to be highly

prejudicial.

THE COURT:  And, Mr. Aycock, you are not

disputing that Samsung can offer evidence that the

asserted patents were part of a portfolio that sold for

10:39AM  $5 million in 2007?

MR. AYCOCK:  That's correct, your Honor.

We're only talking about the pro rata allocation itself.

THE COURT:  Okay.  Ms. Higgins.

MS. HIGGINS:  I just wanted to add, your

10:40AM  Honor -- actually we're good.

THE COURT:  Okay.  Thank you.

I'm going to grant this motion in limine under

Rule 403, with the finding that the pro rata allocation

is based on many factors which are not related to an

10:40AM  actual valuation of these individual patents and that it

would be unduly confusing to the jury and prejudicial to

the plaintiff to allow that pro rata allocation.

I think, frankly, the fact that the sale of

the portfolio is coming in is more than adequate to allow

10:41AM  Samsung to get the benefit of that evidence.  So, as to

Pretrial Conference 1-20-2015

68

```
     1   the pro rata allocation, that part will not be shown to

     2   the jury through evidence or argued to the jury.

     3            And we will take a recess now and then come

     4   back and finish up the motions in limine.

10:41AM  5            (Recess, 10:41 a.m. to 10:56 a.m.)

     6            THE COURT:  I think we're up to the

     7   plaintiff's Motion in Limine No. 7.

     8            Mr. Enger.

     9            MR. ENGER:  Yes, your Honor.  This motion

10:57AM 10   in limine seeks to exclude evidence and argument

    11   regarding Samsung's patents as a defense to infringement.

    12   From reading Samsung's response, it seems like they

    13   agree; they're not going to use their patents as a

    14   defense to infringement.  So, I'm not sure what the -- to

10:57AM 15   use the phrase "Where's the beef?"  I'm not sure what the

    16   problem is here.

    17            THE COURT:  All right.  Is there an issue that

    18   we need to address?

    19            MS. BIANROSA:  Your Honor, Jennifer BianRosa

10:57AM 20   for Samsung.  Samsung does agree that it won't use its

    21   own patents to make an argument that it doesn't infringe

    22   the Rembrandt patents-in-suit, but Samsung should be

    23   permitted to elicit testimony and make argument

    24   consistent with its damages expert report concerning what

10:57AM 25   type of organization Samsung is and that may relate in
```

69

```
 1   part to the fact that Samsung does own patents.
 2             THE COURT:  Well, certainly there's no problem
 3   with Samsung mentioning the ownership of patents.  I
 4   think the only issue here is to whether there will be an
 5   implication that that's a defense to infringement of the
 6   particular asserted claims, and what I'm hearing is that
 7   is not a problem.
 8             MS. BIANROSA:  That is not the intention.
 9             THE COURT:  Okay.  Then I'll show that that
10   one is granted by agreement.
11             And I think that the specific reservation that
12   you made about the testimony on the damages side that
13   Samsung owns patents is not foreclosed by this ruling.
14   Okay.
15             MR. ENGER:  Your Honor, are you ready for
16   Motion in Limine No. 8?
17             THE COURT:  Yes.
18             MR. ENGER:  This is a limine motion that
19   prohibits Samsung from criticizing the patent office or
20   its employees, calling patents monopolies, or otherwise
21   denigrating the patent system.  Samsung's response again
22   appears to agree to this motion in limine.  Samsung does
23   point to two particular things it says it intends to do.
24   It intends to refer generally to the content in the FJC
25   juror instructional video and to argue the propriety of
```

10:58AM

10:58AM

10:58AM

10:59AM

10:59AM

Pretrial Conference 1-20-2015

70

1  the examiner's ultimate determination to allow the

2  patents-in-suit.

3        Frankly, your Honor, either one of those two

4  run afoul of this limine motion.  This is not what this

10:59AM  5  is designed to prohibit.  So, we don't really see a

6  dispute; and for that reason, the court should grant it.

7        THE COURT:  All right.

8        MS. BIANROSA:  Your Honor, I'd just point out

9  that Samsung does have invalidity argument in this case

10:59AM  10  and invalidity argument necessarily questioning whether

11  the patent examiner was correct in allowing the patents.

12  So, Samsung should therefore be allowed to introduce

13  evidence about the prosecution of the patents-in-suit and

14  the propriety of the examiner's decision in allowing

11:00AM  15  those patents.

16        THE COURT:  And I don't think that that is in

17  any way a violation of the order that's sought here.

18  This order would apply to arguments like the patent

19  examiners only have a certain number of hours per, you

11:00AM  20  know, year that they can devote to each patent

21  application or that they don't have enough expertise in

22  certain areas or other similar arguments.  It definitely

23  does not prevent Samsung from arguing that the examiners

24  made a mistake in this case or from commenting on any of

11:01AM  25  the matters that are talked about in general in that

71

1   instructional video.

2          So -- and I take it also that you don't intend

3   to refer to patents as monopolies.

4          MS. BIANROSA:  We do not, your Honor.

11:01AM  5          THE COURT:  Okay.  Then I think that I'll show

6   that this No. 8 is granted but that it does not prevent

7   argument that the examiners were in error in issuing

8   these claims -- or this patent.

9          MR. ENGER:  Your Honor, Limine Motion No. 9

11:01AM 10   prohibits Samsung from introducing evidence or argument

11   about Rembrandt's indirect owners and improper character

12   evidence about Rembrandt's indirect owners.  For example,

13   that one may be a professional poker player.  This type

14   of evidence and argument is irrelevant to the issues in

11:02AM 15   this case and would prejudice the jury against Rembrandt.

16          From its response, again Samsung seems to

17   agree to this MIL.  Samsung does say that it intends to

18   elicit factual testimony about Rembrandt's business model

19   but that factual testimony would seem to be more covered

11:02AM 20   by the limine motion that your Honor granted this morning

21   with respect to MILs 1 and 2 which the court already

22   heard argument on.

23          Samsung also intends to elicit testimony

24   regarding the potential financial interest of the

11:02AM 25   witnesses in the outcome of this litigation.  However, as

1    Rembrandt's indirect owners are not going to be witnesses

2    in this case, that would not be covered by this MIL

3    either.

4              THE COURT:  And, Mr. Enger, tell me:  When you

11:02AM  5    use the term "indirect owners," what does that mean?

6              MR. ENGER:  For example, the shareholder, the

7    stakeholder of Rembrandt, the ultimate shareholder.

8              THE COURT:  Is there a difference between

9    indirect owners and direct owners?

11:03AM  10             MR. ENGER:  Well, you know, I guess to the

11   extent if I own one share of Coca-Cola stock, I'm an

12   indirect owner of Coca-Cola; but to suggest that I own

13   the company is quite a different story.

14             THE COURT:  Okay.  I just didn't know if there

11:03AM  15   was some particular meaning in this case or -- is there

16   another group of individuals or entities who you consider

17   to be the direct owners?

18             MR. ENGER:  Well, there are a number of

19   corporate entities that own other corporate entities.

11:03AM  20   Those are the types that would not be prohibited by this

21   MIL.

22             What we're really getting at here, your Honor,

23   is this particular shareholder who may be the poker

24   player.  That's what we don't want to come in.

11:03AM  25             THE COURT:  All right.  So, then the way I

Pretrial Conference 1-20-2015

73

interpret this is that it's seeking to avoid evidence or

argument about individuals who are shareholders of

Rembrandt.  And with that limitation, is there any

opposition to it from the defendant?

11:04AM 5          MR. SHERWOOD:  Your Honor, we will not oppose

it, with that limitation.

          THE COURT:  Okay.

          MR. SHERWOOD:  I do want to just point out,

though, that I think this is somewhat connected also --

11:04AM 10 and I say this really just for the record, not for the

court to take any action on -- to Samsung's No. 14 that

you've already ruled upon where, in effect, Rembrandt is

saying, "Well, we would like to be able to talk about

Samsung's investments but we don't want you to talk about

11:04AM 15 who invested in Rembrandt."  And I don't think -- so, in

other words, I guess what I'm saying is if they get into

a position where they start talking about Intellectual

Discovery or whatever it's called, No. 14, then I think

we should be able to talk about poker players, which I

11:05AM 20 assume we're not going to get to.  But I think the two --

it's kind of talking out of both sides of your mouth as I

read this, your Honor.  That's my only point.

          THE COURT:  Okay.  Well, I'm not going to tie

those issues together but I understand that you might and

11:05AM 25 if you want to urge to the trial judge whatever you want

74

1    to, that's certainly up to you.  But this ruling will

2    simply be that Motion in Limine No. 9 is granted as to

3    individuals with an ownership interest in Rembrandt.

4            Okay.  The way I have handled No. 10 before,

11:05AM  5    Mr. Aycock, is to say that if you, the plaintiff, doesn't

6    open the door to this testimony by eliciting evidence

7    that Mr. Weinstein has been accepted as an expert by

8    other courts or by providing any details about his

9    testimony in other cases, then I will grant the motion

11:06AM 10    and prevent the defendant from eliciting evidence about

11    any cases in which his testimony may have been questioned

12    or limited.

13            MR. AYCOCK:  We agree with that, your Honor.

14            THE COURT:  All right.  Then let me hear from

11:06AM 15    Samsung if they want to offer argument against that.

16            MS. HERMES:  Yes, your Honor.  Rebecca Hermes

17    for Samsung.  Generally that's okay with us; but our

18    concern would be if Rembrandt were to open the door by

19    saying that Mr. Weinstein's testimony has been found

11:07AM 20    credible or given weight, especially here in the Eastern

21    District of Texas, that that would open the door to us

22    being able to impeach him with cases where his testimony

23    has been found unreliable or not based on proper

24    methodologies.

11:07AM 25            THE COURT:  All right.  I would agree with

75

 1   that.  I think the way you phrased that, if they

 2   specifically elicit or argue that his testimony has been

 3   accepted by this or other courts, that they would be

 4   putting at issue the matters that you're wanting to get

 5   in.

 6             Mr. Aycock, do you understand that also?

 7             MR. AYCOCK:  Yes, your Honor.  That's

 8   acceptable.  I just want to make sure that just the fact

 9   that he has testified before, you know, sort of general

10   testimony of that nature wouldn't open the door.

11             THE COURT:  The fact that he has testified

12   before does not run afoul of this.  I think, you know, if

13   you go much further than that, then I think you run that

14   risk.

15             MR. AYCOCK:  Yes, your Honor.

16             MR. JENNER:  Your Honor, just one -- Jesse

17   Jenner.  I'm sorry.  One further narrow point here along

18   the line, we would be concerned -- I don't know if this

19   is going to be the case; but we would be concerned if

20   they implicitly create the problem by saying

21   Mr. Weinstein has testified numerous times before, dozens

22   of times before, scores of times before, something

23   numerical which would create the impression in the jury's

24   mind this must be some whiz-bang expert on this subject.

25   That would indirectly potentially create the same

76

1    problem, I submit.

2              MR. ALAVI:  Your Honor, from our perspective,

3    we just want clarity.  I think what Ms. Hermes talked

4    about makes sense.  If we suggest that his testimony has

11:09AM   5    been accepted, juries have accepted his testimony, that

6    makes sense.  Mr. Weinstein is an expert.  That's what he

7    does for a living.  What we don't want to be precluded

8    from doing is asking him, you know, "Where did you go to

9    school," "What job do you hold?"

11:09AM   10             "What do you do for a living?"  "I'm an

11   expert."

12             "How long have you been an expert?"  "I've

13   been an expert for 20 years."

14             That doesn't suggest that courts or juries

11:09AM   15   have found his testimony to be credible, therefore

16   opening the door.  We have to be at least able to

17   demonstrate what he does for a living.  And, so, I think

18   there is a nuance here where if you suggest by talking

19   about his experience that juries and courts have accepted

11:10AM   20   his testimony, that runs afoul of I think the policy

21   objective that you're trying to satisfy, your Honor; but

22   to suggest that we can't say that he has been testifying

23   as an expert, he's worked at this company for 20 years,

24   it means we can't talk about his background.  I mean,

11:10AM   25   we're at least allowed to talk about his qualifications

Pretrial Conference 1-20-2015

77

1  and background so the jury understands he's not some guy

2  who just took this up yesterday.

3        MR. JENNER:  Your Honor, I would not quarrel

4  with the way counsel is putting it because the way

11:10AM  5  counsel just put it doesn't get into my numerical

6  problem.  The fact that he's testified many times, if

7  something numerical happens, even without saying it's

8  been accepted by a court, is to say implicitly it's been

9  accepted by a court because he's been allowed to do it 40

11:10AM  10  times.

11        If counsel is limiting the presentation to the

12  fact that he works in a certain place, he has testified

13  as an expert, and kind of limited to that and then goes

14  on, nothing of a numerical nature implying vast

11:11AM  15  acceptance comes up.

16        THE COURT:  Well, the length of his

17  consultation experiences I think does involve a numerical

18  number; but I don't find that that in any way violates

19  this.  So, I'm just going to say that they can talk about

11:11AM  20  the fact that he has testified previously and talk about

21  how long he's been doing it; but as long as there's no

22  numerical component or any reference to being accepted as

23  an expert by courts previously, then I don't consider

24  that they've opened the door.

11:11AM  25        MR. JENNER:  Thank you, your Honor.

1          THE COURT:  All right.  Mr. Aycock, tell me

2     what it is you're seeking to exclude in No. 11.

3          MR. AYCOCK:  So, for No. 11 we're seeking to

4     exclude references to royalties that allegedly might have

11:12AM  5     to be paid or other unidentified patents that would have

6     to be practiced to sell products that are compliant with

7     the Bluetooth + EDR specification.  Relates to stacked

8     royalties or holdup.

9          And, your Honor, the Federal Circuit just

11:13AM  10    issued an opinion in December.  This had to do with jury

11    instructions, but there they explained that the district

12    court doesn't need to instruct the jury on holdup or

13    stacking unless an accused infringer presents actual

14    evidence of holdup or stacking.  That was the *Ericsson*

11:13AM  15    case.

16          Here there is no evidence.  It's just a

17    theoretical concern about stacking of royalties.

18          THE COURT:  Well, why isn't the testimony of

19    an expert about it evidence?

11:13AM  20          MR. AYCOCK:  Well, in that case they were

21    talking about specific evidence rather than simply

22    conjecture about what might happen in the field; and here

23    we have something similar.

24          THE COURT:  So, this is the *Ericsson versus*

11:14AM  25    *D-Link* case?

79

1          MR. AYCOCK:  That's correct, your Honor.

2          THE COURT:  And you're saying there the Fed

3   Circuit said that the district court did not err by

4   including certain jury instructions?

11:14AM  5          MR. AYCOCK:  There they held the district

6   court -- that's right.  The district court did not

7   include this instruction and it didn't err by not

8   including it.  And we think that this would be -- it's

9   not relevant because there is no specific evidence of

11:14AM 10   stacking in this situation and we think that it would be

11   highly prejudicial because -- for Samsung to be allowed

12   to say that there are potentially thousands of patents

13   that they're going to have to pay for when there's no

14   actual evidence that there are other patents that apply.

11:14AM 15          THE COURT:  Well, I mean, obviously one of the

16   ways that a manufacturer acquires licenses for its

17   products is through cross-licensing and lots of other

18   ways that would not involve a specific royalty for a

19   specific product.

11:15AM 20          Are you saying that Samsung can't tell the

21   jury in its analysis of the *Georgia-Pacific* factors that

22   there is lots of intellectual property involved in its

23   products?

24          MR. AYCOCK:  Well, your Honor, there is

11:15AM 25   another Motion in Limine No. 16 that relates to what

80

         you're referring to.  It's the RAND Zero policy or

         license, and we have also moved to exclude that evidence

         as well.

                    THE COURT:  If all you're relying on is the

11:15AM  Ericsson case to argue that the defendant has a burden of

         putting on certain evidence before it can include in its

         damages analysis a royalty stacking argument, then I

         don't think the Ericsson case gives you what you're

         trying to get.

11:16AM            Do you have any other case that says that?

         Because I see this as part of every damage analysis we

         do.

                    MR. AYCOCK:  I think that the Ericsson case is

         the first case where the Federal Circuit has addressed

11:16AM  stacking; but here, your Honor, there just -- there are

         no other specific patents that Samsung has pointed to.

         So, we think to raise this as a general issue and point

         to potentially thousands of other patents is prejudicial

         to Rembrandt.

11:16AM            THE COURT:  Okay.  I'm going to deny No. 11.

         I don't think there's an adequate foundation established

         for that.

                    No. 12 does not appear to be opposed as far as

         the reference to fees other than for a testifying

11:17AM  witness.

1      MR. ENGER:  Your Honor, that was my reading as

2  well.  Since counsel is not going to be a testifying

3  witness in this case, it seems like that's a distinction

4  without a difference and that your Honor should grant

11:17AM  5  this MIL.

6      THE COURT:  And obviously this MIL would not

7  apply to any witness who does testify, whether they're

8  counsel or otherwise, right?  If they have a financial

9  interest in the case, the defendant is free to point that

11:18AM  10  out.

11      MR. ENGER:  That's fair, your Honor.

12      THE COURT:  All right.  With that

13  understanding, Mr. Sherwood, do you have any opposition

14  to this MIL?

11:18AM  15      MR. SHERWOOD:  Not with that understanding,

16  your Honor.  In other words, with that limitation the

17  court has just articulated, I don't have any opposition.

18      THE COURT:  All right.  And basically what it

19  would apply to, then, is the contingent fee interest of

11:18AM  20  counsel in the case, is I guess would be what's left.

21      MR. SHERWOOD:  Well, your Honor, that I'm not

22  quite sure about.  There may be a witness who works for

23  Rembrandt who might have a financial interest in the

24  outcome.  So, I'd just point out that's a possibility.

11:18AM  25      THE COURT:  Yeah.  I'm just saying what is

82

being excluded is references to basically the contingent

fee interest of counsel because anybody who testifies,

their financial interest, whatever its nature may be, is

fair game.

11:19AM          MR. SHERWOOD:  Correct.  And I just, again,

for the interest of clarity, as we've discussed, wanted

to make that statement so that you'd know about it.

          THE COURT:  And I appreciate that.  That's a

good approach.

