1                    IN THE UNITED STATES DISTRICT COURT

2                    FOR THE EASTERN DISTRICT OF TEXAS

3                           MARSHALL DIVISION

4    REMBRANDT WIRELESS                )(

5    TECHNOLOGIES, LP                  )(    CIVIL DOCKET NO.

6                                      )(    2:13-CV-213-JRG-RSP

7    VS.                               )(    MARSHALL, TEXAS

8                                      )(

9    SAMSUNG ELECTRONICS CO., LTD., )(    FEBRUARY 2, 2015

10   ET AL.                            )(    1:30 P.M.

11                          PRE-TRIAL HEARING

12            BEFORE THE HONORABLE JUDGE ROY S. PAYNE

13                 UNITED STATES MAGISTRATE JUDGE

14

15   APPEARANCES:

16   FOR THE PLAINTIFF:  (See sign-in sheets docketed in
                          minutes of this hearing.)
17

18   FOR THE DEFENDANTS: (See sign-in sheets docketed in
                          minutes of this hearing.)
19

20   COURT REPORTER:     Shelly Holmes, CSR-TCRR
                         Official Reporter
21                       United States District Court
                         Eastern District of Texas
22                       Marshall Division
                         100 E. Houston Street
23                       Marshall, Texas  75670
                         (903) 923-7464
24

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)

1                              I N D E X

2

3    February 2, 2015

4                                                         Page

5         Appearances                                      1

6         Hearing                                          3

7         Court Reporter's Certificate                    127

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          LAW CLERK:  All rise.

2          THE COURT:  Good afternoon.  Please be seated.

3          For the record, we're here for the completion of the

4   pre-trial conference in Rembrandt versus Samsung, which is Case

5   No. 2:13-213 on our docket.

6          Would counsel state their appearances for the record?

7          MR. WARD:  Good afternoon, Your Honor.  Johnny Ward,

8   Amir Alavi, Eric Enger, Miranda Jones, Blaine Larson, Kyril

9   Talanov for Rembrandt, and we're ready.

10          THE COURT:  All right.  Thank you, Mr. Ward.

11          MR. SMITH:  And, Your Honor, for Samsung, Michael

12   Smith, Gabrielle Higgins, Rebecca Hermes, Jeff Sherwood --

13          MR. SHERWOOD:  Good afternoon, Your Honor.

14          MR. SMITH:  -- Jerry --

15          THE COURT:  Good afternoon.

16          MR. SMITH:  -- Haddad, and Director of Litigation,

17   Michelle Yang in the gallery.  And we're ready to proceed, Your

18   Honor.

19          THE COURT:  All right.  Thank you, Mr. Smith.

20          I know that the primary agenda for this hearing is the

21   objection to exhibits and deposition designations.  I'm aware

22   of one other issue, that being the issue about the use of

23   Dr. Schneck's testimony.

24          Are there any other issues that the Plaintiff has on

25   the agenda for this conference?

1          MR. ALAVI:  We do, Your Honor.  Amir Alavi for the

2     Plaintiff.

3          We had a -- a request for clarification, make sure we

4     fully understood the scope of the Court's motion in limine with

5     respect to the IPRs that we'd just like to raise for a -- a

6     brief moment with the Court.

7          THE COURT:  All right.  I'll add that to the agenda.

8          MS. HIGGINS:  Your Honor, I wanted to show --

9          THE COURT:  Yes, ma'am.

10         MS. HIGGINS:  -- an item.  We'd also like to seek the

11    Court's further guidance with respect to BlackBerry's motion to

12    seal and the order in that regard.

13         THE COURT:  All right.

14         MR. SHERWOOD:  Your Honor, actually I have --

15         THE COURT:  Thank you, Ms. Higgins.

16         MR. SHERWOOD:  -- two other things to add to the list.

17         THE COURT:  All right, Mr. Sherwood.

18         MR. SHERWOOD:  We have, first of all, a pending motion

19    for summary judgment with respect to marking.

20         THE COURT:  Uh-huh.

21         MR. SHERWOOD:  And -- and secondarily, reaching back

22    to the motions in limine that the Court heard, I just have a

23    couple of sort of open-the-door question clarifications I'd

24    like to ask at some point of the Court.  I think they're very

25    straightforward, should only take a minute, but...

5

1          THE COURT:  And what is the subject matter of those?

2          MR. SHERWOOD:  They relate to the motions in limine

3    that the Court has already ruled on, two of them in particular.

4          THE COURT:  Which two?

5          MR. SHERWOOD:  The -- the one with respect to the --

6    poker player was one of them, and the other one was with

7    respect to the privilege, the invocation of privilege.

8          THE COURT:  All right.  I'll put those on the list.

9          MR. SHERWOOD:  Thank you, Your Honor.

10         THE COURT:  Thank you, Mr. Sherwood.

11         All right.  Do counsel have any approach that they

12   want to suggest regarding the best way to take up the

13   objections to exhibits?

14         Mr. Alavi?

15         MR. ALAVI:  Your Honor, I wish I had a good

16   suggestion.  I think what is going to happen, and we've done it

17   a little bit here, is based on the motions in limine and some

18   discussions we've had with counsel, I think you're going to

19   find that the parties are going to withdraw some exhibits and

20   objections on the fly.

21         We've worked best we could, given travel schedules.

22   Unfortunately didn't get an opportunity to meet in person to go

23   exhibit-by-exhibit as -- as might have been fruitful, but I

24   think you're going to see from both sides, both sides'

25   willingness to withdraw objections and exhibits, so that should

1    speed things up.

2          I would -- I would say -- one thing that I would

3    suggest, Your Honor, and if I may approach, the parties,

4    without letting the Court know, agreed to a -- a legend for

5    objections on the -- on the exhibits.  And so we are printing

6    out two copies for the Court of that -- of those -- that legend

7    which may make it a little easier.  So as soon as they -- we

8    have two copies -- I gave it to counsel, if I may approach

9    counsel's table.  We have copies of that for Court, and it may

10   make things go a little smoother.

11         THE COURT:  All right.

12         MR. ALAVI:  And they're not stapled.  There's a

13   stapler here I've used -- I've used a couple of times.  Thank

14   you, Your Honor.

15         Beyond that, I think, unfortunately, we're going to

16   have to plow through it.  I do think there's the possibility of

17   grouping exhibits together because there are certain exhibits

18   that are fundamentally identical.  And once the Court rules on,

19   for example, an authenticity or hearsay objection, it may then

20   prompt one party to withdraw the duplicative objections to

21   those same exhibits.  So I think there's an opportunity, at

22   least from the Plaintiff's perspective, to the extent we see

23   those, we'll identify those and let you know that it's

24   applicable to a large group of -- of exhibits.

25         THE COURT:  All right, then.  We can start off with

```
 1    the Plaintiff's objections and the Defendants' -- the

 2    Plaintiff's exhibits, I'm sorry, and the Defendants' objections

 3    thereto.

 4              MR. ALAVI:  Your Honor, I think to speed things up,

 5    the Plaintiffs are withdrawing Exhibits 13, 14, 16, 17, and 18.

 6              THE COURT:  Just one minute.  All right.  You can list

 7    those again if you would.

 8              MR. ALAVI:  Yes, Your Honor.  Plaintiffs withdraw

 9    Exhibits 13, 14, 16, 17, and 18.

10              THE COURT:  Okay.

11              MR. ALAVI:  And if you go to Page --

12              MR. ENGER:  No, not 18.

13              MR. ALAVI:  Not 18?  My mistake.

14              THE COURT:  And, Mr. Alavi, I tell you what, if you

15    would speak to the microphone, we'll get a better record here.

16              MR. ALAVI:  Do it this way.  I made -- Your Honor, I

17    made a mistake apparently, so let me -- let me correct that.

18              Plaintiffs are withdrawing Exhibits 13, 14, 16, and

19    17.

20              THE COURT:  Not 18?

21              MR. ALAVI:  Not 18.  And I apologize, Your Honor.

22              THE COURT:  Okay.

23              MR. ALAVI:  And then on Page 3, Plaintiffs withdraw

24    Exhibits 44 and 46.

25              And then on Page 4, Plaintiffs withdraw Exhibits 51
```

1    through 56.

2          So as I understand it, the first objection is to

3    Plaintiff's Exhibit 15.

4          THE COURT:  All right.

5          MR. ALAVI:  And, Your Honor, is it -- would you like

6    us to use the podium, or is it okay if we stay at counsel's

7    table just to go a little faster and use the microphone?

8          THE COURT:  As long as you're speaking to a

9    microphone, I can handle either way.

10         MR. ALAVI:  Right.  Thank you, Your Honor.

11         THE COURT:  All right.  What's the objection to

12   Exhibit 15?

13         MR. HADDAD:  Your Honor, Exhibit 15 is -- are pictures

14   of awards given to the inventor on the patents-in-suit from PC

15   Magazine and -- and other places.  I mean, this is not the type

16   of exhibit that should come into evidence.

17         THE COURT:  And I guess that's what I'm looking for is

18   why not?  What's your objection?

19         MR. HADDAD:  Well, we don't think it's relevant, Your

20   Honor, to the patents-in-suit.

21         THE COURT:  Okay.

22         MR. HADDAD:  We don't know whether these invention --

23   whether these were given for the patents-in-suit, other work

24   he's done.  I know he was an inventor -- a prolific inventor.

25   He was named on many, many other patents.  I forget how many,

1    but it might be, I don't know, a hundred.  He was, you know,

2    working at a big technology company when -- in the -- in the

3    mid-'90s.  And there's just no relationship between these

4    awards and the patents-in-suit.  It's -- it's -- it'd be

5    prejudicial.  It's -- it's as if he got an award for this

6    invention, and it has -- there's no relationship between it and

7    the invention -- the -- the patent that's at -- in suit, Your

8    Honor.

9            THE COURT:  The fact that the inventor has won awards

10   is perhaps of marginal relevance, but it is relevant.  And I'll

11   overrule the objection.  You can certainly point out on cross

12   whether or not these relate directly to the patent-in-suit.

13   But I'll overrule that objection.

14           What's the next objection?

15           MR. ALAVI:  Your Honor, the -- the next exhibit that

16   has objections is Exhibit 22.

17           THE COURT:  All right.  What is Exhibit 22?

18           MR. HADDAD:  You want to address that or --

19           MR. ALAVI:  Your Honor, what we can do is we can put

20   the exhibits on the Court's screen, if that helps the Court

21   look --

22           THE COURT:  Well, some of them I can tell a little bit

23   based on the description, but this is only described as an

24   exhibit to a report.

25           MR. ALAVI:  So, Your Honor, Exhibit 22 is a

```
 1   Broadcom -- a series of Broadcom specification sheets that

 2   Broadcom makes available for -- it's CSR, I'm sorry, my

 3   mistake.  I'm sorry, Your Honor.  It's spec sheets for CSR and

 4   Texas Instrument Bluetooth 2.0, plus EDR chipsets.  Dr. Morrow,

 5   who is a technical expert in the -- in the case, reviewed those

 6   and analyzed whether or not there was a basis to compare those

 7   chipsets for purposes of -- of damages, which then

 8   Mr. Weinstein relied upon.  So these are the actual spec

 9   sheets.

10           THE COURT:  Okay.  Let me hear the objection,

11   Mr. Haddad.

12           MR. HADDAD:  The objection, Your Honor, is that

13   Samsung doesn't use these chips in its products, and -- well,

14   that's -- that's the objection, it's not as -- not relevant.

15           THE COURT:  All right.  And do you agree that -- that

16   Mr. Weinstein referred to these in his report?

17           MR. HADDAD:  We -- he did, Your Honor.  Your Honor, he

18   did -- he did -- he did refer to them in -- in his report.  I

19   mean, we -- we would agree --

20           THE COURT:  Are they contending that these spec sheets

21   are about your product?

22           MR. HADDAD:  No.  No, Your Honor.

23           THE COURT:  So --

24           MR. HADDAD:  Your Honor, we would agree to withdraw

25   our objection to this if other Texas Instruments and Broadcom
```

```
 1   spec sheets were permitted.  I know there's -- we're --
 2   we're -- you know, if we -- if you withdrew your objections, as
 3   well.
 4           MR. ALAVI:  Your Honor, may I -- may I ask a question
 5   of counsel?
 6           THE COURT:  Yes.
 7           MR. ALAVI:  Mr. Haddad, is -- these are exhibits that
 8   are already on your -- on the Defendants' exhibit list?
 9           MR. HADDAD:  Yes.
10           MR. ALAVI:  Okay.  The Plaintiffs -- Plaintiffs are
11   happy to have an agreement that both sides withdraw their
12   objections to spec -- spec sheets for chipsets that are on
13   either side's exhibits lists.
14           THE COURT:  All right.  Then --
15           MR. HADDAD:  Fair enough.
16           THE COURT:  -- that is understood then.  We'll --
17   you'll have to note which objections those are as we go through
18   it, but I'll note that the objection is withdrawn.
19           And it looks like the next objection is to Exhibit 28?
20           MR. ALAVI:  That's correct, Your Honor.
21           THE COURT:  And what's the nature of that objection?
22           MR. ALAVI:  This is a Bluetooth annual report from the
23   Bluetooth SIG that lays out the Bluetooth SIG's communication
24   to its membership, which includes Samsung, about trends in
25   Bluetooth, the product map, what is upcoming in Bluetooth in
```

```
 1   future releases.

 2         THE COURT:  And I see a variety of -- of categories of

 3   objection, Mr. Haddad.  What is the primary objection to this

 4   document?

 5         MR. HADDAD:  Your Honor, it -- the objection is that

 6   it's just not relevant to the issues in -- in this case, and

 7   also that it -- it talks about -- there are revenue figures in

 8   here and -- and things that don't relate to Samsung that might

 9   be confusing.

10         THE COURT:  Well --

11         MR. HADDAD:  That would be confusing.

12         THE COURT:  Is this -- this is a lengthy document, I

13   take it?  No?

14         MR. ALAVI:  20 pages, Your Honor.

15         THE COURT:  Do you -- are you going to refer to the --

16   the jury to the whole 20 pages, or what -- what are you seeking

17   from this?

18         MR. ALAVI:  No, Your Honor, we will not be referring

19   to all 20 pages.  One example would be on Page 4 of the

20   document which Ms. -- Ms. Caswell can pull up.

21         This document talks about the value of EDR, which is

22   the infringing product, and the importance to the industry and

23   to Bluetooth in general.  Both Dr. Morrow relies on this to

24   discuss the importance of EDR, as does Mr. Weinstein.  It's

25   relevant to the hypothetical negotiation because it shows what
```

1  the parties would know about EDR, would have understood about

2  EDR because it's a document that is produced by Samsung and

3  would have informed the hypothetical negotiation as it goes to

4  damages because it talks directly about the -- the value of --

5  of the EDR component of Bluetooth that's at issue in this case.

6          THE COURT:  Well --

7          MR. HADDAD:  Your Honor, they -- what they want to

8  rely on it for -- their experts want to rely on it for is -- is

9  hearsay.  Their experts can rely on hearsay, but -- but for the

10 purpose of admitting this into evidence, they're -- they're

11 relying on it for the truth of the matter asserted, and that's

12 hearsay.

13         THE COURT:  What is your objection -- your exception

14 to the hearsay objection --

15         MR. ALAVI:  Well, there's --

16         THE COURT:  -- Mr. Alavi?

17         MR. ALAVI:  There's -- there's two issues.  One is

18 putting aside whether it comes into evidence.  Certainly the

19 experts can rely on it.  But with respect to hearsay, whether

20 or not it's -- if you offer it not for the truth of the matter

21 asserted, just that the statements were made, that Samsung

22 received those statements, it informs the hypothetical

23 negotiation that this is what Samsung, a member of the SIG, was

24 hearing about the importance of this invention, and it informed

25 what they would have believed the value of EDR is with respect

```
 1   to the hypothetical negotiation.

 2           So whether or not it's admitted for the truth of the

 3   matter asserted, if it's admitted with an instruction that it's

 4   not admitted for the truth, it is relevant to what Samsung's

 5   state of mind would have been during the hypothetical

 6   negotiation because these are documents that they would have

 7   relied upon.

 8           And then finally, there is the residual exception to

 9   the hearsay rule.  The -- this is a document from the Bluetooth

10   SIGs which Samsung --

11           THE COURT:  There's no way it's coming in under the

12   residual exception.  So the -- as far as the hypothetical

13   negotiation, what is the agreed date of the hypothetical

14   negotiation?

15           MR. HADDAD:  October -- September 2011, Your Honor.

16           THE COURT:  Okay.

17           MR. HADDAD:  And this --

18           THE COURT:  This is a 2004 --

19           MR. HADDAD:  Yes.

20           THE COURT:  -- document?

21           MR. ALAVI:  And, Your Honor, I'd also point to 803.17

22   which is market reports and similar commercial publications.

23   This is from a trade group, the Bluetooth SIG, to which Samsung

24   is a member.  It's a communication to them about the value of

25   Bluetooth SIG, data about it, and a roadmap on where they've
```

1    been and where they're going.  It's exactly the type of

2    communications from a trade group that someone in -- like

3    Samsung would rely upon.

4            THE COURT:  Show me the part of the report that you

5    want to show to the jury.

6            MR. ALAVI:  Can you pull up Page 4, Ms. Caswell?

7            We just need to switch the -- so Page 4 -- are you on

8    Exhibit 20?  Okay.  Now, why don't you pull in this part right

9    here?  We're going to zoom in, Your Honor.  There you go.

10           MR. HADDAD:  Your Honor, this is not the type of

11   publication that's like a market quotation, a list, a

12   directory, compilation of data that's reliable.  These are

13   statements that were made -- they want to rely on these

14   statements that were made in 2004 to inform something that

15   happened in -- hypothetically happened in September 2011.  And

16   it's not -- 803.17 talks about market quotations and -- and the

17   like.  Not pros --

18           THE COURT:  I'll sustain the hearsay objection.  I --

19   you can obviously have your expert testify -- informed by his

20   research about trade publications, but Exhibit 28 will not be

21   shown to the jury.

22           MR. ALAVI:  Your -- Your Honor, on -- on that point, I

23   understand the document's not exhibit -- is not admitted into

24   evidence.

25           THE COURT:  But you're saying can it be a

1    demonstrative?

2              MR. ALAVI:  Yes.

3              THE COURT:  No.  I -- you -- you can't use over

4    objection, hearsay documents as demonstratives.  The difference

5    between showing it to the jury on the screen up there as a

6    demonstrative and showing it as an exhibit is so lost on the

7    jury that -- you know, demonstratives are supposed to be merely

8    items that illustrate the witness's testimony.  This will be

9    attributed to somebody other than the witness as a publication

10   by this group in 2004, and that is a -- a hearsay use of it,

11   so...

12             MR. ALAVI:  Well, Your Honor, what I'm looking at is

13   803.18, which -- which does not deal with the admissibility of

14   exhibits, which is why we didn't bring it up, but deals with

15   pamphlets and other periodicals and treatises that an expert

16   relies upon.  And if they call upon it in their direct, the

17   document can be shown to the jury but not admitted into

18   evidence.

19             THE COURT:  The -- the learned treatise exception?

20             MR. ALAVI:  And it applies to more than learned

21   treatises.  It applies to periodicals and pamphlets that an

22   expert would normally rely on.  This is the type of document

23   because both Mr. -- Dr. Morrow and Mr. Weinstein rely upon it.

24   This is certainly a publication from the industry group that

25   discusses the invention at issue.  It's certainly -- and the

1    value of the invention at issue.  It's certainly the type of

2    document that a damages expert would normally rely upon and a

3    technical expert that talks about -- and Dr. Morrow does talk

4    about the value EDR would rely upon.

5            THE COURT:  And what is the statement within this

6    document that you want to have read to the jury?