11:19AM          Okay.  All right, Mr. Enger.  What's next?

          MR. ENGER:  Your Honor, Motion in Limine

No. 13 prohibits Samsung from introducing evidence or

argument that awarding Rembrandt damages would drive up

the prices of Samsung's products or cause Samsung to lay

11:19AM  off employees.  Again, that evidence would be irrelevant

and unduly prejudicial.  Again, I don't see the beef

here.

          In response, Samsung says that it does not

oppose this MIL with respect to testimony that a damages

11:19AM  award would negatively impact Samsung's employees or

customers.  That seems like they've agreed to it.  They

introduce some other information about introducing

evidence that Rembrandt's requested royalty rate is

disproportionate and that it may affect Samsung's chip

11:20AM  purchasing decisions and profitability.  Again, those are

83

1    outside the scope of this MIL.

2            THE COURT:  All right.  And I think that the

3    reason they made the concession they made about

4    negatively impacting employees or customers is because

11:20AM  5    that's what was ruled in a previous case.  But I think

6    that what you have agreed to is fine for this case.

7            Ms. Hermes, is that -- you're agreeing that

8    there won't be any argument that a damage award in this

9    case would endanger your company or negatively impact

11:21AM  10   employees or customers?  Is that --

11           MS. HERMES:  Correct.  We just wanted to make

12   sure that we still can cross-examine Mr. Weinstein on

13   certain assumptions he made in his analysis and how that

14   would affect the hypothetical negotiation in terms of

11:21AM  15   Samsung looking at the profitability of its products or

16   its purchasing decisions with third-party chip suppliers.

17           THE COURT:  Okay.  Well, as long as he doesn't

18   raise the specter that a certain damage award in this

19   case would threaten the financial viability of Samsung or

11:21AM  20   negatively impact employees or customers, then you will

21   have no problem with this ruling.

22           MS. HERMES:  Yes, your Honor.

23           THE COURT:  Okay.  As to 14, Mr. Enger,

24   what -- what's the issue that you're after there?

11:22AM  25           MR. ENGER:  Your Honor, this limine motion

84

 1  basically prohibits Samsung from taking back the binding

 2  admissions that were taken during depositions of

 3  Samsung's corporate representatives; and this is limited

 4  to the subjects for which they were actually properly

11:22AM  5  designated.

 6         THE COURT:  Why isn't this just something that

 7  should be left for impeachment?  If you think they have

 8  contradicted the testimony of a corporate representative,

 9  why isn't your remedy to impeach them with that?

11:23AM 10         MR. ENGER:  Well, your Honor, I think that

11  would be one option; but the better solution would be not

12  to let them do that in the first place.  And the reason

13  being is because when you look at the text of

14  Rule 30(b)(6), it says that you're bound by the

11:23AM 15  admissions of your corporate representatives.

16         THE COURT:  I understand that.  But how is

17  making that an in limine ruling -- how does that help

18  anything?

19         MR. ENGER:  Well, it prohibits Samsung from

11:23AM 20  even trying in the first place to take back those

21  admissions, which, you know, once you've rung the bell,

22  it's tough to unring it.  Can't put that cat back in the

23  bag.

24         THE COURT:  I think that's what impeachment is

11:23AM 25  all about.

Pretrial Conference 1-20-2015

85

                        You know, if you think that you need an

instruction to the jury that certain testimony was -- or

should be considered by the jury to be binding, which

would only come up if you impeached a witness, and then

11:24AM  Samsung says that that prior testimony shouldn't be

binding, but I -- you know, I think that's something you

can take up with the judge if you think that you need

some kind of limiting instruction to the jury but this to

me is in the nature of a limine ruling that just says

11:24AM  "follow the rules" and I stay away from those because I

don't think they help.  So, I'm going to deny this one.

Not because I disagree with the gist of it but because I

don't believe it's helpful.

                        MR. ENGER:  Thank you, your Honor.

11:24AM             THE COURT:  The same thing I think is true of

15, unless you can point out some difference.

                        MR. ENGER:  Well, some background might be

helpful, your Honor.  Samsung submitted 30(b)(6) notices

that included kind of two broad categories of topics,

11:25AM  damages topics and technical topics.  We presented

Dr. Paul Schneck on the technical topics and Mr. Derek

Wood on the damages topics.

                        The problem was during the technical

deposition, which should have been all about technical

11:25AM  topics, the entirety of the deposition was spent on

86

```
 1  damages issues.  So, our corporate representative

 2  basically punted and said, "I'm not the guy that knows

 3  about that.  Talk to Mr. Wood.  I have not been

 4  designated to speak on behalf of the company about that."

 5          Now, the problem with this is on

 6  cross-examination -- or I'm sorry -- yeah,

 7  cross-examination, they can use this type of information

 8  and these type of answers to the questions where he's

 9  punting to Mr. Wood to make the witness look very

10  unknowledgeable; and in fact he wasn't supposed to be

11  knowledgeable about those topics.  It was outside the

12  scope.  It's prejudicial, your Honor.

13          THE COURT:  Well, that -- I don't see any

14  reference to that in your motion.  If that's what this is

15  all about --

16          MR. ENGER:  I can give you some examples of

17  the testimony that we're exactly afraid of, your Honor.

18          THE COURT:  I mean, this is all relating to

19  the testimony of one witness?

20          MR. ENGER:  Yes, your Honor.

21          THE COURT:  Well, I guess my problem is that

22  that issue has not been presented very well.  Typically

23  whether a question is outside the scope of the deposition

24  notice is going to have to be taken up on a

25  question-by-question basis.
```

11:25AM (line 5)
11:25AM (line 10)
11:25AM (line 15)
11:26AM (line 20)
11:26AM (line 25)

87

                    MR. ENGER:  I think this is a very narrow

limine motion, your Honor.  I think it's -- it's highly

prejudicial, you know, being able to impeach Dr. Schneck

on damages testimony for which he was not the corporate

representative, make him look like he's unknowledgeable

whenever he was not, again, the corporate representative

on those topics.  He didn't need to be knowledgeable, in

other words.

                    THE COURT:  And this is Dr. Schneck?

                    MR. ENGER:  Dr. Paul Schneck, S-C-H-N-E-C-K.

                    THE COURT:  All right.  Let me hear from the

defendant about Dr. Schneck.

                    MS. HIGGINS:  Your Honor, as you point out,

the motion itself is vague and overbroad; and even if

we're talking specifically about the testimony from

Dr. Schneck, Rembrandt's counsel is still asking for a

blanket rule here with respect to his testimony.  We

submit that this is something that is very difficult to

do with respect to and as you've said -- as you've

pointed out, your Honor, should be taken up on a

case-by-case basis if it even comes up.  If the witness

is asked a question and the answer is "I don't know,"

then frankly there's no need to impeach the witness.

                    We also -- I think that this is just not the

proper subject of a MIL.  It's a request for mandatory

1    relief; and once again, you know, we believe this is a

2    situation where the parties ought to be able to follow

3    the federal rules.

4         THE COURT:  And, Ms. Higgins, I do not intend

11:28AM  5    to grant this motion as broadly written; but if there's

6    an issue lurking about Dr. Schneck that is going to come

7    up during the trial, then I would like to see if there's

8    a way to reach that before trial.

9         MS. HIGGINS:  Your Honor, if, for example,

11:28AM 10   Dr. Schneck at trial -- this is classic impeachment

11   scenario.  If Dr. Schneck at trial is asked a question

12   and all of a sudden his memory is better and he can

13   answer the question, you know, that's a situation where

14   we should be able to impeach him with the fact that he

11:29AM 15   said at his deposition "I don't know."  That's proper

16   impeachment.  And, so, once again, I think a blanket rule

17   here is improper.

18        THE COURT:  Well, if Dr. Schneck was asked

19   questions at his deposition and the deposition was just a

11:29AM 20   30(b)(6) deposition and the topics in that 30(b)(6)

21   deposition did not include the subject about which he was

22   questioned, then the fact that he didn't know at that

23   time would not impeach his later knowing if he testifies

24   as a corporate representative at trial.  And, so, I guess

11:30AM 25   what I'm struggling with is that there may be a series of

1  questions that he was asked at his 30(b)(6) deposition to

2  which objection should have been made.

3         Mr. Enger, was there a contemporaneous

4  objection about those questions being beyond the scope of

11:30AM  5  the deposition notice?

6         MR. ENGER:  Yes, your Honor.  I objected to

7  that numerous occasions, and I also got a running

8  standing objection at the beginning of the deposition

9  whenever it became apparent what the tactic was going to

11:30AM  10  be.

11         MS. HIGGINS:  But still, your Honor, you know,

12  dealing with this in the hypothetical as opposed to a

13  specific instance with a specific question and answer, I

14  think it's difficult.

11:31AM  15         THE COURT:  Well, I guess the only way it

16  occurs to me it might be helpful is if the plaintiff has

17  a series of questions that Dr. Schneck was asked at his

18  30(b)(6) deposition as to which a contemporaneous

19  objection was made, then I'm willing to rule on those

11:31AM  20  objections with an eye toward whether that testimony will

21  be allowed to be used even to impeach Dr. Schneck.  In

22  other words, if it was beyond the scope of the deposition

23  notice and that objection was made at the time, then I

24  think they're entitled to a ruling on that and that

11:31AM  25  testimony would not be available to impeach him.

90

                              So, what I'm going to say on this is I'm going

1

to deny this motion in limine; but I'm going to instruct

3 counsel to meet and confer about the use of Dr. Schneck's

4 deposition.  And if you're able to work it out, fine.  If

11:32AM  5 not, then I want the plaintiff to file a supplemental

6 motion in limine that will be filed in time to be taken

7 up at our next hearing before trial.

8               Mr. Enger, how soon do you think you can

9 accomplish meeting and conferring with the other side and

11:32AM 10 raising that issue in any supplemental motion?

11               MR. ENGER:  I certainly think we could meet

12 and confer this week.  In terms of getting the motion

13 filed, early next week seems reasonable.

14               THE COURT:  Okay.

11:33AM 15               MS. HIGGINS:  And, your Honor, if I may, it

16 might be helpful to know whether plaintiff's counsel

17 plans to call Mr. Schneck for topics outside of his

18 30(b)(6) testimony.

19               MR. ANAIPAKOS:  We anticipate calling

11:33AM 20 Dr. Schneck, your Honor, on a variety of topics; and we

21 do anticipate some of those will be outside the scope of

22 his 30(b)(6) designation.  That's the purpose for the

23 motion in limine.

24               THE COURT:  All right.  Well, that means it's

11:33AM 25 still a live issue, I guess, so...

11:34AM

                    MS. HIGGINS:  Your Honor, if I may, it's very

difficult, if we don't know what the testimony is at the

time of trial, to know whether or not we -- you know.  We

believe the right to impeach or at least discuss that on

a case-by-case basis here is important.

                    THE COURT:  Well, on what basis would you be

allowed to use an answer that was beyond the scope of the

deposition notice when you got a timely objection?

                    MS. HIGGINS:  Your Honor, as I said, I think

it's very case-by-case specific; and I think that having

to review the specific testimony from the deposition of

Mr. Schneck versus the testimony that he's offering on

the stand is really the only way that you could resolve

that issue.  And I don't have a specific example in mind.

                    THE COURT:  Well, I guess what I'm saying is

how would you be entitled to use it if you asked the

question in violation of the scope of your notice and

that was timely pointed out?  Under what theory would you

use that testimony?

                    MS. HIGGINS:  Well, for example, Mr. Schneck

is the CEO of Rembrandt and there might be certain

factual information that is within the scope of what the

man knows and if he did not answer questions that were

outside the scope of the deposition -- and there was also

the issue of whether those -- that testimony and the

92

1  question was indeed outside the scope.  And I think

2  unless you're looking at the specifics of the question

3  and answer and counsel's objection, we don't even know

4  for sure that the objection itself is meritorious.  So,

11:35AM  5  I --

6         THE COURT:  I agree.  That's the matter we

7  would be taking up at the next hearing.

8         MR. ENGER:  Your Honor, whenever you really

9  get down to it, this is a very simple issue.  He was

11:36AM  10 designated on technical topics, things like inception,

11  reduction to practice, prosecution.  He was not --

12  99 percent of the deposition was about the corporate

13  structure, what's their business model, how much did they

14  acquire the patents for, things of that nature, which he

11:36AM  15 said "I don't know" after being instructed -- I'm

16  sorry -- after an objection that that was outside the

17  scope.

18         Now if he comes to trial and he testifies in

19  his personal capacity, not as a 30(b)(6) witness, he

11:36AM  20 shouldn't be impeached for saying "I don't know the

21  answer."

22         THE COURT:  I understand the theory.  And to

23  the extent that the point Ms. Higgins is making is that

24  we should look at the context of the answer and the

11:36AM  25 notice, I agree with all that.  I'm just saying I don't

93

1  want to leave that for the trial judge to have to take up

2  cold with the jury in the box.  So, I'm going to allow

3  Mr. Enger until some date next week.  And I guess the

4  earlier the better.

11:37AM  5          How about if we say you're to file that by

6  next Monday, Mr. Enger?

7              MR. ENGER:  That's acceptable, your Honor.

8              THE COURT:  Okay.

9              MR. ENGER:  Providing we can have a timely

11:37AM 10  meet and confer.

11             THE COURT:  And we can gather back here on

12  Monday the 2nd for a hearing on it.  And the defendant

13  can file its response -- if you get it on Monday, file

14  your response by -- Ms. Higgins, do you think by midnight

11:38AM 15  Thursday?  Basically three days.  Can you handle that?

16             MS. HIGGINS:  Yes, your Honor.

17             THE COURT:  And then we will gather here on

18  the 2nd -- on, say, the morning of the 2nd to take that

19  up.

11:38AM 20             MS. HIGGINS:  Thank you, your Honor.

21             THE COURT:  All right.  Thank you.

22             But the motion in limine itself is denied on

23  the theory that it's just overbroad.

24             All right.  Tell me about No. 16, Mr. Aycock.

11:39AM 25             MR. AYCOCK:  Your Honor, No. 16 we referred to

Tonya B. Jackson, RPR-CRR
409.654.2833

94

11:39AM

1  earlier when we were talking about Motion in Limine

2  No. 11.  And here we're seeking to exclude evidence and

3  arguments related to the RAND Zero policy and license,

4  and this is -- there is an industry group, the Bluetooth

5  SIG, that has a -- essentially a cross-license, just like

6  as your Honor alluded to earlier; and here we're seeking

7  to exclude this information.

8           There's no dispute that Rembrandt and Summit

9  were never Bluetooth SIG members and they don't have an

11:39AM 10 obligation under that policy or license.  And we think

11 that the fact that Samsung and other entities have

12 entered into royalty-free licenses has nothing to do with

13 the value of the patents at issue here, and we think that

14 that's only prejudicial because it suggests that the

11:40AM 15 value is nothing.

16          THE COURT:  All right.

17          MS. HERMES:  As Rembrandt noted, Samsung is a

18 member of the Bluetooth SIG working group and is aware

19 of -- and was aware at the time of the hypothetical

11:40AM 20 negotiation -- of the existence of the royalty-free

21 cross-licensing.  I think that would have been a factor

22 they would have considered at the time of the

23 hypothetical negotiation when they were sitting down with

24 Rembrandt.

11:40AM 25          Further, the accused EDR functionality in this

|  | 1 | case is an optional feature of the Bluetooth standard and |

1  case is an optional feature of the Bluetooth standard and

2  as such would clearly have been in Samsung's mind when it

3  was thinking about licensing this technology.  We think

4  it's relevant background information for damages.  We

11:41AM 5  think it's relevant to *Georgia-Pacific* Factor 8.  It goes

6  to the profitability of the products, as well as

7  Factor 15, the hypothetical negotiation.  That's it.

8           THE COURT:  All right.  Thank you, Ms. Hermes.

9           MR. AYCOCK:  If I may respond, your Honor.

11:41AM 10          THE COURT:  Mr. Aycock, do you have any

11  authority dealing with exclusion of this particular kind

12  of evidence?

13          MR. AYCOCK:  I don't, your Honor.

14          THE COURT:  I don't see why this is not fair

11:41AM 15  game for the experts to testify about.

16          MR. AYCOCK:  Well, your Honor, I believe that

17  Samsung has repeatedly asserted that it's relevant to the

18  hypothetical negotiation without actually explaining why.

19  Why the fact that they have entered into licenses that

11:41AM 20  are royalty-free with other entities related to other

21  aspects of the Bluetooth standard has anything to do with

22  the value of this particular patent.  They've asserted

23  it, but they've never explained why there's any

24  relationship there.

11:42AM 25          THE COURT:  Well, I think that's something

96

        1   that is best left to the testimony of the experts and the

        2   cross-examination of them.  I'll deny No. 16.

        3               MR. ENGER:  Your Honor, Motion in Limine

        4   No. 17 prohibits Samsung from arguing that some claim

11:42AM  5   elements are more important than others.  I think the law

        6   is clear that the claims define the invention as a whole

        7   and any argument that some claim elements are more

        8   important than others is improper.  I understand this is

        9   a relatively common limine motion that's been granted in

11:43AM 10   the Eastern District on other occasions.

       11               What we're afraid of and what we don't want to

       12   happen is Samsung's invalidity expert shouldn't be

       13   permitted to say that some missing limitation is

       14   unimportant and therefore you don't have to -- pay it

11:43AM 15   little mind whenever you're assessing invalidity.  That's

       16   what this all boils down to.

       17               THE COURT:  All right.

       18               MR. HADDAD:  Gerard Haddad for Samsung, your

       19   Honor.  Your Honor, Rembrandt's motion doesn't identify

11:43AM 20   with any specificity the evidence it seeks to exclude

       21   other than a very general reference; and the only law

       22   Rembrandt cites is a cropped portion of a citation to the

       23   *Hilton Davis* case, your Honor, where --

       24               THE COURT:  Well, tell me:  Do you intend to

11:44AM 25   elicit any such testimony?  I'm not -- I would be

97

surprised if you're going to have your infringement

expert testify that a certain limitation doesn't matter.

       MR. HADDAD:  Your Honor, I'm not sure what

limitation that they might be referencing.  I don't know

11:44AM  of any particular limitation where he says one is less

important than the other.  If there were -- if there was

something like that, I think it should be brought to our

attention so I could look at it and think about it.