7            MR. ALAVI:  It is the statement -- there's going to be

8    multiple statements on this page that we're showing to the

9    jury.  But, for example, the discussion on Page 4 about the new

10   features that are introduced in EDR and the bullets that follow

11   that talk about what the new features of this EDR function

12   are -- the first two bullet points.  The section on backwards

13   compatibility, which is on the sentence right before that.

14           This is a description from a trade group in a

15   publication they put out about what Bluetooth EDR does, that

16   it's backwards compatible, that it increases speed, that does

17   these features.  That's exactly what a technical expert would

18   look -- look at, in addition to other things, to describe to

19   the jury what EDR does and what its benefits are.  And it's

20   certainly what a damage expert would normally rely upon to

21   discuss what the value of the invention is.

22           THE COURT:  And that's fine.  And this -- the way you

23   would use this under 803.18 would be to draw your expert's

24   attention to it on his direct and ask him what it says.  And he

25   can then read it to the jury if it -- if he has laid the proper

1   foundation that it's a reliable authority.  It still will not

2   be shown to the jury.  It won't be put up on the screen.  It's

3   not -- he's simply entitled then to read whatever statement it

4   is that he -- he wants from it.

5          MR. ALAVI:  Okay.  And my question for the Court is

6   there's going to be several exhibits like this.  Do you want us

7   to raise our 803.18 purpose as we address these

8   exhibit-by-exhibit, or deal with them at the -- at the trial

9   and lay the predicate and then have them read it into evidence?

10         THE COURT:  It won't be an exhibit.  So we need to

11  deal with the objection to the exhibit now, and this exhibit

12  will not be received, but you can attempt to make use of it

13  under 803.18, and it will be up to the trial judge at that time

14  to rule on whether or not you've laid a foundation under --

15  under that rule to have a particular passage read to the jury.

16         MR. ALAVI:  Great, Your Honor.  Thank you for that

17  guidance.  So we'll deal with 803.18 if they come up at trial.

18  Thank you.

19         THE COURT:  Okay.

20         MR. HADDAD:  Your -- Your Honor, so at trial, they

21  would have to establish that it's somehow reliable?

22         THE COURT:  Yeah, their expert would have to testify

23  that he regards statements within this as reliable, and that

24  it's something that --

25         MR. HADDAD:  Right.

```
1              THE COURT:  -- that is a reliable authority.  Yeah,

2     and that's true of any learned treatise or other document that

3     that you want to use that way.  But it's still not an exhibit.

4              That takes us to No. 29?

5              MR. HADDAD:  Yes, Your Honor.

6              THE COURT:  What's the objection to 29?

7              MR. HADDAD:  Your Honor, this -- very similar, it's --

8     I mean, this is what appears to be a PowerPoint presentation.

9     It's hearsay.

10             THE COURT:  Okay.  Hearsay objection?

11             MR. HADDAD:  Yes, Your Honor, hearsay objection.

12             THE COURT:  All right.  What's the response to the

13    hearsay objection?

14             MR. ALAVI:  Your Honor, this is the same -- same

15    argument you've just heard on 28.

16             THE COURT:  It's an 803.18?

17             MR. ALAVI:  That's right.  This -- so -- and I -- I

18    understand the Court's instructions not to get -- get into

19    that.  It's the same issue.  This is something the experts have

20    relied on from the Bluetooth SIG, and they'll be testifying

21    about it.  But it -- same arguments as to why it would fit into

22    some of the hearsay object --

23             THE COURT:  Is --

24             MR. ALAVI:  -- exceptions.

25             THE COURT:  Is this a publication of some sort or --
```

```
 1              MR. ALAVI:  It is published by the Bluetooth SIG, we
 2    believe, on their website.
 3              THE COURT:  Okay.
 4              MR. HADDAD:  I'm not sure, Your Honor.  I mean --
 5              MR. ALAVI:  We'll have to lay the foundation with the
 6    testimony, Your Honor, and we understand that.
 7              THE COURT:  All right.  Then I'll -- I'll sustain the
 8    objection to No. 29, as well.
 9              MR. ALAVI:  And, Your Honor, we withdraw -- Plaintiffs
10    withdraw Exhibit 30.
11              THE COURT:  All right.  What's next?
12              MR. ALAVI:  Your Honor, Exhibit 31 is a part of the
13    Bluetooth specification.
14              THE COURT:  What's the objection to it?
15              MR. HADDAD:  Your Honor -- yeah, we're going to
16    withdraw our objection here.
17              THE COURT:  All right.  What about 32?
18              MR. ALAVI:  Your Honor, Plaintiffs withdraw Exhibit 32
19    and Exhibit 33.
20              THE COURT:  All right.
21              MR. ALAVI:  And, Your Honor, for Exhibit 34, that's
22    a -- a dictionary.  We plan on using that as an 803.18 exhibit
23    if the foundation is laid at trial.
24              THE COURT:  Then -- all right.  Do you still want to
25    offer it as an exhibit to the jury, or are you just going to
```

1    have your expert read it if the foundation is laid?

2          MR. ALAVI:  Your Honor, we're only going to offer it

3    if there's no objection because I don't think I can overcome

4    the objection given the Court's prior guidance.

5          THE COURT:  All right.  Is there an objection?

6          MR. HADDAD:  Yes, hearsay, Your Honor, but...

7          THE COURT:  All right.  Then the hearsay objection is

8    sustained to Exhibit 34.

9          What about 38?

10         MR. ALAVI:  Your Honor, Exhibits 38, 39, and 40 are

11   treatises, so, again, they're going to be offered under 803.18,

12   unless -- unless Samsung has no objection to offering them into

13   evidence.

14         MR. HADDAD:  Same objection, Your Honor, hearsay.

15         THE COURT:  All right.  38 through 40, the objection

16   is sustained.

17         What about 41?

18         MR. ALAVI:  We withdraw 41, Your Honor, and we

19   withdraw Exhibit 47, as -- as well, Your Honor.

20         THE COURT:  All right.

21         MR. ALAVI:  So that gets us to Exhibit 57, I believe,

22   is the next exhibit with an objection.

23         THE COURT:  What's the objection to 57?

24         MR. HADDAD:  One moment, Your Honor.  Your Honor,

25   we -- we withdraw our objection to 57.

1          THE COURT:  58?

2          MR. HADDAD:  We withdraw 58, Your Honor.

3          THE COURT:  All right.  Objection to 58 is withdrawn.

4          59?

5          MR. HADDAD:  We -- we have no objection, Your Honor,

6     to 59.  Withdrawn.

7          THE COURT:  All right.  60?

8          MR. HADDAD:  Your Honor --

9          THE COURT:  Do you need some more time to go over

10    these?

11         MR. HADDAD:  No, this one -- this one, Your Honor,

12    we'll withdraw.

13         THE COURT:  You know, given that there are 50 pages of

14    this, what I'd like for y'all to do -- if the two of you could

15    just sit down for a few minutes and see how many of these you

16    can sort out.  I -- what I'd like to do is be able to rule on

17    the ones to which there are live objections.

18         And I've got other stuff I can do, so it won't bother

19    me a bit for y'all to take some time and see if you can work

20    out what you want to do on this, and let me know when you're

21    ready, and I'll come back.  And if you come up with a series of

22    objections that you want rulings on to guide others, I'm happy

23    to do that, too, but I feel like right now I am more than

24    anything else interfering with your ability to communicate

25    about these and maybe knock them out.  So we're going to take a

```
 1   recess to give you time to do that and come back as needed.
 2              LAW CLERK:  All rise.
 3              (Recess.)
 4              LAW CLERK:  All rise.
 5              THE COURT:  Please be seated.
 6              Mr. Ward, where do we stand?
 7              MR. WARD:  Well, we went through both exhibit lists
 8   and are ready to announce where we are on those lists, and
 9   there's some rulings that need to be ruled on by the Court.
10              THE COURT:  All right.  Why don't we just go to the
11   objections that require rulings and do those.  And have you
12   marked up a copy of one of the lists that indicates which
13   exhibits are withdrawn and which objections are withdrawn?
14              MR. ALAVI:  Your Honor, it's --
15              THE COURT:  Mr. Alavi.
16              MR. ALAVI:  -- it was fairly complicated, so I think
17   on what we were able to do was we -- we took copious notes, and
18   we are going to prepare a -- a list for the Court of
19   pre-admitted exhibits that comply with those notes, but we
20   don't have a clean copy because there was a lot of commentary
21   back and forth.  What we do have is I think we know which
22   object -- which exhibits are objected to, and I think it's
23   something like a handful, six or seven on the Plaintiff's list,
24   and maybe a handful or more, six or seven on the Defendants'
25   list.  And we can identify essentially which objection -- which
```

1  exhibits are objected to for the Court pretty easily.

2      THE COURT:  And how can I have assurance that -- that

3  you are both in agreement on what your agreements are?  You

4  don't have a single document that reflects those?

5      MR. ALAVI:  My -- my plan, Your Honor, is until you

6  kick us out of here, to go through an exhibit list with

7  opposing counsel and basically get it done tonight.  That

8  way -- and -- and we don't want the Court to wait on us, but

9  we -- exactly for that reason, I think we need to -- the

10  parties need to sit down and go through a clean exhibit list

11  and make sure that they go through their notes, and we have

12  full agreement.

13      I think we had four or people taking notes.  We went

14  over it a couple of times, so I think we're in fairly good

15  shape.  There's always the chance of a mistake, but I would

16  propose that at least counsel doesn't sleep until they -- they

17  have that agreed to list for the Court.

18      THE COURT:  All right.  Ms. Higgins, you were going to

19  speak for the Defendant, I believe?

20      MS. HIGGINS:  In terms of the objections to exhibits,

21  Your Honor, my colleague, Ms. Hermes, is going to address

22  those.

23      THE COURT:  Okay.  I'm sorry, I'm misinterpreted your

24  rising.

25      MS. HIGGINS:  That's okay.  I was just going to offer

1    some assistance over there to my esteemed opposing counsel.

2          THE COURT:  All right.  Well, is there agreement on

3    the process that Mr. Alavi just outlined?

4          MR. SMITH:  Yes, Your Honor.

5          THE COURT:  Okay.  Then let's move to the objections

6    to the exhibits.

7          MR. ALAVI:  Your Honor, I think the -- the first

8    exhibit issue is fairly simple.  An example of it is Exhibit

9    64, but whatever the Court rules on this will impact every

10   other exhibit.  The parties have agreed that certain exhibits

11   need to be redacted pursuant to various rulings, whether it be

12   a motion in limine or some other ruling.  And the parties agree

13   that when it's redacted, there should be some notation on the

14   redaction that says redacted.  The parties want the Court's

15   guidance.  I think Samsung has suggested that the redactions

16   say redacted by Court order.

17         It's the Plaintiff's preference to put redacted, and

18   then have the Court instruct the jury that sometimes you'll see

19   documents that are redacted for various reasons.  That's

20   information that the jury should not see or cannot see, as

21   opposed to interject the Court into the exhibit and suggest

22   that the Court is keeping a document or keeping information

23   from the jury.  But quite frankly, whatever the Court wants to

24   do, we're fine with.

25         THE COURT:  So your proposal on the Plaintiff's side

1    would be that it just say redacted?

2         MR. ALAVI:  Yes, Your Honor, with some type of

3    instruction either when you read the stipulation or at

4    beginning of trial, there will be documents that are sometimes

5    redacted.  That is just information that for various reasons

6    members of the jury or members of the public are not allowed to

7    see, as opposed to suggesting that the Court has ruled in favor

8    of one party or the other by redacting a document and putting

9    redacted by Court order on the document.

10        THE COURT:  And what is your concern about the

11   prejudice from it saying whether the Court did it or not?

12        MR. ALAVI:  Well, if you're the party introducing the

13   exhibit, it suggests that maybe you did something wrong or --

14   or the Court ruled against you, which generally we don't like

15   to have -- as a party, have the jury hear or understand.

16        MS. HIGGINS:  And, Your Honor, if I may, I think the

17   concern we have by not having it say redacted Court order is

18   that even with an instruction, it invites the jury to speculate

19   about why it is they're seeing a document that's redacted and

20   who all redacted it.  And so we think it would be better if

21   they just all consistently said redacted by -- by Court order.

22        THE COURT:  All right.  It will be sufficient for the

23   document to say redacted, and Judge Gilstrap will advise the

24   jury that they should not read anything into the redaction of

25   the exhibits.

1          MR. ALAVI:  Your Honor, the next exhibit -- and it's a

2    cluster, but they are a little bit different, are Exhibits 95

3    and 98.  And if I may, I will go to the podium to talk about

4    these a little bit.

5          And Ms. Caswell will put up -- put up the documents.

6    We can start with Exhibit 95.  Which one do I push, the right

7    table?

8          So this is a hearsay objection, Your Honor.

9    Exhibit 95 is a J.D. Power report, and I think it's important

10   for me to give you the context of this report, but let me tell

11   you why we think it doesn't come in.  It comes in over a

12   hearsay objection.

13         The first is under 803.17.  This is a -- a -- this is

14   a -- I'll get the rule real quick.  This is exactly what 803.17

15   was intended to cover, which is market reports.  J.D. Powers is

16   a market company.  But what's more important about this

17   particular exhibit is that it is not created solely by J.D.

18   Power.  J.D. Power creates these documents and then Samsung

19   goes to J.D. Power and has it custom made for Samsung's

20   internal use.  And I have the deposition of Mr. Bremer --

21   Brenner who was the corporate rep on these marketing documents,

22   and he testified, and I have the pages here for the Court to

23   see.  On Page 24 --

24         THE COURT:  Show me the part of the document that you

25   want the jury to consider.

1            MR. ALAVI:  Ms. Caswell, would you scroll through?

2            So what you'll see is -- keep going, keep going, keep

3    going.  Here, let me -- I need to get a little closer because

4    my eyesight is not that good.

5            So there's several parts of the report and -- that are

6    relied on by the experts.  For example, parts of the report

7    that talk about battery performance being an important feature.

8    So that's at the top under performance.  And Mr. Bremer

9    testified about this when he was -- he was given the document

10   and testified, yes, these are marketing surveys that we get,

11   and battery performance is consistently an issue that we see

12   with consumers.  It's something that they're -- find important,

13   and we design products to try to take care of batter

14   performance.  So that part -- and it carries over -- oops --

15   several pages.  Let me find the rest.

16           So, for example, there's this gap analysis that's done

17   where Samsung is commissioning J.D. Power to see how they do

18   against their competitors on different features, including

19   battery performance.

20           And then we show -- we're going to use these parts of

21   the report that talk about what does Samsung -- when they talk

22   to J.D. Power and they find out what features of a smartphone

23   are important, you see the features and some of those things,

24   for example, are battery performance.  So this is used -- at

25   least this report, Your Honor, to show that Samsung commissions

1    a report.  It's a market report that they use, and people in

2    the industry use.  It's commissioned by them to find out what

3    consumers find to be important.  And battery performance -- and

4    it -- it's so small, I'm not even sure if that one has the

5    battery performance on it, but it's throughout, is one of

6    the features that marketing companies who are hired by Samsung

7    to produce reports for them find to be an important feature.

8    So --

9          THE COURT:  What -- what evidence do you have that

10   this was commissioned by Samsung?

11         MR. ALAVI:  So Page 24 of Timothy Benner's report who

12   is the corporate rep designated on this topic.  Question on

13   Page 21:  So then let me take a step back.  This is a report

14   that J.D. Power condensed and tailored for Samsung, correct?

15   To -- question:  To present Samsung?

16         Answer:  That is correct.

17         And in the testimony before that on Page 23, when I

18   asked him did J.D. Power prepare this report, he said:  Well,

19   J.D. Power prepares generic reports, and then they also prepare

20   custom tailored reports where they go -- when you order a

21   report, they will go get their data and custom tailor it per

22   your order.  And that's on Page 22 and 23 of his deposition.

23         THE COURT:  Now, there's a difference between J.D.

24   Powers only presenting the requested parts of their data to

25   somebody and J.D. Powers going out and gathering data at the

1    request of somebody -- in this case, Samsung.

2            MR. ALAVI:  That's correct, Your Honor.

3            THE COURT:  Do you have evidence that Samsung directed

4    J.D. Powers to go out and gather this evidence for Samsung?

5            MR. ALAVI:  No, Your Honor.  That's not the position

6    we're taking.  This is a -- this is a market report that was

7    originally -- the information was gathered by J.D. Power for

8    the industry as a whole, and then this report -- that

9    information was tailored for Samsung to address Samsung's

10   request.  And that's exactly what 803.17 deals with, market

11   reports and similar commercial publications.  That is -- and

12   Samsung's testimony, their corporate rep is, they, in fact, use

13   this report.  On Page 25 of his testim -- of his deposition,

14   Mr. Benner testified that this report was actually used by the

15   product team to decide what to develop and what was important

16   to put into their products.

17           So we think it's admissible under 803.17.  Even if you

18   find it doesn't meet the hearsay exception, it is certainly

19   relevant if not offered for the truth of the matter.  It's at

20   least relevant to the hypothetical negotiation because it shows

21   what Samsung, one participant of the hypothetical negotiation

22   at the time, thought was relevant, including battery

23   performance.  And, therefore, if there's an invention that

24   improves battery performance, they would be interested in

25   paying to license that patent because it's important to them.

```
 1          THE COURT:  All right.  Let me hear from the

 2   Defendant.

 3          MS. HERMES:  So Samsung -- Rebecca Hermes on behalf of

 4   Samsung.

 5          Samsung does object to both Plaintiff's Trial Exhibits

 6   95 and 98 as hearsay.  These are prepared entirely by J.D.

 7   Power.  I'm going to refer to the deposition of Timothy J.

 8   Benner at Page 23 where he testified that they collect it in a

 9   way that we don't influence.  They're a third party.  They're

10   completely anonymous.  I think that's a -- a sic from us, and

11   that's part of what they need to maintain that anonymity

12   because they do give awards in terms of the top customer

13   satisfaction and things like that.

14          On Page 25, he said, there's parts of it that are

15   good, parts that are bad.  Pretty much any syndicated report is

16   that.  It's kind of -- there are some things that we would

17   agree with and certain things we don't agree with.

18          And so I don't believe it falls under the hearsay

19   except -- exception cited by opposing counsel in that -- if I

20   can just -- 803.17 seems to refer to market quotations, lists,

21   and directories.  And so that sounds more like sort of stock

22   sort of material and less this sort of analyst information.

23          THE COURT:  Well, do you dispute that Samsung relies

24   upon this sort of report?

25          MS. HERMES:  Samsung certainly hires J.D. Power to
```

 1   come in and present the J.D. Power results, but I don't know

 2   that the testimony goes to the fact that Samsung relies on this

 3   in making any decisions about its products.  They take it in,

 4   like I'm sure they take in a lot of information in the

 5   industry.

 6               THE COURT:  Why wouldn't this be something that would

 7   be fair game for the hypothetical negotiation?

 8               MS. HERMES:  So I was just hoping we could pull up the

 9   document and -- and check the date on that.  If we could get

10   Plaintiff's Exhibit 95?

11               MS. HIGGINS:  Can we move it to the front page?

12               MR. ALAVI:  Yeah, we're getting to the front page.

13               MS. HERMES:  Does the exhibit --

14               THE COURT:  The date of June of 2013.

15               MS. HERMES:  So that would be two years after the

16   hypothetical negotiation.

17               THE COURT:  What's the date of the data that they're

18   relying on?

19               MS. HERMES:  I assume it's from -- so we haven't had a

20   chance to depose J.D. Power on -- on the data in this report.

21   But we assume it's -- it's recent to the -- the reports are

22   generally done fairly -- fairly close together.

23               THE COURT:  And this was a document produced by

24   Samsung --

25               MS. HERMES:  Correct.

1          THE COURT:  -- from its files?  I will overrule the

2    hearsay objection.