       THE COURT:  Well, Mr. Enger, whether something

11:44AM  is -- has been granted in other cases or not as an in

limine ruling doesn't really tell me much because often

it's something by agreement or otherwise.  I just don't

want to grant in limine rulings that I don't fully

understand because I think that just creates mischief.

11:45AM         What -- everybody knows the law is that the

device or system or whatever it is that is accused will

have to meet all of the limitations of the claim.

       MR. ENGER:  Your Honor, let me give you an

example.  Our claims have a number of limitations.  One

11:45AM  of the limitations is this master/slave protocol.  What I

don't want to have happen, for example, is Samsung's

invalidity expert to get up there and say, "Yeah, I know

that the master/slave protocol isn't present; but that's

unimportant.  That doesn't really get to the heart of

11:45AM  this invention.  Therefore, it's not really important

1    that it's not found in this prior art reference."  That's

2    the type of argument we're seeking to prohibit.

3              THE COURT:  Mr. Enger, you should hope that

4    they testify that way.  I -- do you have some reason to

11:45AM  5    expect that in this case, from the report or deposition

6    of their expert?

7              MR. ENGER:  Your Honor, the way that they

8    framed the invention really downplays this master/slave

9    notion and really up-plays other aspects of the invention

11:46AM 10    that are found in other limitations, which is their

11    prerogative to explain it that way but not to suggest

12    that certain limitations are more important than others.

13              THE COURT:  I am going to deny that.  I think

14    that's something you can address in jury instructions.

11:46AM 15    If you believe that the defendant has tried to give the

16    jury a false impression about what the law is regarding

17    infringement, that's something that I think should be

18    argued to the court and cleared up in jury instructions.

19    And I think that the jury instructions, even the

11:46AM 20    preliminary instructions, will be clear that each of the

21    limitations of the claim must be met.  But in any event,

22    I'm going to deny that.

23              18.  I understand from the briefing that the

24    parties are in agreement that there will be no reference

11:47AM 25    to the fact that certain claims are not being asserted in

1  the case but that that will have no effect on the

2  defendants' ability to go through the prosecution history

3  and talk about what changes were made or what discussions

4  there were about the claims during the prosecution

11:47AM  5  history.  Is that --

6          MR. ENGER:  Your Honor, we don't believe that

7  falls within the scope of this MIL.

8          THE COURT:  Okay.  Well, Mr. Haddad, tell me

9  if you understand this differently.

11:48AM  10         MR. HADDAD:  Your Honor, we agree not to

11  present evidence or elicit testimony regarding the fact

12  that Rembrandt narrowed the list of claims that it

13  intends to assert in this litigation; but Samsung

14  shouldn't be precluded from presenting evidence relating

11:48AM  15  to, for example, its marking defense, factual -- factual

16  evidence relating to the prosecution.

17         So, for example, your Honor, during

18  prosecution he -- just last month, part of the

19  prosecution record is that Rembrandt disclaimed several

11:48AM  20  claims in two filings with the patent office; and that

21  should be part of what we can elicit because that's

22  relevant to the prosecution record, like all the other

23  facts of the prosecution record, your Honor.

24         THE COURT:  I think that I can say with

11:48AM  25  confidence that that evidence would not violate this

100

1  order.

2          MR. HADDAD:  Thank you, your Honor.

3          THE COURT:  Whether or not it's otherwise

4  admissible is a different issue that I'm not addressing,

11:49AM  5  but this has no effect on the evidence of the prosecution

6  history before the PTO.

7          MR. HADDAD:  Okay.

8          THE COURT:  If that -- just to use the word

9  "prosecution" that way.  The prosecution of this lawsuit

11:49AM  10  is what we're talking about not allowing, but prosecution

11  history before the PTO is not implicated by this ruling.

12          MR. HADDAD:  Thank you, your Honor.

13          THE COURT:  Okay.  All right, Mr. Enger.

14  What's next?

11:49AM  15          MR. ENGER:  Am I understanding that you're

16  granting MIL 18?

17          THE COURT:  Yes, as to the fact that the

18  plaintiff has narrowed the claims asserted during this

19  litigation.

11:49AM  20          MR. ENGER:  Understood.

21          MIL 19 is about products and third parties

22  that are not accused of infringement.  I think there

23  might be a disagreement -- or a misunderstanding between

24  the parties about the scope of this motion in limine.  It

11:50AM  25  really only prohibits Samsung from introducing evidence

1   or argument suggesting that products or parties not

2   accused of infringement did not infringe, as that would

3   not -- be improper and would be confusing to the jury.

4   MIL 19 does not prohibit the mere mention of any third

11:50AM   5   party or products, including BlackBerry.  It just

6   prohibits Samsung from inferring that there are a whole

7   host of non-infringing products available by virtue of

8   the fact that Rembrandt didn't sue them in this

9   litigation.

11:50AM   10              Samsung agrees to this MIL and the scope

11   intended.  In their response, they say they agree not to

12   elicit any testimony that a product or party not accused

13   of infringement in this case does not mean such products

14   or parties do not infringe the patents-in-suit.

11:50AM   15              THE COURT:  And that would be not to elicit

16   testimony and not to argue to the jury the fact that some

17   product was not sued means that --

18              MR. ENGER:  It doesn't infringe.

19              THE COURT:  -- it doesn't infringe.

11:51AM   20              MR. ENGER:  Yes, your Honor.

21              THE COURT:  And that's the understanding that

22   the defendants have of this as well?

23              MR. SHERWOOD:  Yes, your Honor, I think that's

24   correct.

11:51AM   25              THE COURT:  All right.  Then that -- it will

1    be granted to that extent.

2              All right.

3              MR. ENGER:  Your Honor, Limine Motions No. 20

4    and 21 I think are related, and perhaps it makes sense to

11:51AM    5    discuss those together.  Those motions prohibit Samsung

6    from introducing evidence or argument about privileged

7    subject matter and asking questions that attempt to

8    elicit privileged subject matter.  Those privileged

9    matters are not discoverable and forcing Rembrandt to

11:52AM   10    object in front of the jury every time a privilege issue

11    arises would cause undue prejudice.

12              From reading the response, I don't think

13    Samsung really disputes that privileged matters are

14    off-limits; but basically their dispute is this motion

11:52AM   15    in limine is just too vague.  Not so, your Honor.  The

16    parties have engaged in extensive discovery, and the

17    lines are clear about what matters are considered

18    privileged and what matters are not.  And I have a list

19    of examples that, you know, from the deposition

11:52AM   20    testimony, should be very clear what we consider to be

21    privileged and why we shouldn't have to get up and object

22    that they're seeking information on privileged matters.

23              The bottom line, as we see it, is if a topic

24    drew a privilege objection during deposition such that

11:52AM   25    Samsung knows Rembrandt considers that topic privileged,

1  Samsung should have to ask the court's permission before

2  presenting evidence on that topic or asking questions

3  about that topic during trial.

4          THE COURT:  All right.

11:53AM  5          MS. BIANROSA:  Your Honor, Samsung maintains

6  that Rembrandt's motions in limine are vague.  There's no

7  specific testimony that they cite in here that they're

8  specifically objecting to.  Samsung is not going to be

9  asking any questions to a witness such as "What did you

11:53AM  10  say to your lawyer" or "What did your lawyer say to you";

11  but there are certain questions that normal businesses

12  could answer about the nature of their business that

13  Rembrandt won't answer because of the nature of

14  Rembrandt's business and they're claiming privilege more

11:53AM  15  broadly than a normal business would.  And the fact that

16  Rembrandt is in the license and litigation business is --

17  shouldn't preclude Samsung from being allowed to ask the

18  same questions that it could ask any other business.

19          THE COURT:  And I guess, Ms. BianRosa, I think

11:53AM  20  what we're talking about here is if you're on notice that

21  the plaintiff has asserted a privilege to something, then

22  should you be ordered not to go into that in the presence

23  of the jury without approaching the court first.  That's

24  really the way I understand this.  And I think it would

11:54AM  25  apply both ways, frankly.

Pretrial Conference 1-20-2015

104

1   But if you know that they have previously

2   asserted a privilege as to that, why shouldn't that be

3   something that is off-limits unless you get leave of

4   court on an approaching-the-bench basis?

11:54AM  5   MS. BIANROSA:  Well, your Honor, I think it's

6   just that the way it is outlined in Rembrandt's motions,

7   it's just too broad right now.  We really do need a list

8   as to what they are asserting privilege over.  Otherwise,

9   it's just really too broad.

11:54AM  10   THE COURT:  Well, the way I was contemplating

11   this was that it wouldn't be what they intend to assert

12   privilege as to but only what they have already asserted

13   is privileged.  So, you would be on notice of that.

14   Is there -- I just -- I don't think that they

11:55AM  15   should have to reassert the privilege in front of the

16   jury if they've already asserted it before trial as to

17   something.  And if you're -- if you can point out to me

18   how that would create a hardship for you, then I want to

19   try and accommodate that.

11:55AM  20   MS. BIANROSA:  Well, I think, again, your

21   Honor, this also goes to, like in one of the previous

22   MILs, that -- the propriety of any of those privilege

23   assertions and whether or not we should have to follow

24   them.  So, I think that some of these things will need to

11:55AM  25   be gone through on a question-by-question basis here as

1  well.

2          THE COURT:  Well, the privilege would have

3  been asserted during discovery; and I assume if you think

4  that a privilege was improperly asserted during

5  discovery, you have the vehicle of a motion to compel to

6  bring that up.  If you haven't done that and you still

7  want to challenge it, then I'm sure there are other

8  procedural vehicles that you can use; but one of them

9  should not be just bringing it up in front of the jury

10 and causing the court to have to address a privilege

11 objection that you already know about in that way.

12          Are you concerned that there are some

13 privilege defenses that they've asserted that you intend

14 to attack at the trial?

15          MS. BIANROSA:  No, I don't think we have

16 anything specific in mind, your Honor.  I think it's just

17 that we haven't received the universe of what Rembrandt

18 thinks that we're going to go through at trial and what

19 they're objecting to, and it's -- it really places the

20 burden on us to go through all the deposition transcripts

21 and look for any privilege objection and tailor our

22 questioning around that.

23          THE COURT:  Well, all I'm going to say is that

24 if you are aware of a privilege objection as to

25 something, then you should not raise it in front of the

1  jury without getting some ruling from the court out of

2  the presence of the jury.  You know, frankly, even the

3  morning before court starts would be preferable but --

4  and obviously it may come up that there's something you

11:57AM  5  did not realize they had asserted a privilege to and that

6  would be unfortunate, but it happens.

7          But to the extent you know they have claimed a

8  privilege as to certain evidence, then don't present that

9  evidence without raising it with the court out of the

11:58AM  10  presence of the jury.  So, I guess I'm granting 20 and 21

11  to that extent.  And that applies to both sides.

12          All right.  No. 22.

13          MR. ENGER:  Your Honor, Limine Motion 22

14  prohibits Samsung from parading before the jury

11:59AM  15  Rembrandt's ties to Texas or lack thereof so as to

16  suggest that Rembrandt is abusing the court system by

17  filing this lawsuit in Marshall or otherwise wasting the

18  Texas jurors' time.  Again, we don't believe that that

19  evidence has any probative value and unduly prejudices

11:59AM  20  Rembrandt.

21          From reading the response, I don't see that

22  there's a big beef about this.  They say they will not

23  present arguments or evidence to suggest Rembrandt filed

24  this lawsuit in Marshall, Texas, for an improper or

11:59AM  25  underhanded purpose but they instead merely seek

permission to ask Rembrandt's witnesses about background

issues such as where they work.

THE COURT:  You know, and I guess I see this

as related also to a motion that the defendant has filed,

11:59AM  a motion in limine regarding the fact that Samsung is a

foreign company based in Korea and --

MR. ENGER:  I see parallels as well, your

Honor.

THE COURT:  And I would assume that you're

12:00PM  going to abide by the same restrictions that you're

seeking from them, that you're not going to seek to draw

attention to that or emphasize that.

MR. ENGER:  No, your Honor.  As their MIL is

written, it prohibits us from even mentioning they're

12:00PM  from Korea.  That goes too far.  But for us to make that

a trial theme and suggest some sort of a nativist, you

know, because they're from Korea and we're a United

States company, that's a problem; but we will not be

making any of those types of arguments.  But the issue

12:00PM  that they are Korean, you know, in the appropriate tone

and the appropriate time for the damage analysis is

necessary.

THE COURT:  Well, I think that the court's

intention is to restrict both sides from arguments about

12:00PM  where the parties are located.  Certainly you can draw

                    out any factual evidence about the -- where any

                    particular witness lives or works, but there shouldn't be

                    any argument that Rembrandt has no connection to Texas or

                    that Samsung is a foreign or Korean company and that that

12:01PM             has anything to do with the issues in the case.  And as

                    long as both sides abide by that, then I don't expect

                    there will be any trouble.

                            MR. ENGER:  Just a little clarification, your

                    Honor.  Are you saying that we're not allowed to mention

12:01PM             that Samsung is from Korea?

                            THE COURT:  No.  You're allowed to mention

                    that where relevant.

                            MR. ENGER:  I see.  But not to make any sort

                    of nativist arguments.

12:01PM                     THE COURT:  Not to -- to use it in a way that

                    is not relevant to whatever you're talking about.

                            MR. ENGER:  Understood.

                            THE COURT:  All right.  Does the defendant

                    need any clarification on that issue?  Ms. Hermes?

12:02PM                     MS. HERMES:  With regards to Rembrandt, I

                    think we're in agreement.  We would only think that that

                    would be relevant if they were to present to the jury

                    some ties to Texas, that we would be able to

                    cross-examine on that topic only if they opened the door

12:02PM             by saying that they have a strong presence in Texas or

109

1    something of that nature.

2            With regard to Samsung's foreign status, we

3    are obviously -- we feel like what they've said doesn't

4    draw a very distinct line in terms of what they're going

12:02PM  5    to say about Samsung being a foreign corporation.  We

6    think that that fact is of no consequence under the

7    patent laws and is more prejudicial to Samsung to paint

8    them as a foreign corporation than to say that Rembrandt

9    is from Pennsylvania, for example.

12:03PM  10            THE COURT:  Well, I agree.  I do think that

11    there are points in the case where it will be relevant to

12    have testimony or argument about where Samsung is from;

13    but if the plaintiffs are making arguments that are not

14    based on the relevance of it, then that's something that

12:03PM  15    you can take up with the trial judge and that I can

16    expect the plaintiff to desist from.

17            Anyway, I think that we're as clear as we can

18    be on that; and I -- more than that I don't know that we

19    can put out at this time.  But I don't think there's any

12:03PM  20    doubt but that the members of the jury will know that

21    Samsung is a foreign corporation, but I just don't expect

22    the plaintiff to base arguments on that.

23            Okay.  Then I'll show that No. 22 is granted

24    except to the extent of facts regarding where particular

12:04PM  25    witnesses or -- where particular witnesses are located.

1    And I guess -- I don't know.  Do I need to make it any

2    broader than that for --

3            Ms. Hermes, do you -- is there anything other

4    than that that you're interested in being able to put on

12:04PM  5    about the defendants -- the plaintiff?

6            MS. HERMES:  Only if the plaintiff were to

7    open the door by suggesting that they have had contacts

8    with Texas.

9            THE COURT:  That you don't think they do.

12:04PM  10            MS. HERMES:  Correct.

11            THE COURT:  All right.  Tell me about No. 23,

12    Mr. Enger.

13            MR. ENGER:  Yes, your Honor.  This is about a

14    defense of practicing the prior art.  We don't think

12:05PM  15    Samsung should be allowed to introduce evidence or

16    present arguments comparing the accused devices to the

17    prior art because there is no practicing prior art

18    defense to infringement.

19            Again this doesn't seem disputed.  Seems like

12:05PM  20    it should have been agreed to.  They agree not to present

21    a practicing prior art defense but want to present

22    evidence pertaining to its invalidity defense.  I guess,

23    your Honor, so long as Samsung is comparing the claims to

24    prior art and not the infringing Bluetooth products to

12:05PM  25    the prior art -- that would be improper -- Samsung is not

1  going to run afoul of this MIL.

2           THE COURT:  I mean, all I see reserved in the

3  opposition is the right to present prior art to show

4  anticipation, if I'm reading that right.

12:06PM   5           MR. HADDAD:  Yes, your Honor.

6           THE COURT:  Okay.  Well, I will show then that

7  this motion is granted to the extent of the -- any

8  argument that they're not infringing because they're

9  practicing the prior art but does not in any way impair

12:06PM  10  their right to present their invalidity defense based on

11  anticipation.

12           MR. HADDAD:  Or obviousness, your Honor.

13           THE COURT:  Okay.  Or obviousness.  Thank you.

14           MR. HADDAD:  Thank you.

12:07PM  15           THE COURT:  All right.  Mr. Enger, what's

16  next?

17           MR. LARSON:  It's actually Mr. Larson, your

18  Honor.

19           THE COURT:  All right.  Mr. Larson.

12:07PM  20           MR. LARSON:  This next MIL is to exclude

21  references to prior art that were not properly included

22  in Samsung's original invalidity contentions.  Now, we

23  filed a motion to strike portions of Dr. Goodman's

24  invalidity report, which is Docket No. 165, that are

12:07PM  25  related to this MIL, your Honor.  So, I'm happy to

1  present argument on that motion, on the motion to strike;

2  but I believe the motion to strike will take care of this

3  motion in limine.

4          THE COURT:  All right.  Then what I would

12:07PM  5  intend to do is just carry this motion to be taken up in

6  connection with the motion to strike the expert's

7  testimony.

8          Does that appear likely to handle all the

9  issues in it, Mr. Haddad?

12:07PM  10         MR. HADDAD:  We agree, your Honor.  Thank you.

11         THE COURT:  Okay.  And as I understand it, 25

12  is granted by agreement.

13         MR. ENGER:  That's correct, your Honor.

14         THE COURT:  Okay.  All right.  That takes care

12:08PM  15  of plaintiff's motions in limine.

16         Do any of the counsel who will need to

17  participate further also need to be upstairs for the

18  docket call at 1:30, I think it is?