3          MR. ALAVI:  Your Honor, I think Exhibit 78 is a

4    similar exhibit.  It's a -- it's another report that Mr. Benner

5    testified was a syndicated report on Page 78.

6          THE COURT:  What I just looked at is Exhibit 95.  Was

7    there another exhibit number close to that that was at issue on

8    this, too, or --

9          MR. ALAVI:  Yes, Your Honor.  It's Exhibit 98.

10         THE COURT:  And, Ms. Hermes, do you agree that that

11   would be subject to the same ruling?

12         MS. HERMES:  I'll note that it appears to be 2014,

13   which is two years later, but other than that, it would -- the

14   arguments would be the same.

15         MR. ALAVI:  And as the Court's aware, the book of

16   wisdom allows as part of the hypothetical negotiation, assumes

17   that the parties have the forward looking information.

18         THE COURT:  All right.

19         MR. ALAVI:  The hypothetical negotiation is in 2011.

20         THE COURT:  I'll overrule the objection as to 98, as

21   well.

22         What's the next one?

23         MR. ALAVI:  Your Honor, the next exhibit is

24   Exhibit 159, and Mr. Enger will be arguing that exhibit.

25         MR. ENGER:  Your Honor, this exhibit -- Plaintiff's

1    Exhibit 159 is a document that was set forth by the working

2    group of the 802.11 standards body.  This was -- it sets forth

3    their procedures.  It's from 1994, and it explains exactly who

4    they're able to distribute drafts of the 802.11 specification

5    to.  I think it's the last page, Page 5.

6          THE COURT:  Does this have to do with whether or not

7    it's publicly available?

8          MR. ENGER:  Yes, Your Honor.  If you see what's been

9    blown up, it says that -- this explains who the documents can

10   be distributed to.

11         THE COURT:  All right.  Let -- let me hear from the

12   Defendants as to the objection to this.

13         MR. HADDAD:  Your Honor, this was a -- a deposition

14   exhibit at the deposition of Mr. O'Hara, and when it was

15   presented to him, he respond -- I don't have the testimony in

16   front of me right now, but he responded something to the effect

17   of he didn't know whether this was ever adopted by the IEEE

18   802.11 working group.  So there's -- there's no testimony

19   that -- that even -- would get this in.

20         THE COURT:  Document -- just the little part I'm

21   looking at here, certainly looks like it was adopted.  It's got

22   a revision date on it.

23         MR. HADDAD:  Well, the testimony -- the testimony

24   that's in the record, and I'll -- I guess I'll pull it up.  And

25   I don't think -- I don't think Plaintiffs dispute that he said

```
 1   that he -- he didn't know that it -- whether it was ever

 2   adopted.

 3          THE COURT:  Well, the witness may or may not have

 4   known it, but is there -- is there some indication on the

 5   document itself?

 6          MR. HADDAD:  As to whether it was adopted?

 7          THE COURT:  As to whether it's considered by the IEEE

 8   to be in force?

 9          MR. HADDAD:  I don't think there's anything in here

10   that says whether it is in force --

11          THE COURT:  All right.

12          MR. HADDAD:  -- Your Honor.

13          THE COURT:  Well, then let me hear -- Mr. Enger,

14   what's the response to that?

15          MR. ENGER:  The response is that our witness,

16   Mr. Kerry, will be able to prove up this document.  He'll --

17   he'll give convincing testimony.  I -- I anticipate that this

18   document was, indeed, in fact, and it was indeed adopted as the

19   working group's procedures in 1994 that extended all the way up

20   until 1996/97 time frame whenever the draft WiFi standard was

21   at issue.

22          THE COURT:  Has Mr. Kerry been deposed?

23          MR. ENGER:  No, Your Honor.  We've offered several

24   dates, and none have been accepted, Your Honor.

25          THE COURT:  All right.
```

1          MR. ENGER:  In all fairness, there was a death in his

2    family that required him not to be able to do it until very

3    recently, but -- but that -- that -- notwithstanding, he has

4    not been deposed.

5          THE COURT:  Mr. -- Mr. Haddad, why shouldn't I say

6    that -- that they can admit this if they lay a foundation

7    through Mr. Kerry?

8          MR. HADDAD:  If they can lay a foundation, Your Honor,

9    then -- then there'd be no objection, but as it stands now,

10   there -- there's no evidence.  In fact, the -- the testimony

11   that we have in the record is that it's not reliable, and it

12   was never admitted -- not admitted.  It was never approved.

13         THE COURT:  And what -- what evidence is there in the

14   record that it was never approved?

15         MR. HADDAD:  Mr. O'Hara testified that he didn't know

16   whether -- whether it was ever approved, and his deposition was

17   taken.

18         THE COURT:  How is he doesn't know the same as it was

19   never approved?

20         MR. HADDAD:  Well -- well, it's not the same.  It's

21   just that the testimony from Mr. O'Hara is that it was -- it

22   was -- any -- there is no testimony that it was approved, and

23   any testimony that is in the record is that he has no idea

24   whether it was.

25         THE COURT:  All right.  I'll allow this to remain on

```
 1   the list, No. 159, but I'll direct that it not be used in any

 2   manner until Mr. Kerry has laid a foundation.

 3            What's next?

 4            MR. ALAVI:  Your Honor, the next exhibit is

 5   Exhibit 245, which is a patent, and Mr. Enger will argue that.

 6            THE COURT:  All right.  Let me hear the objection to

 7   it.

 8            MR. HADDAD:  Your Honor, Plaintiffs are offering this

 9   patent to prove the matter asserted.  They have a -- their --

10   they have an expert report.  Their expert, Dr. Mr. Akl, relied

11   on this to prove --

12            THE COURT:  So hearsay is the objection?

13            MR. HADDAD:  Hearsay is the objection, Your Honor.

14   I'm sorry.

15            THE COURT:  Okay.

16            MR. HADDAD:  It's been a long day.

17            THE COURT:  All right.  What's your response to that,

18   Mr. Enger?

19            MR. ENGER:  The response is that our expert will not

20   be relying on this patent for the -- the truth of the matter

21   asserted, but rather just to simply show that occasionally

22   people represent wireless networks with lines.  That -- that's

23   the extent of it.  He's not going to be addressing the -- the

24   substance of this technology and -- and trying to offer

25   opinions on how it works.
```

1          THE COURT:  So this is just about the issue of whether

2   or not a line on a diagram can be a wireless network -- a

3   wireless communication line?

4          MR. ENGER:  That's all our expert has offered this --

5   this patent for.

6          MR. HADDAD:  But -- but, Your Honor, he's offering it

7   for the truth of the matter that -- that's asserted there --

8          THE COURT:  I mean --

9          MR. HADDAD:  -- that indeed a -- a wireless system can

10  be represented by a -- by a line.  In fact --

11         THE COURT:  I -- I can't imagine that that's in doubt.

12  I think clearly there are diagrams that -- that use lines for

13  wireless communication lines.

14         Is there -- do you have an expert, Mr. Haddad, who is

15  going to testify that a line on a diagram cannot represent a

16  wireless communication line?

17         MR. HADDAD:  I -- we do not have a -- an expert who's

18  going to testify to that, Your Honor.

19         THE COURT:  That does not surprise me.

20         MR. HADDAD:  What we're -- my only point is that the

21  way they're using this document is to -- is for the truth of

22  the matter asserted in the document.

23         THE COURT:  Okay.  I understand the objection.  It's

24  overruled.

25         MR. ALAVI:  Your Honor, the next exhibit is

1    Exhibit 346, and this may be one where we can -- if we can get

2    some guidance a bit.

3            Let me give the -- the Court the background.

4    Exhibit 346 is an exhibit to Mr. Weinstein's supplemental

5    report.  The supplemental report deals with the BlackBerry

6    license.  And what he did is he was able to -- because he had a

7    chart that he had done for his BlackBerry expert report, that

8    BlackBerry gave Rembrandt permission to use, because the

9    protective order in this case prohibits the Plaintiffs from

10   using BlackBerry confidential information in any way in the

11   Samsung case.

12           So he got permission to use that -- that exhibit he

13   had done in order to calculate the number of units that were

14   settled in the BlackBerry settlement agreement to calculate a

15   per unit royalty.

16           There is a hearsay objection, and I understand the

17   hearsay objection.  It is a -- I think a compilation of data.

18   But quite frankly, we're offering it -- but we can also live

19   with being able to show the jury, and that's why I need some

20   guidance.  My understanding is if it's not admitted, the Court

21   does not allow the -- the -- a party to show, for example, an

22   expert's exhibit that he's done calculating information.

23           So our original preference is to admit it.  It's a

24   compilation.  It involves BlackBerry units.  It's calculated

25   through the date of the settlement.  It's the basis by which he

1    then takes the settlement amount in the BlackBerry license,

2    which is a backwards look -- looking only license and

3    calculates a per unit royalty.  And I think there's a hearsay

4    objection lodged.

5             THE COURT:  All right.  Let me hear the hearsay

6    objection.

7             MS. HIGGINS:  So, Your Honor, in terms of the hearsay

8    objection, the -- it is hearsay.  They're offering it for the

9    truth of the matter asserted.  One of the things that we

10   have going on here, Your Honor, is that you will hear from

11   counsel with respect to other BlackBerry exhibits, that

12   information relating to the units sold should come in, but yet

13   Mr. Weinstein in this case did a report where he analyzed

14   BlackBerry -- BlackBerry's units, BlackBerry's chip price,

15   and in connection with that, they would like to allow this

16   hearsay document in, but then preclude other documents, such as

17   other information from Mr. Weinstein's report, which put this

18   in context.

19            And -- and so we believe the document is hearsay.

20   It's not a compilation because we -- we don't have the -- the

21   underlying document from which this was created.  And so we

22   think it's hearsay.  And if Your Honor is going to let it in,

23   we think the -- the other related documents that have to do

24   with BlackBerry that put this whole agreement in context should

25   also be able to come in so that we can cross-examine

1    Mr. Weinstein with them.

2            THE COURT:  All right.  You're -- do you contend that

3    Mr. Weinstein is not able to rely upon this number, for

4    whatever it's worth, in his testimony?

5            MS. HIGGINS:  It -- it is hearsay, and there's a

6    difference between him relying on it and -- and -- and this

7    exhibit coming into evidence, Your Honor, and --

8            THE COURT:  That's what I'm asking about.  Is -- is --

9    is your objection only to the introduction of 346 as an exhibit

10   to the jury, or is it to his reliance upon the numbers revealed

11   in there for his opinions?

12           MS. HIGGINS:  He may rely on it, but we also had other

13   objections to this exhibit, as well.  It is prejudicial,

14   especially if Samsung is not allowed to put -- put these units

15   in context of the report.  So this -- this is an exhibit that

16   was --

17           THE COURT:  Well, let me --

18           MS. HIGGINS:  -- prepared for another report.

19           THE COURT:  Let me just hear from the Plaintiff on --

20   on the hearsay objection, because I would agree with you, this

21   appears to me to be hearsay, and so I -- I need to hear what

22   their response to that is.  And it may not be necessary for you

23   to get to your other objections.

24           MR. ALAVI:  So, Your Honor, I think the answer to the

25   hearsay objection is twofold.  The first is -- and the

1  testimony -- there's actually emails to this effect that are

2  on -- that are going to be admitted is that during the

3  negotiations, Mr. Weinstein was asked by Rembrandt and

4  calculated the number of units that BlackBerry sold.

5       And so what Mr. Weinstein testifies is based on the

6  date that the settlement was reached and the fact that

7  Rembrandt was using his calculations to figure out how many

8  units were sold, he was able to extrapolate the number of

9  units.  So it doesn't have to be offered for the truth of the

10  matter asserted.  It is an exhibit that is a calculation that

11  he performed and provided to the Plaintiff in this case when

12  the Plaintiff was negotiating the amount of the settlement.

13       So no one is suggesting, for example, that, you know,

14  maybe -- maybe BlackBerry gave us the wrong numbers in

15  discovery.  We don't have to introduce the numbers for the

16  truth of the matter asserted.  It is a document that the

17  Plaintiff relied upon in coming up with the settlement number,

18  and that's how he calculates the per royalty unit.  So it's not

19  hearsay in the classic sense because it's not offered for the

20  truth of the matter asserted.

21       THE COURT:  I'm going to sustain the objection to 346.

22  You -- it may be relied upon as a basis for a calculation, but

23  unless the door is opened on cross-examination, it will not be

24  admitted.

25       What's next?

1        MR. ALAVI:  The next exhibit, Your Honor, is 854, and

2   Mr. Enger will take that argument.

3        MR. ENGER:  Your Honor, this is a paper co-authored by

4   Defendants' validity expert and non-infringement expert,

5   Dr. Goodman.  You can see his name right there in the title.

6   This -- this is not hearsay because it's not being offered for

7   the truth of the matter asserted.  It's not being offered to

8   show that any particular statement within this document is

9   actually true.  Rather, I believe it's on the second or the

10  third page, there's a -- a statement that he wrote -- further,

11  please, maybe one more.  It could be in here.

12        But -- but the -- the point, Your Honor, is that he

13  used the word "indicate" very differently than his opinions at

14  trial.  And -- and so we're offering it not to show that --

15        THE COURT:  That's fine.  Let me hear about the

16  objection.

17        MR. HADDAD:  Your Honor, this -- this -- this is

18  hearsay.  They're -- they're offering it to prove the fact

19  that the -- the word "indication," used by the author, who's

20  our expert, used it differently.  And they're offering it for

21  that -- that particular purse -- purpose.  If they want to --

22  they want to introduce this into evidence -- if they want to

23  use this on cross, this is exactly what cross is for.  You said

24  something and in something else you wrote, and they can cross

25  him on it.  But to put this in evidence means that they've --

```
 1   that -- that --

 2         THE COURT:  Is there something in the document that

 3   you think has some harmful relevance, other than the use that

 4   they want to put it to?  I mean, are -- are we really worried

 5   about anything here?

 6         MR. HADDAD:  Well, we don't -- we think it is hearsay,

 7   Your Honor.  They're offering it to prove that the word means

 8   something else.

 9         THE COURT:  They're offering it to prove that -- that

10   your expert used it in a way that's contrary to the way he's

11   going to tell the jury about; is that right?

12         MR. HADDAD:  As an out-of-court statement offering to

13   prove it here in court, they're -- that's what they're trying

14   to do.  And they can use it on cross if they want.

15         THE COURT:  I think this is classic that it's the fact

16   that the statement was made that it's being offered for, not

17   whether that out-of-court statement's true, but that this

18   witness has previously said something different.

19         Now, I agree with you that it ought to be used on

20   cross-examination, but is there -- Mr. Enger, is this -- do you

21   intend to use this in anything other than the cross-examination

22   of the witness?

23         MR. ENGER:  No, Your Honor.

24         THE COURT:  All right.  Well, with that understanding,

25   I'll overrule the objection, but -- because I don't think it's
```

1   a valid hearsay objection.

2          That's 854.  All right.

3          MR. ALAVI:  Your Honor, the next set of -- of

4   exhibits, it's a cluster of exhibits.  I think they're also

5   closely related, we can deal with them as a cluster, are

6   Exhibits 883 and -- through 887.

7          And, Your Honor, this is complicated enough, that if I

8   may, I can give the Court a little bit of background.

9          Dr. Becker is the Defendants' damages expert.  His --

10  these are -- these are pleadings from a case, as the Court was

11  able to tell just by looking at the first exhibit.

12         THE COURT:  It's like a docket sheet.

13         MR. ALAVI:  The first one is a docket sheet, and there

14  are various pleadings.

15         Dr. Becker, his primary opinion in the case is that

16  there is a license agreement that was reached in the settlement

17  between Bandspeed and Samsung that deals with a different

18  patent and a different part of Bluetooth that is the most

19  appropriate license to use as a comparable license.  And he

20  comes up with some opinions as to what the number is.

21         When I deposed -- and he -- he gives litigation

22  discounts, and he purports to know what type of litigation

23  discount you should give in order to come up with a number.

24         When I deposed him, I brought various docket sheets,

25  pleadings that were in the Bandspeed matter that are relevant

1    to part of his testimony, which is whether or not he gave the

2    appropriate litigation discount in trying to treat this as a

3    comparable license, putting aside it's a different technology,

4    a different patent.

5         And he testified that he had made no investigation

6    whatsoever into the Bandspeed litigation when applying

7    litigation discounts to then decide out of his head when he

8    pulled it out how all the factors should lead to a lump-sum

9    license.  So I went through various pleadings with him in the

10   Bandspeed case, including the fact that in the Bandspeed case,

11   the Defendants all took the position that Bandspeed, because it

12   was a member of the Bluetooth SIG, had already given everyone a

13   license for free -- to go through with him the type of work he

14   should have done in order to actually give a credible opinion

15   that the Bandspeed license, with all the litigation discounts

16   and other things that he applied, should have been the basis

17   for a comparable license.

18        THE COURT:  All right.

19        MR. ALAVI:  These are being admitted for that purpose.

20        THE COURT:  Let me just interrupt you now and hear

21   about the objections to this.

22        Ms. Hermes, do you object to all of these?

23        MS. HERMES:  Yes, Your Honor, we object to these on

24   the basis of hearsay, relevance, and that they're prejudicial.

25        THE COURT:  How can there be a relevance objection

1    if -- if your expert's relying upon the license from this case?

2         MS. HERMES:  Well, I will note that four of the

3    documents relate to the docket sheets and a summary judgment

4    motion from the case for other Defendants and a motion that was

5    brought two years after Samsung settled the case, and so we

6    don't see how that has any relevance to -- I mean, I'll note

7    there's one -- so that if you look at --

8         THE COURT:  Move on.  Then tell me which of the

9    documents you think are irrelevant on that ground.

10        MS. HERMES:  So that would be PX 883, which is a

11   docket sheet for Bandspeed versus Acer.  It's a different

12   Defendant.  PX 884 is a docket sheet for Bandspeed versus

13   Garmin.  885 is an amended complaint for Bandspeed.  That would

14   be amended complaint as to all of the Defendants, but --

15        Mr. Gregov, if we could pull up PX 885?  If you could

16   just get the date off that document.

17        MR. ALAVI:  Ms. Caswell will pull it up for you.  I

18   think it's --

19        MS. HERMES:  Oh.

20        MR. ALAVI:  -- switched to ours.

21        MS. HERMES:  If we can get the date on that one.

22        THE COURT:  January of 2011.

23        MS. HERMES:  So that -- so that would include Samsung.

24   So that would not -- that would -- we would take that out, as

25   well as the affirmative answer in terms of this particular

```
 1    aspect of the injection.

 2            And then the Toshiba Corporation motion for summary

 3    judgment on the patents, that was two years after Samsung

 4    settled out of the litigation.

 5            THE COURT:  All right.  Besides relevance, what are

 6    your other objections?

 7            MS. HERMES:  That it's prejudicial because it's

 8    confusing to the jury.  There are obviously defenses --

 9            THE COURT:  What else?

10            MS. HERMES:  And then hearsay.

11            THE COURT:  Okay.  Thank you.

12            Mr. Alavi, what is your response, first off, to the

13    relevance objection that some of these post date the settlement

14    by Samsung?

15            MR. ALAVI:  Well, I think the only thing that post

16    dates is the summary judgment motion, and I'll -- because the

17    two docket sheets -- this was a consolidated case that was

18    ultimately transferred, so that's why the two docket sheets are

19    in there.  They're -- they include Samsung.

20            THE COURT:  All right.

21            MR. ALAVI:  So we can't get into the attorney-client

22    communication that Samsung had with its own counsel, but what

23    we do have is their answer where they raised the license

24    defense.

25            THE COURT:  I'm talking about the motion for summary
```

1  judgment.