19         MR. WARD:  I've got someone covering for my

12:08PM  20  group.  So, no.

21         MR. SMITH:  I will either get someone to cover

22  for me or someone else here will cover for me down here,

23  your Honor.

24         THE COURT:  Okay.  Then what I'd propose to

12:08PM  25  do, I -- unless counsel think that we can in just a few

1    minutes get through the rest of it, I propose to break

2    until after lunch.

3            I see no objection to that.  Then we will

4    reconvene here at 1:30.  I've got a conference call at

12:09PM  5    1:00, but I'll be clear in plenty of time to resume at

6    1:30.  So, we will be in recess until that time.  Thank

7    you.

8            (Recess, 12:09 p.m. to 1:33 p.m.)

9            THE COURT:  I think we are ready now to turn

01:33PM  10    to the defendants' motions in limine.

11            Who wants to speak to those for the

12    defendants?

13            MR. ALAVI:  Your Honor, I'm sorry to -- if I

14    may.  On Motion in Limine No. 1 for the defendants,

01:33PM  15    there's a protective order issue because we are going to

16    be discussing a license with BlackBerry.  BlackBerry has

17    designated that document as AEO, outside counsel only,

18    and has requested that we seek to have the courtroom

19    sealed during the discussion of that license and the

01:34PM  20    transcript designated as sealed.  Or in the alternative,

21    if the court doesn't do so, that the parties refrain from

22    mentioning the amount of the settlement in the open

23    courtroom.

24            THE COURT:  Well, I will just direct the

01:34PM  25    parties then not to mention the amount of the license

1  payment.  I don't think there's any need to mention the

2  specific amount.

3         MR. JENNER:  I think, your Honor, the numbers

4  are all contained in one provision of the agreement which

5  is quoted in full in the brief so that we can refer your

6  Honor to that and perhaps just refer to something like

7  numbers A, B, and C or something like that.

8         THE COURT:  I think it's in your motion, in

9  fact, so --

10         MR. JENNER:  Page 5, yeah.

11         THE COURT:  Yes.  So, I've got it; and it's no

12  problem.

13         I understand the request that's made in order

14  to comply with the agreement, but I'll deny the request

15  to close the courtroom and instead just ask that we not

16  mention the dollar amounts.

17         MR. ALAVI:  Thank you, your Honor.

18         MR. JENNER:  Having said all that, your Honor,

19  MIL No. 1 is pretty closely tied to the *Daubert* motion;

20  and as your Honor carried one of the MILs this morning,

21  would your Honor prefer to carry this MIL to

22  consideration with the *Daubert* or to go ahead and take

23  the whole thing on now?

24         THE COURT:  If both sides are comfortable that

25  they have briefed the issue fully in connection with the

Daubert motion, I don't have a problem with taking it up

in that connection.

MR. ALAVI:  The plaintiffs believe it's fully

briefed and are happy to have the MIL taken up with the

Daubert motion, your Honor.

THE COURT:  All right.  In that case, I will

carry defendants' Motion in Limine No. 1 to take it up

with the Daubert motion.

And being as I'm from Louisiana, I guess that

I should say I don't pronounce it Daubert or Daubert

(pronouncing) or any other French term because I was with

the lawyer from Ohio who represented the family at a

conference and he assured me that they call themselves

Dauberts (pronouncing).  So, I simply refer to them as

Daubert motions.  But I like the French pronunciation on

it otherwise, being from New Orleans; but anyway, we'll

take up the Daubert motion then.

Ms. Higgins.

MS. HIGGINS:  Your Honor, Samsung's Motion

in Limine No. 2 specifically goes to Samsung's request

that references to two particular -- two agreements in

particular, a Wi-LAN agreement between Wi-LAN and Samsung

as well as a MOSAID agreement between MOSAID and Samsung,

request that references and testimony regarding these

licenses be excluded.

1       And I think first and foremost, if you look to

2   Rembrandt's expert, Mr. Weinstein's expert report, what

3   you will find there is that Mr. Weinstein has admitted

4   that both of these agreements are not technologically

01:37PM  5   comparable to the patents-in-suit.  So, we're dealing

6   with a situation here where we submit that these

7   agreements in the context of this lawsuit that relates to

8   Bluetooth and EDR -- that's "enhanced data rate

9   technology" -- these agreements specifically relate to

01:38PM 10   WiFi patents.  And as your Honor may know, Wi-LAN and

11  MOSAID are notorious patent enforcement entities; and

12  they have been involved in a lot of litigation.  So, we

13  submit that these agreements have no probative value.

14       Specifically, the Federal Circuit in *Lucent*

01:38PM 15  has said that a party must show that agreement be

16  sufficiently comparable to the hypothetical license at

17  issue in suit.  That's 580 F.3d at 1325.  And we would

18  submit that here these licenses are not that.  They're

19  not relevant in this particular case.

01:38PM 20       I think if you look to Rembrandt's opposition,

21  what they say these agreements are relevant to is

22  Samsung's -- and this is a quote -- willingness -- this

23  is at page 5 of their opposition -- "Samsung's

24  willingness to pay to license patented technology."

01:39PM 25  That's any patented technology, your Honor.  They're not

1    referring to the patented technology or even comparable

2    technology here.  As their expert has admitted, these are

3    licenses that are not technologically comparable to the

4    patents-in-suit.

01:39PM    5        Rembrandt also argues that these agreements

6    must come in because they're the best evidence, and

7    that's just not the case here.  Better evidence, by far,

8    for example, would be Samsung's agreement with BandSpeed

9    that pertains to two patents and specifically Bluetooth

01:39PM    10    technology.

11        In addition to not being probative, we also

12    submit that these two licenses, Wi-LAN and MOSAID, are

13    also highly prejudicial.  Clearly what Rembrandt seeks to

14    do here is take two agreements that have nothing to do

01:40PM    15    with the technology at issue here and they want to waive

16    those agreements in front of the jury, agreements that

17    have big numbers in them, and this, quite frankly, is

18    highly prejudicial, not probative, and should be

19    excluded.

01:40PM    20        And indeed, you know, based on your Honor's

21    ruling earlier today where your Honor considered 403 in

22    connection with an agreement in connection with the

23    patents-in-suit, here we're dealing with agreements that

24    are even way far afield from that and should also be

01:40PM    25    excluded not only under 402 but 403.

 1          THE COURT:  Ms. Higgins, tell me:  How did

 2   these licenses come to be at issue in this case?

 3          MS. HIGGINS:  There were document requests,

 4   your Honor, that were served that were broad; and, so,

01:40PM  5   they were produced in the course of discovery.  They were

 6   then included in Mr. Weinstein's expert report under

 7   *Georgia-Pacific* Factor 2 and then indeed in response to

 8   that included in Samsung's expert report and specifically

 9   distinguishes having to do with WiFi technology, not

01:41PM  10   Bluetooth technology.

11          THE COURT:  But you mentioned that your

12   position is that they have no relationship to the

13   technology at issue and, yet, they were responsive to a

14   request.  How is that?

01:41PM  15          MS. HIGGINS:  Because they were, as I

16   understand it, your Honor, a broad document request that

17   sought production of Samsung's license agreements.

18          THE COURT:  Well, it's my understanding from

19   the briefing that there were three licenses produced and

01:41PM  20   that these are two of the three.

21          MS. HIGGINS:  Yes, your Honor.  So, Wi-LAN and

22   MOSAID are two of them.  The third agreement that was

23   produced is the Samsung/BandSpeed agreement.  And as I

24   explained, that agreement dealt specifically with two

01:42PM  25   patents and Bluetooth technology, not WiFi technology.

01:42PM
01:42PM
01:42PM
01:43PM
01:43PM

1    THE COURT:  Okay.  All right.  Let me hear

2  from counsel for the plaintiff, and I'll give you a

3  chance to respond.

4    MR. ALAVI:  Your Honor, Mr. Talanov from our

5  firm will argue it.  And if the court will indulge me,

6  the numbers in the agreements are AEO; so, we will not

7  be, in the argument, disclosing the numbers in the

8  agreement because of the designations on those documents.

9    THE COURT:  All right.  That's fine.  I don't

10  have a need for the numbers.

11    And you're Mr. Talanov?

12    MR. TALANOV:  Yes, Mr. Talanov for Plaintiff

13  Rembrandt, your Honor.

14    THE COURT:  All right.

15    MR. TALANOV:  Your Honor, if I may, Rembrandt

16  is not disputing the fact that the MOSAID and Wi-LAN

17  licenses are not comparable; but nevertheless, they are

18  highly relevant under several *Georgia-Pacific* factors

19  because they provide the context of the hypothetical

20  negotiation, including the willingness and the

21  reasonableness of the parties entering into the

22  hypothetical negotiation as well as the general licensing

23  practices and the commercial context surrounding the

24  hypothetical negotiation.

25    THE COURT:  Well, do you want these in even if

01:43PM

01:44PM

01:44PM

01:44PM

01:45PM

1  they come in without the numbers?

2            MR. TALANOV:  No, your Honor.  We believe that

3  the numbers are highly relevant as well.  And just to be

4  clear, we believe that this is highly similar to your

5  Honor's -- right along the lines of your Honor's ruling

6  on Plaintiff's Motion in Limine No. 16 that had to do

7  with the Bluetooth RANDZ license where defendants argued

8  that this license is -- essentially the same argument,

9  that it's highly probative of the context of hypothetical

10 negotiation and specifically comparing it to the size of

11 the Rembrandt claim.  And we believe that the numbers of

12 the MOSAID and Wi-LAN licenses are highly relevant in

13 this case because otherwise the jury would be unfairly

14 misled and Rembrandt would be prejudiced by only

15 considering the royalty-free Bluetooth RANDZ license --

16 which, by the way, has not been established as

17 sufficiently comparable and does not relate specifically

18 to the patents-in-suit -- and also the lower value

19 BandSpeed license.  So, we believe that the jury is

20 entitled to hear the evidence and to see all the licenses

21 and all the amounts to sufficiently establish the context

22 of the hypothetical negotiation.

23            THE COURT:  And --

24            MR. ALAVI:  If I may, your Honor, the way

25 Mr. Weinstein uses these licenses is in Factor No. 15 to

01:45PM

establish the willingness of Samsung to license patented

technology and the willingness of Samsung to pay material

amounts of money to license such technology.  We didn't

cherry-pick these licenses.  These were the three

licenses that Samsung produced in response to the request

for production.

THE COURT:  And what was the request for

production?

MR. ALAVI:  The request for production covered

licenses for Bluetooth or -- I don't think it used the

word "comparable" -- Bluetooth or other wireless patents.

If you're left with just the BandSpeed license

and the Bluetooth license, Mr. Weinstein is not -- so,

there's two issues.  One, can we get these licenses in

without the numbers.  The answer is we want them even

without the numbers just to show that in the commercial

context, under Factor No. 15, that Samsung is willing to

enter into negotiations and enter into licenses for

bandwidth technology.  That's *Georgia-Pacific* Factor 15.

The numbers are relevant because it shows that

Samsung pays more than nominal amounts to license

important technology.  You exclude the numbers and what

you are left with is two licenses that Samsung

handpicked, the Bluetooth license with SIG -- that's the

Zero -- and the BandSpeed license for a lower number.

1  And it creates a false impression with the jury as to

2  what Samsung is willing to pay for licenses for

3  technology that they believe is important.

4         If they had produced hundreds of licenses, I

01:46PM  5  think they could have made an argument that we

6  cherry-picked the best licenses.  This was all that was

7  produced.  So, we have to be able to allow the expert to

8  testify about the commercial context; and that's what

9  Mr. Weinstein does.  And he's very clear in his report

01:46PM  10  that he does not use this as a comparable license and he

11  does not suggest that they are a basis for calculating

12  royalty.  They establish the commercial context, which is

13  Samsung enters into licenses for patented technology in

14  the wireless area and is willing to pay substantial

01:47PM  15  amounts of money to do so.  So, that's the context that

16  it's used in *Georgia-Pacific* Factor 15.

17         MR. TALANOV:  Your Honor, if I could make just

18  one additional point.  Counsel for Samsung cites to the

19  *Lucent v. Gateway* opinion from Federal Circuit.  However,

01:47PM  20  the cite that Samsung provides specifically relates to

21  Factor No. 2 within the *Georgia-Pacific* factor where it

22  goes to calculating the actual amount of the royalty.

23         Here, your Honor, what we're doing is we're

24  not trying to say that the MOSAID and the Wi-LAN licenses

01:47PM  25  should go into the actual calculation or to suggest to

01:47PM

1  the jury what the actual range for the damages amount

2  should be.  What we're doing is we're trying to say is

3  under other factors, such as 8 and 15, these licenses are

4  highly instructive of the context of the negotiation, the

5  willingness and the reasonableness of the negotiation.

6  In other words, if Samsung was only willing to pay

7  nominal amounts as opposed to higher amounts, the jury

8  may not consider that reasonable for Samsung to not

9  pay --

01:48PM

10          THE COURT:  Mr. Talanov, do you have any

11  reason to believe that there were more licenses that

12  would have been responsive to that request than the three

13  that were produced by Samsung?

14          MR. TALANOV:  Your Honor, I have no such

01:48PM

15  reason to believe that there were more.  These are the

16  licenses that Samsung did produce.  They could have

17  objected, but these are the licenses that Samsung did

18  produce in response to our request for any licenses

19  related to this lawsuit.

01:48PM

20          THE COURT:  All right.  The only -- I don't

21  want to say "the only."  The main factor that you have

22  argued that relates to the amount of these licenses is

23  willingness to pay more than minor amounts for technology

24  licenses.  Do you have any case law that you think

01:49PM

25  supports the idea that the court should allow licenses

Pretrial Conference 1-20-2015

124

1  that aren't of comparable technology in order to support

2  that factor?

3          MR. TALANOV:  Well, your Honor, we don't have

4  any specific cases on point; but I would just refer your

01:49PM  5  Honor back to the decision with regard to Plaintiff's

6  Motion in Limine No. 15.  It hasn't been established that

7  the Bluetooth RANDZ licenses relate to these patents or

8  that they are sufficiently comparable.  They haven't been

9  addressed as such in either parties' expert reports; and,

01:49PM  10  yet, our belief is that it's best for this type of

11  testimony -- for the licenses to be considered and for

12  counsel to develop testimony of experts regarding these

13  licenses both on direct and cross.

14          THE COURT:  All right.  Ms. Higgins, I'll give

01:50PM  15  you the last word on this.

16          MS. HIGGINS:  Yes, your Honor.  Under

17  Rule 403, these licenses are clearly highly prejudicial

18  and indeed it's straight out admitted conditioning of the

19  jury to high royalty numbers that have nothing to do with

01:50PM  20  the patents-in-suit here.

21          In particular, Rembrandt doesn't need the

22  numbers in these irrelevant, noncomparable agreements to

23  argue that Samsung is willing to pay money for patented

24  technology.  The relevant test here should be whether or

01:50PM  25  not these agreements are comparable, and their own expert

1    admits in his report that they are not.

2            In terms of case law, we did cite the *Lucent*

3    case; and I still think that that case applies here.

4    Your Honor, I may suggest another Federal Circuit case,

01:51PM  5    which I'm sure your Honor is familiar with, *RescueNet*.

6    On *RescueNet*, certain agreements were kept out; and

7    certain agreements were allowed in.  With respect to

8    agreements that were precluded, what the court said in

9    *RescueNet* was (reading) notably, none of these licenses

01:51PM  10   even mention the patent-in-suit or show any other

11   discernable link to the claimed technology.  And that's

12   exactly what we have here.  We have two agreements that

13   have nothing to do with the patent-in-suit.  If Samsung

14   had patents to -- Samsung sells refrigerators; and if

01:51PM  15   they had licenses with high numbers in them that related

16   to refrigerators, would they be able to allow Rembrandt

17   to wave those licenses in front of the jury?  This is the

18   same situation.

19           In terms of discovery, the document requests

01:52PM  20   that were served on Samsung were broad.  They were

21   related to "Give us your license agreements relating to

22   wireless technology."  That includes WiFi.  These

23   agreements were produced, but that does not mean that

24   they should be put in front of the jury here.  They are

01:52PM  25   highly prejudicial and should be kept out.

126

1        THE COURT:  I understand your arguments.  I'm

2   going to carry this motion.  I want an opportunity to

3   look at the case law a little more closely.

4        Let's move on to No. 3.

01:52PM   5        MS. HERMES:  Your Honor, as to Plaintiff's

6   Motion in Limine No. 3, we seek to preclude Rembrandt

7   from referencing Samsung's gross profit, gross revenue

8   figures as well as indications of Samsung's wealth.  That

9   was also a topic mentioned in our *Daubert* motion, and

01:53PM  10   here it is more broad.  We would want to preclude not

11   just Mr. Weinstein but any witness from disclosing those

12   sorts of large billion-dollar figures that would be

13   prejudicial to Samsung.

14        THE COURT:  And I understand there's an

01:53PM  15   agreement on this one; is that right?

16        MR. ALAVI:  Yeah.  Your Honor, my

17   understanding is we've entered into a stipulation and

18   filed it with the court that resolves this motion

19   in limine.

01:53PM  20        THE COURT:  I knew that there was a

21   stipulation, and I didn't know -- or didn't remember

22   which motion it was regarding.

23        MR. ALAVI:  So, we negotiated specific

24   language on this in the stipulation; so, I think it's

01:53PM  25   moot.

1          MS. HERMES:  I'll just note that the

2   stipulation only refers to Mr. Weinstein's testimony and

3   only discusses the *Daubert*; but if counsel is happy for

4   this stipulation to apply to the motion in limine,

01:54PM   5   then --

6          MR. ALAVI:  I'm confused, your Honor.  We had

7   a negotiation to resolve both this MIL and the *Daubert*

8   motion on this point and entered into a stipulation.  So,

9   if it's the defendants' position that they now want to

01:54PM   10   argue the motion in limine and get a broader protection,

11   I think we can withdraw the stipulation and argue it.  I

12   don't see the need to do so when we've negotiated a

13   stipulation to deal with this motion in limine and the

14   *Daubert* motion.