2       MR. ALAVI:  That's right, Your Honor.  And this motion

3  for summary judgment was the motion that was filed by the

4  remaining Defendants in the defense group, the joint defense

5  group after all the other Defendants had settled on the very

6  defense that Samsung raised in its affirmative defenses in the

7  case which was license.  And the issue, though, is Mr. Becker

8  at least has an obligation if he says apply, some kind of

9  litigation discount, to try to investigate the merits of the

10 case.  We're not going to get into all these details, but I

11 think we're entitled --

12      THE COURT:  I'll sustain the objection to 887 because

13 I don't care what the other Defendants asserted years after

14 Samsung settled out.

15      And I'll overrule the objections to 883 through 886.

16 I believe that they are relevant, and they're not offered for a

17 hearsay use.

18      What's next?

19      MR. ALAVI:  Your Honor, the next exhibit is, I think,

20 the last one, but I will double-check, is Exhibit 913.  And

21 this is a -- an internal Samsung marketing report that deals

22 with battery life on notebook computers.  And I think the

23 objection is hearsay.  I can give you a little bit of

24 information to --

25      THE COURT:  What's your response to a hearsay

1    objection?

2          MR. ALAVI:  It's Samsung's own internal document.

3    They produced it.  NAHQ is Samsung's own entity that produces

4    marketing reports for Samsung.

5          THE COURT:  All right.

6          MR. ALAVI:  So it's a party admission.

7          THE COURT:  Thank you.

8          MS. HERMES:  Our objection is that this has not been

9    used with any Samsung witness in the case, so it's hearsay.

10   And that they haven't proved it up to be any kind of a business

11   record.

12         THE COURT:  How would whether it's been used with a

13   Samsung witness have anything to do with whether it's hearsay?

14         MS. HERMES:  So the -- the document itself contains

15   hearsay within hearsay.  So it's Samsung's marketing research,

16   and so it's the marketing people going out and -- and bringing

17   back information that itself would be hearsay.

18         THE COURT:  Okay.  I'll overrule the objection to 913.

19         MR. ALAVI:  Your Honor, if you give me -- may I have

20   30 seconds just to make sure I didn't miss anything?

21         THE COURT:  All right.

22         MR. ALAVI:  We did cover all the objections.

23         I did want to ask the Court's guidance on one issue,

24   and I think it will appear in both exhibits.  There are certain

25   clusters of exhibits that the parties acknowledge are out

1    because of the motion in limine.  So we're leaving them on our

2    witness list, but with the idea that if someone opens the door,

3    they're on the exhibit list.

4         We assume the Court did not want to deal with specific

5    objections to those, but if we're wrong, we can go back and

6    work our way through those.

7         THE COURT:  They -- they should not be on the exhibit

8    list.  This exhibit list is for documents that have been

9    pre-admitted, with the sole exception of a document that the

10   Court has allowed to stay on the list pending a foundation.

11   But the fact that there's something that the door may be opened

12   on, that should not be on this list.  Obviously, if you think

13   the door's been opened, you can approach the bench.  If they --

14   if the other side raises the objection that you haven't

15   disclosed it, then you can show that it was on an earlier

16   witness exhibit list, but the only thing that should be on this

17   exhibit list is pre-admitted exhibits.

18        MR. ALAVI:  Okay.  So that's the guidance we needed.

19   We'll confer with the other side.  I think -- I think at least

20   from my perspective, the guidance is clear.  Only admitted

21   exhibits.  If -- I don't think we can pre-admit exhibits that

22   are subject to the motion in limine.  So if the door's open, we

23   approach and -- and talk to the Judge at that time about using

24   the exhibits?

25        THE COURT:  That's right.

1          MR. ALAVI:  Okay.

2          THE COURT:  And in the unlikely event that -- that the

3     claim is that you've not previously disclosed that exhibit,

4     then bring up the fact that it was on the list before.  But it

5     shouldn't be on the list after this hearing.

6          MR. ALAVI:  Thank you, Your Honor.  I think we're now

7     ready to move to the Defendants' exhibits.

8          THE COURT:  All right.  Who's going to present for the

9     Defendant?

10          MR. HADDAD:  Gerard Haddad for Samsung, Your Honor.

11          I believe the first exhibit, Your Honor, is 1059, and

12     we'll deal with this in a group, 1059, 1060, 1061, and 1062.

13          THE COURT:  All right.

14          MR. HADDAD:  Your Honor, each of these documents are

15     documents authored by the inventor, Mr. Bremer.  Each one --

16     it's hard to see, but at the bottom, it says, you know,

17     sincerely, Gordon Bremer.  On 1069, 1070, 1071, they're all --

18     I'm sorry, 1059, 1060, 1061, and 1062, each one has -- it

19     either indicates at the top it's from Gordon Bremer or inside.

20          And so, Your Honor, he wrote it.  He's coming live.

21     And he can lay -- establish that it's not hearsay -- lay the

22     foundation.

23          THE COURT:  Frankly, whether or not he's coming

24     doesn't have anything to do with whether it's hearsay.  But

25     it -- the use for which you're offering it may have something

1    to do with it.  If he's coming, why do you need his documents?

2              MR. HADDAD:  Your Honor, this -- these documents

3    show -- they -- they go to Mr. Bremer when he was employed by

4    Paradyne, that he was involved with selling patents and -- and

5    involved with selling and -- and trying to market them to other

6    people, other -- other entities.

7              THE COURT:  Do you need these because you don't think

8    that Mr. Bremer is going to admit what's -- what's in these or

9    to refresh his recollection or why -- why is he not simply

10   going to testify about this?

11             MR. HADDAD:  Well, we don't know what -- we don't know

12   exactly what he'd say at -- at trial, but we -- we can use it

13   for -- Your Honor, you're right, we could use it to impeach him

14   if he says something other than what is stated in these

15   records.

16             THE COURT:  Well --

17             MR. HADDAD:  But these are records of the -- of -- of

18   the company he was working for, when he was working there, and

19   he was the author.

20             THE COURT:  Okay.  Let -- let me --

21             MR. HADDAD:  Very -- it's very similar to

22   Dr. Goodman's article.

23             THE COURT:  We knew what Dr. Goodman was going to say,

24   I guess.  Do you have some reason to think that Mr. Bremer is

25   going to contradict the contents of these exhibits?

1          MR. HADDAD:  No, Your Honor.

2          THE COURT:  All right.  Let -- let me hear from the

3    Defendant -- Plaintiff on the objection.

4          MR. ALAVI:  Your Honor, what I've heard is they want

5    to offer these out-of-court statements by Mr. Bremer years ago

6    for the truth of the matter asserted.  It's hearsay.  There's

7    no exception.  He's going to come to testify.  If he

8    contradicts an out-of-court statement that he made 10 years

9    ago, he can be impeached.  That's how the document should be

10   used.

11         THE COURT:  You're calling Mr. Bremer as your witness?

12         MR. ALAVI:  We're calling him, yes, Your Honor.

13         THE COURT:  Okay.

14         MR. HADDAD:  Your Honor, there's value in -- in -- in

15   putting this document in front of the jury to show what he

16   actually did.  He had a pattern.  He was -- he was employed by

17   Paradyne, and had -- and -- and had -- there's a whole series.

18   There's four documents where he's selling these.

19         THE COURT:  These -- tell me about what the exception

20   is to the hearsay rule or what the non-hearsay use is of it.

21         MR. HADDAD:  It -- it's a business record of the

22   company showing they were looking -- looking to market their

23   patent -- market their patents, including -- and -- and

24   Mr. Bremer was involved in marketing those patents, from all

25   the way back in the early days of the --

```
1              THE COURT:  I -- I don't think you've come close to

2     satisfying the test of the business records exception.  Have

3     you got something showing this is --

4              MR. HADDAD:  Well, he's coming live.

5              THE COURT:  Yeah.  And --

6              MR. HADDAD:  Part of his -- part of his job

7     responsibilities when he was at Paradyne was to analyze

8     Paradyne's patent portfolio and figure out who they should send

9     these letters out to and figure out who to -- to whom they

10    should be marketing their patents.  That was his job

11    responsibility.

12             THE COURT:  And you understand what the test is for

13    803.6, for business record.  And -- I mean, I -- certainly I

14    don't see any of those satisfied in this, but if you think

15    that -- I mean, certainly you can question Mr. Bremer about

16    this, and you can impeach him with it.  If he -- if he

17    testifies in contradiction to what you've got in that document,

18    but it is a hearsay document.  Hearsay documents can be used to

19    impeach the author, but I'll sustain the objection to 1059

20    through 1062, and -- but that does not mean that you cannot

21    seek to impeach him with it if he testifies to the contrary.

22             What's next?

23             MR. ALAVI:  Your Honor, the next one is actually a

24    guidance point or at least to get something on the record.

25    There are two exhibits, Exhibits 1108 and 1113.  These are --
```

```
 1  one of the exhibits is from a related Rembrandt entity --
 2  that's 1108.  The other is 1113.  The Plaintiffs -- Plaintiffs
 3  have agreed to withdraw their objections to these documents,
 4  and we've reached an agreement with Samsung that by withdrawing
 5  our objections, that is not a waiver of the -- the motions in
 6  limine that the Court has already granted with respect to
 7  Rembrandt's business practices, and that the parties will use
 8  this -- these two documents consistent with the Court's motion
 9  in limine ruling.  We just don't want to on the record waive --
10  withdraw the objection and then have an argument that we
11  somehow waived the motion in limine.
12          THE COURT:  All right.  So what you're saying is that
13  you believe that the Court has ruled on an in limine basis in a
14  manner that would cause 1108 and 1109 to be admissible?
15          MR. ALAVI:  We do believe that they're admissible, but
16  they come close enough to the line that we don't want to be
17  seen as -- by withdrawing our objection, waiving those limine
18  points that we had previously moved on and the Court has ruled
19  on.
20          THE COURT:  All right.  I'll state that your
21  withdrawal of your objection does not waive your objection to
22  the Court's motion in limine ruling.
23          What's next?
24          MR. SHERWOOD:  Your Honor, I'd like to speak to this
25  because I have -- maybe not quite a disagreement but something
```

1    that I do want to raise with respect to this particular -- I'm

2    looking at actually 1108, Your Honor.

3             THE COURT:  You know, at this point, the document's

4    admissible.  Do you have a problem with it being admissible?

5             MR. SHERWOOD:  I have a problem with one slide.  I

6    have a problem with Slide 8, Your Honor.  And your motion -- in

7    their motion in limine, they asked that there -- that it be

8    excluded any reference to essentially the poker playing

9    activity of an indirect owner of Rembrandt.  And what's in this

10   slide -- I thought it was Slide 8.

11            MR. ALAVI:  No, it's the last one.

12            MR. SHERWOOD:  I think it's --

13            MR. ALAVI:  We'll find it for you, counsel.

14            MR. SHERWOOD:  I'm pretty sure it is Slide 8 actually,

15   at least in my copy it is.  Yeah, there you go, Your Honor.

16            It's talking about how the general partner is

17   contributing profits to a 501(c)(3) charitable organization,

18   support for under privileged children, and introducing decision

19   science to school children.  And, Your Honor, I think that if

20   they want to keep out poker playing, which, Your Honor, has

21   ruled that they will, then so, too, this has to stay out.  It's

22   a goose and gander --

23            THE COURT:  This is your exhibit, right?

24            MR. SHERWOOD:  It's their document, Your Honor.

25            THE COURT:  All you have to do is withdraw it as an

1    exhibit, right?

2              MR. SHERWOOD:  Well, Your Honor, I want to use part of

3    it, but I don't want this to -- this is -- this is something I

4    think the Court has ruled does not come in, this particular

5    information.  So what I'm asking is that -- that Slide 8 be

6    removed -- be redacted.

7              THE COURT:  All right.  Is that something you've

8    talked to the other side about?

9              MR. SHERWOOD:  Yes, Your Honor.

10             THE COURT:  And -- and what -- what is the -- the

11   issue?  They object to the removal of this page; is that what

12   you're telling me?

13             MR. SHERWOOD:  That was the sense I got from what

14   Mr. Alavi said, yes.

15             THE COURT:  All right.  Mr. Alavi, tell me what --

16             MR. ALAVI:  Your Honor, your motion in limine dealt

17   with the ultimate individual owner of the Rembrandt entities, a

18   limited partner who -- who receives distributions, and bar

19   discussion of the fact that he plays poker.  This deals with

20   the general partner of this entity, and it's an ent -- it's a

21   corporate entity in that it gives its profits to charity.

22             We don't -- we didn't have to withdraw our objections

23   to this.  This is not a document of the Plaintiff.  It's a

24   document of a related entity.  They want to use it to make

25   their case about what a non-practicing entity does.  No good

1    deed goes unpunished, from our perspective.  We withdrew our

2    objection, but we don't want it used in a way -- things

3    redacted that are good.  They want the bad, but not the good.

4    It's unrelated to the motion in limine the Court granted, which

5    was that they could not discuss that an individual --

6              THE COURT:  All right.  Thank you.

7              Mr. Sherwood, you can have 1108 in or out.  What's

8    your choice?

9              MR. SHERWOOD:  I guess we'll take it in, Your Honor.

10              THE COURT:  All right.  Thank you.

11              MR. ALAVI:  Your Honor, the next -- well, I'll let --

12    the Defendants' exhibit list.  I'm sorry, I jumped the gun.

13              MR. SHERWOOD:  So could we put 1120 up on the screen,

14    please?

15              Your Honor, we talked about this exhibit when we were

16    together before.  It came up in the context of their Motion in

17    Limine No. 2.  And, in fact, on Pages 46 and 47 of the

18    transcript from that prior hearing, I specifically raised this

19    drawing which was drawn by Mr. Wood who was a 30(b)(6) dep --

20    witness for Rembrandt.

21              What it does is it explains what the ownership -- what

22    the structure is, not ownership.  It's the structure of

23    Rembrandt.

24              Mr. Wood himself, Your Honor, is not an employee of

25    the Plaintiff, but he was offered as a 30(b)(6) for the

1  Plaintiff because the Plaintiff, in fact, Your Honor, has no

2  dep -- has no witnesses and needs to have somebody else testify

3  for it.

4        Motion in Limine No. 2, Your Honor, related to -- and

5  your order granting that also relates to this, the use of

6  pejorative terms such as corporate shells, making negative or

7  disparaging remarks about Rembrandt's corporate structure.

8  This is a drawing that their 30(b)(6) witness made during the

9  course of his deposition, explaining how Rembrandt functioned.

10 And, in fact, Your Honor, explaining where the money came from

11 for them to buy the patents and where any proceeds would go in

12 the -- in the Rembrandt network.

13       THE COURT:  Why does that matter?

14       MR. SHERWOOD:  Why does that matter, Your Honor?

15 Be -- because we want to show what Rembrandt is, who Rembrandt

16 is.  In other words, we have the right, I think, Your Honor, to

17 acquaint the jury with -- with who Rembrandt is.  And -- and

18 I'm not proposing that this will be done in a negative or

19 pejorative way.

20       I mean, just to give you an example of how far they've

21 taken your ruling, they have objected in the deposition

22 designations to Mr. Wood, the man who wrote this, even being

23 able to testify about who he works for.  You know, the

24 beginning of the deposition, we say:  Who do you work for?  And

25 they've objected to that, saying that your motion in limine has

```
 1   precluded us from even introducing to the jury who the man is.

 2          THE COURT:  Well, that -- that is clearly not the

 3   purpose of that ruling.  However, this was the purpose of that

 4   ruling.  The ownership history of the patents is something that

 5   is relevant and allowable.  The corporate structure of

 6   Rembrandt -- I mean, what relevant issue does a jury have to

 7   decide that this relates to?

 8          MR. HADDAD:  Well, Your Honor, just -- just -- it --

 9   what I said before goes now.  This is -- it's the pathway

10   through which ownership of these patents passed.  And, in fact,

11   Mr. Anaipakos on Page 47 said, we would be fine with the

12   discussion of chain of title.  Well, this drawing was used to

13   illustrate the structure through which those patents passed to

14   get from Summit, which you can see here at the bottom right is

15   a Rembrandt entity, up to Rembrandt Wireless, which has

16   asserted these claims.

17          THE COURT:  Exhibit 1120 is -- the objection is

18   sustained.  I believe that's squarely covered by the ruling on

19   Motion in Limine No. 2.  We've already litigated this issue.

20          MR. SHERWOOD:  Your Honor, if -- may I just say that

21   the ruling at the bottom of Page 47 said that it was granted

22   except as to the ownership history.

23          THE COURT:  Yeah.  And you can talk about the

24   ownership history of the patents.  This is not limited to that.

25          MR. SHERWOOD:  I understand, Your Honor.
```

```
 1           THE COURT:  All right.  What's next?

 2           MR. ALAVI:  Your Honor, may I help opposing counsel?

 3           THE COURT:  If he wants help, you may help him.

 4           MR. ALAVI:  Okay.  The next one is 1488.

 5           MS. HERMES:  I was asking if 1017 had been withdrawn.

 6           MR. ALAVI:  It was --

 7           MS. HERMES:  Yes.  Okay.

 8           MR. ALAVI:  It was.

 9           MS. HERMES:  Then we'll go on to 1488.

10           Your Honor, Defendants' Exhibit 1488 was created by

11   our damages expert, Dr. Becker.  Dr. Becker did a summary of

12   patents that refer to Bluetooth.  Mr. Weinstein bases his

13   damages model on the Bluetooth chip within the Samsung

14   products, and in some cases takes a 14-cent royalty on a chip

15   that costs 30 cents.

16           And so to rebut that sort of analysis, Dr. Becker has

17   looked at all the patents that cover Bluetooth of which he's

18   found there are approximately 7,025 patents.  The summary would

19   be admissible under 1006, and the underlying contents, the

20   patents are not being offered for the truth of the matter

21   asserted for anything claimed in them but just to establish

22   that they are, in fact, patents that mention Bluetooth.

23           THE COURT:  All right.  Let me hear the objection.

24           MR. ALAVI:  Your Honor, there's a hearsay objection

25   and a relevance and prejudice objection.  On the hearsay
```

1   objection, it's classic hearsay.  It's a document created by

2   the expert outside the courtroom.

3          The response that you heard from Samsung is that it

4   complies with Rule 1006.  The problem with that is they've

5   never made the underlying 7,000 patents available to anyone in

6   this case, other than their own expert for inspection.  We've

7   never gotten them.  They were never produced to us.

8          There's a relevance and prejudice project -- objection

9   because what did Mr. -- Dr. Becker do?  He went and looked for

10  patents that had the word "Bluetooth" in them.  What could that

11  include?  Non-Bluetooth patents.  It's fine if he testifies

12  about the work he did.  We will cross him, believe me, but to

13  take his exhibit which is a search of all patents that use the

14  word "Bluetooth" --

15         THE COURT:  Well, let -- let me just hear back from

16  Ms. -- Ms. Hermes.  Is this just a list of patents that have

17  the word "Bluetooth"?

18         MS. HERMES:  No, Your Honor.  It was a more detailed

19  analysis that's set forth in Dr. Becker's report, and it lays

20  out that he looked for patents.  I -- I don't have them --

21         MS. HIGGINS:  Two art units in two patents -- art

22  units.

23         MS. HERMES:  Yeah, he -- he went to specific art units

24  in a patent search that would be relevant, and then -- and then

25  from that, he culled it down to -- to companies that were

1    members of Bluetooth SIG.  And then -- and then after that,

2    then he looked to be sure that they mentioned Bluetooth.  So

3    they had to be within certain areas of art.  That was to ensure

4    that they weren't, for example, a patent on a Bluetooth

5    headphone or something that didn't -- didn't apply, and then

6    Bluetooth SIG numbers meant that they would be --

7          THE COURT:  All right.  Have -- have you made the

8    originals or duplicates of these 7,025 patents available for

9    examination or copying or both by other parties at a reasonable

10   time and place?