01:54PM   15          THE COURT:  Is there a disagreement about --

16          MS. HERMES:  Well, as I read -- yes.  I

17   believe I -- yes, that's correct.  The stipulation states

18   that Rembrandt agreed to Samsung's Motion in Limine

19   No. 3, including as set forth in the stipulation; and

01:54PM   20   that was in the corrected notice of agreements reached

21   during the meet and confer.  So, if that is the agreement

22   of the parties, then we are in agreement.

23          MR. ALAVI:  But the scope of the agreement set

24   forth in the stipulation.

01:55PM   25          MS. HERMES:  Well, the stipulation only refers

128

```
 1  to --
 2              THE COURT:  There's a separate document
 3  entitled "Stipulation"?  Is that what you're indicating?
 4              MR. ALAVI:  Yes, your Honor.  The way we
 5  resolved this MIL as well as another MIL and a portion of
 6  the Daubert motion was through a stipulation that the
 7  parties negotiated, drafted, entered into, and filed with
 8  the court.
 9              THE COURT:  All right.  And, Ms. Hermes, are
10  you aware of that stipulation?
11              MS. HERMES:  I'm holding it in my hand.
12              THE COURT:  All right.  Does that resolve it?
13              MS. HERMES:  To the extent that plaintiffs do
14  not intend to introduce testimony of Samsung's gross
15  revenues, gross profits, and wealth, if that's the
16  understanding of both sides, then yes, it is resolved.
17              THE COURT:  Well, I'm --
18              MR. ALAVI:  We're going to abide by the
19  stipulation, your Honor.
20              THE COURT:  All right.
21              MS. HERMES:  The stipulation doesn't actually
22  refer to the motion in limine.  The stipulation withdraws
23  a portion of the Daubert motion in exchange for
24  withdrawing portions of Mr. Weinstein's report and
25  refraining Mr. Weinstein from testifying about them.  So,
```

129

1   we believe it would be counter to the agreement the

2   parties reached if Rembrandt then put the testimony in

3   through another witness.

4                MR. JENNER:  I'm sorry.  Your Honor, do you

01:56PM   5   have a copy of that stipulation?  Is that what you're

6   looking at?

7                THE COURT:  I'm looking at the corrected

8   notice, which is Document 220; and I'm trying to put my

9   hands on the stipulation.

01:56PM   10                MR. JENNER:  It's on page -- well, they're not

11   numbered -- yeah, page 2 of 7, it says at the top; and

12   it's within Roman No. III on that page 2.  And the

13   language that I think counsel are referring to is the

14   second paragraph that begins "Samsung withdrew

01:57PM   15   Defendants' Motions in Limine 5 and 6" and so forth.

16                Do you have that?

17                THE COURT:  I do.  But what I'm understanding

18   from Mr. Alavi is that there is another document entitled

19   "Stipulation"; is that right?

01:57PM   20                MS. HERMES:  Yes.  I have an extra copy if

21   you'd like for me to pass it up, your Honor.  It's Docket

22   No. 222.

23                THE COURT:  Okay.

24                MR. JENNER:  Your Honor, rather than force you

01:57PM   25   to hunt around for this, I'd be happy to hand up what I'm

130

 1    told is the further stipulation.

 2              THE COURT:  I guess -- all right.  I'm just

 3    trying to figure out if the parties believe they have

 4    resolved Motion in Limine No. 3.

01:57PM    5              MR. ALAVI:  Your Honor, I think I can solve

 6    this.  The stipulation and the reason why the stipulation

 7    is important to the plaintiff is that when we addressed

 8    this issue, there is a carve-out in the stipulation that

 9    allows our expert to talk about what the gross profit

01:58PM   10   margin is and allows him to discuss that he looked at,

11   for example, Samsung's financial information and how he

12   calculated the gross margin, without revealing that

13   information.  So, I thought that we had resolved this MIL

14   and the *Daubert* motion with this stipulation.

01:58PM   15              If the defendants now believe that the

16   stipulation is too narrow because it only speaks to

17   Mr. Weinstein, I'm happy to solve that problem for them

18   as long as the stipulation -- as long as the Motion

19   in Limine No. 3 as granted has the same carve-out that's

01:58PM   20   in the stipulation that will allow Mr. Weinstein, the

21   expert, to talk about gross margin calculations, how he

22   came about it, and there's some additional language about

23   what he's trying to say.

24              What I don't want to have happen is you grant

01:58PM   25   MIL No. 3 and suddenly that is a broader grant of relief

1   on Mr. Weinstein than what's in the stipulation.  That's

2   why I keep pointing to the stipulation, because the MIL

3   is much broader than what we agreed to in the

4   stipulation.

01:59PM  5         THE COURT:  Well, I'm looking at the

6   stipulation now on page 2 of Document 222, paragraph 3a,

7   where it says, "However, in the event that the court

8   denies Sections 5 and 6 of Samsung's *Daubert* motion" and

9   following then.

01:59PM  10        So, is that contingent on the outcome of

11  another motion?

12        MS. HERMES:  If I could respond.  Your Honor,

13  if the court denies those sections of Samsung's *Daubert*

14  motion, Samsung certainly intends to abide by the

01:59PM  15  provisions of Section 3a of the stipulation.  Our concern

16  is that there's no doubt that by covering the stipulation

17  through the stipulation here and not ignoring the broader

18  language in the report to the court, that Rembrandt won't

19  be able to introduce, you know, multibillion-dollar

02:00PM  20  revenue and profit figures through a witness other than

21  Mr. Weinstein, which we believe would be prejudicial.  We

22  just want to make sure there's no misunderstanding there.

23        MR. ALAVI:  To answer your question, your

24  Honor, there's a *Daubert* motion to strike Mr. Weinstein's

02:00PM  25  actual opinions; and if the court denies that *Daubert*

02:00PM

    1   motion, then we'll have a damage expert.  That's what
    2   that Section 5 and 6 talks about.  And he'll be allowed
    3   to talk about it -- even though he won't be able to talk
    4   about, under our stipulation, the actual revenue number
    5   and the actual profit number, he's allowed to talk about
    6   certain things like the gross profit margin and how he
    7   calculated it and that he wasn't making it up out of thin
    8   air, he actually looked at numbers.  So, I thought that
    9   resolved both the MIL and the motion to strike as part of

02:00PM

   10   the *Daubert* motion.

   11         We're happy to enter into and agree to MIL 3
   12   since defendants don't have that understanding; but we
   13   want that carve-out that's in the stipulation to be part
   14   of MIL 3 so that the granting of the MIL does not take

02:01PM

   15   away what we've agreed to in the stipulation as it
   16   relates to Mr. Weinstein.

   17         MS. HERMES:  We're amenable to that, your
   18   Honor.

   19         THE COURT:  All right.  Then Motion in Limine

02:01PM

   20   No. 3 will be granted subject to the provisions of
   21   paragraph 3 of the stipulation in Docket 222.

   22         MR. ALAVI:  I don't have the stipulation in
   23   front of me.  If I may speak to Ms. Hermes and
   24   double-check.  As you can tell, I was not anticipating we

02:01PM

   25   would be arguing this motion in limine so...

1          That's correct.  Paragraph 3a.

2          THE COURT:  Okay.  All right.

3          MR. ALAVI:  We apologize for the confusion on

4    that motion in limine, your Honor.

02:02PM 5          THE COURT:  Okay.  I think we've addressed

6    No. 4 to some extent.  That's Samsung's status as a

7    foreign company.  And with the understanding that we're

8    granting that except as it may be relevant to any issues

9    in this case.  In other words, it is not that it -- there

02:03PM 10   can be no mention of their foreign status but just that

11   there will only be mention or argument in connection with

12   an issue to which their nationality is relevant.

13          Ms. Hermes, do you have a better idea of how

14   to approach that?

02:03PM 15         MS. HERMES:  No, your Honor.

16          THE COURT:  Okay.

17          MS. HERMES:  Your Honor, I was just standing

18   up because I believe that there was a footnote that

19   defendants had addressed in their opposition and just

02:03PM 20   wanted to make sure that we didn't pass Motion in Limine

21   No. 4 about the Footnote 4 on page 7 of plaintiff's

22   motion in limine that says (reading) Samsung also moves

23   to preclude any testimony or argument regarding the

24   absence of any Samsung witness at trial or any suggestion

02:04PM 25   or questions of a witness or argument that a witness or

02:04PM

1  party is not trustworthy or is dishonest based on the

2  language they speak, their nationality or ethnicity.  I

3  think that the opposition was geared at the first

4  sentence of that, but I'll defer to counsel for

5  Rembrandt.

6          MR. ENGER:  Your Honor, I'm not sure about the

7  propriety of including a separate MIL in a footnote; but

8  to the extent that that's proper, as we set forth in our

9  response, we believe that there is this missing person

02:04PM  10  presumption that the testimony would be unfavorable.  And

11  we've cited a number of cases where that was the case.

12  We haven't heard any reason why those cases don't apply

13  here.  So, there's -- we should be afforded the

14  long-standing missing witness presumption for witnesses

02:05PM  15  not called who are under Samsung's control.

16          MS. HERMES:  We have a response to that, your

17  Honor.

18          THE COURT:  All right.  Samsung is seeking

19  here to preclude any reference to an uncalled witness; is

02:05PM  20  that right?

21          MS. HERMES:  In particular what we had in mind

22  was the idea that Rembrandt would suggest that there was

23  something improper about Samsung not bringing a

24  high-level or C level executive from Korea.  That's why

02:05PM  25  we have included it in this motion in limine, because it

related to the fact that Samsung is a foreign

corporation.

           So, obviously to the extent witnesses were

disclosed as having information relevant to the case,

they have been deposed and the parties are working

towards the admissibility of that testimony.  Or

obviously if a witness comes live, Rembrandt would be

entitled to cross-examine them.  This would be the idea

that Samsung should have brought some sort of C level

executive and that if they don't, then Rembrandt can

argue to the jury that that says something about the

value of the case to Samsung.

           THE COURT:  You know, the uncalled witness

rule is that a witness who is equally available to both

sides cannot be attributed to either side for failing to

call them.  But to the extent that witnesses are not

equally available, such as Samsung witnesses who are

beyond the subpoena power of the court, why should the

court preclude the defendant from -- or the plaintiff

from commenting on the failure to call?

           MS. HERMES:  We're not aware that Rembrandt

has requested that any particular C level employee be at

the trial; and, so, it would be that they wouldn't call

anybody and then they would still argue that somehow it

was improper for us to have not brought someone anyway.

1        THE COURT:  I mean, I occasionally see this

2   motion granted as a mutual motion where both sides agree

3   not to comment on the other side's failure to call a

4   witness; but absent any agreement, the only thing the

02:07PM  5   court would enforce would be the standard rule that if

6   the witness is equally available to both sides, then --

7   then you can't comment on that and attribute it to the

8   other side.

9        MS. HERMES:  We would certainly be open to a

02:07PM 10   mutual agreement if the other side -- but we're not aware

11   that they have requested the availability of any

12   witnesses that we're not providing.

13        THE COURT:  Mr. Enger?

14        MR. ENGER:  Your Honor, what this -- what we

02:08PM 15   want to make sure that we preserve the right to do, if

16   they bring a corporate representative who is not

17   particularly knowledgeable about the facts or issues of

18   this case, we want to be able to point out to the jury

19   that they brought a corporate representative who is not

02:08PM 20   knowledgeable about this issue.  As long as we're allowed

21   to cross-examine the witness on that particular issue and

22   point out that they could have brought someone that was

23   more knowledgeable but chose not to, then we don't have a

24   problem here.

02:08PM 25        THE COURT:  Well, the question is:  Do you

1  join in a request to have a rule that's broader than the

2  default rule which is just that it only applies to

3  witnesses that are equally available to both sides?

4         MR. ENGER:  No, your Honor.

02:08PM  5         THE COURT:  In that case, I'll deny the

6  request and either side can comment on the failure of the

7  other side to call any witness that is not equally

8  available to their side.

9         MR. JENNER:  Your Honor, I'm not sure I

02:09PM  10  understand what their predicate is for this.  I mean, I

11  could understand it if they had asked us to bring a

12  particular witness with germane knowledge about

13  something.  Samsung has thousands and thousands of

14  witnesses in Korea, and what the -- I think what I hear

02:09PM  15  them asking the court is to be able to choose anybody who

16  doesn't show up that we didn't know they wanted and make

17  an uncalled witness argument on that.  That just doesn't

18  seem fair.

19         THE COURT:  I don't think I heard that from

02:09PM  20  Mr. Enger.  What he indicated was that if your witness is

21  not able to answer certain relevant questions, that they

22  wanted to be able to criticize you for bringing a witness

23  who didn't have that knowledge.

24         MR. JENNER:  That narrows it down somewhat

02:09PM  25  but --

1          THE COURT:  Well, do you have any authority

2    for the proposition that the court can preclude them from

3    commenting on the failure of one side to call witnesses

4    that are only available to it?  If you do, tell me about

02:10PM  5    it.

6          MR. JENNER:  Well, your Honor, I don't.  I

7    don't know that we understood this is where this was

8    going to wind up.  But as I understand it, they had asked

9    for one witness; and we don't know about other witnesses.

02:10PM 10    We don't know what they would want to cross-examine them

11    about.  So, unless what they were to cross about and

12    complain about a lack of knowledge in response to is

13    strictly limited to the scope of the direct, I guess I

14    could understand where they would be coming from.  But if

02:10PM 15    there were to be any opportunity to start cross-examining

16    witnesses about subject matters that we had no reason to

17    anticipate and then take the position that we should have

18    brought somebody else who could answer the questions that

19    we didn't anticipate, it just doesn't seem fair.

02:11PM 20          So, I guess what I'm saying is no, I haven't

21    looked for authority on what we're talking about now.

22    I'd like to have the opportunity to do that if it's

23    important to your Honor.  But it just seems to me that

24    right now this is a fairness issue.

02:11PM 25          THE COURT:  And what you're seeking in

1  fairness is a rule to prohibit them from what?

2          MR. JENNER:  Making the uncalled witness

3  argument as to witnesses they gave us no opportunity or

4  notice to bring to the trial, because that would seem to

02:11PM  5  be argument by ambush.

6          THE COURT:  Okay.  When do you want that

7  notice?

8          MR. JENNER:  Well, given the fact that we have

9  to try to get people freed up in Korea, I'd like to have

02:11PM  10  that notice as expeditiously as possible, if there's

11  somebody they think that should come.  I know they can't

12  do that today.  But if they're making this argument, I

13  presume they've got something in mind.  We'd like to hear

14  about it by perhaps the end of the day tomorrow.

02:12PM  15          THE COURT:  I don't know.  Our rules typically

16  don't provide for one side to ask the other to bring

17  particular witnesses, but if that's what you're

18  proposing.

19          MR. ENGER:  Your Honor, this is --

02:12PM  20          MR. JENNER:  Had I known, your Honor, if there

21  was some witness of that character, I would have thought

22  the witness that they want us to bring would be on their

23  witness list, so that they really ought to know who that

24  witness is.  If it's somebody that's not on their witness

02:12PM  25  list, then I don't know where this is coming from.

1    THE COURT:  Basically I don't think that this

2  is in a posture at this point for me to decide; but I'll

3  say that to the extent that Samsung was asking for relief

4  in Footnote 4 on page 7 of your motion in limine, that

02:13PM   5  relief is denied.  And if you come up with a basis to

6  seek additional relief, let me know.

7    MR. JENNER:  Okay.  Thank you, your Honor.

8    THE COURT:  5 and 6 I think were by agreement.

9    They're withdrawn by defendant?

02:13PM  10    MS. HERMES:  Yes.  Yes, your Honor.  We

11  withdrew those as duplicative of the exact evidence we

12  were asking you to exclude in the *Daubert* motion.  So,

13  it's subject to the stipulation.

14    THE COURT:  7 is -- as I understand it,

02:14PM  15  although 7 is worded broadly at the introduction, it is

16  intended to relate specifically to just two witnesses,

17  Philip Koopman and Stuart Kerry; is that right?

18    MR. HADDAD:  Yes, your Honor.

19    THE COURT:  And your request is based on the

02:14PM  20  failure to timely disclose those witnesses?

21    MR. HADDAD:  Yes, your Honor.  I mean, as we

22  had mentioned in our motion, there were 13 witnesses that

23  they put on their trial witness list that were not

24  disclosed in their 26(a) disclosures; but we're not

02:14PM  25  complaining about the bulk of them.  It's just the two

1    that were never deposed.

2              The first time we ever heard of these

3    witnesses was in their invalidity -- their invalidity

4    expert's report in November of 2014.

02:14PM    5         THE COURT:  I tell you what, Mr. Haddad, let

6    me let them first try to tell me what their theory is on

7    disclosure; and then I'll give you a chance to respond to

8    that.

9              MR. HADDAD:  Thank you, your Honor.

02:15PM   10         THE COURT:  Thank you.

11             MR. ENGER:  Thank you, your Honor.  This is

12   not -- Dr. Akl's report was not the first time that

13   defendants had ever heard of Messrs. Kerry and Koopman.

14   These are authors of defendants' own prior art documents.

02:15PM   15   Mr. Koopman wrote an article that they were relying upon

16   as --

17             THE COURT:  Mr. Enger, them knowing about a

18   person's existence and them knowing that you intend to

19   call the person as a witness are two very different

02:15PM   20   things.  When did you disclose to the other side that you

21   intended to call these individuals as witnesses at the

22   trial?

23             MR. ENGER:  They showed up by name in our --

24   Dr. Akl's invalidity report, and the first time that they

02:15PM   25   showed up as a witness for trial was on the trial list.

1          THE COURT:  Why?

2          MR. ENGER:  Well, frankly, you know, we didn't

3    discover their relevance and their importance until later

4    in the case.

02:16PM  5          THE COURT:  So, what is the actual date on

6    which the defendant was first given notice of any intent

7    to call either of these as witnesses?

8          MR. ENGER:  In the expert report of Dr. Akl.

9          THE COURT:  Did that expert report state that

02:16PM  10   you intended to call them as witnesses?

11         MR. ENGER:  It did not.  It said that they had

12   conversations with the invalidity expert Dr. Akl, and it

13   set forth two and three pages long of exactly what the

14   conversation was.

02:16PM  15         THE COURT:  And when is the first date that

16   you advised the defendant of an intent to call them as

17   witnesses?