11         MS. HERMES:  Not yet, Your Honor.  They're publicly

12   available.

13         MS. HIGGINS:  So the list, Your Honor, is a list of

14   the patent numbers.  So they're -- you know, you can just look

15   them up.

16         THE COURT:  Well, it's certainly not -- not useable

17   under Rule 1006 -- if you have not complied with the

18   requirements of 1006.  And like other documents that an expert

19   produces in his report, that's for disclosure purposes to the

20   other side.  They're not admissible just because they were part

21   of his report.  He can talk about them.  But I'll sustain the

22   objection to Exhibit 1488.

23         What's next?

24         MS. HIGGINS:  Your Honor, DX 1710 is a

25   BlackBerry/Bandspeed license.  The objections here are

1    relevance, prejudice, and violation.

2            THE COURT:  This is a license from --

3            MS. HIGGINS:  From Bandspeed to BlackBerry.  And

4    what is significant about this license is that it pertains to

5    two patents.  It pertains to two Bluetooth patents.  And so we

6    are talking about the relevant field here.  And specifically,

7    we believe that in this case once BlackBerry and Rembrandt

8    settled and we then received a supplemental report from

9    Dr. Weinstein relying on the BlackBerry/Rembrandt agreement,

10   that BlackBerry -- then in terms of considering the

11   hypothetical negotiation, BlackBerry becomes relevant.

12           And I'd like to -- to start with -- with relevance.

13   This is an agreement that is relevant to the hypothetical

14   negotiation under Georgia-Pacific Factor 15.  It's also

15   relevant under Georgia-Pacific 12 as to what a company in the

16   industry would consider licensing technology for in the space

17   of Bluetooth.

18           THE COURT:  And what is this licensing?

19           MS. HIGGINS:  This is licensing two Bluetooth patents

20   that were involved in litigation.

21           THE COURT:  What do they have to do with the

22   patents-in-suit?

23           MS. HIGGINS:  They -- they are patents that are in the

24   same technology.  Here, Mr. Weinstein is arguing that the

25   smallest salable unit is a Bluetooth chip.  This is a license

 1    for Bluetooth.  I will also point out that Mr. Weinstein did

 2    a full analysis of this very license in -- in connection with

 3    the -- the BlackBerry/Rembrandt case, which has settled, and

 4    relied upon this license.

 5            And so what BlackBerry would do in -- in a

 6    hypothetical negot -- negotiation in con -- in connection with

 7    what they will argue BlackBerry did in connection with the --

 8    the Rembrandt/BlackBerry -- excuse me, negotiation, is very

 9    relevant here.

10            And in terms of -- you will hear counsel -- they will

11    also argue that -- that somehow there has been a -- a

12    violation here of a protective order in the timing of the

13    production of this agreement and the fact that it was produced

14    in this case.  And I respectfully submit to the Court that that

15    is just false.

16            In terms of -- I think the timeline is important.

17    Mr. Weinstein wrote a report where he analyzed this agreement

18    in this case in his report -- expert report for BlackBerry.

19    And that was months ago.  When -- when BlackBerry and Rembrandt

20    settled the litigation -- and as Your -- Your Honor knows, that

21    happened very recently -- we very quickly subpoenaed

22    BlackBerry.  In fact, discovery was extended.  We subpoenaed

23    BlackBerry.  We obtained this agreement.  And the very next

24    day, we put it on the Defendants' exhibit list.

25            So we believe it is relevant.  There has not been any

```
 1   violation here.  And there -- there is no prejudice for

 2   allowing a Georgia-Pacific agreement to be used to

 3   cross-examine Mr. Weinstein who is going to offer opinions with

 4   respect to an agreement -- another agreement regarding

 5   BlackBerry and Rembrandt.  And we think this agreement, too, is

 6   relevant to the hypothetical negotiation.

 7               THE COURT:  Now, the other agreement between

 8   BlackBerry and Rembrandt that Mr. Weinstein's going to testify

 9   about is about the patents-in-suit?

10               MS. HIGGINS:  It is.  Correct, Your Honor.

11               THE COURT:  And how does this license with Bandspeed

12   have anything to do with that?

13               MS. HIGGINS:  Because it has relevance.  They are

14   going to argue about what Blackberry did as a person who

15   negotiated with Rembrandt in the context of a license

16   agreement.

17               This is another agreement where -- where BlackBerry

18   negotiated a settlement, just like it -- it did here in this

19   case, Your Honor, in the very same industry.  In -- in the --

20   Bluetooth space.  It's also with respect to two patents.  We

21   have two patents here.

22               THE COURT:  Okay.  Thank you.

23               MR. ALAVI:  So, Your Honor, I still don't understand

24   the relevance of the document, but we do have objections to it,

25   and let me walk the Court through them.
```

1          The first objection is I'm unclear as to who would

2    testify about this license.  And there are only two options,

3    Mr. Weinstein and Dr. Becker, and there are problems with both

4    of them.

5          The first is Dr. Becker.  That is Samsung's expert in

6    this case.  He cannot testify about this license because he did

7    not consider it.  He does not have an opinion on it.  He has an

8    opinion on a license between Samsung and Bandspeed.  If this

9    gets in and suddenly their expert testifies, I want to compare

10   this BlackBerry license to the Samsung license and do some

11   magic and have some new number for you, that would be an

12   undisclosed opinion.

13         So the only other person who can testify about it is

14   Dr. -- Mr. Weinstein, and there's a problem with it, which is

15   when Mr. Weinstein prepared his expert reports in this case,

16   including the supplemental report, there was a protective

17   order.  The protective order, which was insisted upon by both

18   Samsung and BlackBerry, had a provision that prohibited

19   Mr. Weinstein from cross using documents from one case into the

20   other case -- that is, if he had BlackBerry information,

21   including this license, he could not consider it when he was

22   doing the Samsung expert report.

23         We settled with BlackBerry.  They never gave the

24   Plaintiffs permission to use these documents.  So Mr. Weinstein

25   did his supplemental report using the documents he was allowed

1  to use.  And what they want to do in front of the jury is cross

2  him on a document that he was prohibited from considering.  And

3  when did they get this document?  I'm sorry, Your Honor.

4          THE COURT:  Mr. Alavi, I -- we were talking about

5  Bandspeed earlier.  That has to do with some settlement

6  involving Bandspeed.  What was that one?

7          MR. ALAVI:  That was the Samsung/Bandspeed settlement

8  agreement that Dr. Becker relies on, and we introduced

9  documents to impeach Mr. Becker's methodology in using that

10  license.  This is a license between BlackBerry and Bandspeed.

11          THE COURT:  All right.

12          MR. ALAVI:  And so it would be unfair for him to have

13  to testify -- how do we explain to the jury -- there were a lot

14  of BlackBerry documents, quite frankly, that we would have

15  liked to have used in the Samsung expert report, but couldn't.

16  And so it's unfair after his reports came, he was -- quite

17  frankly, at his deposition, the first -- the first time he knew

18  anyone to be using the BlackBerry expert report, which is a

19  later exhibit, was during his deposition.  We had no disclosure

20  from -- from BlackBerry that they had given consent to Samsung

21  for these documents to be used in this case.

22          THE COURT:  Okay.  Thank you, Mr. Alavi.

23          MS. HIGGINS:  Your Honor, may I respond briefly?

24          THE COURT:  You may.

25          MS. HIGGINS:  Your Honor, so there is --

```
 1            THE COURT:  If you would --

 2            MS. HIGGINS:  May I?

 3            THE COURT:  Yeah, if you'd go to a microphone.  Thank

 4   you.  That's fine.

 5            MS. HIGGINS:  So first of all, there is no prejudice

 6   here.  This is an agreement that Mr. Weinstein has fully

 7   considered in this case.  It's in his expert report that he

 8   prepared vis-à-vis BlackBerry.  And I -- I do want to address

 9   this -- this protective order because I -- I -- I frankly think

10   it's misleading.

11            So we are talking about the protective order in this

12   case, which is Document 68.  And what that says is that

13   notwithstanding, the foregoing Plaintiff shall not disclose or

14   share any designated material, and it says, absent further

15   order of the Court or without express written permission from

16   the defending producing party.  And so this -- this agreement

17   was subpoenaed.  It was produced so that Samsung could review

18   it.  There is no prejudice because Mr. Weinstein has reviewed

19   it, reviewed it prior to his report in this case, reviewed it

20   prior to his deposition.  His expert report from that -- that

21   contains an analysis of this license was actually used at his

22   deposition.  And we have obtained in a declaration of -- of

23   BlackBerry, which -- which also --

24            THE COURT:  Ms. Higgins, I --

25            MS. HIGGINS:  -- authenticating record -- a business
```

```
 1   record.

 2          THE COURT:  My -- my biggest concern about this is --

 3   is relevance and whether there's any indication that -- that

 4   these -- that the license between Bandspeed and BlackBerry

 5   involves technologically comparable patents.  And all you've

 6   told me is that there are two patents within the Bluetooth

 7   space, which you previously represented has more than 7,000

 8   patents in it.

 9          MS. HIGGINS:  And I -- I can further -- so these

10   patents relate to something called advance frequency hopping.

11   The patents-in-suit, the Plaintiff alleges, re -- relate to

12   enhanced data rate.  These are both Bluetooth features, and

13   you --  they -- they will allege that Bluetooth is the relevant

14   thing we are talking about here.  And this is -- this is an

15   agreement by a company in that space.  And it's not just that

16   it's a company that's in the space.  It is the very company

17   that they are using to argue here somehow negotiated a license

18   which their expert purports to convert into some kind of

19   allocation here.  And -- and this is evidence actually that --

20   that BlackBerry agrees to lump sum agreements, the very type of

21   agreement that the BlackBerry/Rembrandt agreement is.

22          So we think it is very relevant here to

23   cross-examination.

24          THE COURT:  Have -- have you had any technical expert

25   testify or report about the comparability of the technology
```

1    involved in this license compared to the license --

2            MS. HIGGINS:  Yes.

3            THE COURT:  -- the patents-in-suit?

4            MS. HIGGINS:  Yes, sir.  Dr. Goodman has so opined in

5    his expert report that this is comparable technology.

6            THE COURT:  And that was on this -- the

7    Bandspeed/BlackBerry license?

8            MS. HIGGINS:  That was, Your Honor, generally and

9    specifically in connection with the Samsung/Bandspeed license.

10   The Samsung/Bandspeed license and this license involve the same

11   patents as in the Samsung/Bandspeed agreement, which the

12   parties -- which the jury will be hearing about because it is

13   in Dr. Becker's report.

14           THE COURT:  So obviously, Bandspeed entered into a

15   significantly different license with Samsung than it did with

16   BlackBerry in terms of the dollar amount?

17           MS. HIGGINS:  I don't want to discuss the dollar

18   amount in open Court, Your Honor.

19           THE COURT:  You can either answer the question or not.

20           MS. HIGGINS:  Not too different, Your Honor.

21           THE COURT:  Then what is the -- the point of it, if it

22   is to the same effect as the Samsung/Bandspeed license?

23           MS. HIGGINS:  Because, Your Honor, it is relevant to

24   the Georgia-Pacific -- Pacific factors.  They are relying on

25   another BlackBerry/Rembrandt settlement, and that issue there

1    is whether that settlement, quite frankly, is a lump-sum

2    settlement, or according to this contrived allocation clause,

3    gets converted into a running royalty rate.  This is evidence

4    that when Samsung sits down to that table with -- with -- with

5    Rembrandt and they get to rely on -- on the BlackBerry

6    agreement, this BlackBerry agreement is an agreement that says

7    that BlackBerry enters into lump-sum licenses --

8              THE COURT:  So --

9              MS. HIGGINS:  -- and it is a comparable license.

10             THE COURT:  -- if we redact the dollar amounts from

11   this, is there any reason it won't show that?

12             MS. HIGGINS:  I -- I think the dollar amount is -- is

13   relevant, Your Honor.

14             THE COURT:  The -- you've told me that you need this

15   to show that BlackBerry enters into lump-sum --

16             MS. HIGGINS:  And -- and -- and the -- the amount of

17   agreements that they enter into for comparable technology is --

18   is also something that can be considered here -- should be

19   considered here.

20             THE COURT:  Of course, one of the concerns I have is

21   the lateness with which this all comes up.  When did you

22   produce this document?

23             MS. HIGGINS:  So this doc -- document was produced in

24   this litigation by BlackBerry.  As you heard, Samsung was

25   precluded from relying on this agreement early on because

 1   BlackBerry did not produce it to Samsung.  After the

 2   BlackBerry/Rembrandt settlement, we subpoenaed BlackBerry, and

 3   they produced the agreement.  And it became -- given the fact

 4   that we had a new piece of evidence here that Dr. Weinstein did

 5   a supplemental report on that implic -- that implicated

 6   BlackBerry, this was already relevant as a comparable license,

 7   and it became more relevant here to the hypothetical

 8   negotiation after the Rembrandt/BlackBerry settlement.

 9        THE COURT:  So when did you get this license?

10        MS. HIGGINS:  So Samsung -- the facts are, Your Honor,

11   that Rembrandt and BlackBerry settled on November 12th, 2014,

12   and -- and -- and we subpoenaed BlackBerry soon thereafter.

13   Discovery was specifically reopened because of that Weinstein

14   supplemental report about the BlackBerry/Rembrandt agreement.

15   We subpoenaed BlackBerry in November, and then BlackBerry

16   pro -- produced to Samsung, pursuant to the subpoena, this

17   agreement on December 16, 2014.

18        On December 17th, 2014, we immediately put this

19   exhibit on the trial exhibit list.  So there has been no delay

20   here, Your Honor.

21        THE COURT:  This exhibit -- this license was actually

22   entered into a year ago?

23        MS. HIGGINS:  The license was entered into in 2013.

24   It was produced by BlackBerry in this litigation, but not to

25   Samsung.

1          THE COURT:  What prevented you from subpoenaing this a

2     year ago?

3          MS. HIGGINS:  The Court -- the Court's pro --

4     protective order was -- was one thing that they argued

5     precluding -- precluded Mr. Weinstein from analyzing this

6     license vis-à-vis BlackBerry, and we went, then, and subpoenaed

7     BlackBerry and -- and sought their permission to use this

8     agreement.

9          THE COURT:  And what prevented you from doing that a

10    year ago?

11         MS. HIGGINS:  BlackBerry had not yet settled with

12    Rembrandt, Your Honor, and upon that settlement, BlackBerry, as

13    a party here, which is relevant to the hypothetical

14    negotiation, had not yet settled yet, so we had a change in the

15    facts which made this relevant.  And as soon as that happened,

16    we acted quickly upon this to obtain this agreement and produce

17    it.

18         THE COURT:  And your argument about the relevance of

19    this is that it's based on --

20         MS. HIGGINS:  It's a -- it's -- it's a comparable

21    license.  It's relevant to Georgia-Pacific Factor 15.  It's

22    relevant to the hypothetical negotiation.  It's also relevant

23    to Georgia-Pacific Factor 12, which goes to what this license

24    that is in the comparable BlackBerry space, what -- what people

25    in the industry would -- would pay for comparable technology.

```
 1              THE COURT:  All right.  Thank you, Ms. Higgins.

 2              Mr. Alavi, tell me what the differences are between

 3   this license and the others that are being considered in this

 4   case.

 5              MR. ALAVI:  Your Honor, the -- the only license that

 6   our expert relies on is the license between BlackBerry and

 7   Rembrandt for the patents-in-suit.  Not different patents that

 8   are similar technology.  That license with BlackBerry is a

 9   fully paid-up license that provides BlackBerry with a license

10   on an ongoing basis.  The license between BlackBerry and

11   Rembrandt is only for past damages.  It is expressly for past

12   damages only and provides no license going forward.

13              But the real issue --

14              THE COURT:  Who's relying on a license between

15   Bandspeed and Samsung?

16              MR. ALAVI:  Samsung's expert.  And you didn't hear

17   them say they want Samsung's expert to use this.  What you

18   heard -- and I think the quote is they want to impeach

19   Mr. Weinstein for not using this when he couldn't use it.

20   They're going to say, your supplemental report doesn't consider

21   this Bandspeed license, does it?  Your original report doesn't

22   consider this Bandspeed license.  Now, let's go through this

23   analysis of what your report should have looked like if you had

24   considered this evidence, which Mr. Weinstein was prohibited

25   from using under the protective order.  If they --
```

1          THE COURT:  All right.

2          MR. ALAVI:  -- it'd be a different story if he had

3   had -- if they had gotten this in discovery before his

4   supplemental reports were due, if BlackBerry had told us, you

5   have permission to use it in the Samsung case, he could have

6   considered it.  Now they want trial by ambush.

7          And by the way, produced on December 16th is four days

8   after the extended discovery cutoff.  After Mr. Weinstein's

9   supplemental report.  After he was -- he -- he had considered

10  all the materials he could have considered.  And what they want

11  to do is say, you didn't consider this.  And that's -- that's

12  the type of prejudice because there's a Court order that

13  prohibited him from considering it.

14         THE COURT:  All right.

15         MR. ALAVI:  That is prejudicial with the jury.

16         MS. HIGGINS:  It -- it was timely subpoenaed with --

17  within the extended period, Your Honor.  And as soon as we got

18  it from BlackBerry, we did --

19         MR. ALAVI:  The discovery cutoff was December --

20         THE COURT:  Just -- Mr. Alavi --

21         MR. ALAVI:  I'm sorry, Your Honor.

22         THE COURT:  -- you produced it after the discovery

23  cutoff?

24         MS. HIGGINS:  We subpoenaed it during the discovery

25  cutoff, and then -- and I think as you -- you know, Your Honor,

1    everything was on a very fast-paced schedule here because on

2    the eve of trial, BlackBerry/Rembrandt have settled.  And so

3    right after that happened, there were -- I mean, there were

4    days before the supplemental expert report was due.  We did

5    serve the subpoena timely.  We -- and as -- as soon as we got

6    it, and I -- I believe that it was after the close of fact

7    discovery -- as soon as we got it, we did put it on the exhibit

8    list and --

9        THE COURT:  And is Mr. Alavi correct that you want to

10   use this in connection with Mr. Weinstein because you feel he

11   should have considered it?

12       MS. HIGGINS:  We don't plan to fault him for not

13   considering it.  We actually -- the man has considered it.  I

14   can show you, if you'd like, Your Honor, his expert report in

15   this case where he actually analyzed this agreement.  So --

16       THE COURT:  It was -- now, you're using this case

17   loosely.

18       MS. HIGGINS:  I am, Your Honor.  That was the expert

19   report for BlackBerry.

20       THE COURT:  All right.

21       MS. HIGGINS:  You are correct, Your Honor.

22       THE COURT:  The only reason the Bandspeed patents are

23   in this case is because your expert is relying upon a license

24   from Bandspeed?

25       MS. HIGGINS:  Correct, Your Honor.  He is relying on a

1   license from Bandspeed as a Georgia-Pacific Factor 2 agreement

2   on -- on comparable technology.  And as -- as I said, the --

3   the jury will hear evidence from Dr. Goodman that this is

4   comparable technology here.

5           THE COURT:  Ms. Higgins, I'm -- I believe it comes too

6   late.  I'm going to sustain the objection to Exhibit 1710.

7           What's next?

8           MS. HERMES:  Your Honor, Defendants' Exhibit 1736 --

9   if we could pull that up, please -- is a chart summarizing

10  underlying TI chip price data.  There's no objection to the

11  underlying data.  This is a Rule 1006 summary of that data.

12          THE COURT:  Produced by whom?

13          MS. HERMES:  The data was produced by Texas

14  Instruments.

15          THE COURT:  I mean, the chart?

16          MS. HERMES:  The chart is from Dr. Becker's report.

17          THE COURT:  Okay.  So you're offering this as a

18  summary?