18         MR. ENGER:  I believe that would be on the

19   trial list, your Honor.

02:16PM  20         THE COURT:  And I'm just trying to get a date.

21   I don't know when you exchanged those.

22         MR. ENGER:  I believe it was in early

23   December, your Honor.  I can look at the pleadings.

24         December 5th.

02:17PM  25         THE COURT:  And, Mr. Enger, do you contend

         1   that that is a timely disclosure of a witness under the

         2   rules?

         3              MR. ENGER:  Well, your Honor, I think it was a

         4   harmless -- no harm, no foul kind of situation because

02:17PM  5   there was still an opportunity to depose both gentlemen.

         6   Defendants never asked for it.

         7              THE COURT:  And you're saying they could have

         8   asked to take their depositions late, or are you

         9   contending that's within the time allowed for

02:17PM 10   depositions?

        11              MR. ENGER:  I'm saying they could have asked

        12   to take the depositions later, your Honor.

        13              THE COURT:  All right.  And what is the

        14   prejudice to your side if they're not allowed to testify?

02:18PM 15              MR. ENGER:  With respect to Kerry, on one side

        16   you'll have O'Hara who is one of the authors of this

        17   draft WiFi standard.  He'll show up live at trial, and

        18   he'll be able to say that it was publicly available.

        19   Mr. Kerry, who was actually more senior on that

02:18PM 20   committee, has the exact opposite conclusion.  We should

        21   be able to present rebuttal testimony to Mr. O'Hara --

        22   namely, that testimony of Mr. Kerry -- to show that the

        23   draft WiFi standard was not publicly available.

        24              THE COURT:  And when did you learn of the

02:18PM 25   position of Mr. O'Hara on it?

144

                         MR. ENGER:  I believe sometime over the

summer.

                         THE COURT:  And when did you learn that

Mr. Kerry had a different position on that?

02:18PM      MR. ENGER:  I believe we didn't identify

Mr. Kerry until shortly before Dr. Akl's rebuttal report

was due.

                         THE COURT:  Which was when?

                         MR. ENGER:  Early November.

02:19PM      THE COURT:  And what about Mr. Koopman?

                         MR. ENGER:  What specifically about

Mr. Koopman?

                         THE COURT:  I mean -- all right.  What is the

prejudice to your side if Mr. Koopman is not allowed to

02:19PM      testify?

                         MR. ENGER:  Defendants are misinterpreting a

paper that Dr. Koopman wrote in such that they are

believing that it provides a motivation to combine the

prior art with a master/slave protocol.  Dr. Koopman

02:19PM      would show up at trial and would explain that they've

completely misinterpreted his paper.  It does -- in fact,

it teaches away from applying a master/slave protocol.

So, it would present an unfair picture of the evidence to

the jury, your Honor.

02:19PM      THE COURT:  And when did you learn that the

145

1  defendant would be presenting that picture which you

2  believe is unfair?

3          MR. ENGER:  They identified Dr. Koopman's

4  paper early in the case and -- at the time of their

02:20PM  5  initial invalidity contentions; but it wasn't until much

6  later in the case whenever we received their invalidity

7  report, Dr. Goodman's report, that we realized it would

8  be such an important part of their invalidity case.

9          THE COURT:  And when was that?

02:20PM  10          MR. ENGER:  September.

11          That sound right, Gerry?

12          MR. HADDAD:  Goodman's?  October 6th.

13          MR. ENGER:  October 6th.

14          THE COURT:  So, you learned of that

02:20PM  15  October 6th; and you listed Koopman as a witness two

16  months later.

17          MR. ENGER:  Yes, your Honor.

18          THE COURT:  Is there any reason you didn't do

19  that sooner?

02:20PM  20          MR. ENGER:  We believed that putting them on

21  notice of the conversation in Dr. Akl's report was

22  sufficient.

23          THE COURT:  You don't really think that just

24  somebody knowing of the existence of a person is the same

02:21PM  25  as putting them on a witness list, do you?

1          MR. ENGER:  No, your Honor.

2          THE COURT:  Well, I -- so, did -- you really

3   thought that the fact that your expert mentioned the

4   person --

02:21PM   5          MR. ENGER:  It was more than a mention.  It

6   was several pages of a conversation that they had.  It

7   put them on notice certainly that he was an important

8   person to their invalidity case.

9          THE COURT:  Yes.  And they're not claiming

02:21PM  10   that you failed to disclose the existence of the person,

11   just that it wasn't a timely designation as a witness.

12   Yes?

13          MR. ENGER:  I believe that's their position,

14   your Honor.

02:22PM  15          THE COURT:  All right.  Thank you, Mr. Enger.

16          MR. HADDAD:  Your Honor, one more thing about

17   Mr. Koopman.  I'd just like to add that he's a paid

18   expert.  The testimony they're using from Dr. Koopman

19   is -- he's going to be interpreting an article that he

02:22PM  20   wrote and making some arguments that another article he

21   wrote interprets that article -- the article on which we

22   are relying, a published article, should be interpreted

23   somehow differently.  We've received no expert report on

24   that either, and that is expert testimony.  It's doing an

02:22PM  25   interpretation analysis.  It's not just that he is a fact

1  witness.  There's an issue there as well, your Honor.

2          THE COURT:  All right.  With respect to

3  Mr. Kerry, what do you say to the prejudice argument that

4  Mr. Enger made about the jury being left with an unfair

02:23PM  5  impression of the evidence?

6          MR. HADDAD:  Your Honor, Mr. Kerry, we just

7  learned about him -- this is sort of a trial by ambush

8  here.  We disclosed Mr. O'Hara early on, long ago, well

9  within the fact discovery time period in our 26(a)

02:23PM 10  disclosures.  Rembrandt had plenty of opportunity to take

11  his deposition, learn what he was going to say; and they

12  have known about Mr. Kerry since October of 2013.  They

13  had 90 people to choose from that were disclosed on this

14  piece of prior art and which we disclosed back in October

02:23PM 15  of 2013.  We relied on Mr. O'Hara.  They knew what our

16  position was with Mr. O'Hara.  They had plenty of time to

17  find someone, and we learned about it just a few weeks

18  ago.

19          THE COURT:  Do you agree that Mr. Kerry and

02:24PM 20  Mr. O'Hara have opposing positions on whether or not this

21  information was publicly available?

22          MR. HADDAD:  It's hard to say without us

23  knowing really what happened in a hearsay conversation.

24  There's a phone call between their expert and someone

02:24PM 25  else, and it's hard to say what our interpretation is of

1  their -- of their expert's phone call without us asking

2  some more questions.  And we didn't have that

3  opportunity.  Absolutely no opportunity.  And we're just

4  weeks from trial here.

02:24PM  5            THE COURT:  I understand.  They've indicated

6  that they did not learn of this -- of the materiality of

7  Mr. Kerry's testimony until recently as well.

8            MR. HADDAD:  They must have known the

9  materiality of Mr. Kerry's testimony.  They took the

02:25PM 10  deposition of Mr. O'Hara during the summer, and

11  Mr. Kerry's testimony is to oppose Mr. O'Hara.  So, they

12  must have known that -- maybe they didn't like what

13  Mr. O'Hara said.  They could have found someone else.

14  And that was during the summer, and fact discovery didn't

02:25PM 15  close.  We extended fact discovery for certain issues

16  several times for things that the various parties weren't

17  able to conclude.  But, you know, we just found out about

18  this when the trial list was served on us a couple weeks

19  ago, month ago.

02:25PM 20            THE COURT:  And do you have reason to believe

21  that the plaintiff knew about Mr. Kerry's position on

22  this issue well before they notified you?

23            MR. HADDAD:  They certainly could have asked

24  him and let us know.  They knew of Mr. O'Hara's position

02:25PM 25  as of the summer, long before fact discovery closed; and

1  they could have picked one of the 90 people that were on

2  this list that were -- also attended these meetings and

3  found someone within the time period of fact discovery,

4  not just let us know in the trial on the trial witness

02:26PM  5  list.

6                THE COURT:  All right.  Let me hear from

7  Mr. Enger again on Mr. Kerry.

8                When did you become aware of Mr. Kerry's

9  position on this issue about public knowledge?

02:26PM  10                MR. ENGER:  Not until shortly before Dr. Akl's

11  report when we disclosed it to defendants.

12                THE COURT:  And that was what date again?

13                MR. ENGER:  September.

14                Dr. Akl's report, the initial -- the

02:26PM  15  invalidity rebuttal reports were in October.

16                MR. HADDAD:  November.

17                MR. ENGER:  November.

18                THE COURT:  So, you learned of this sometime

19  in around November or just before; and you disclosed it

02:27PM  20  December the 5th?

21                MR. ENGER:  We put the witness on the witness

22  list on December the 5th.  That's right.  We learned

23  about it during the one-month period whenever Dr. Akl was

24  preparing his invalidity rebuttal report.  We disclosed

02:27PM  25  it shortly thereafter in the report, and then we put him

1    on the list December 5th.

2                THE COURT:  And I take it Mr. Kerry has not

3    been deposed?

4                MR. ENGER:  No, your Honor.  Defendants have

5    not asked to depose him.

6                THE COURT:  Mr. Haddad, does the defendant

7    want to depose Mr. Kerry if he's allowed to testify?

8                MR. HADDAD:  Well, I mean, your Honor, I guess

9    that would be very important for us.  I mean, I would

10   think they would need to have sought leave to add a

11   witness like this long after fact discovery ends and

12   after they knew our -- long after they knew our position

13   and knowing the prior art since October of 2013.  I think

14   it really handicaps us weeks before the trial here.  It's

15   an ambush.

16               THE COURT:  Mr. Haddad, the reason this is

17   giving me trouble is that we are trying to achieve a

18   resolution of the case on the merits.  It's important

19   that the rules be followed, but exceptions are made when

20   there are circumstances that are beyond the control of

21   either side.  What I'm hearing is that it's a very close

22   time frame from when the defendants learned of the

23   importance of Mr. Kerry's testimony, when it was

24   disclosed to you in the expert report, and when they put

25   him on their trial witness list; and it sounds like the

151

1    prejudice to you can be cured by causing him to be

2    presented for deposition.

3           How will you be prejudiced as long as you get

4    his deposition before trial?

02:29PM  5           MR. HADDAD:  And I guess after the deposition

6    we'll figure that out and we'll have to look at our

7    expert reports and see whether that needs any updating

8    and -- we're only talking about Mr. Kerry, correct, not

9    Mr. Koopman?

02:29PM 10           THE COURT:  I believe that the case regarding

11   Dr. Koopman is not compelling enough, especially given

12   that he is at this point retained by plaintiff, to

13   justify his joinder in the case at this stage.  And I'm

14   going to grant the motion to exclude with respect to

02:29PM 15   Dr. Koopman, but I at this point will deny the motion

16   with respect to Mr. Kerry with the stipulation that he be

17   made available promptly for deposition.  And if you want

18   to file some supplemental motion after that, if you can

19   show some prejudice beyond that which is contemplated at

02:30PM 20   this time, then I'll give you an opportunity to make that

21   argument.

22           MR. HADDAD:  Okay, your Honor.

23           THE COURT:  All right.  No. 8.

24           MR. HADDAD:  Your Honor, this is related to

02:30PM 25   No. 7, your Honor.  It's the private conversations

02:31PM

between Rembrandt's expert Dr. Akl and Dr. Koopman and
also Mr. Kerry.  I think it's -- I think it's sort of
definitely tied in with the previous motion.  And if
we're going to exclude Dr. Koopman, your Honor, I think
we need to exclude the conversations on which any opinion
that conversation was based.

THE COURT:  You know, experts can routinely
rely upon hearsay in formulating their opinions; but
they're not thereby entitled to repeat that hearsay to
the jury.  Are we talking about just preventing Dr. Akl
from testifying to the jury about these conversations, or
are you talking about trying to prevent him from basing
an opinion on that?

MR. HADDAD:  Well, I think it's both, your
Honor.  He relied on Dr. Koopman for expert --
essentially expert testimony that Dr. Koopman did not
submit an expert report on.  This is also not the type of
information that one would find in a learned treatise or
other type of hearsay that an expert often relies on.
This is, you know, a private conversation between two
people, again that we had no opportunity to examine,
where Dr. Koopman was interpreting an article that he was
an author on but when he talked about it, he was talking
about a former version of the article, a draft version
that was submitted for publication, edited, and then

02:33PM

02:33PM

02:33PM

02:34PM

02:34PM

1    published.  We relied on the published application -- the

2    published article, your Honor.

3           So, I think any testimony on which he relies

4    on opinions of Dr. Koopman as opposed to -- unlike --

5    they cited to Rule 703 which really relates to facts and

6    data, that type of hearsay.  That's not what Dr. Koopman

7    was.  Dr. Koopman is opinion testimony, and they're

8    trying to get that in through their expert Dr. Akl.

9           THE COURT:  So, you are trying to restrict the

10   testimony -- or actually the opinions of Dr. Akl through

11   this motion?

12          MR. HADDAD:  Yes, your Honor.

13          THE COURT:  And are you contending that the

14   opinion is beyond the scope of Dr. Akl's expertise?

15          MR. HADDAD:  What I'm contending, your Honor,

16   is that he sought out the expert opinion of another

17   expert who hasn't given us an expert report -- who is a

18   paid expert, by the way, and has been retained by the

19   plaintiffs -- and we haven't seen an expert report and

20   it's unlike relying on facts and data.

21          THE COURT:  You only get an expert report from

22   someone who is going to testify.

23          MR. HADDAD:  Yes, your Honor.  So, this was

24   their way around it.  Get another opinion from someone

25   else.  And it's not as if he is relying on another piece

02:34PM

1  of, you know -- relying on a textbook, your Honor, to

2  help him convey his opinions.  He's relying on the

3  opinion of someone who said, "Well, I wrote another

4  article and it got edited and that's what was published

5  and what I meant to say was" and interpreted -- is

6  interpreting what he submitted that no one ever even saw.

7  We don't even know what it was he submitted in draft

8  form, and now he's trying to get that in through --

9              THE COURT:  How would he get that in?

02:35PM

10             MR. HADDAD:  By a conversation that we

11  don't --

12             THE COURT:  Well, he -- over your objection,

13  he's not going to be allowed to testify about his

14  conversation with Dr. Koopman.  That would be hearsay.

02:35PM

15  He can't introduce hearsay evidence just because he

16  relied upon it.

17             Are you saying that you don't want him to be

18  able to give the opinion that he formulated after

19  consulting with Dr. Koopman?

02:35PM

20             MR. HADDAD:  I guess his own opinion where --

21  if he's interpreting the article to mean one thing and we

22  interpret the article to mean another thing, completely

23  devoid of any reference to what an author of the article

24  may have said or may not have said, I can't -- you know,

02:35PM

25  I can't control that, what he's going to interpret, if

1  it's within the scope of his report, other than what

2  he's -- that conversation.  But if that opinion is based

3  on that conversation, your Honor, then that opinion has

4  to be excluded, too.

02:36PM  5          THE COURT:  I don't think so.  I think that an

6  expert is entitled to consult other experts and he's

7  entitled to consider matters that are inadmissible as

8  long as they're the sorts of things that experts

9  typically rely upon and certainly consulting other

02:36PM  10  experts is common.  They simply can't be the mouthpiece

11  then to tell the jury what that other person said; but if

12  you challenge their opinion, then they're entitled to

13  support it by reference to whatever their sources were.

14          MR. HADDAD:  Okay.  Your Honor, then we accept

02:37PM  15  that if they don't -- if we keep the testimony out

16  relating to -- we're talking about Dr. Koopman right now.

17          THE COURT:  And that -- the ruling would be

18  that over your objection the plaintiff is not permitted

19  to have Dr. Akl refer before the jury to what Dr. Koopman

02:37PM  20  told him.

21          MR. HADDAD:  Okay.  Fair enough, your Honor.

22          THE COURT:  He can offer his opinions,

23  whatever they are; and then if you don't open the door by

24  challenging his basis for that opinion, then he can't

02:37PM  25  provide it on cross.

                         MR. HADDAD:  Okay, your Honor.

 1

                         MR. ENGER:  Your Honor, I'd like to seek a

 2

 3   brief point of clarification, if I may.

 4                       THE COURT:  Go ahead.

02:38PM  5               MR. ENGER:  So, what Dr. Akl did with

 6   Dr. Koopman is exactly the same thing that Samsung's

 7   expert, Dr. Goodman, did with Mr. O'Hara.  He relied only

 8   upon a conversation that he had with Mr. O'Hara to form

 9   his opinion on public availability.

02:38PM 10              So, if you're going to make a rule that says

11   you can't get into the substance of that conversation and

12   the foundation of what he relied upon because that's

13   hearsay for our expert Dr. Akl, the same rule should

14   apply for Samsung's expert Dr. Goodman with respect to

02:38PM 15   O'Hara.

16                       THE COURT:  I didn't make the rule.  Believe

17   it or not, it's in the Federal Rules of Evidence.  I'm

18   just applying it when I get objections.  So, if you have

19   an objection to what their expert is saying, you've got

02:38PM 20   to raise it.  And all I'm doing is ruling on their

21   objection to your expert.  If you --

22                       MR. ENGER:  I just want to make sure we're

23   playing by the same set of rules, your Honor, because

24   what we're doing with Dr. Akl is exactly the same thing

02:39PM 25   that Samsung is doing with Dr. Goodman.  They're both

02:39PM

1  relying upon another expert to provide them information

2  about, you know, prior art.  And if you're going to say

3  that our expert Dr. Akl can't get into the substance, he

4  can say he relied upon a conversation he had with Koopman

5  but not the substance of that, then the same should go

6  for Samsung's expert Dr. Goodman.  He should be able to

7  say he relied upon something Mr. O'Hara told him but not

8  get into the substance of what Mr. O'Hara told him.

9          THE COURT:  And if you present that objection,

02:39PM 10  it will get the same ruling.  We're going to apply the

11  rules the same way.  But I don't have that objection

12  before me right now.

13          MR. ENGER:  Thank you, your Honor.

14          MR. HADDAD:  Your Honor, there's a reason you

02:39PM 15  don't have that objection and that's because we are

16  calling Mr. O'Hara live and, so, there is no hearsay

17  issue with respect to Mr. O'Hara on whom Dr. Goodman will

18  rely.