19          MS. HERMES:  Yes.

20          THE COURT:  All right.  Let me hear the objection.

21          MR. ALAVI:  Your Honor, we had previously agreed to an

22  admission of a -- a different summary, so this is duplicative.

23  But quite frankly, with -- we withdraw our objections to 1736

24  through 1738.

25          THE COURT:  All right.  They will be admitted then.

1          Are there any further exhibit objections?

2          MS. HIGGINS:  No, Your Honor.

3          THE COURT:  All right.

4          MR. ALAVI:  I -- I believe -- I believe counsel is

5    correct, but I think we just need to clarify it for our notes.

6    1739 was still open, but I think it was tied to the summary

7    judgment motion because it's the response.  And since the

8    summary judgment didn't come in, I just want to confirm that

9    counsel is withdrawing it.

10         MS. HIGGINS:  That is correct.

11         THE COURT:  All right.  Are there objections to the

12   deposition designations?

13         MR. ENGER:  Yes, Your Honor, there are.

14         THE COURT:  Are any of these depositions -- do any of

15   them have no active objections, or are there objections to all

16   of the depositions?

17         MR. ALAVI:  Your Honor, we have a summary, so we're

18   trying to find it.

19         MR. ENGER:  So, Your Honor, one thing that the parties

20   have agreed to or -- or discussed was for the witnesses that

21   will appear live at trial, tabling our objections for the

22   depositions because they will not be --

23         THE COURT:  Tabling is not going to work.  I don't

24   have any problem simply saying that there will be no admissible

25   deposition designations as to those people, but the purpose of

1    this and what you were ordered to meet and confer about was to

2    resolve these and present them timely.  And we're here now 9:30

3    at night, and I believe there's been a failure by counsel to

4    meet and confer on these matters.  And I am close to simply

5    saying we're not going to have depositions in this trial, and

6    the jury will enjoy it.

7            If you've got a way that you think you can cut through

8    this, that's fine.  But we're -- anything that has not been

9    approved today is not coming into trial.

10           MR. ENGER:  Okay.  Your Honor, I'd -- I'd like to

11   discuss Rembrandt's designations and Samsung's objections

12   thereto.

13           THE COURT:  Do you have any witnesses -- I -- I don't

14   want to hear anything from any witness unless they are a

15   witness that cannot appear live at the trial.

16           MR. ENGER:  Understood, Your Honor.  There's a number

17   of witnesses that -- of Samsung witnesses that I understand are

18   in Korea and will not be coming to trial.

19           THE COURT:  Tell me about those.

20           MR. ENGER:  The first is Mr. Junhak Lim.  And if we

21   can pull up Mr. Lim's testimony at Page 36, please?

22           THE COURT:  How many of these objections have been

23   resolved?

24           MR. ENGER:  The parties have been withdrawing a number

25   of objections over the last several days.  Probably we've

```
 1   whittled it down by at least half, but the ones that are --
 2   as you can see in the document, a number of them say withdrawn
 3   in parenthesis.  Those are ones that are no longer live.  But
 4   there are a number of -- that are still at issue.
 5           THE COURT:  I don't see any that say withdrawn.
 6   Where -- where would that be?
 7           MR. ENGER:  Your Honor, there have been a number of
 8   these that were flying around the last 15 minutes before the
 9   hearing started.  But, for example, 36, Lines 24, to 37, Line
10   17, was withdrawn.
11           THE COURT:  You've withdrawn the designation or the
12   objection?
13           MR. ENGER:  The designation.  I'm looking through -- I
14   don't see any -- I recall there are a number of -- of
15   objections that were also withdrawn by Samsung, for example, to
16   Mrs. Ko.
17           THE COURT:  Let's go on -- tell me about another
18   witness.  This is a current employee of Samsung?
19           MR. ENGER:  That's my understanding, yes.
20           THE COURT:  All right.  So Samsung has the ability to
21   cause him to appear?
22           MR. ENGER:  That's my understanding, correct.
23           THE COURT:  All right.  Who's your next witness?
24           MR. ENGER:  Mr. -- Mr. Kim -- Junghyun Kim.
25           THE COURT:  Is he --
```

1          MR. ENGER:  A Samsung witness, as well, also in Korea.

2          THE COURT:  All right.  Go on to the next one.

3          MR. ENGER:  Namhee Ko -- Ms. Namhee Ko, also in Korea.

4          THE COURT:  Who's next?

5          MR. ENGER:  Mr. Tim Benner.  We've issued a trial

6    subpoena to him.  My understanding is he will be appearing live

7    at trial.

8          THE COURT:  All right.  Who's next?

9          MR. ENGER:  Mr. Mark Powell.  This is one of the

10   representatives of the Bluetooth SIG.

11         THE COURT:  And where is he located?

12         MR. ALAVI:  Your Honor, we're withdrawing -- we've

13   resolved objections to exhibits which as a result, we're

14   withdrawing all of our affirmative designations of Mr. Powell.

15         THE COURT:  All right.  So you no longer have a need

16   for him?

17         MR. ALAVI:  That's correct, Your Honor.

18         THE COURT:  All right.  Who's next?

19         MR. ENGER:  Mr. Joel Linsky.  He is a Qualcomm -- I

20   believe he's a Qualcomm employee, possibly a Broadcom employee

21   living in California, third party.

22         THE COURT:  Okay.  Who's next?

23         MR. ENGER:  Stephen Hall.  My understanding is

24   Mr. Hall will be appearing live at trial by -- Samsung will be

25   bringing him.

```
 1              THE COURT:  All right.  Who's next?

 2              MR. ENGER:  Mr. Robert O'Hara.  Again, I -- my

 3    understanding is he will be appearing live at trial, brought

 4    by -- by Samsung.

 5              THE COURT:  All right.

 6              MR. ENGER:  Next is Paul Schneck.  That's a Rembrandt

 7    employee, and we're bringing him to trial.  So I don't see the

 8    need to discuss his deposition designations.

 9              THE COURT:  All right.

10              MR. ENGER:  Next is Mr. David Misunas.  He's the

11    30(b)(6) representative for Zhone, the entity from which

12    Rembrandt acquired the patents.

13              THE COURT:  And will he be coming?

14              MR. ENGER:  He will not be.

15              THE COURT:  Where is he located?

16              MR. ENGER:  In California, I believe, Bay Area.

17              MS. HIGGINS:  Your Honor, we can withdraw objections

18    to Mr. Misunas.  There's only a few remaining.  We withdraw

19    them.

20              THE COURT:  All right.  Then we have no issue about

21    Mr. Misunas' deposition?

22              MR. ENGER:  Not with respect to Rembrandt's

23    designations, Your Honor.

24              THE COURT:  Okay.

25              MR. ENGER:  The next witness is Mr. Manvir -- Manvir
```

```
 1  Kalsi.

 2              THE COURT:  And --

 3              MR. ENGER:  That is a Samsung witness who I do not

 4  believe will be appearing at trial.

 5              MR. ALAVI:  And, Your Honor, Plaintiffs withdraw all

 6  their affirmative designations from Mr. Kalsi, but we may

 7  have -- we -- I think we have counter designations to what

 8  Samsung may have designated, and those are still live.

 9              THE COURT:  All right.

10              MR. ENGER:  There's testimony designated for

11  Mr. Gordon Bremer, although he will be appearing live at trial.

12              THE COURT:  All right.

13              MR. ENGER:  And there is one line of testimony

14  designated for Mr. Derek Wood who may or may not be appearing

15  live at trial, but there's no objections to that, so there's

16  nothing to resolve.

17              THE COURT:  All right.  Let me hear from the

18  Defendants on their deposition designations.

19              MR. LING:  Your Honor, Vincent Ling on behalf of

20  Defendant, Samsung.

21              We've withdrawn a number of desig -- of deposition

22  designations and counter designations, which I'll walk the

23  Court through.

24              THE COURT:  All right.  And it would be helpful if you

25  would speak at the podium.  We'll get a better recording of
```

```
 1    your presentation.  And could you give me your name again, sir?

 2              MR. LING:  All right.  Vincent Ling.

 3              THE COURT:  Okay.  Go ahead.

 4              MR. LING:  So beginning with -- we've withdrawn

 5    designations for Mr. -- sorry, Ms. -- Ms. Kim -- oh, sorry,

 6    those are the objections.  We've -- we've withdrawn

 7    designations for Namhee Ko.

 8              THE COURT:  And -- all right.  I'm looking at the

 9    list --

10              MR. LING:  It should be Page -- around Page 16.

11              MS. HIGGINS:  So, Your Honor, in -- in terms of actual

12    objections, if -- if the Court would like to hear those.

13    Mr. Ling and Mr. Haddad are -- have sort of divvied up the

14    transcripts.

15              THE COURT:  At this point, I would like to --

16              MS. HIGGINS:  We can walk you through the -- the

17    people, if you would like.

18              THE COURT:  That's what I would like.

19              MS. HIGGINS:  So, Your Honor, Mr. Benner, the -- the

20    first person is a Samsung employee, and he will -- he has been

21    subpoenaed and is scheduled to appear live.

22              I believe we just heard Rembrandt tell us that Gordon

23    Bremer, the inventor, will be --

24              THE COURT:  Let --

25              MS. HIGGINS:  -- appearing live.
```

```
 1              THE COURT:  Let me go -- all right.  Let me just slow
 2   you down.
 3              On Timothy Benner, if he's appearing live, why should
 4   his deposition be used other than for impeachment.
 5              MS. HIGGINS:  If -- if -- if counsel were to designate
 6   some -- he was a 30(b)(6) witness, Your Honor, so if they were
 7   to designate some -- some testimony, we -- we could technically
 8   have a counter designation.  I -- I think it's probably
 9   unlikely.
10              MR. ALAVI:  Your Honor, we are not going to designate
11   anything for Mr. Benner who is coming live.  We just didn't
12   know if he was coming or not.  We thought maybe there'd be a
13   motion to quash the subpoena, but he's here live, no
14   designations from us.
15              MS. HIGGINS:  And then no counters are needed either,
16   Your Honor.
17              THE COURT:  All right.  Then Mr. Benner's deposition
18   will not be used.
19              All right.  Now, Mr. Bremer is next.
20              MS. HIGGINS:  Yes, Your Honor.  Mr. Bremer is the
21   inventor, and we understand that counsel for Rembrandt will be
22   calling Mr. Bremer live.
23              MR. ALAVI:  That's correct, Your Honor.
24              THE COURT:  Then Mr. Bremer's deposition will not be
25   used, except for impeachment, and you don't need to designate
```

1    it for impeachment in advance, so we will not need to cover

2    that.

3         MS. HIGGINS:  On Page 8, Your Honor, is Stephen Hall,

4    and Mr. Hall is also scheduled to be called by Samsung live.

5    He's a third party.

6         THE COURT:  Then Mr. Hall's deposition will not be

7    used.

8         Mr. Kalsi?

9         MS. HIGGINS:  Mr. Kalsi, I believe I just heard

10   counsel say that they have withdrawn their affirmative

11   designations, and, therefore, we have no designations, Your

12   Honor.

13        THE COURT:  So Mr. Kalsi's deposition will not be

14   used.

15        Mr. Junghyun Kim?

16        MS. HIGGINS:  Mr. -- I'm -- I'm just looking through

17   here, Your Honor, and there are only a few objections

18   remaining.  Mr. Kim is in Korea, and he is not appearing live.

19   He was a 30(b)(6).

20        THE COURT:  We will --

21        MR. ALAVI:  Your Honor, may I just speak to this?  The

22   only objections that they had are with respect to optional

23   completeness.  In other words, with respect to our initial

24   designations, if you look at Page -- starting on Page 14, there

25   are no objections.  We -- we made some counter designations,

1    and they just asked to read additional material as -- in the

2    interest of optional completeness.

3         THE COURT:  There appear to be extensive objections by

4    Samsung to Rembrandt's designations about Mr. Kim.  And the two

5    are matters that I'm going to have to decide together.  What --

6    why can't Mr. Kim be here to testify?

7         MR. HADDAD:  Your Honor, he's located in Korea.

8         THE COURT:  I understand that.  He's got a week.

9         MR. HADDAD:  Well, Your Honor, we're not -- we're --

10   we are not designating any test -- obviously designating any

11   testimony for Mr. Kim.  It's only the testimony that's been

12   designated by Rembrandt.  They took his deposition.

13        THE COURT:  All right.  We'll come back to Mr. Kim.

14        MR. HADDAD:  They -- if they have no affirmative

15   designations --

16        THE COURT:  We'll come back to Mr. Kim.

17        MR. ENGER:  We do have affirmative designations, Your

18   Honor.

19        THE COURT:  What about -- is it Mr. Ko?

20        MS. HIGGINS:  Your Honor, it is Ms. Ko.

21        THE COURT:  Ms. Ko.

22        MS. HIGGINS:  She was Samsung's 30(b)(6) licensing

23   designee.  And Ms. Ko is in Korea.  And as you -- you can see,

24   there's very little testimony which has been designated, and

25   I -- I see one count -- well, I'm not even sure.  I think -- I

1    don't even think we have any issue here.  Everything looks like

2    it's been withdrawn in this direction.

3              Did I miss something, Mr. Enger?

4              MR. ENGER:  We -- we have a number of affirmative

5    designations, Your Honor.

6              MS. HIGGINS:  Okay.

7              THE COURT:  Well, we'll -- we'll get back to those.

8    But as to -- as to Samsung's designations as to Ms. Ko, those

9    are at this point without objection, I take it; is that right?

10             MS. HIGGINS:  Yes.

11             THE COURT:  All right.  Let's go to Junhak Lim -- Lim.

12             MS. HIGGINS:  Mr. Lim is -- is a Samsung employee.

13   He was a 30(b)(6) technical witness, and Mr. Lim is in Korea.

14   His deposition was taken.  And I believe there are designations

15   in -- in both directions.  And as you can see, Your Honor, a

16   lot of effort to with -- withdraw those objections.

17             MR. HADDAD:  Samsung is withdrawing its affirmative

18   designations of Mr. -- Mr. Lim.

19             THE COURT:  All right.

20             MS. HIGGINS:  Mr. Linsky, on Page 19, Your Honor, is a

21   third-party witness who was deposed, and I don't believe he's

22   expected to appear live.

23             THE COURT:  Where is he?

24             MS. HIGGINS:  Is it Pennsylvania?

25             MR. HADDAD:  Mr. Linsky is in Southern California,

```
 1   Your Honor.
 2            MS. HIGGINS:  Sorry.
 3            MR. HADDAD:  We are -- Samsung withdraws all its
 4   objections to Rembrandt's designations, Your Honor, to
 5   Mr. Linsky.
 6            THE COURT:  All right.
 7            MR. HADDAD:  And that -- with respect to our
 8   designations, Your Honor, Rembrandt had no objections for
 9   Mr. -- of just -- just to optional completeness.  That's right.
10   Otherwise, there's no dispute.  Yeah.
11            THE COURT:  So Mr. Linsky, who is the
12   Qualcomm/Broadcom representative, his designations by Rembrandt
13   are without objection; is that what I'm hearing, Mr. --
14            MR. HADDAD:  Yes -- yes, Your Honor.
15            THE COURT:  -- Haddad?
16            MR. HADDAD:  He's -- he's from Qualcomm, Your Honor --
17            THE COURT:  All right.
18            MR. HADDAD:  -- so we have a separate witness from
19   Broadcom who is coming live.
20            THE COURT:  All right.
21            MR. HADDAD:  That's Mr. Hall.  And, yes, Your Honor,
22   we were -- Samsung is withdrawing its objections to Rembrandt's
23   designation -- initial designations.
24            THE COURT:  And as to your designations, the only
25   objection is the optional completeness?
```

1          MR. HADDAD:  Yes.  Yes, Your Honor.

2          THE COURT:  All right.  Then those objections will be

3   sustained, meaning that you will add in the designations that

4   Rembrandt seeks to have added?

5          MR. HADDAD:  Yes, Your Honor.

6          THE COURT:  All right.  Go -- go ahead, Ms. Higgins.

7          MS. HIGGINS:  Your Honor, the next witness is David

8   Misunas on Page 21.  David Misunas is a third-party witness who

9   was deposed from the company Zhone.  That's a -- a Zhone in the

10  Rembrandt patent sale agreement.  And as can you see, Your

11  Honor, I think there's only just a -- a very few Rembrandt

12  objections that we haven't been able to resolve.

13         I'm -- I'm looking at Page 57 on Page 22.  I -- I

14  don't think there are others.  It looks like there's another

15  one on Page 23, at Line -- Page 132.

16         THE COURT:  And who is sponsoring Mr. Misunas?

17         MS. HIGGINS:  We -- Your Honor, Samsung will be

18  designating some of Mr. Misunas's testimony.

19         THE COURT:  And so where are the live objections as to

20  Mr. Misunas?  Those are Rembrandt's objections?

21         MS. HIGGINS:  Yes, sir.

22         MR. ENGER:  Your Honor, I believe there's at least one

23  Samsung objection, as well.

24         THE COURT:  That's not what I heard.

25         MR. ENGER:  Are you withdrawing the objections to Page

```
 1   158?

 2           MS. HIGGINS:  Hold on.

 3           MR. ENGER:  Okay.

 4           MS. HIGGINS:  Your Honor, earlier I -- I said that we

 5   with -- withdrew our remaining objection.  We -- I withdrew

 6   those about 15 minutes ago.

 7           THE COURT:  Okay.  So is there -- does Rembrandt have

 8   a live objection to Mr. Misunas's deposition testimony?

 9           MR. ENGER:  Your Honor, I believe there are two live

10   objections.

11           THE COURT:  Where are they?

12           MR. ENGER:  They are at Page 57 and Page 132.

13           THE COURT:  And what's the objection with Page 57?

14           MR. ENGER:  We'll withdraw this objection, Your Honor.

15           THE COURT:  All right.  So is there any remaining

16   objection to Mr. Misunas?

17           MR. ENGER:  Page 132 through 134, Your Honor.

18           THE COURT:  And what's that objection?

19           MR. ENGER:  Your Honor, it's -- it's not relevant.

20   It's unduly prejudicial.  There's lack of personal knowledge,

21   no foundation.  What -- what's basically going on here is

22   they're comparing a redline between the -- the patent sale

23   agreement that occurred in 2007 for these patents with a very

24   different patent sale agreement that occurred in 2006 and

25   trying to draw all comparisons between the two.  That doesn't
```

1    make any fact at issue in this dispute any more or less

2    relevant.

3              THE COURT:  And what is the other license or agreement

4    that they're trying to compare it to?

5              MR. ENGER:  It's an earlier patent sale agreement

6    between Rembrandt and Zhone, and they're trying to draw

7    distinctions between the two.

8              THE COURT:  All right.  That objection is overruled.

9              Next is Mr. O'Hara.  Are there any objections to

10   Mr. O'Hara's deposition testimony?

11             MR. HADDAD:  Your -- Your Honor, Mr. O'Hara is coming

12   live.

13             THE COURT:  Good.  Then his deposition will not be

14   used.

15             What about Mark Powell?

16             MS. HIGGINS:  Mr. Powell, Your Honor, is -- was

17   deposed.  He is a third-party employee for the Bluetooth

18   Special Interest Group, and -- and we have affirmatively

19   designated some of Mr. Powell's testimony specifically, for

20   example, in connection with the Bluetooth Special Interest

21   Group license.

22             THE COURT:  And what are the remaining objections to

23   Mr. Powell's deposition testimony?

24             MR. ENGER:  Your Honor, there was -- there was one

25   live dispute on Page 51 and 52 of Mr. Powell's deposition.