19          THE COURT:  Okay.  Well, then, I won't be

02:39PM 20  looking forward to that objection.

21          MR. HADDAD:  Okay.

22          THE COURT:  So, No. 8 is granted to the extent

23  that Dr. Akl will not be permitted to repeat what

24  Dr. Koopman told him but he can rely upon it as a basis

02:40PM 25  for his opinion.

1        MR. SMITH:  Your Honor, if I could request a

2   clarification.

3        THE COURT:  Mr. Smith.

4        MR. SMITH:  Previously you had said Dr. Akl

02:40PM  5   could not refer to what Mr. Koopman told him and I

6   believe what the court just said was could not repeat and

7   I wanted to make sure I was clear on what the court's

8   ruling was.

9        THE COURT:  I think that you're right.  I

02:40PM  10   meant refer to it.  He can rely upon it, but he can't

11   refer to it.

12        MR. SMITH:  Okay.

13        THE COURT:  And I would --

14        MR. ALAVI:  Your Honor?

02:41PM  15        THE COURT:  Yes.

16        MR. ALAVI:  So I have a clarification, can the

17   expert describe what he did, interviewed Dr. Koopman?

18   Doesn't say what was said, doesn't refer to what was

19   said, but just lays out the basis for his opinion.  Which

02:41PM  20   he has to do for the record on appeal anyway.  You can't

21   just stand up and give opinions without disclosing the

22   basis for it.

23        THE COURT:  Well --

24        MR. ALAVI:  We don't want to run afoul of the

02:41PM  25   ruling.  So, I just wanted to make sure he can do that

1  without referring to or describing what was said to him.

2         MR. SMITH:  Which would be making him the

3  mouthpiece of the witness, as the court referred to,

4  *Factory Mutual Insurance versus Alon,* Fifth Circuit,

02:42PM 5  705 F.3d 518.

6         MR. ALAVI:  It's his own opinion.  He's

7  saying, "What did you do to develop your opinion?"

8         "I looked at this document.  I looked at this

9  document.  I interviewed the author.  I did X and Y.  I

02:42PM 10 relied on my expertise."

11        "And what's your opinion?"

12        "My opinion is."

13        That's not a mouthpiece because he's not

14 repeating the hearsay conversation.  He's giving his

02:42PM 15 opinion, and he's letting the jury -- and more

16 importantly the appellate court -- know what the basis

17 for his opinion is so there's a full record that he has a

18 basis for rendering the opinion that he renders.

19        THE COURT:  If -- what I don't want is for you

02:42PM 20 to connect those two things closely together.  I don't

21 think there's anything objectionable to Dr. Akl

22 mentioning that he talked to Dr. Koopman, along with

23 everything else he did; but if he says that he talked

24 with Dr. Koopman and "In my opinion, here it is," I'll

02:43PM 25 consider that to be a violation of it and, you know, I

160

1   will let Judge Gilstrap know that and he will have to

2   enforce that line.  But as long as you're simply

3   mentioning talking to Dr. Koopman in connection with all

4   the other work he did and not in connection with this one

02:43PM  5   opinion, then I don't believe you will have violated that

6   rule.

7              MR. ALAVI:  Thank you for the clarification,

8   your Honor.

9              THE COURT:  All right.

02:44PM 10             MR. SMITH:  Thank you, your Honor.

11             THE COURT:  Thank you.

12             MR. HADDAD:  Your Honor, there's the -- we

13  also moved on this motion with respect to Mr. Kerry, a

14  private conversation with Mr. Kerry.

02:44PM 15             THE COURT:  And the same ruling would apply to

16  that.  Obviously if Mr. Kerry testifies at trial, then

17  there's nothing wrong with Dr. Akl alluding to that

18  testimony in connection with his opinion; but if Dr. --

19  or if Mr. Kerry has not testified at the time of

02:44PM 20  Dr. Akl's testimony, then he should not make any

21  statement that conveys Dr. -- or Mr. Kerry's statements

22  to the jury.  Does that make sense?

23             MR. HADDAD:  Yes, your Honor.

24             THE COURT:  Okay.  All right.  That takes us

02:46PM 25  to No. 9.

161

```
            1        MR. SHERWOOD:  Your Honor, we've withdrawn

            2   No. 9.

            3        THE COURT:  Okay.  That's good.

            4        What's the disposition of No. 10?

02:46PM     5        MR. ALAVI:  Your Honor, I'll let the

            6   defendants confirm this; but I think No. 10 was withdrawn

            7   as -- in the motion itself.

            8        THE COURT:  All right.

            9        MR. ALAVI:  I think it's an agreed -- so, let

02:46PM    10   me -- I'll let Mr. Haddad confirm this.  I think we

           11   agreed to No. 10; so, there's no briefing on it.  We just

           12   need to submit an agreed limine.

           13        THE COURT:  All right.  I see in the table of

           14   contents it refers to it has withdrawn.  Okay.

02:47PM    15        MR. ALAVI:  But to be clear, because I don't

           16   want to misrepresent anything to the court, it's

           17   withdrawn because it's agreed to; so, the parties need to

           18   submit agreed language to the court on the doctrine of

           19   equivalents.  It's going to be an agreed motion in

02:47PM    20   limine.

           21        THE COURT:  Okay.  And what is it going to

           22   agree to do?

           23        MR. ALAVI:  That Rembrandt will not argue

           24   doctrine of equivalents.

02:47PM    25        THE COURT:  Okay.
```

1          MR. ALAVI:  We'll put together some language

2   that both sides agree to and submit it to the court.

3   Sorry for the -- it's a little confusing but...

4          THE COURT:  All right.  And No. 11 is one that

02:48PM   5   I would expect to grant.

6          MR. SHERWOOD:  Your Honor, I take it I don't

7   need to argue.

8          THE COURT:  Well, not at this point.  You're

9   ahead.

02:48PM  10          MR. SHERWOOD:  Okay.  I'll sit down, then.

11          MR. HEIM:  Your Honor, Mike Heim for

12   Rembrandt.

13          THE COURT:  Yes, Mr. Heim.

14          MR. HEIM:  Couple of things to note.  First of

02:48PM  15   all, as we said earlier, there have been ten IPRs filed

16   in this case; and those IPRs, the PTO has reached a

17   decision with respect to the asserted claims in this

18   case.  The decisions in those IPRs are final decisions

19   that are not appealable pursuant to 35 U.S.C., 314(d).

02:48PM  20   So, we have, you know, a unique situation here where

21   Samsung, as the party who filed the IPRs, presented

22   argument as to these trial claims that is identical to

23   the arguments that they are making in this case.  It's

24   the same references; it's the same arguments.  They're

02:49PM  25   submitting the same evidence.  They're submitting the

1  declarations from their expert, declarations from

2  Mr. O'Hara that we just talked about.

3          The Patent and Trademark Office, after

4  receiving those ten different IPRs with respect to the

02:49PM  5  claims that we are asserting, has denied those IPRs; and

6  the Patent and Trademark Office gave a very lengthy

7  explanation of the two main prior art references that

8  defendants were relying on.

9          The first is a draft WiFi standard and the

02:49PM  10  Patent and Trademark Office ruled that that standard was

11  not prior art; and as a result, it did not institute the

12  IPR as to the IPRs that relied on that draft standard.

13  That is a final decision.  The defendants requested

14  reconsideration.  That was denied.

02:50PM  15          And, so, we have a situation first, as to the

16  first piece of prior art, where they have fired their

17  guns, they've gone off to IPRs, they filed all these

18  proceedings, and they have lost.  It is part of the

19  prosecution history in this case.  It is a final

02:50PM  20  decision.  It is the exact argument by the exact party in

21  this case.

22          They are going to get up at trial and they're

23  going to argue that same reference again and they're even

24  going to say that the Patent and Trademark Office hasn't

02:50PM  25  looked at it because they're going to refer to the

1   original prosecution, which is just blatantly wrong.  We

2   have an extensive file history, 15-page opinion from the

3   Patent and Trademark Office, explaining exactly why the

4   draft standard is not prior art.  That's the first piece

02:50PM   5   of prior art.

6           The second piece of prior art is a patent by

7   the name of "Boer."  They filed additional IPRs based on

8   Boer.  With respect to those IPRs, the Patent and

9   Trademark Office refused to institute proceedings as to

02:51PM   10   the trial claims based on Boer, again giving extensive

11   rationale of why they were doing that.

12           So, it's part of the record.  It's the

13   argument made by this very party.  Same arguments, same

14   evidence.  It has been denied by the Patent and Trademark

02:51PM   15   Office; and, your Honor, the jury is entitled to hear

16   that evidence.  It says if it was an *ex parte* or

17   *inter partes* reexamination, that is final.  And which the

18   defendants have made all the arguments and they've lost

19   and they want to start anew in the litigation.

02:51PM   20           So, for that reason, your Honor -- and there's

21   been fairly extensive briefly on this -- we think that

22   this is a unique situation because of the fact that it's

23   the same party, Samsung, making the same arguments with

24   the same evidence.

02:51PM   25           THE COURT:  Mr. Heim, you know, up until I

1  guess a couple hours ago, I was not aware that the

2  plaintiff was no longer asserting the claims as to which

3  the IPR was instituted; and the situation there is that

4  the court has in the past simply kept out all the

02:52PM  5  references on both sides.  What you're presenting is a

6  little different situation here.

7           MR. HEIM:  Yes, your Honor.  In the *Droplets*

8  case, you have a situation where both sides were

9  selectively trying to keep things out of reexamination

02:52PM  10  for covered business method.  That's not the case here.

11  We have a final decision on the trial claims.

12           THE COURT:  Well, I can certainly understand

13  the concern that if the defendants are going to argue to

14  the jury that the PTO never had an opportunity to examine

02:52PM  15  that art, that that would raise a serious question in

16  view of the fact that it has been presented to the PTAB.

17           MR. HEIM:  And it goes beyond that, your

18  Honor.  What you've heard earlier today is they want to

19  get the record out and say they've given up on these

02:53PM  20  claims or there's all this history, including disclaimers

21  that occurred in the IPRs.  So, what they want to do is

22  give a completely one-sided picture of what has gone on

23  in these IPRs when, in fact, the most dispositive, the

24  most clear picture here is that they made their

02:53PM  25  arguments, they took their shot, and they lost.

1          THE COURT:  There's still proceedings going on

2    in the PTAB in connection with this IPR on the claims

3    where it was not instituted.  Tell me what your view of

4    those is.

02:54PM    5          MR. HEIM:  Yes.  Let me just break it up for a

6    second, your Honor.

7               First of all, we have the IPR proceedings that

8    are based primarily on the WiFi standard.  As far as I

9    understand it, those are done.  You know, that's a

02:54PM    10   situation where they denied institution of the IPR.

11   There has been a request for reconsideration.  That has

12   been denied.  I don't believe that's an appealable

13   decision.  So, we're done.

14              So, then there's the other IPRs in which

02:54PM    15   they've used the Boer reference.  And in that case, some

16   of the claims, the trial claims, they did not institute

17   the IPR; and then there are other claims on which they

18   did institute the IPR.  The only thing of course that we

19   would use is the PTO's decision with respect to the

02:54PM    20   failure to institute as to the trial claims.

21              Now, they have filed new IPRs -- and we're not

22   going to get into those -- where they're trying to join,

23   trying to make other arguments.  But with respect to the

24   final decision that occurred with respect to the Boer

02:55PM    25   reference on the trial claims, your Honor, we believe

1    that's final, that's done.

2              THE COURT:  So, which claims -- was that Boer

3    reference asserted against all of the claims that you're

4    currently asserting?

02:55PM    5              MR. HEIM:  Yes, your Honor, it was.  And other

6    claims as well which the PTO instituted.  But with

7    respect in particular to the trial claims, they

8    petitioned for an IPR in those claims and that petition

9    was denied and the IPR was not instituted on those

02:55PM   10   claims, '580 claims 2, 19, 52, 59 and '228 patent

11   claim 21.

12             And let me just raise one other point, your

13   Honor.  In this case, of course, the invalidity case,

14   they're going to have to prove their case by clear and

02:56PM   15   convincing evidence.  They face a lesser standard at the

16   Patent and Trademark Office.  It's a reasonably

17   likelihood.  Some have compared to a substantial

18   evidence -- a preponderance of the evidence -- I'm

19   sorry -- preponderance of the evidence standard.  They

02:56PM   20   lost on that.  On a lesser standard at the IPR, they

21   lost.

22             At trial they have a greater standard.  They

23   have clear and convincing evidence, and for that

24   additional reason we believe that it's relevant for the

02:56PM   25   jury to hear this.

1          THE COURT:  Are there other references that

2     are being asserted besides the Boer reference?

3          MR. HEIM:  Your Honor, so, there was the draft

4     WiFi standard which the Patent and Trademark Office found

02:56PM  5     was not prior art.  That's a set of their IPRs.  The

6     other set is based primarily on Boer.  So, that's the

7     general focus of the IPR.  There are some secondary

8     references or prior art that's mentioned as secondary,

9     but it's identical to what Dr. Goodman is doing in this

02:57PM 10     case.  And they submitted a declaration from Dr. Goodman

11     that lays out virtually the same arguments, if not the

12     identical arguments.

13          THE COURT:  And is there other prior art

14     that's being asserted in support of the invalidity case

02:57PM 15     in court?

16          MR. HEIM:  Your Honor, there are two

17     additional -- one or two, depending on how you count --

18     two additional pieces of prior art that they are

19     asserting; and, your Honor, their basis of asserting

02:57PM 20     those -- and there is actually a motion to strike that

21     because it was raised late.  But those additional pieces

22     of prior art are based exclusively on their argument that

23     these patents are not entitled to their priority date.

24     It is essentially a priority date attack that they're

02:57PM 25     making with respect to these other two references.

|       |                                                                    |
|-------|--------------------------------------------------------------------|
|       | 1    With respect to the substance, the 102/103                    |
|       | 2  substance, and giving effect to the priority date, those        |
|       | 3  are the only two references, the same two references that       |
|       | 4  were the subject of the IPRs.                                   |
| 02:58PM | 5    THE COURT:  All right.  Thank you, Mr. Heim.                 |
|       | 6    MR. HEIM:  Thank you, your Honor.                             |

02:58PM 5        THE COURT:  All right.  Thank you, Mr. Heim.

6        MR. HEIM:  Thank you, your Honor.

7        MR. SHERWOOD:  Your Honor, I take it you want

8   to hear argument now.

9        THE COURT:  Yes, I do.

02:58PM 10        MR. SHERWOOD:  So, first of all, your Honor, I

11   think -- and this I suspect might have been the court's

12   initial reaction to this issue.  This brings us into a

13   whole set of collateral inquiries about what an IPR is,

14   what the standards are, who makes the decision, what the

02:58PM 15   procedures are, what the PTAB follows with respect not to

16   the merits of the issues but to whether an IPR ought to

17   be instituted; and that is actually on, as the court well

18   knows, a submission that is made by the petitioner to the

19   PTAB.  So, there are a variety of issues here that I

02:59PM 20   think are collateral to the issues that the jury is going

21   to decide; and as we have indicated, we think it's --

22   particularly in a timed trial like this, it's a highly

23   prejudicial thing to be forced to spend time with that.

24        I also want to point out that specifically

02:59PM 25   with respect to the Boer reference, you know, what's been

02:59PM

03:00PM

going on here is that the IPRs have had a significant
amount of success here in the sense that the number of
claims that are not subject to trial has -- you know, the
number of claims that are being tried at the PTAB, I
should say, is significant.  They've disclaimed.  They've
dropped the ones.  I mean, so, we get into a whole issue
of saying, "Well, we would want to tell the jury all
about that, too," to explain to the jury all of the
navigation that is going off by the plaintiff to try to
avoid what is going on in PTAB.  So, that's yet another
aspect of this kind of collateral burdensome thing that
if this wasn't granted, you know, the jury would be
subjected to.

03:00PM

03:00PM

03:01PM

           Second of all, as the court has pointed out,
all of these claims are subject to pending proceedings
before the PTAB.  And to me, this takes us right back to
the argument that I made earlier today with respect to
the motion to stay.  The sensible, streamlined thing
would be to say, okay, let's actually let the PTAB finish
its process before we take any of this up.  And I
understand the court has decided not to do that.  The
plaintiff has opposed a stay; and, yet, now they want to
talk about PTAB proceedings that everybody understands
are not complete and that Samsung is, in fact, still
exercising its rights with respect to those.

1        THE COURT:  Well, tell me about the status

2   with respect to the two references, the Boer reference

3   and the draft WiFi standard.

4        MR. SHERWOOD:  Well, so, your Honor, with

03:01PM  5   respect to the draft WiFi standard, to take that first,

6   if the court looks at the decisions that Rembrandt

7   attached to its opposition, those decisions are simply

8   focused on one question; and that is whether that draft

9   standard qualified as a printed publication.  And that's

03:01PM 10   not a decision on anything more than that.  It's not a

11   decision on anticipation; it's not a decision on

12   obviousness.  It's a decision on whether the petition as

13   presented to the PTAB provided sufficient evidence in

14   view of the PTAB, the three judges, as to whether it was

03:01PM 15   publicly accessible.  And, you know, there again, your

16   Honor, I think we just get into a collateral, you know,

17   prejudicial process and debating and litigating and

18   arguing that.

19        With respect to the Boer reference, that is

03:02PM 20   the reference upon which the PTAB did institute trial

21   with respect to many of these claims.  That is obviously

22   one of the two primary references that we're asserting

23   here that -- with the 802.11 standard.  And we have

24   various combinations that are in our expert's report.

03:02PM 25   They've taken depositions on that; and, you know, that's

1    all part of the record of the case at this point.

2            There is not a complete identity with respect

3    to the issues and the arguments that were presented to

4    the PTAB and those that are going to be presented to the

03:02PM   5    jury.  Just by way of one example, we have a piece of

6    prior art that we refer to as a "press release" that's

7    actually issued contemporaneous -- or more or less

8    contemporaneous, I should say, with the Boer reference.

9    So, that is a combination that was not presented to the

03:03PM  10    PTAB that is a part of our case here.

11            Have I answered your question about the two

12    references, your Honor?  I'm not sure what else you

13    wanted to know about them.