1    Rembrandt is with -- is withdrawing that objection.

2         THE COURT:  All right.  So the deposition designations

3    listed by Samsung for Mr. Powell are admitted, and I understand

4    that -- Mr. Enger, that the Plaintiff has withdrawn its

5    designations for Mr. Powell; is that still true?

6         MR. ENGER:  Yes, Your Honor.

7         THE COURT:  Okay.  Mr. Schneck?  He'll be here live,

8    so his deposition will not be used.

9         MR. SHERWOOD:  Your Honor, may I just raise one thing

10   in that respect?

11        THE COURT:  You may, Mr. Sherwood.

12        MR. SHERWOOD:  As the Court is aware, there's been

13   supplemental briefing with respect to Mr. Schneck, and

14   specifically his cross-examination.  I don't know if the Court

15   wants to hear about that now or -- or how the Court wants to

16   proceed with respect to that.  The parties filed supplemental

17   papers, as you know.

18        THE COURT:  And -- yeah, I think -- all right.  We can

19   take -- we can take that up now.

20        Remind me, this was a matter that was ruled on as a

21   motion in limine; is that right?  I know that --

22        MR. ENGER:  That's correct, Your Honor.  It was not

23   clear to us whether your ruling covered the supplemental

24   briefing as to Dr. Schneck or whether it was limited -- or

25   whether it was more broad than that.

1          THE COURT:  Frankly, it's been a long time since I

2     looked at that supplemental briefing this morning.  My

3     recollection is that it didn't change anything, but I'm trying

4     to remember now what the issue was.

5          MR. ENGER:  Your Honor, the issue was whether

6     Dr. Schneck, who at the time, was designated as a corporate

7     representative on a small narrow group of topics --

8          THE COURT:  He was also -- just a minute, Mr. Enger.

9     He -- there's no dispute that he was also noticed as a 30(b)(1)

10    witness?

11         MR. ENGER:  That's correct, Your Honor.

12         THE COURT:  In that case, the fact that gave his

13    answers in both capacities, I -- I don't think makes any of the

14    deposition less admissible.

15         You -- you simply are worried that they're going to

16    point out that there were things he didn't know at the time his

17    30(b)(6) deposition because he had not been asked to prepare

18    for them?

19         MR. ENGER:  That's right.  He was not designated in

20    those topics at the time, and now at trial, he will be our

21    trial corporate representative on a much broader scope, and it

22    wouldn't be fair to impeach him on the testimony whenever he

23    was just in his individual capacity and on a narrow topic of

24    scope.

25              THE COURT:  Why not?  All -- all it would be is that

1  the jury would find out that whatever he knows, he recently

2  learned.

3         MR. ENGER:  Your Honor, it -- you know, he -- he has a

4  pretty important title at -- at Rembrandt.  I think he's a

5  treasurer and a chairman in a number of aspects.  And to

6  suggest that he had limited personal knowledge at one time and

7  now has a -- a broader corporate knowledge we think would be

8  unduly prejudicial.

9         THE COURT:  But you knew he was being individually

10  deposed, as well?

11         MR. ENGER:  At the time, he was not the best person to

12  talk on those particular topics, but whenever you have to pick

13  one person overall to serve as your corporate representative,

14  Dr. Schneck is the best person to do so.

15         THE COURT:  I understand that.  But I -- I don't think

16  there's anything wrong with the Defendants pointing out that in

17  his personal capacity, he did not know these things.  And he

18  can explain why he now knows them, but I -- I think that -- you

19  know, if he had not been noticed for an individual deposition,

20  it would be a different result, but because he was, I'm going

21  to overrule that objection.

22         MR. ENGER:  Thank you, Your Honor.

23         MR. SHERWOOD:  Your Honor, may I just comment on one

24  thing with respect to this?

25         THE COURT:  All right.  I mean --

```
 1              MR. SHERWOOD:  There -- there is no such thing as a
 2   corporate trial representative in terms of testimony.
 3              THE COURT:  I understand that.  What -- what is -- why
 4   are we going into this?  I mean, is there a live issue about
 5   something?
 6              MR. SHERWOOD:  Well, it would relate to competency,
 7   Your Honor, which I guess we can raise at trial.
 8              THE COURT:  If --
 9              MR. SHERWOOD:  I understand you've ruled on their
10   motion in limine.  I'm not addressing that at all.  I've gone
11   on to something else.
12              THE COURT:  You're objecting to his competence now as
13   a witness on behalf of his company?
14              MR. SHERWOOD:  What I'm saying, Your Honor, is that he
15   is limited in his testimony, as Rule 602 says, to what he
16   is comp -- what he has personal knowledge on.  He can't be
17   prepared in the sense of people sit in a conference room and
18   tell him things.  That's just repeating hearsay which clearly
19   is not -- not allowable.
20              THE COURT:  Whether or not -- you know, personal
21   knowledge is something that is acquired just like any other
22   kind of knowledge.  And if it is recently acquired, that may be
23   a basis to cross-examine him about it.  If you believe that he
24   cannot establish a foundation of personal knowledge, then you
25   should object, but certainly this man is the CEO; is that --
```

```
 1            MR. SHERWOOD:  Chairman, I think, yeah.

 2            THE COURT:  Chairman?  Well --

 3            MR. SHERWOOD:  Of -- of Rembrandt, the parent.  I

 4   don't know if he is of all the other companies.

 5            THE COURT:  Okay.  Well, if you -- certainly you can

 6   object based on lack of personal knowledge to anything that

 7   he's asked, if you think you have a valid objection for it.

 8   But there is nothing that says that personal knowledge cannot

 9   be obtained just like any other.

10            MR. SHERWOOD:  Thank you, Your Honor.

11            THE COURT:  So -- all right.  And his deposition is

12   not going to be used except for impeachment obviously.

13            What about Mr. Wood?

14            MR. ENGER:  Your Honor, we have no affirmative

15   designations for Mr. Wood, although there are live objections

16   to Samsung's designated testimony, as I understand it.

17            THE COURT:  Who is Mr. Wood?

18            MR. ENGER:  Mr. Wood is Rembrandt's corporate counsel.

19            MS. HIGGINS:  Which we understand is -- he's a

20   30(b)(6) witness, and we understand that he won't be coming

21   live to trial.

22            MR. ALAVI:  We -- we don't plan on bringing him live

23   at this time.

24            And, Your Honor, with Mr. Wood's deposition, what

25   you're going to find is a lot of the testimony, for example,
```

1  relates to motion in limine points, such as the -- that exhibit

2  that has the chart that the Court excluded.

3        MS. HIGGINS:  And obviously, Your Honor, in view of

4  that ruling, those designations will be with -- withdrawn.

5        THE COURT:  So what testimony does Samsung intend to

6  offer of Mr. Wood by deposition?

7        MS. HIGGINS:  Your Honor, Mr. Wood, he's a Rembrandt

8  employee.  He was offered as a 30(b)(6) witness with respect to

9  certain topics.  He also was the Rembrandt representative who

10 signed -- there is a Rembrandt/ARRIS agreement that our expert

11 witness, Dr. Becker, will be opining about.  He signed that

12 agreement, and there was some testimony with respect to that

13 agreement.  So it's a combination of some 30(b)(6) topics, plus

14 that agreement.

15       THE COURT:  Basically, what do we have left here?

16 We've got Mr. Wood, who is a Rembrandt employee.  We've got

17 Mr. Lim --

18       MS. HIGGINS:  Your Honor, Ms. Ko, and I -- I think she

19 will be very quick, if I may address her?

20       THE COURT:  Let me see.  All right.  Tell me about

21 Ms. Ko.

22       MS. HIGGINS:  Okay.  Your Honor.  First of all, Ms. --

23 Ms. Ko is in Korea.  She was Samsung's 30(b)(6) on the topic of

24 licensing.  We have sought and obtained an agreement from

25 Rembrandt's counsel that we do not need to bring her live, and

1   we can play a very short clip of her deposition.

2         THE COURT:  I thought we already went over her

3   deposition and it was okay.

4         MS. HIGGINS:  There's one out -- there's -- there's

5   one outstanding objection.  We can withdraw all other

6   objections.  But I -- if I can -- there is testimony that we

7   have objected to that has been designated by Rem -- Rembrandt

8   which we believe is covered by a MIL.  It says:  Do you have

9   any reason to doubt that Samsung paid approximately -- and it's

10  a very large number with many, many figures -- to Qualcomm for

11  patent licenses?  And so that Q&A, we believe, is covered by

12  the MIL, and so as long as we -- we have agreement that it is,

13  we have no other objections.

14        MR. ENGER:  I'm not sure we agree that that's covered

15  by that very specific MIL, but we'll withdraw that objection.

16        MS. HIGGINS:  There -- there is also testimony in here

17  about --

18        THE COURT:  Hold on.  You're withdrawing an objection,

19  or you're withdrawing --

20        MR. ENGER:  The designation.  I'm sorry, Your Honor.

21        THE COURT:  All right.  And that designation is where?

22        MS. HIGGINS:  It is Page 44, Line 12, and it -- it

23  first -- 12 through 14 asks about a Qualcomm license and how

24  much was paid.  The answer is at 44, Line 17/18.  And then

25  she's also asked about a very large sum agreement that Samsung

1    paid Ericsson, both irrelevant agreements.

2            So that extends now to 45, 2.  So it's 44, 12, down to

3    45, Line 2, Your Honor.

4            THE COURT:  All right.  Mr. Enger, is that withdrawn,

5    as well?

6            MR. ENGER:  Yes, Your Honor.

7            THE COURT:  All right.  So where does that leave us

8    with respect to Ms. Ko?

9            MR. ALAVI:  Your Honor, I wasn't clear.  Did Samsung

10   withdraw all the rest of their objections?

11           MS. HIGGINS:  Yes, Your Honor.

12           MR. ALAVI:  Okay.  Then we're done with Ko.  Then I

13   think we're done with Ms. Ko, Your Honor.

14           THE COURT:  All right.  So who else do we have?  We

15   have Wood, Lim, and Kim?

16           MR. ENGER:  I believe that's correct.

17           MR. SHERWOOD:  Your Honor, I think I can boil it down

18   on Mr. Wood, if I may proceed?

19           THE COURT:  All right.

20           MR. SHERWOOD:  So the -- on Page 39 of the -- of the

21   document that the Court has before us, I think that as somebody

22   for Rembrandt said, the first four designations are covered by

23   the Court's ruling with respect to structure.  So we understand

24   that we'll not be able to play those.

25           THE COURT:  All right.  Those are out.

1          MR. SHERWOOD:  The objections that Rembrandt has made

2     with respect to privilege, going over to Page 40, and the --

3     the next one where there's an objection is Page 30, Line 12,

4     through 31, Line 3.  And the only thing that I think is still

5     alive there is -- is -- is the privilege, and -- and I've

6     looked at those.  And I understand those are covered by the

7     Court's rulings, so -- so that's with -- not withdrawn, but we

8     won't play that.  And the same with respect to the next two

9     entries where there's also a privilege objection.

10          MR. ENGER:  So -- so the -- the deposition testimony

11     at Pages 30 through 31, the entries where we've objected on

12     privilege, those are withdrawn?

13          MR. SHERWOOD:  They're not withdrawn, but I understand

14     we can't play them.

15          THE COURT:  All right.  In other words, the objection

16     is sustained.

17          MR. SHERWOOD:  Right.  Right.  And then looking down

18     the page, Your Honor, the -- the designation beginning at

19     33:13, again, address -- is the structure issue that the

20     Court's already ruled on, as is the next one, starting on Page

21     34, Lines 5 to 20.  So we understand we cannot play those.

22          THE COURT:  All right.  The objection will be

23     sustained as to those, as well.

24          MR. SHERWOOD:  Then there's no objection for the next

25     two designations, and then, Your Honor, starting on Line -- on

1    Page 37, Line 9, this is -- this is where I -- I guess there's

2    a dispute, but this testimony is about the sale transaction.

3    And we understand the Court's ruling with respect to the pro

4    rata allocation, but that testimony doesn't begin until Page

5    38, Line 4.  So we understand we cannot play that.  It carries

6    on from Page 38, Line 4, down to Page 39, Line 7.  But what

7    comes before it on Page 37 and the very top of 38, including

8    the purchase price, that is not covered by the Court's ruling,

9    and we should be able to play that.

10           THE COURT:  What's the objection to that part?

11           MR. ENGER:  None, Your Honor.

12           THE COURT:  Okay.  So Line 37, 9, to 39 -- I mean, to

13   38, 4, or 38, 3, I guess --

14           MR. SHERWOOD:  38, 3, Your Honor, yes.  Right.

15           THE COURT:  -- comes in.

16           MR. SHERWOOD:  And then, Your Honor, turning over to

17   the next page, Page 41, the first -- looks like five

18   designations, again, all relate to the path of the money used

19   to buy the patents and so forth, which we understand the

20   Court's ruling with respect to not being able to play that.

21           THE COURT:  All right.

22           MR. HADDAD:  And then you can see, we've withdrawn

23   several designations going down the page, and then starting on

24   Page 60, there are no objections, so we obviously can play

25   those.  And that carries through over to Page 42.  The

1    designation on -- on Page 82, we'll withdraw that one.

2          THE COURT:  And the objection's sustained as to the

3    designations on 102 and 103.

4          MR. SHERWOOD:  Yes, Your Honor, correct.

5          THE COURT:  All right.

6          MR. SHERWOOD:  And we can withdraw the -- the very

7    last one, as well.

8          THE COURT:  All right.

9          MR. SHERWOOD:  So just -- just for the record, that

10   would be --

11         THE COURT:  That takes care of Mr. Wood.

12         MR. SHERWOOD:  Yeah.  But just for the record, that

13   last designation starts on Page 130.

14         THE COURT:  So the designation on 130 and 131 is

15   withdrawn?

16         MR. SHERWOOD:  Yes, Your Honor.

17         THE COURT:  Okay.  Does that leave us anything other

18   than Mr. Lim and Mr. Kim?

19         MR. ENGER:  Not that I'm aware of, Your Honor.

20         THE COURT:  Anything from your side, Mr. Sherwood?

21         MR. SHERWOOD:  I don't think so, Your Honor.

22         THE COURT:  All right.  We're going to take a brief

23   recess now.  I'd like counsel to meet further on Mr. Lim and

24   Mr. Kim, and we'll come back and look at them.

25              LAW CLERK:  All rise.

1          (Recess.)

2          LAW CLERK:  All rise.

3          THE COURT:  Thank you.  Please be seated.

4          Mr. Enger?

5          MR. ENGER:  Your Honor, I'm pleased to report that we

6    were able to work out all of our objections to the deposition

7    of Mr. Lim and almost all of our objections to the deposition

8    of Mr. Kim.

9          THE COURT:  All right.  Refer me to a page.

10         MR. ENGER:  The one outstanding objection is at Page

11   106.

12         THE COURT:  Actually I mean, a page of the exhibit

13   first.

14         MR. ENGER:  Page 7 of Rembrandt's amended trial

15   deposition designations.

16         THE COURT:  Okay.  All right.

17         MR. ENGER:  Your Honor --

18         MR. ALAVI:  Is this Kim?

19         MR. ENGER:  This is Lim -- I'm sorry, this is Kim.

20         MR. ALAVI:  Kim?

21         MR. ENGER:  Kim.

22         Your Honor, this objection relates to the issue of

23   spoliation, which Your Honor has already ruled on a motion in

24   limine about.  As -- as you will recall, your motion in limine

25   did not preclude Plaintiff from acquiring as to the existence,

1    maintenance, or production of Bluetooth-related documents.

2    There's been a number of lines of testimony preceding this that

3    we think establish pretty conclusively that some -- some

4    documents were destroyed.  They're no longer maintained by the

5    test lab, but the -- the particular testimony that I'd like to

6    refer you to starts at Page 106, Line 6, and I believe it's

7    being pulled up now on the screen.

8         We don't believe there's anything inappropriate about

9    this.  This was Samsung's corporate representative on the

10   topics of -- of its PIC's documents.

11        THE COURT:  All right.  Let me hear the objection.

12        MR. HADDAD:  Your Honor, as counsel for Rembrandt

13   mentioned, there was a motion in limine that excluded any

14   mention of spoliation or destruction of documents.  That was

15   what the motion was.  The motion was granted, however, the --

16   it did not preclude Plaintiff from -- I'm just reading from it,

17   Your Honor, require -- from the inquiring into the existence,

18   maintenance, or production of Bluetooth-related documentation.

19   We had a -- nearly six-hour deposition where they -- they

20   drilled into location of documents and -- and how they're

21   maintained and where they are.

22        And we have a few documents, Your Honor -- a few

23   questions, Your Honor, where the impression is made that --

24   that documents were destroyed, and yet there's no evidence that

25   documents were destroyed.  The background here is that --

1          THE COURT:  All right.  What -- what language are you

2  objecting --

3          MR. HADDAD:  Specifically, Your Honor, I guess it's up

4  on the board there, 106 -- I'm -- I'm sorry, 106, Line 6.  Is

5  it appropriate for the test lab to destroy the compliance

6  folders for a particular product?  I don't think it's

7  appropriate is the answer.  Then continuing on:  What did

8  Samsung do to ensure the test labs didn't destroy the

9  compliance folders?  There's been no evidence leading up to

10  this that there's been any destruction of any documents, and

11  now they're asking him, you know -- you know --

12          THE COURT:  All right.

13          MR. HADDAD:  -- what -- how -- and it goes on, Your

14  Honor, again and again on the next -- 107:  Did Samsung do

15  anything to ensure the test labs didn't destroy the compliance

16  folders?  If we find that a certain test lab destroys such

17  information -- oh, that was -- that was the answer -- we

18  wouldn't use it again.

19          Then the question was:  Mr. Kim, I'm not trying to be

20  tricky here.  If Samsung did something to ensure that these

21  compliance folders were not destroyed, I want you to tell me

22  about it.  If Samsung did do anything to ensure these

23  compliance folders were not destroyed, I want you to tell me

24  that, too.  And the response was:  So we never imagined that

25  information would be destroyed.

1          And then -- then the final question is:  Is that what

2    happened here, these compliance folders were destroyed?  And

3    he's -- he makes kind of an odd answer.  I think there might

4    have been a translation problem.  I do not know about the

5    product list.

6          And then the next question was:  Do you know?  Okay.

7    So, Your Honor, the -- the -- the line of -- the line of

8    questioning begins at 106, Line 6, and ends at 108, Line 14.

9    And then we have a counter designation through Line 18 on that

10   same page.

11         And -- and basically, they're assuming -- he's

12   assuming that -- that -- in each of these questions, they're

13   assuming that -- that a destruction of documents has happened

14   when none has been shown.

15         THE COURT:  All right.  Let -- let me hear from

16   Mr. Enger.

17         MR. ENGER:  Your Honor, what the previous testimony

18   that they've agreed can come in shows is that Samsung had an

19   obligation to maintain these compliance folders.  Samsung did

20   not comply with that -- that requirement and instead designated

21   these compliance folders to its test labs.

22         And in this line of questioning it's saying, what did

23   you do to ensure that the test labs didn't destroy the

24   documents?  The answer is:  I didn't do anything.  We never

25   believed that they would destroy anything.  We didn't check,

1    but they would never maliciously do this.

2           THE COURT:  Do you have evidence that the test labs

3    destroyed the records?

4           MR. ENGER:  Only the inference, Your Honor, which is

5    that they were required to maintain these.  They no longer

6    exist.  We've asked for this evidence since the beginning of

7    the case, and it was never produced to us.

8           THE COURT:  All right.  So all of the questions about

9    the test lab destroying the records are -- are based on the

10   inference that you don't have the records?

11          MR. ENGER:  No, the -- the inference is that they were

12   required to keep them and that they -- whenever we asked them

13   for them, they could not give them to us because they don't

14   have them.  They -- I think the only inference is that they

15   were destroyed.