14            THE COURT:  Are you going to make an argument

03:03PM  15    to the jury that the PTO did not look at one of these

16    references?

17            MR. SHERWOOD:  Well, your Honor, that's an

18    interesting question.  I do appreciate the point with

19    respect to saying that the PTO never saw, for example,

03:03PM  20    the draft standard, when we know there obviously was an

21    IPR filed with respect to that; but again I go back to

22    the point that that was not a decision on the merits with

23    respect to any 102 or 103 issue.

24            As Mr. Heim said, that decision is not

03:04PM  25    appealable.  We have no way to challenge the accuracy of

173

1  that other than to do what we've done, which is to file

2  new IPRs.

3           Now, the new IPRs have been filed on Boer, not

4  on the 802.11 standard, just to be clear on that point,

03:04PM  5  your Honor.

6           THE COURT:  Are you familiar with any

7  jurisprudence dealing with the admissibility of decisions

8  not to institute IPRs?

9           MR. SHERWOOD:  Well, your Honor, we have cited

03:04PM  10  a couple of cases in our brief, specifically the *Droplets*

11  case and the *Interdigital* case.  The *Droplets* case, as I

12  understand it, does not contain any analysis, so to

13  speak, of this issue.  The court is smiling.  I think the

14  court may be more -- I'm sure is more aware of it than I

03:05PM  15  am.

16           THE COURT:  I did know what the analysis was.

17           MR. SHERWOOD:  It's probably what you were

18  thinking when we took this one up.

19           And as I said, we have cited the *Interdigital*

03:05PM  20  case; and I think the analysis there is essentially what

21  I'm saying, which is that we're going to go off on a

22  frolic here talking at length about the IPR process and

23  issues and what the standard is.  I mean, Mr. Heim made

24  reference to the standard.  The standard is a reasonable

03:05PM  25  likelihood that the petitioner would prevail with respect

1   to at least one of the claims challenged in the petition.

2   And that is a different standard.  I agree, your Honor.

3   But that is not a resolution, as I said before, with

4   respect to anticipation or obviousness.

03:05PM   5        And what will happen here, though, is that the

6   jury will get confused about what the PTAB actually did

7   decide with respect to 802.11 in particular, the one that

8   they attached to their papers, and what the issue is

9   that's before it.

03:06PM  10        Now, we're going to have testimony; we're

11  going to have evidence about that precise issue of public

12  accessibility.  So, that's all going to be before the

13  court; and it's going to be before the court in a much

14  more robust and complete way than it was ever before the

03:06PM  15  PTAB.

16        THE COURT:  All right.

17        MR. SHERWOOD:  Your Honor, I mean, I just

18  would add I think this is a really highly prejudicial

19  thing to allow this to come in and for the jury to hear

03:06PM  20  this.  I think the court can understand that.

21        THE COURT:  I think it is evidence that would

22  carry significant weight with the jury and that's the

23  reason why I think it's important to get it right and I

24  think because this -- the posture of this has changed

03:06PM  25  since I looked at it yesterday, now that there has been a

change in the asserted claims, I want to look at the

*Interdigital* case I guess and, anyway, give it some more

thought.  But I'm -- I am concerned that even if the

decision is not to admit this, that it would open the

03:07PM  door if the defendant makes an argument to the jury that

it's not -- that the reference has not been seen by the

PTO.  But in any event, I'll carry this one at this time;

and I appreciate your argument.

MR. SHERWOOD:  Thank you, your Honor.

03:07PM  That might be our last one -- oh, is there one

more?  Okay.

THE COURT:  I think that No. 12 has been

granted by agreement, is my understanding.

MS. BIANROSA:  Yes, your Honor.  We're on

03:08PM  Motion in Limine No. 13, to exclude any mention of

spoliation or a destruction of documents.

Rembrandt has been using the term "destroyed"

with respect to these PICs documents but they don't have

any evidence that any documents were in fact destroyed

03:08PM  and that type of accusation in front of the jury is

highly prejudicial.  Rembrandt can't point to any

documents or testimony that it got during discovery of

Samsung's destruction of any documents, and exploration

into that area again at trial is not going to prove to be

03:08PM  any more fruitful and will only serve to be prejudicial

and color the jury with inappropriate accusations of

Samsung.

And just to go into what those PICs documents

are, some of those PICs documents may never have even

03:09PM  been created for certain products.  Where the PICs

documents exist, Rembrandt has them.  And there are a lot

of reasons why some PICs documents may not exist.  Like,

for example, they may rely on an earlier version of

certain products or they may rely on the Bluetooth chip

03:09PM  vendor certification of Bluetooth and in those cases

there wouldn't be any PICs documents.

But Samsung went to six different companies in

Korea to get the PICs documents that are produced, and it

produced what we received from the vendors.  Any

03:09PM  allegation that there was a contractual obligation to a

third party, it's really irrelevant here to the issue of

spoliation.  Samsung did in fact comply with its

contractual obligations and its vendors that do the

testing maintain those testing records and those are the

03:10PM  documents that we produced.

In addition, spoliation doesn't exist here

because the obligation to preserve those documents only

arises at a time when the party knows that there was a

claim against it -- so, here the March, 2013,

03:10PM  complaint -- and Rembrandt doesn't have any evidence of

1  destruction and can't connect any of its claims to a time

2  when Samsung knew that it had an obligation to preserve.

3       Rembrandt actually examined a Samsung witness

4  on this very issue, Mr. Kim; and he said that if Samsung

03:10PM  5  ever heard that their Bluetooth certification companies

6  destroyed documents, Samsung in fact would never use that

7  company again.

8       And Rembrandt cites cases in its opposition to

9  this motion in limine.  Rembrandt's own cases state that

03:11PM 10  for an adverse inference instruction based on spoliation,

11  the proponent must establish that the evidence was

12  destroyed and that it was destroyed with a culpable state

13  of mind.  And Rembrandt hasn't shown any of those here,

14  your Honor.  There's no evidence of destruction, and

03:11PM 15  there's certainly no evidence that goes to a state of

16  mind.

17       THE COURT:  Well, you are seeking to prevent

18  them from offering evidence on it because you don't

19  believe they have enough evidence.

03:11PM 20       MS. BIANROSA:  We don't believe there's any

21  evidence, your Honor.  We are trying to exclude any

22  mention or argument even as to spoliation because it

23  would be highly prejudicial in front of the jury.

24       THE COURT:  All right.  Let me hear from the

03:12PM 25  plaintiff.

1      MR. ENGER: Your Honor, this case is all about

2  Bluetooth and how Samsung's products implement Bluetooth.

3  So, it should come as no surprise to Samsung that one of

4  the most important pieces of evidence in this case would

03:12PM  5  be the testing data that Samsung generates as part of

6  confirming that its products adhere to Bluetooth; these

7  protocol implementation conformance statements, or PICs,

8  which Samsung fills out based upon that testing data that

9  explains how its products implement Bluetooth; and,

03:12PM  10  three, this declaration of compliance that Samsung fills

11  out where Samsung certifies that it adheres to the

12  Bluetooth specification and promises to keep all this

13  testing data, all these PICs in a, quote/unquote,

14  compliance folder that it maintains at an address, which

03:13PM  15  was put down as Samsung's own address.

16      Samsung doesn't dispute that it doesn't have

17  these compliance folders with the testing data, the PICs,

18  and the declarations of compliance for about half of its

19  products. This is not only a violation of the court's

03:13PM  20  discovery obligations but it's also a violation of the

21  Bluetooth membership agreement.

22      You heard argument that we didn't have any

23  evidence of destruction. That's not true. I deposed

24  Samsung's corporate representative, Jun Hak Lim, at

03:13PM  25  length about this issue; and he testified that despite

being obligated to maintain the compliance folders and

despite telling the Bluetooth SIG that it maintained the

compliance folders at its corporate headquarters, at the

address of Samsung's corporate headquarters, that Samsung

03:13PM  or its -- what Samsung actually did was delegate that

third-party testing data to the third-party test labs.

And then when it became apparent that the compliance

folders were important to this issue, so much so that

Rembrandt had to file a motion to compel, Samsung tried

03:13PM  to get these compliance folders from the test labs but

they could not get them.  This strongly suggests that

they were destroyed.

Samsung's corporate representative on this

topic did virtually no investigation.  And that's why

03:14PM  they claim that we don't have any discovery on this, is

because they refused to educate their corporate

representative on how they were destroyed.

At the end of the day, your Honor, the jury

should be permitted to hear evidence related to Samsung's

03:14PM  document retention practices and decide whether and to

what extent relevant evidence has been lost in this case

due to those practices.

THE COURT:  All right.  Thank you, Mr. Enger.

MS. BIANROSA:  Your Honor, this kind of

03:14PM  prejudicial language is really what we are trying to

03:14PM

03:15PM

03:15PM

03:15PM

03:15PM

03:15PM

1  avoid in front of the jury.  Mentioning that Samsung

2  refused to instruct its witness on how it destroyed

3  documents presupposes the fact that there was any

4  destruction to begin with.

5          Samsung is not going to allege that Rembrandt

6  can't prove infringement because they don't have the

7  Bluetooth PICs documents for certain products.  And, in

8  fact, Samsung admitted that its accused products comply

9  with the Bluetooth standard and the PICs documents would

10  only confirm that and add nothing else to Rembrandt's

11  case.

12          THE COURT:  Mr. Enger, tell me how these

13  documents that you're -- it's a worthwhile issue.  If

14  you're going to be arguing that these documents should

15  have been presented, what would they have added to your

16  case?

17          MR. ENGER:  Well, your Honor, the compliance

18  folders for each one of these products is a stack of

19  paper maybe 8 inches tall.  There's a lot of testing data

20  in there, there's these PICs, and there's the declaration

21  of compliance.  What we don't have is the testing data

22  and the declaration of compliance.  That information you

23  cannot get from the Bluetooth SIG's website.  The only

24  place to get it was from Samsung.  Those have been

25  destroyed.  We don't have those; and that's crucial

181

1   evidence that we could use to prove up our infringement

2   case, your Honor.

3            THE COURT:  Tell me how.

4            MR. ENGER:  Well, they show exactly how the

03:16PM   5   products implement the Bluetooth specification.  They

6   show exactly that Samsung declares compliance with that

7   specification.  They show exactly, you know, the manner

8   in which Samsung implements Bluetooth and all the

9   different functionality that their products have that are

03:16PM   10  Bluetooth related.

11           Plus, your Honor, as I mentioned, there was,

12  you know, 8 inches of paper per compliance folder per

13  product.  You know, who knows what we might have found in

14  there.  That's entirely why this issue is important and

03:16PM   15  why we're entitled to this adverse inference instruction.

16           THE COURT:  Well, whether or not you get an

17  adverse inference instruction is something that would be

18  determined at the end of the evidence.  So, I don't see

19  that as the issue on this motion.  This is simply whether

03:17PM   20  or not you can present to the jury the evidence about

21  these documents.

22           Ms. BianRosa has argued that the fact that

23  Samsung stipulates that it complied with the Bluetooth

24  standard lessens the importance of this.  What do you say

03:17PM   25  to that?

Pretrial Conference 1-20-2015

03:17PM

1          MR. ENGER:  I would agree it lessens the blow;

2    but it doesn't eliminate it, your Honor.  Who knows what

3    we would have found in those big compliance folders.  We

4    don't have the testing data to be able to show the jury

5    exactly what Dr. Morrow considered for infringement, and

6    we don't have the declaration of compliance which

7    explains and certifies the compliance with the Bluetooth

8    specification.

9          THE COURT:  All right.  Well, I'm --

03:17PM

10          MS. BIANROSA:  Your Honor, if I could just

11    add.  From all of the PICs documents that were produced,

12    Rembrandt still hasn't articulated here what was so

13    important in those 8 inches of documents that it would

14    use from the PICs documents that it is alleging are

03:18PM

15    missing now.

16          MR. ENGER:  With all due respect, that's not

17    true, your Honor.  I said we would use the testing data

18    to show exactly how the products comply with the

19    Bluetooth specification.

03:18PM

20          THE COURT:  Well, I'm going to grant this

21    motion to a limited extent; and that is that I'm going to

22    direct that you not make any argument to the jury in your

23    voir dire or opening about spoliation.  But I'll allow

24    you to explore whether or not the defendant has

03:18PM

25    maintained and produced the records that you believe that

03:19PM

1  they're required to regarding Bluetooth, and you can

2  address that matter with the court before your closing

3  arguments as to whether or not there's a basis to argue

4  spoliation to the jury at that time.

5      MR. ENGER:  So, to be very clear, we can

6  present evidence showing that there was destruction but

7  we cannot ask for an adverse inference until the very

8  end.

9      THE COURT:  Well, you can present evidence as

10  to whether or not the documents exist.  "Destruction" is

11  a conclusory term that I think needs to not be used until

12  you've got the evidence in about it.  Does that make

13  sense?

14      MR. ENGER:  So, to be clear, all this evidence

15  will come from a deposition of a Samsung Korean witness

16  which we can't -- they're not bringing the Korean witness

17  to trial, and we don't have time to go back and take

18  another deposition.  So, does it make sense whenever we

19  do the deposition designations to go through pages 100

20  through 108 of Lim's deposition and get some more

21  guidance on whether or not we can use that particular

22  evidence at the time?

23      THE COURT:  If there's objections to it,

24  certainly we'll go through it.  But what I'm -- I'm

25  simply at this point granting this motion as to argument,

184

1    not as to evidence.

2                 MR. ENGER:  Understood.

3                 THE COURT:  Okay.  All right.

4                 And I think we've already dealt with No. 14.

03:20PM    5                 MR. SHERWOOD:  That's correct, your Honor.

6                 THE COURT:  All right.  What other issues

7    besides the -- I know there's some pending motions that

8    need to be addressed by the court.

9                 Are there other issues that either side wants

03:21PM   10    to present today?

11                 MR. ALAVI:  Your Honor, I think, taking

12    guidance from the court, we'll defer the exhibits and the

13    depo designations until February 2nd so that we can have

14    another opportunity to meet and confer and see if we can

03:21PM   15    reduce the scope of objections.  So, from the plaintiff's

16    perspective, we have nothing further -- oh, I'm sorry.

17    Mr. Ward has something.

18                 MR. WARD:  One thing, your Honor.  And

19    Mr. Smith and I talked before lunch about Samsung

03:21PM   20    potentially limiting its prior art references like we've

21    limited our claims.  I didn't know if the court had a

22    practice where if we don't reach an agreement, the court

23    enters an order.  Obviously we're trying to get things

24    streamlined as we get down for trial.  We haven't had a

03:21PM   25    chance to discuss that.  So, I know -- maybe we can take

185

1  a break and then come back and hopefully articulate some

2  type of agreement on the record.  If not, maybe get some

3  guidance from your Honor.

4        MR. SMITH:  Your Honor, I think you just heard

03:22PM  5  what our invalidity argument is, how limited the

6  references are in our expert's report.  It's down to --

7  we received a request yesterday to try and cut it down

8  from I think 40 that were in our '282.  It is cut down to

9  I think somewhere -- 10 or 12 in the expert's report.

03:22PM  10  But it's what you've just heard of.  We think it's been

11  cut down sufficiently.  It may or may not be cut down

12  further.  We don't know that and I can't represent

13  whether it will or won't, but at this point I don't know

14  that we're -- that there are any additional changes that

03:22PM  15  we're going to make to it.

16        THE COURT:  All right.  Well, I'd ask you just

17  to finish out this conversation between the two sides.

18        And then, Mr. Ward, if you've got something

19  that you want to seek from the court, you can present it

03:22PM  20  at that time.

21        MR. WARD:  Sure.

22        THE COURT:  With respect to the exhibits and

23  the deposition designations, I would like to get updated

24  lists before the February 2 hearing.  I want to -- I

03:23PM  25  guess, frankly, if you'll just bring them to the hearing.

03:23PM

1  I just want to have an up-to-date list to go from at that

2  time.  It won't do me any good to have them in advance;

3  but if I don't have them at the hearing, it will be very

4  hard for us to make a record of what the decisions are as

5  we go through.

6           So, if you could just, each side, bring an

7  up-to-date list of their exhibit objections and their

8  deposition designation objections, we'll go from there on

9  the 2nd.

03:23PM

10          And I --

11          MR. JENNER:  I beg your pardon, your Honor.

12  Did you set a time for February 2nd?

13          THE COURT:  I don't know that I did.  Is there

14  a preference?  I know some of you are coming in, if it

03:24PM

15  helps you to do it in the afternoon.  It doesn't really

16  matter to me whether we start at 1:00 or at 9:00.

17          MR. ANAIPAKOS:  Your Honor, I will note for

18  the record the Super Bowl is the night preceding.

19          MR. JENNER:  My wife would be very happy if I

03:24PM

20  got on an airplane early Monday morning instead of

21  Sunday.

22          THE COURT:  What time would accommodate your

23  wife?

24          MR. JENNER:  That's always difficult and

03:24PM

25  dangerous.  Whatever your Honor considers the afternoon

1  start, 1:00 o'clock, 1:30, I think we can get here by

2  then.

3          THE COURT:  Why don't we say 1:30, and you can

4  tell Mrs. Jenner we did that just for her.

03:24PM  5          MR. JENNER:  I will make a point of that.

6          THE COURT:  All right.  And if the Saints were

7  in the Super Bowl, we'd be starting later; but they're

8  not.

9          All right.  Well, then, is there anything

03:24PM 10  further that either side needs?

11          Mr. Smith?

12          MR. SMITH:  Nothing from the defendants, your

13  Honor.

14          THE COURT:  Mr. Ward?

03:24PM 15          MR. WARD:  Nothing from the plaintiff.

16          THE COURT:  All right.  Then we're in recess.

17          (Proceedings adjourned, 3:25 p.m.)

18

19  COURT REPORTER'S CERTIFICATION

20          I HEREBY CERTIFY THAT ON THIS DATE,

21  JANUARY 22, 2015, THE FOREGOING IS A CORRECT TRANSCRIPT

22  FROM THE RECORD OF PROCEEDINGS.

23

24

25                    /s/
                    _____
                    TONYA JACKSON, RPR-CRR

Tonya B. Jackson, RPR-CRR
409.654.2833