16          THE COURT:  I'll sustain the objection to those

17   questions at Page 106 to 108.  I don't believe that there's a

18   foundation to put an argument of destruction of documents

19   before the jury.

20          What's next?

21          MR. ENGER:  That's all, Your Honor.

22          THE COURT:  All right.  Any other issues regarding

23   Mr. Kim?

24          MR. HADDAD:  No, Your Honor.

25          THE COURT:  Are there any other issues regarding the

1    deposition designations?

2            MR. ENGER:  No, Your Honor.

3            THE COURT:  Mr. Alavi, you said that you have

4    something you want to take up regarding the scope of the IPR --

5            MR. ALAVI:  That's correct, Your Honor.

6            THE COURT:  -- limine?  What is that?

7            MR. ALAVI:  So we understand the Court's ruling and

8    understand the basis for it.  There's one issue that we want to

9    raise and seek clarification on.

10           As the ruling currently stands, and if both parties

11   abide by the MIL, that is, no one opens the door, the jury will

12   never hear that the Patent Office considered the WiFi standard

13   or Boer in connection with these two patents.  The problem that

14   we have, or we want to make sure -- actually, that's the

15   question.

16           The problem we have is that the patent video that the

17   jury's going to hear tells them what a patent looks like and

18   tells them if you want to see what prior art was considered,

19   you go to a section of the patent and look at it.  A jury could

20   take the patents back to the jury room -- one the jurors, and

21   we see this in trials or when we talk to jurors -- can go and

22   say, hey, look, Boer and WiFi were never considered by the

23   Patent Office.  And that could influence the jury discussion in

24   the jury room.  And that's just not a true fact.

25           And so we would be prejudiced if the jury came away

1    with the impression by listening to the patent video and

2    looking at the patent and concluding that the Patent Office

3    never considered Boer or the WiFi standard.

4          So the question is, we understand the Court doesn't

5    want us to get into the IPRs, doesn't want us to relitigate the

6    IPRs, doesn't want to tell the jury that Samsung filed all

7    these IPRs.  And we understand their arguments.  We disagreed

8    with them, but we understand the Court's ruling.  But are we

9    precluded from letting the jury know that even though it's not

10   listed on the face of the patent, the Patent Office did, in

11   fact, consider the WiFi standard and Boer in connection with

12   these patents?

13         And we think we should be able to, otherwise the jury

14   will be left with a false impression by listening to the

15   Court's patent video and by looking at the patent, and we would

16   be prejudiced.  I mean, there's no way for us, other than being

17   allowed to talk about that very, very minor point, not that it

18   was in an IPR, not what the IPR standard is, not that Samsung

19   filed all these IPRs, but simply that, in fact, these two

20   references were considered by the Patent Office so that we

21   don't have a misleading impression of what the real facts are.

22         THE COURT:  You know, that ruling was based upon Rule

23   403 and the balancing of the risk of confusion and prejudice in

24   introducing the IPRs to the jury.  And I'm going to deny your

25   request on the same basis.  I think that would inevitably lead

1    to either confusion in the jury's mind or explanations about

2    why those would be considered by the Patent Office, and I

3    understand your request, but it is denied.

4            MR. ALAVI:   Thank you, Your Honor.

5            The second issue is related to the Court's ruling on

6    the motion to seal the courtroom with respect to the BlackBerry

7    license, and we understand we're not to discuss the amount of

8    the BlackBerry license in open court.  But the question we have

9    is -- for the Court is what would the Court like us to do with

10   the exhibit which is the BlackBerry license and particularly

11   when it pops up on the screen and the amount, how does the

12   Court want us to deal with that?

13           MS. HIGGINS:   And -- and, Your Honor, this is an issue

14   that Samsung feels is very, very important here, too.  You

15   know, the parties, Rembrandt, Samsung, and third-party

16   BlackBerry all -- all collectively requested that the courtroom

17   be sealed and expressly for a very limited purpose with respect

18   to the -- the Rembrandt settlement amount and allocation, and

19   we have -- we have very serious concerns if we're not able to

20   discuss the amount of that agreement in connection with the

21   allocation clause, and there's really no way to separate the

22   one from the other.

23           And -- and so Samsung respectfully requests that the

24   Court reconsider -- there's a one-liner in your motion in

25   limine that says:  In lieu of sealing the court, the parties

```
 1  are hereby ordered not to discuss the amount of this agreement.

 2  And we would request that the Court give consideration to

 3  sealing for this very limited purpose.  We understand that it

 4  happens sometimes.  In fact, the only, you know, party here

 5  that can be in the courtroom is Samsung.  And -- and that's --

 6  that is acceptable to Samsung.

 7          And we think it's -- it's really a critical issue, and

 8  we want the full and fair opportunity to be able to

 9  cross-examine Mr. Weinstein.

10          THE COURT:  Why does the amount need to come in?

11          MS. HIGGINS:  Because the -- what Mr. Weinstein

12  admittedly did here was take a -- a royalty number that was

13  manufactured by Rembrandt.  He multiplied by a number of units,

14  and he came up with -- with a total amount.  And we want to be

15  able to -- to present through the cross of -- of Mr. Weinstein

16  what happened here.  And -- and in order to have the ability to

17  cross-examine the witness, we believe that we need -- it's

18  critical to be able to discuss everything in the agreement

19  and -- and that it -- that there -- there's an issue of

20  fairness if we're not able to do so.

21          THE COURT:  I don't think everything in the agreement

22  is relevant, and that is the reason why -- I -- I think that --

23  you know, the reason why you want to get that information

24  before the jury, I don't think, is based on any -- any

25  relevance it has, but rather the effect of the numbers.
```

1          MS. HIGGINS:  But, Your Honor, there -- there are

2    emails which are coming into evidence that -- that show that --

3    that BlackBerry sent a number to -- to Rembrandt, and they

4    said, this lump sum number, let us know if this is a number

5    that -- that that your expert can -- can use going forward.

6    And so that -- that's a reference to num -- the lump-sum

7    number.

8          And -- and frankly, what's going on here is they

9    want to take a lump-sum agreement and through an allocation

10   clause -- and Your Honor knows our position on this -- but

11   through that allocation clause, they -- they want to improperly

12   convert it into a lump-sum agreement, and we're entitled to --

13   to cross-examine Mr. Weinstein on the -- the full scope of

14   the -- the agreement, which the -- the one thing that -- that

15   is clear that the parties did agree to here, Your Honor, is --

16   is the lump sum.

17         That allocation clause is -- it explicitly says in the

18   agreement that BlackBerry does not agree to an allocation.  And

19   so we feel that -- that the jury should hear that -- that that

20   is what the parties agree to.  And it's fine Your Honor has

21   ruled that in addition to that, they get to hear about the

22   allocation.  But Samsung would be highly prejudiced here if

23   there wasn't a full and fair opportunity to -- to cross-examine

24   the witness.  And the sealing of the courtroom can be -- can be

25   very, very limited here to --

1          THE COURT:  So what part of it, other than the number,

2    are you saying you are prevented from going into?

3          MS. HIGGINS:  So, I mean, it is the -- it's the math,

4    Your Honor.  There's the -- the number that is in turn divided

5    into two smaller numbers.  And then Mr. Weinstein uses those

6    two smaller numbers to divide by units and then calculate

7    royalty rates.

8          And so Mr. Weinstein, even in explaining what he did

9    here, has to do the math.  And for us not to be able to discuss

10   with him the math, it just seems like, you know, you're -- our

11   hands would be tied, Your Honor.

12         THE COURT:  And --

13         MS. HIGGINS:  And so if -- if the -- you know, the

14   agreement has -- you know, is coming in, but -- but we feel we

15   should -- we should be able to fully cross-examine the --

16         THE COURT:  All right.

17         MS. HIGGINS:  -- witness on the --

18         THE COURT:  Mr. Alavi, what's your response?

19         MR. ALAVI:  Your Honor, I think they want the number

20   in to anchor the jury.  Samsung is a company that is

21   substantially larger in unit sales than BlackBerry.  They want

22   to anchor the number.  I think the math -- there is no dispute

23   that Mr. Weinstein did division properly.  The math is not at

24   issue.

25         The issue is -- the only issue -- the only issue is

1    the position that Samsung has taken that you should ignore the

2    allocation in its entirety, and, therefore, the entire

3    agreement should be ignored.  And that can be done without

4    showing the number.  I think we can redact the number.  They

5    can -- all the language they want to use is the language after

6    the allocation that says BlackBerry does not agree to an

7    allocation.  They can do the emails if they want to

8    cross-examine Mr. Weinstein with the emails.  They don't need

9    the number.

10         I think they're just trying to anchor the jury, and

11   it's not necessary.  I think we can comply with the Court's

12   order and not seal the courtroom.  We can redact the number and

13   redact it on the exhibit that the jury sees, and -- and

14   everyone can cross-examine Mr. Weinstein about his approach,

15   but there's no dispute that he did division correctly, that is,

16   that he took the denominator and the numerator and got to the

17   right result.

18         MS. HIGGINS:  Your Honor, and Rembrandt did agree with

19   the motion to seal the courtroom, and I actually think what's

20   going on here is the opposite, that they're trying to take

21   advantage of the fact that we're not actually able to look at

22   the math now.

23         And one of the significant things about the math, Your

24   Honor, if you look at it, is that the numerator will be many,

25   many digits, and they will be three, four, five, six, seven,

1  eight.  And interestingly, the denominator will also be three,

2  four, five, six, seven, eight, so that it equals 10.  And part

3  of what's going on here is that -- that 10 comes from the fact

4  that Mr. Weinstein worked backwards.

5          And we should be able to present what -- what really

6  happened here to the jury, and part of the whole

7  Georgia-Pacific analysis here is what -- what the party --

8  they're the ones that want to rely on the agreement.  What the

9  parties -- we're going to talk about the negotiations and what

10  they agreed to.

11          The only thing here, as I said, Your Honor, that they

12  agreed to is that number.  And the other numbers, too, and the

13  math is -- is critical here.

14          THE COURT:  All right.  I -- I note your objection,

15  and it is overruled.

16          What's next?

17          MR. ALAVI:  Your Honor, those were all the issues that

18  the Plaintiffs had.

19          THE COURT:  All right.

20          MR. ALAVI:  I should say this.  We're prepared and are

21  marking the exhibit list to be able to provide either tonight

22  or first thing tomorrow morning a list of everything that's

23  pre-admitted.  But -- and we're -- we've worked a little bit on

24  that already, and we're -- we're going to finish that up

25  promptly.

1          THE COURT:  All right.  We'll get to the timing on

2     that in a moment.

3          Let me see, there was -- Mr. Sherwood, you indicated

4     that you had some matters that you wanted to raise.  As -- as

5     far as the -- the motion for summary judgment on the marking

6     issue, we have that on the briefs, and we'll get a -- a ruling

7     out on that shortly.

8          But you had another matter on -- I think something to

9     do with the invocation of privilege and -- and something else?

10          MR. SHERWOOD:  Right, Your Honor.  And -- and that is

11    very simply, again, a kind of goose/gander kind of thing, which

12    is to say that in presenting a witness, and they've -- they've

13    identified a number of areas in the objections with respect to

14    deposition designations where they show that there was a -- a

15    question that they believe invaded the privilege.  I don't

16    think they should be able to go into any of that subject

17    matter with any of those witnesses.  I think that's a logical

18    import of the Court's ruling, and I just wanted to confirm

19    that.

20          THE COURT:  If what you're saying is that there are --

21          MR. SHERWOOD:  What I'm saying is they're saying that

22    they want to use the privilege as a shield.  And so in -- in

23    effect, what they cannot do as a sword is then elicit

24    testimony, not privileged, but in the subject matter area that

25    that question that they asserted privilege to covered.

1          So, for example, there was a question of Dr. Schneck,

2    something about an improvement in the claims in these patents

3    versus the other patents.  So that would be an example of

4    something where they said, oh, can't ask him about that because

5    the only thing he knows about that is privileged.  Well, Your

6    Honor, I don't think he should be able to testify on that

7    subject at all, and that's all I'm trying to confirm here.

8          THE COURT:  You're saying that -- and is this with

9    regard to any witness other than Schneck?

10          MR. SHERWOOD:  Well, maybe Mr. Wood, as well.

11          THE COURT:  All right.  So what you're asking is for a

12    ruling that if the Plaintiff has asserted a privilege when you

13    asked questions of their witness during a deposition that they

14    should not be entitled to elicit testimony from the witness on

15    that subject?

16          MR. SHERWOOD:  On that subject matter, yes, Your

17    Honor, exactly.

18          THE COURT:  All right.  And are there particular

19    subject matters that you have in mind, or are you -- I mean, I

20    don't know if you will agree with them or they will agree with

21    you about what that subject matter is.

22          MR. SHERWOOD:  Well, they -- they gave us a long list

23    of parts of the depositions where they asserted privilege, so

24    that would seem to me to be a pretty good guide.  I don't -- I

25    admit I don't have a list of those --

```
 1          THE COURT:  All right.

 2          MR. SHERWOOD:  -- readily available for the Court.

 3          THE COURT:  Let -- let me hear from the Plaintiff on

 4  that.

 5          Mr. Alavi, do you intend to ask questions on a subject

 6  matter on which you asserted a privilege?

 7          MR. ALAVI:  Your Honor, that's -- let me say this to

 8  start with, no, with the caveat that I think what Mr. Sherwood

 9  talked about since it was fairly vague is -- it could be

10  broader than what everyone agrees the sword/shield issue is.

11  If a witness answered a ques -- was asked a question and there

12  was a privilege objection, we understand that you cannot come

13  and ask that witness that same question and have them answer

14  that question.  You've waived the privilege.  There's a

15  sword/shield problem.

16          But if you ask a witness, what did the general counsel

17  tell you about X, and you assert a privilege, and that's the

18  only question asked in the deposition, but that witness had a

19  conversation with a third party about that topic, that

20  conversation with that third party wouldn't be privilege.

21          So I'm a little concerned about the just because you

22  assert a privilege, the entire topic is governed.  But we have

23  no intention, if we objected on the basis of privilege, and if

24  it was a broad topic.  If it was what do you know about the

25  continuation process, and the answer is, everything I know is
```

1    privileged, well, we can't get into that.  We understand that.

2    If it was what did you talk to the prosecution attorneys about

3    this prosecution?  What did you tell them and what did they

4    tell you?  And we assert a privilege, and then there's some

5    other topic about -- that wouldn't fall in the privilege, I

6    think we're allowed to do that.

7              THE COURT:  All right.

8              MR. SHERWOOD:  Your Honor, may I just comment on that

9    briefly?

10             THE COURT:  Mr. Sherwood, do you have a specific area

11   that you want to raise?  If so, I might be able to offer

12   something definitive, but I agree with you.  I think everybody

13   agrees with you, that if the subject matter really is the same,

14   then they can't go into that.  But I think the devil is in the

15   details there, and it's whether it's the same subject matter

16   is what I think will have to be worked out.  And I don't know

17   of any way to do that other than with specifics, and, you

18   know --

19             MR. SHERWOOD:  Well, I can -- I can -- I appreciate

20   the Court's comments.  I can give you a specific now.  But --

21   but -- but you're right, the devil is in the details.  And the

22   questions that were asked were not the questions that Mr. Alavi

23   was talking about.  We don't ask a question where we know we're

24   eliciting privileged information.  We're all sophisticated

25   enough to know not to do that.  These were all more open-ended

 1   questions.

 2           So, for example, in Dr. Schneck's deposition, on Page

 3   115, the question was asked, is one way that the claims might

 4   operate better, that they cover more products, for example?

 5   And the witness's answer was:  I don't know anything about that

 6   that isn't privileged.  So you're right, that's a broad subject

 7   matter, and there are a bunch of these in here, Your Honor.

 8           And -- and so I -- I'll take the Court's guidance,

 9   such as you've already given it to us, and appreciate that the

10   devil is in the details, understanding that every one of these

11   broad topics -- it wasn't a situation of a focused question.

12   They were all broader issues.  And so, you know, any

13   discussion, for example, by this witness about how the claims

14   might operate better is out of bound because they invoked the

15   privilege when we asked them that question in the deposition.

16   And I think the Court has agreed with me on that, appreciating

17   that there's some definitional challenges here.

18           THE COURT:  I agree with you on the general principle.

19   And I'm afraid I'll just have to leave it to you to urge

20   objections where you think they're appropriate.

21           MR. SHERWOOD:  That's fine, Your Honor.  Thank you.

22           THE COURT:  Okay.

23           MR. ALAVI:  And, Your Honor, just on the devils in the

24   details, so they asked him, Mr. Schneck, the question about the

25   specific patents, and he says, I don't know.  And then they ask

```
 1    him general questions.  Well, let's not talk about these

 2    patents.  Let's just talk about patents in general.  What would

 3    be the reasons why you would seek a continuation to expand the

 4    claims?  And he answers the questions.  That, I think, would

 5    not violate what we've talked about because there was no

 6    objection lodged.  There was only a specific objection about

 7    that particular patent.

 8            So I think it's the -- as you said, the devil's in the

 9    details.  We have no intention, because I don't want to waive

10    the privilege, Your Honor.  I've seen it happen in a trial

11    where someone got cute and got the privilege waived, so we're

12    going to be very careful on those issues.

13            THE COURT:  Okay.  Good.

14            I -- I need new exhibit lists that both sides have

15    blessed by 12 hours from now, 11:00 o'clock tomorrow morning.

16    And the same thing for deposition designations.  So I -- I will

17    need those to be delivered to chambers by 11:00 tomorrow.  And

18    if there are remaining issues, we will take them up at that

19    time.

20            Mr. Ward?

21            MR. WARD:  One agreement that we've reached, Samsung

22    and Rembrandt, subject to the Court's approval, deals with

23    reallocating some time from that provided for voir dire to

24    opening.  The Court gave us 40 minutes for voir dire.  Our

25    co-counsel are concerned about not having enough time for
```

125

1  opening.  We have 25 minutes.  We were going to suggest that we

2  have 35 minutes for voir dire and 30 minutes for opening, if

3  the Court would permit it.

4      THE COURT:  I think that will be acceptable.  And all

5  I can tell you is that I'll -- I'll get that answer for you

6  tomorrow.

7      MR. WARD:  Thank you, Your Honor.

8      MR. SMITH:  Thank you, Your Honor.

9      MR. ALAVI:  Your Honor, I just want to make sure we

10 get you the right thing at 11:00 o'clock.  On the exhibit list,

11 all you want are the exhibits that have been pre-admitted.  All

12 other exhibits should be removed from the list?

13     THE COURT:  Right.

14     MR. ALAVI:  And then --

15     THE COURT:  With the exception of -- I know there was

16 at least one that you're to lay a foundation by Mr. Kerry, I

17 think it is, and I think that's the only one that was

18 specifically reserved for a foundation.

19     MR. ALAVI:  And then for those in which you've

20 sustained an objection, would you like the objection listed

21 there and then -- because we have a checkmark and overruled.

22 That way the -- the Court has the full record, or do you just

23 want admitted, not -- you know, just admitted?

24     THE COURT:  As long as there is no doubt that the --

25 which exhibits are pre-admitted and -- and which are not, I

1  don't care if you -- if -- if for some reason it's easier to

2  leave the ones that have been ruled out on there with a clear

3  indication that they're not admitted, I'll leave that to you.

4  But I need the list to clearly show what's pre-admitted and

5  what's not.

6          MR. ALAVI:  We'll take care of it.

7          Thank you, Your Honor.

8          THE COURT:  Okay.  Any other questions?  If not, we're

9  adjourned.  Thank you.

10          LAW CLERK:  All rise.

11          (Hearing concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    /s/ Shelly Holmes                          2/4/15
     SHELLY HOLMES, CSR-TCRR                     Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/16

12

13

14

15

16

17

18

19

20

21

22

23

24

25