```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3   REMBRANDT WIRELESS          *    Civil Docket No.
     TECHNOLOGIES, LP,           *    2:13-CV-213
 4                               *    Marshall, Texas
                Plaintiff,       *
 5   VS.                         *
                                 *
 6   SAMSUNG ELECTRONICS CO. LTD,;*
     SAMSUNG ELECTRONICS         *
 7   AMERICA, LLC; SAMSUNG       *
     TELECOMMUNICATIONS AMERICA, *
 8   LLC; SAMSUNG AUSTIN         *
     SEMICONDUCTOR, LLC,         *
 9                               *    February 9, 2015
                Defendants.      *    1:16 p.m.
10

11                TRANSCRIPT OF JURY TRIAL
          BEFORE THE HONORABLE RODNEY GILSTRAP
12             UNITED STATES DISTRICT COURT

13

14   APPEARANCES:

15   FOR THE PLAINTIFF:         DEMETRIOS ANAIPAKOS
                                AMIR ALAVI
16                              JAMIE A. AYCOCK
                                Ahmad, Zavitsanos, Anaipakos,
17                              Alavi & Mensing, P.C.
                                1221 McKinney Street
18                              Suite 3460
                                Houston, TX  77010
19

20
     APPEARANCES CONTINUED ON THE NEXT PAGE:
21
     COURT REPORTER:            SHELLY HOLMES,CSR, TCRR
22                              Official Court Reporter
                                100 East Houston, Suite 125
23                              Marshall, TX  75670
                                903/923-7464
24
     (Proceedings recorded by mechanical stenography,
25   transcript produced on CAT system.)
```

```
 1    APPEARANCES CONTINUED:

 2    FOR THE PLAINTIFF:        MICHAEL F. HEIM
                               ERIC ENGER
 3                             MIRANDA Y. JONES
                               BLAINE A. LARSON
 4                             Heim, Payne & Chorush, LLP
                               600 Travis Street, Suite 6710
 5                             Houston, TX  77002-2912

 6                             T. JOHN WARD, JR.
                               Ward & Smith Law Firm
 7                             1127 Judson Road, Suite 220
                               Longview, TX  75601

 8

 9    FOR THE DEFENDANTS:       MICHAEL C. SMITH
                               Seibman, Burg, Phillips &
10                             Smith, LLP
                               113 E. Austin Street
11                             P.O. Box 1556
                               Marshall, TX  75673
12
                               JEFFREY K. SHERWOOD
13                             DANIEL G. CARDY
                               JI YOUNG PARK
14                             Dickstein Shapiro LLP
                               1825 Eye Street NW
15                             Washington, DC  20006-5403

16                             GERARD A. HADDAD
                               JENNIFER BIANROSA
17                             Dickstein Shapiro LLP
                               1633 Broadway
18                             New York, NY  10019

19                             JEFFREY A. MILLER
                               Dickstein Shapiro LLP
20                             1842 Page Mill Road, Suite 150
                               Palo Alto, CA  94304
21
                               JESSE J. JENNER
22                             BRIAN P. BIGGINGER
                               DEANNE K. CEVASCO
23                             VINCENT Y. LING
                               Ropes & Gray, LLP
24                             1211 Avenue of the Americas
                               New York, NY  10036
25
```

```
 1    APPEARANCES CONTINUED:

 2    FOR THE DEFENDANTS:        GABRIELLE E. HIGGINS
                                 REBECCA R. HERMES
 3                               Ropes & Gray LLP
                                 1900 University Avenue
 4                               6th Floor
                                 East Palo Alto, CA  94303
 5

 6                     P R O C E E D I N G S

 7           (Jury out.)

 8           COURT SECURITY OFFICER:  All rise.

 9           THE COURT:  Be seated, please.

10           All right.  Counsel, before we bring the jury

11    in, I understand there's an issue about several boxes of

12    exhibits.  Let me hear briefly, very briefly, from both

13    sides about that.

14           MR. ALAVI:  Your Honor --

15           THE COURT:  From the podium, please.

16           MR. ALAVI:  Your Honor, may it please the

17    Court.

18           The issue relates to documents that are called

19    PICS.  These are documents that show that the accused

20    products follow the EDR 2.0 specification, or greater,

21    from the Bluetooth SIG.

22           There are roughly 400 products accused.  We're

23    trying to figure out the Court's procedures on what

24    constitutes use of a document with a witness.

25           We have an expert who has reviewed each of
```

1  those PICS and will include all of the products, the 400

2  products, practice the EDR 2.0+EDR -- 2.0+EDR standard.

3       We -- we don't have enough time in 10 hours to

4  go document-by-document.  Here's the PIC for this

5  product; here's the product number; and here's where it

6  shows that it practices this standard.

7       So what we thought we would do is provide all

8  400 of the PICS to the expert.  He would go through --

9  in detail through one to explain how the product work --

10 works and how this shows it and then testify that these

11 other 400 are -- and give the exhibit numbers -- are the

12 PICS for the other products in this case and they all

13 show the same thing.

14      So there's a question for the Court, because I

15 think Samsung has indicated that would be insufficient

16 use for purposes of having the documents go back as part

17 of the record.

18      And then the second piece is we understand --

19 we completely understand that the Court does not want

20 seven boxes of documents in front of the witness stand

21 for fire code and other types of reasons, but we'd

22 probably have to get past this threshold issue first to

23 see how we deal with the seven boxes.

24      THE COURT:  And this is with your second

25 witness?

 1          MR. ALAVI:  With our second witness, Your

 2    Honor.

 3          THE COURT:  What's Samsung's response?

 4          MR. SMITH:  Your Honor, the only problem is we

 5    didn't -- we didn't know what the Court's threshold was

 6    for use.  My -- my -- if the Court intends it to be the

 7    witness takes it out and uses it on his testimony,

 8    that's what I've been familiar with.

 9          I don't know what the Court wants to do about

10    an expert pointing to boxes and saying, basically, I

11    reviewed that.

12          Of course, he can offer his opinions on them,

13    and there's not a substantive objection to the PICS.

14    We -- I just wanted to defer to whatever the Court's

15    practice is so that we knew going into it what was

16    sufficient to get exhibits into the record.

17          THE COURT:  Well, the Court's usual standard

18    on these things is, are they published to the jury, and

19    that does not require that each page of each document be

20    physically flipped to and shown and discussed.

21          If the Plaintiffs follow the kind of procedure

22    that they've outlined where he goes through a portion of

23    these in great detail and then identifies the others --

24    and I'm happy to let you take seven different boxes one

25    at a time and let him look through him; we'll work with

 1   the CSO -- and he identifies what's in there and that he

 2   has examined each part of it, and he testifies to it on

 3   a more or less global basis, in my view, that's adequate

 4   publication to be a part of the record.

 5          MR. SMITH:  If that's the case, Your Honor,

 6   then we -- we don't believe that the individual boxes

 7   need to go up.  If the Court's going to receive a

 8   reference to the contents of a box to be sufficient, it

 9   would save time if --

10          THE COURT:  Well, in light of the fact that

11   you've raised the issue, I think it's better if the

12   witness actually takes the box, looks in it, and

13   identifies what's in it so we don't have any question

14   about, well, those were the wrong boxes or this, that,

15   or the other.

16          And it's not going to take a lot of time to

17   carry six additional boxes back and forth.  Plaintiffs

18   can start out with the box they intend to use in greater

19   detail at the witness stand with the witness.

20          And if you will marshal those other boxes at a

21   place in the courtroom at that time that's not

22   disruptive, then you simply need to ask leave to

23   approach, come by to pick up the next box, hand it to

24   Mr. Wolverton, he'll carry it to the witness and bring

25   you back the prior box.

1          And then you can go through what's in those

2     additional boxes.  Did he look at them; did he consider

3     them; what are they; or whatever questions you want to

4     ask.

5          And that may take a little more time, but it's

6     not going to take a substantial amount of time.  And

7     that way there shouldn't be any question in anybody's

8     mind the witness has identified them and published them

9     to the jury.

10         Anybody -- any questions about that procedure?

11              MR. SMITH:  No, Your Honor.

12              THE COURT:  Okay.  Do we have any other wishes

13    before we bring the jury in?

14              MR. ALAVI:  Not from the Plaintiffs, Your

15    Honor.

16              THE COURT:  Okay.

17              MR. SMITH:  Not from the Defendants, Your

18    Honor.

19              THE COURT:  As local counsel is probably

20    aware, it's the Court's practice to give my preliminary

21    instructions, including opening arguments, and then I'll

22    ask if anyone wants to invoke the Rule, and we'll swear

23    the witnesses that are present as a group.

24         Anybody has any problem with that, speak now

25    or forever hold your peace.

1           All right.  Then in that case, Mr. Wolverton,

2    bring in the jury.

3           COURT SECURITY OFFICER:  All rise for the

4    jury.

5           (Jury in.)

6           THE COURT:  Welcome back, ladies and

7    gentlemen.  Please be seated.

8           Thank you for being on time.  We're going to

9    proceed along the lines I discussed in jury selection

10   with you.  Going forward, it will be my attempt to start

11   each day around 8:30 in the morning.  It will be my

12   attempt to stop each day around 5:30, give or take.

13          Those aren't exact.  I don't cut people off in

14   the middle of a sentence because it happens to be

15   exactly 5:30 p.m., but I will be looking for a

16   convenient time to break at that time of the day.

17          And I'll be looking to get us started as close

18   to 8:30 each morning as I can so that we can get through

19   the material that we have in hopes of being able to

20   allow you to return a verdict this week and then not

21   carry over into the next week.

22          Now, I have some preliminary instructions that

23   I want to give you before we start with the opening

24   statements from the lawyers and then get on to the

25   evidence.

You've now been sworn as the jurors in this case.  And as such, you are the sole judges of the facts.  You'll decide what all the facts are in this case.

As the Judge, I will give you instruction on the law.  I will handle questions of evidence and procedure, and I will oversee the flow of the trial and maintain the decorum of the courtroom.

At the end of the evidence, I'll give you detailed instructions on the law to apply in deciding the case.  And I'll give you a list of questions that you are then to answer.

This list of questions is called the verdict form.  Your answers to those questions will need to be unanimous, and those unanimous answers will constitute the verdict in this case.

Now, I want to tell you briefly what this case is about.  This case involves a dispute regarding certain United States patents.  I know that you've seen the patent film.  I know you have those instructions, but I want to discuss with you on the record about a patent and how one is obtained.

Patents are either granted or denied by the United States Patent and Trademark Office, often called the PTO.  And many times I will refer simply to the PTO,

1    meaning the U.S. Patent and Trademark Office.

2         A valid United States patent gives the

3    patent-holder the right for up to 20 years from the date

4    of the patent application, the date the patent

5    application is filed, to prevent others from making,

6    using, offering to sell, or selling the patented

7    invention within the United States or importing it into

8    the United States without the patent-holder's

9    permission.

10        A patent is a form of property called

11   intellectual property.  Like other forms of property, a

12   patent can be bought or sold.  A violation of the

13   patent-holder's rights is called infringement.

14        The patent-holder may try to enforce a patent

15   against persons it believes to be infringers by a

16   lawsuit filed in federal court.  That's what we have in

17   this case.

18        The process of obtaining a patent is called

19   patent prosecution.  To obtain a patent, one must first

20   file an application with the PTO.  The PTO is an agency

21   of the United States Government that employs trained

22   Examiners to review patents and -- or to review

23   applications for patents.

24        The -- the application includes what is called

25   a specification.  The specification contains a written

1  description of the claimed invention, telling what the

2  invention is, how it works, how to make it, and how to

3  use it.

4          The specification concludes or ends with one

5  or more numbered sentences.  These numbered sentences

6  are the patent claims.  When a patent is granted by the

7  Patent and Trademark Office, the claims define the

8  boundaries of its protection and give notice to the

9  public of those boundaries.

10          After the applicant files the application, an

11  Examiner reviews the application to determine whether or

12  not the claims are patentable -- that is to say,

13  appropriate for patent protection -- and whether or not

14  the specification adequately describes the invention

15  claimed.

16          In examining a patent application, the

17  Examiner reviews certain information about the state of

18  the technology at the time the application was filed.

19          The PTO searches for and reviews this type of

20  information that is publicly available or that is

21  submitted by the applicant.  This type of information is

22  called prior art.

23          The Examiner reviews this prior art to

24  determine whether or not the invention is truly an

25  advance over the state of the art at the time.  Prior

art is defined by law, and I will give you, at a later time, specific instructions on what constitutes prior art.

However, in general, prior art includes information that demonstrates the state of the technology that existed before the claimed invention was made or before the application for the patent was filed.

A patent contains a list of certain prior art that the Examiner has considered.  The items on this list are called the cited references.

After the prior art search and examination of the application, the Examiner informs the applicant in writing of what the Examiner has found and whether the Examiner considers any claim to be patentable, thus would be allowed.  This writing from the Examiner is called an Office Action.

If the Examiner rejects the claims, the applicant has the opportunity to respond to the Examiner and try to persuade the Examiner to allow the claims. The applicant also has a chance to change or amend the claims or submit new claims.

This process between the applicant and the Examiner goes back and forth for some time until the Examiner is satisfied that the application meets the requirements for a valid patent.  And in that case, the

1    application issues as a United States patent.

2         Or in the alternative, if the Examiner

3    ultimately concludes that the application should be

4    rejected, in which case no patent is issued.

5         Sometimes patents are issued after appeals

6    within the Patent and Trademark Office or to a court.

7    The papers generated by these communications back and

8    forth between the Examiner and the applicant are called

9    the prosecution history.

10        The fact that the PTO grants a patent does not

11   necessarily mean that any invention claimed in the

12   patent, in fact, deserves the protection of a patent.

13        While the issued patent is presumed valid

14   under the law, a person accused of infringement has the

15   right to argue here in federal court that the claimed

16   invention in a patent is invalid.

17        It's your job as the jury to consider the

18   evidence presented by the parties and determine

19   independently and for yourselves whether or not the

20   Defendant has proven by clear and convincing evidence

21   that the patent is invalid.

22        To help you follow the evidence, I'll give you

23   a brief summary of the positions of the parties.

24        The Plaintiff, Rembrandt Wireless Technology,

25   and patent owner in this case -- I'll often refer to

1  simply as Rembrandt -- has brought this action.

2         The Defendants are Samsung Electronics

3  Company, Limited; Samsung Electronics America, Inc.; and

4  Samsung Austin Semiconductor, LLC, which I'll refer to

5  these parties collectively as simply Samsung.  They are

6  the Defendants.

7         The Plaintiff, Rembrandt, contends that

8  certain claims of the following patents have been

9  infringed.

10         The case involves United States Patent

11  No. 8,023,580, referred to often as simply the '580

12  patent, and United States Patent No. 8,457,228, referred

13  to, in shorthand, as simply the '228 patent.

14         These patents may refer -- may be referred to

15  jointly as the patents-in-suit.  The named inventor of

16  the patents-in-suit is Mr. Gordon Bremer.

17         The claims that Rembrandt contends have been

18  infringed have been referred to as the asserted claims.

19  Over the course of the trial, you're -- you will learn

20  more about which claims are asserted against Samsung.

21         Rembrandt filed suit in this court seeking

22  money damages from Samsung for allegedly infringing the

23  patents-in-suit by making, selling, or offering to sell

24  in the United States products that Rembrandt argues are

25  covered by the asserted claims.

1              The products that are alleged to infringe are

2    Samsung products that comply with Bluetooth

3    specifications and that include enhanced -- include an

4    enhanced data rate or EDR.  I may refer to these simply

5    as the accused products.

6              Rembrandt argues that Samsung has infringed

7    the patents-in-suit.  Rembrandt seeks damages in the

8    form of a reasonable royalty to compensate it for the

9    alleged infringement.

10             Samsung denies that they are infringing any of

11   the asserted claims of the patents-in-suit.  Samsung

12   further denies that Rembrandt is entitled to any

13   damages.

14             Additionally, Samsung contends that the

15   asserted claims are invalid in one or -- or more

16   grounds.

17             Invalidity is a defense to infringement.

18   Therefore, even though the U.S. Patent and Trademark

19   Office or PTO has allowed the asserted claims, you, the

20   jury, must decide whether or not those claims are

21   invalid.

22             Your job is to decide whether the asserted

23   claims have been infringed and whether the asserted

24   claims of the patents-in-suit are invalid.

25             If you decide that any claim of the

1   patents-in-suit have -- has been infringed and is not

2   invalid, you'll then need to decide what amount of money

3   damages are to be awarded to Rembrandt as compensation

4   for such infringement.

5          Now, my job in this case is to tell you what

6   the law is, handle the rulings on evidence and

7   procedure, and conduct the trial as efficiently and

8   effectively as possible.

9          In determining the law, it is specifically my

10  job to determine the meaning of any of the claim

11  language from within the asserted -- the asserted

12  patents that needs interpretation.

13         I've already determined the meaning of the

14  claims in the patent -- of the patents-in-suit, and you

15  must accept those meanings that I give you and use those

16  meanings when you decide whether any particular claim

17  has or has not been infringed and whether or not any

18  claim is invalid.

19         You'll be given a document in a moment which

20  reflects those meanings that I have arrived at.

21         For any claim term for which I have not

22  provided you with a definition or a construction, you

23  should apply the plain and ordinary meaning.

24         If I provided you with a definition, however,

25  you are to apply my definition to those terms throughout

1  the case.

2          However, my interpretation of the language of

3  the claims should not be taken as an indication by you

4  that I have a personal opinion or any opinion at all

5  regarding issues such as infringement and invalidity.

6  Those issues are yours alone to decide as the jury in

7  this case.

8          I'll provide you with more detailed

9  instruction on the meaning of the claims before you

10  retire to deliberate and reach your verdict.

11          In the -- in deciding the issues that are

12  before you, you'll be asked to consider specific legal

13  rules.  And I'll give you an overview of those rules

14  now, and then at the -- at the -- at the conclusion of

15  the case, I'll give you much more detailed instructions.

16          The first issue you'll be asked to decide is

17  whether Samsung has infringed any of the asserted claims

18  of the asserted patents.  Infringement is assessed on a

19  claim-by-claim basis, and Rembrandt must show by a

20  preponderance of the evidence that a claim has been

21  infringed.

22          Accordingly, there may be infringement as to

23  one claim but no infringement as to another claim.

24  There are also a few different ways that a patent can be

25  infringed.  I'll explain -- explain the requirements for

each of these types of infringement to you in detail at the conclusion of the trial.

In general, though, Samsung may infringe the asserted patents by making, using, selling, or offering for sale in the United States or importing into the United States a product meeting all the requirements of a claim of the asserted patent.

I'll provide you with more detailed instructions on the requirements of infringement at the conclusion of the case.

Another issue that you'll be asked to decide is whether the asserted patent or patents is invalid.  A patent is presumed to be valid, but may be found to be invalid for a number of reasons, including because it claims subject matter that is not new or is obvious.

For a patent claim to be invalid because it is not new, Samsung must show by clear and convincing evidence that all of the elements of the claim are sufficiently described in a single previous printed publication or patent.  We call these items prior art. If a claim is not new, it is said to be anticipated.

Another way that a claim can be found to be invalid is that it may have been obvious.  Even though a claim is not anticipated because every element of a claim is not shown or sufficiently described in a single

1    piece of prior art, the claim may still be invalid if it

2    would have been obvious to a person of ordinary skill in

3    the field of technology of the patent at the relevant

4    time.

5         You'll need to consider a number of questions

6    in deciding whether the inventions claimed in the

7    asserted patents are obvious.  And I'll provide you with

8    more detailed instructions on these questions at the

9    conclusion of the trial.

10         A patent may also be invalid if its

11   description in the specification does not meet certain

12   requirements.  To be valid, a patent must meet the

13   written description requirement.

14         In order to meet this written description

15   requirement, the description of the invention in the

16   specification portion of the patent must be detailed

17   enough to demonstrate that the applicant actually

18   possessed the invention as broadly as claimed in the

19   claims of the issued patent.

20         If you decide that any claim of the

21   patents-in-suit has been infringed and is not invalid,

22   that is, the presumption of validity has survived, then

23   you will need to decide what amount of money damages are

24   to be awarded to Rembrandt to compensate it for the

25   infringement.

1          A damage award must be adequate to compensate

2     the patent-holder for the infringement, but in no event

3     may the damage award be less than what the patent-holder

4     would have received had it been paid a reasonable

5     royalty for the use of its patent.

6          I'll instruct you later on the meaning of a

7     reasonable royalty.

8          The damages you award are meant to compensate

9     the patent-holder and not to punish the Defendant.  You

10    may not include in your award any additional amount as a

11    fine or penalty above what is necessary to fully

12    compensate the patent-holder for the infringement.

13         I'll give you more detailed instructions on

14    the calculation of damages at the conclusion of the

15    trial.

16         Now, ladies and gentlemen, through the process

17    of this trial, you're going to be hearing from a number

18    of witnesses, and I want you to keep an open mind while

19    you're listening to the evidence and not decide any

20    facts until you have heard all of the evidence.

21         While the witnesses are testifying, remember

22    that you will have to decide the degree of credibility

23    and believability to allocate to each witness and to the

24    evidence.

25         So while the witnesses are testifying, you

1   should be thinking about and asking yourselves things

2   like this:  Does the witness impress you as being

3   truthful?

4           Does he or she have a reason not to tell the

5   truth?

6           Does he or she have any personal interest in

7   the outcome of the case?

8           Does the witness seem to have a good memory?

9           Did he or she have the opportunity and ability

10  to observe accurately the things that they testified

11  about?

12          Did the witness appear to understand the

13  questions clearly and answer them directly?

14          And, of course, does the witness's testimony

15  differ from the testimony of other witnesses, and if it

16  does, how does it differ?

17          These are some of the kinds of thing that you

18  should be thinking about while you're listening to each

19  of the witnesses during the trial.

20          I also want to talk to you briefly about

21  expert witnesses.

22          When knowledge of a technical subject may be

23  helpful to you as the jury, a person who has special

24  training and experience in that particular field -- we

25  refer to them as an expert witness -- is permitted to

1   testify to you about his or her opinions on technical

2   matters.

3          However, you're not required to accept an

4   expert's or any other witness's opinions at all.  It's

5   up to you to decide whether to believe that an expert

6   witness or any witness, for that matter, is correct or

7   incorrect or whether or not you want to believe what

8   they say.

9          I anticipate that there will be expert

10   witnesses testifying in support of each side in this

11   case, but it will be up to you to listen to their

12   qualifications, and when they give an opinion and

13   explain the basis for it, you'll have to evaluate what

14   they say and whether you believe it and what degree you

15   want to give it any weight.

16          During the trial, I'll also -- I also

17   anticipate that there will be testimony of witnesses

18   that will be presented to you in what we call

19   depositions.

20          In trials like this, it's difficult to get

21   everyone present physically at the same time.  So

22   lawyers from each side, prior to the trial, take the

23   depositions of witnesses.

24          In a deposition, they have a court reporter

25   present.  The witness is there and is sworn in under

1    oath just as if he or she were in open court, and the

2    parties ask them questions through their counsel, and

3    that process is recorded.

4         Portions of those recordings, video

5    recordings, of the questions and answers may be played

6    to you as part of the trial so that you can see the

7    witness and hear the testimony even though they're not

8    physically present in the courtroom.

9         That deposition testimony is entitled to the

10   same consideration insofar as possible and is to be

11   judged as to the credibility and believability and

12   otherwise considered by you, the jury, in the same way

13   as if the witness had been present and given the

14   testimony from the witness stand in open court.

15        Now, ladies and gentlemen, during the trial,

16   it's possible that the lawyers from time to time will

17   make objections, and when they do, I will make rulings

18   on those objections.

19        It's the duty of an attorney on each side to

20   object when the other side offers testimony or other

21   evidence the attorney believes is not proper under the

22   rules or orders of the Court and the rules of evidence

23   and procedure.

24        Upon allowing testimony or other evidence to

25   be introduced over an objection, the Court does not,

1    unless expressly stated, indicate an opinion as to the

2    weight or effect of such evidence.  Again, determining

3    the weight and effect of evidence is solely your

4    responsibility as the jury.

5           You are the sole judges of the credibility of

6    all the witnesses and the weight and the effect to be

7    given to all of the evidence in this case.

8           I do want to compliment counsel and the

9    parties on both sides, because through pretrial

10   procedures that you have not been a part of, many, many

11   documents and proposed exhibits have been gone through,

12   taken up, ruled on by the Court, and that has saved you

13   a lot of time, and, hopefully, that will minimize the

14   number of objections that we hear during the trial.

15          Even so, it is possible that we will get

16   objections during the trial, and in that case, I will

17   rule on them.

18          So if a party shows you an exhibit -- shows

19   you an exhibit in this case, it means that it's already

20   been ruled on as to its admissibility by the Court, and

21   they may ask you such questions and put it in context as

22   they believe is proper.

23          Both sides have worked hard to streamline this

24   process, and they're entitled to our thanks.  You may

25   not understand fully how much time they have saved you,

1    but they have saved you, with the Court's work with

2    them, a considerable amount of time.

3           However, as I say, we may still get objections

4    during the trial.

5           If I sustain an objection to a question

6    addressed to a witness, then you must disregard the

7    question entirely and draw no inference from the wording

8    of it or speculate about what the witness would have

9    said, if I had permitted the witness to answer the

10   question.

11          On the other hand, if I overrule an objection,

12   you should consider the question and the answer just as

13   if no objection had been made.

14          You should know that the law of the United

15   States allows a judge in my position to comment to the

16   jury on the evidence in a case.

17          But such comments from the Court on the

18   evidence are only an expression of the judge's opinion

19   as to the evidence, and the jury is free to disregard

20   such comments in their entirety, because, as I've stated

21   before, you, the jury, are the sole judges of the facts,

22   the credibility of the witnesses, and how much weight,

23   if any, you want to give to their testimony.

24          However, even though I may have that right, as

25   I've indicated to you earlier, I intend to try very hard

1    to make sure not to comment on the evidence in the case

2    or to give you any idea about what I think of the

3    evidence presented throughout the trial.

4           Now, in front of me our court reporter,

5    Ms. Holmes, is taking down everything that is said in

6    the courtroom, and it will be reduced to writing in the

7    form of a transcript.

8           But that transcript will not be available to

9    you at the time you retire to deliberate on your

10   verdict.  The transcript is prepared in the event there

11   is an appeal to an appellate court after this trial is

12   over.

13          That being the case, each of you will have to

14   rely on your own memories of the evidence.  In a moment,

15   we're going to give each of you a juror notebook.

16          One of the things you'll find in the back of

17   that notebook is a legal pad with blank pages on it on

18   which you may take notes, if you choose.  It's up to you

19   to decide whether or not you want to take notes during

20   the trial, and if you do, how detailed you want your

21   notes to be.

22          Remember, though, if you do that, the notes

23   are for your own personal use.  You'll have to rely on

24   your memory of the evidence, and that's why you should

25   pay close attention to the testimony of each and every

witness.

You should not abandon your own recollection simply because someone else's notes indicate something differently.  Your notes are to refresh your recollection, and that's the only reason you should be keeping them.

At this time, I'm going to ask our court security officer to hand out the juror notebooks to the members of the jury.

In these notebooks, ladies and gentlemen, you'll see that you each have a copy of the two asserted patents that we've talked about, the '228 patent and the '580 patent.

Also in your notebooks, you'll see something listing the claim terms.  Those are the words that are found in the numbered claims at the back of the patents-in-suit that I told you about before.  Along with each claim term are the definitions that the Court has given you to work with in regard to those terms.

Also you'll find in there witness photographs for each of the witnesses that we anticipate will testify in the case.  And below their photographs are spaces where you may also take additional notes, if you choose to.

When you leave for the day during the trial

1    this week, be sure that you take your notebooks with you

2    and leave them on the table in the jury room.  They

3    should either be with you in the courtroom or they

4    should be on the table in the jury room and not anywhere

5    else.

6         There may be times when we take a brief recess

7    where I know that it will be short, and I will tell you

8    that you may simply leave your notebooks in your chairs.

9    But when you leave for the day, make sure that you carry

10   them into the jury room and leave them on the table in

11   the jury room.

12        We're going to have opening statements in just

13   a few minutes, so I want to give you a brief roadmap of

14   where the trial is going and how it's structured.

15   You'll have plenty of time to look through those

16   notebooks during the course of the trial.

17        After the opening statements, each side will

18   present an opening statement.  Then when both opening

19   statements are complete, the Plaintiff, Rembrandt, will

20   present its evidence in support of its contentions that

21   the claims of its patents-in-suit have been and continue

22   to be infringed by the Defendant, Samsung.

23        To prove infringement of any claim, Rembrandt

24   must persuade you that it is more likely than not that

25   Samsung has infringed that claim; that is, by a

preponderance of the evidence.

After Rembrandt puts on its testimony and rests, then Samsung, the Defendants, will present their evidence as to the asserted claims of the patents and their assertion that those -- that the patents-in-suit are invalid.

To prove invalidity of any claim, Samsung must persuade you by clear and convincing evidence that the claim is invalid.  In addition to presenting evidence of invalidity, Samsung will also put on evidence responding to Rembrandt's proof of infringement and damages.  Then Samsung will rest.

After Samsung has rested, then the Plaintiff, Rembrandt, may put on additional evidence, if they choose to, responding to Samsung's evidence that the claims of the patents are invalid or unenforceable and offer any other rebuttal evidence to the charges of infringement and damages.  This is called the rebuttal case.

During the rebuttal evidence, the Plaintiff may respond to any evidence offered by the Defendants.

After all the evidence is completed -- the Plaintiff puts on its case-in-chief, the Defendants put on their case-in-chief, and then the Plaintiffs put on their rebuttal case, if they choose to.

1          When all the evidence has been presented, I'll
2    give you final instructions on the law that applies to
3    this case.   Those final instructions are called the
4    Court's charge to the jury.
5          The lawyers will then present their closing
6    arguments to you.   And then after that, you will retire
7    to the jury room to deliberate and reach your verdict.
8          Also I'll repeat my earlier instruction to you
9    not to discuss the case at all among yourselves during
10   the trial.   Only when all the evidence is complete and
11   you retire to the jury room to deliberate and reach your
12   verdict, only then is it proper for you to discuss the
13   case among yourselves.
14         Also I'll remind you again, as I did before
15   lunch, that the attorneys and the witnesses and the
16   corporate representatives have been instructed by the
17   Court not to talk to you.
18         So as you pass them in and around the
19   courthouse coming and going, if they walk by you and
20   don't speak, don't think they're rude and unfriendly.
21   They're simply doing what I've instructed them to do.
22         All right.   With those instructions, we're now
23   going to hear the Plaintiff's opening statement followed
24   by the Defendants' opening statement.
25         Plaintiff may now present its opening

1    statement to the jury.

2              MR. ANAIPAKOS:  May I proceed, Your Honor?

3              THE COURT:  You may.

4              MR. ANAIPAKOS:  Thank you.

5              THE COURT:  Would you like a warning on your

6    time, Counsel?

7              MR. ANAIPAKOS:  Please, Your Honor, at five

8    minutes left.

9              THE COURT:  All right.  You may proceed.

10             MR. ANAIPAKOS:  May it please the Court.

11             Good afternoon, everybody.  My name is

12   Demetrios Anaipakos, and together with my colleagues, we

13   are proud to represent Rembrandt Wireless.

14             You have been asked to resolve a patent

15   dispute between two companies.  My client, Rembrandt

16   Wireless, is the owner of two patents issued by the

17   United States Patent and Trademark Office.

18             And the evidence we will present to you

19   throughout this trial will show you that Samsung has

20   infringed on those patents by selling millions and

21   millions of products that use the inventions claimed in

22   those patents without our permission and without paying

23   for them.  That is why we are here.

24             In this -- in this morning's opening remarks,

25   I'm going to cover five topics with you.  First, we're

1    going to review very briefly what a patent is.

2            Then we're going to talk specifically about

3    the Rembrandt patents at issue in this case; our view of

4    why Samsung infringes these patents; why, since Samsung

5    attacks the patents, the patents are, in fact, valid;

6    and then lastly, we will talk to you about the damages

7    we believe are owed to Rembrandt.

8            Let's begin by reviewing some of what you've

9    already learned this morning about our patents and the

10   patent system.

11           The founding fathers of this country thought

12   that patents were so important that they established the

13   patent system in the Constitution itself.  Article 1,

14   Section 8 on the screen before you gives inventors the

15   exclusive right to their discoveries.

16           The patent system has come a long way in the

17   more than 200 years since the Constitution was signed,

18   but one thing has remained the same all that time.

19   Patents are a form of property.  You can often think of

20   them like a deed to a piece of property.

21           So let's take an example of a landowner who

22   owns a piece of real property.  The yellow border marks

23   the boundaries of the property.  The property owner, of

24   course, can keep trespassers off the property.

25           And to pick up on a hypothetical Mr. Ward

1    talked about this morning, if Exxon were to drill on the

2    landowner's property and discover oil, it would not

3    matter that Exxon did not know it was trespassing.  It

4    still -- you would owe the landowner a royalty.  Why?

5    Because it used the landowner's property.

6            Patents work the same way.  A patent owner

7    like Rembrandt has the right to seek damages from an

8    infringer, and we expect the Court will instruct you

9    that an infringer does not need to know that there was a

10   patent and certainly does not need to know that

11   Rembrandt was the owner of the patent to be held

12   accountable for patent infringement.

13           What matters is whether the infringer is using

14   the patented invention without permission.  If so, they

15   infringe the patent.  And here, the evidence will show

16   that Samsung did just that.

17           We know that patents are property rights that

18   owners can enforce.  So let's start discussing the

19   Rembrandt patents at issue in this case.

20           At the outset, I want to make something very

21   clear.  We think the evidence in this case will show

22   that the Rembrandt patents are extraordinarily

23   important.  They contain powerful inventions in them

24   that Samsung has put into millions and millions of

25   Bluetooth devices, including since this lawsuit was

1    filed.

2              Every important invention has at least one

3    thing in common, and that is a clever inventor.  And

4    this case is no different.

5              The very first witness you're going to hear

6    from is Mr. Gordon Bremer, the inventor on these

7    patents.  Mr. Bremer is now retired and -- and living in

8    Florida.  He spent 32 years working as an engineer for

9    an AT&T company called Paradyne that later became known

10   as Zhone.

11             He had a very successful career there.  You'll

12   hear that he was the head of his patent committee.  He

13   has personally been awarded 100 issued and U.S. --

14   pending U.S. patents.

15             So what was the problem that Mr. Bremer wanted

16   to solve?  He was thinking about the need of multiple

17   electronic devices to communicate with each other.  They

18   do this through different types of modulation methods.

19             You're going to hear that term a lot in this

20   case.  And there are several different types of

21   modulation methods.

22             For now, I want you to think of them like

23   languages.  And if you see the illustration on the

24   screen in front of you, we've illustrated what's called

25   a master device.

1          That's what engineers refer to as a master

2    device, and the other devices are, unfortunately enough,

3    referred to as slave devices.  The master controls the

4    communication between the devices.

5          And here we've shown the Chinese flag and the

6    letters CHN to indicate that the way these devices

7    communicate, their modulation method is in Chinese, the

8    one exception being the TV on the left there.  That one

9    can speak in both English and Chinese.

10          So what's the net effect of this?  At this

11   time, all the devices can speak together because they

12   all speak a common language, Chinese.  But what happens

13   when you go out and decide to buy a new device, a more

14   powerful device, a faster device?  That's when problems

15   start.

16          The new device uses a different modulation

17   method, a different language.  So what happens now?  It

18   can no longer communicate with the older devices.

19          New devices and old devices do not use the

20   same modulation method.  They do not speak the same

21   language.  That causes large interruptions and leaves

22   you with very unattractive options.  You can either

23   throw away your old devices or have these massive

24   network interruptions.

25          But what you can't do is you can't have all of

1    these devices talk to each other and work seamlessly

2    with each other.  That was until Gordon Bremer came

3    around and solved that problem.

4         So what was Mr. Bremer's solution?  Here we

5    have the old situation where all of the devices spoke

6    the same modulation method.  In Mr. Bremer's solution,

7    different types of modulation methods, different

8    languages, are embedded in a signal that goes from the

9    master to the various other devices.

10        In other words, they can all speak each

11   other's languages now.  They can choose which language

12   to speak.  They can change languages on the fly.  They

13   can decide to use one language or another language,

14   depending on the circumstances.  All the devices can

15   speak simultaneously.

16        So we've solved the problem that you'll hear

17   about in this case called backwards compatibility,

18   meaning that now, because they can switch languages on

19   the fly, new devices and old devices can work in unison

20   with each other, in harmony.  There can be complete

21   backwards compatibility.

22        So Mr. Bremer's invention is known as embedded

23   modulation.  And Mr. Ward, who now wins the award for

24   least technical member of the team this morning -- this

25   morning incorrectly said that Mr. Bremer had invented

1  different types of modulations.  What he invented was

2  actually embedded modulations.

3        And that invention is first contained in an

4  application filed with the Patent and Trademark Office

5  in 1997.  You see right there, the title of the

6  invention is Embedded Modulations.

7        The date that's highlighted is December 5th,

8  1997.  That's known as the priority date because it sets

9  the date for Mr. Bremer's invention.  So when we talk

10  about Mr. Bremer's invention, we're talking about the

11  invention on December 5th of 1997.

12        Mr. Bremer's invention was awarded a patent by

13  the Patent and Trademark Office.  So let's take a quick

14  look at the process that Mr. Bremer and other inventors

15  have to go through.

16        As you heard on the video this morning and

17  again from the Court this afternoon, one of the first

18  things that happens is someone -- a trained

19  professional, known as a Patent Examiner, is assigned to

20  the application.

21        And as the name implies, the job of the Patent

22  Examiner is to examine the application.  Lots of

23  applications get rejected.  The process is not quick or

24  easy.

25        You'll hear from Mr. Bremer, for example, that

1    some of his patent applications were examined for four

2    years, five years, longer.

3            So if and when the good news arrives that a

4    patent has issued, what does it look like?  You saw the

5    ribbon copy this morning, and on the screen before you

6    now are copies of the two patents that are being

7    asserted in this case.  Again, we refer to them by the

8    last three numbers:  The '580 patent and the '228

9    patent.

10           I'm going to take you on a quick tour of the

11   information you will see in these patents, although they

12   are in your juror notebooks, and you'll be able to look

13   in them in as much detail as you'd like.

14           They're structured the same way, so for the

15   purposes of our tour, we will look at the '580 patent.

16   The first page lists the title of the patent, the

17   inventor, and the priority date that we discussed a

18   moment ago.

19           And importantly, ladies and gentlemen, Samsung

20   is not contesting the priority date.  Both of the

21   patents before you, the '580 and the '228, have the same

22   priority date.

23           And why is that date important?  Well, for one

24   reason, it sets the date by which the Examiner will

25   consider what's been called prior art.

1          And as you see on the screen in front of you,

2    the references cited section starts to list the prior

3    art that the Examiner considered.  That starts on the

4    first page here, but in this instance, it was

5    extraordinarily extensive.  It goes on for several pages

6    in the patent.

7          What is prior art?  It includes things

8    disclosed to the public before the priority date; hence,

9    the name prior art, things like patents and other

10   scientific articles.

11         Here, the -- the search was extensive.  I've

12   counted all of the prior art references in these

13   patents.  There are 260 of them.

14         And what was the point of the prior art

15   search?  From our perspective, it was to make sure that

16   the patent was valid and that, in fact, no one had

17   invented Mr. Bremer's embedded modulation technique

18   before he did.

19         After the prior art listing, there are some

20   figures and drawings that I have not included, but

21   they're in your juror notebook.

22         And then we get to the part of the patent

23   known as the specification.  The specification provides

24   a written description of the invention, the scope,

25   background, the summary of the invention, and some of

1   the ways that it can be implemented.

2           After the specification, you get to the

3   numbered claims.  Those ought to jump out at you --

4   the -- the numbered paragraphs.  Those are called the

5   claims.  These are very important because they define

6   the particular invention.

7           We're going to come back and look at the

8   details of the claim in a minute, but for now, let's

9   consider how these patents we're looking at became

10  Rembrandt's property in the first place.

11          Rembrandt bought these patents in 2007 from a

12  company called Zhone, and the first page of the patent

13  sale agreement, which is in evidence, is on the screen

14  in front of you.  Again, you'll be able to look at this

15  in as much detail as you want.

16          Rembrandt paid $5 million to Zhone under this

17  agreement.  For what?  For some 74 patents and patent

18  applications, and those patent applications included the

19  patents that eventually issued here, the -- the '580 and

20  the '226 (sic) patents.

21          So Rembrandt made the business decision to

22  invest its money to buy these patents.

23          So exactly what kind of business is Rembrandt

24  in?  Who is Rembrandt?  Well, we're joined at counsel

25  table by Dr. Paul Schneck.  He was the co-founder and is

1  the chairman of Rembrandt.

2          You'll learn that Rembrandt is a team of

3  people with a lot of expertise in intellectual property,

4  scientists, engineers, finance people, lawyers.  They

5  invest in inventions.  They put their own money at risk

6  looking for patents and other intellectual property

7  opportunities.

8          They run a business, and it should be no

9  surprise that they try to make money on their

10 investments.  They seek patents that are valuable or

11 might become valuable in the future.

12         They, in effect, look for a Rembrandt in the

13 attic.  And some of you may be familiar with that book,

14 but the idea is that some folks have Rembrandts in their

15 attic, and they don't know it.  So the premise of -- of

16 Rembrandt is that they look for value where others do

17 not see it.

18         And how do they do that?  Well, they have a

19 process at Rembrandt, and you're going to see these

20 documents as well.  These are taken from the very early

21 days of Rembrandt.

22         And they have a catch phrase that they use to

23 describe their process.  They call it the, quote,

24 unquote, secret sauce.  And you can see there that it

25 walks you through how they operate.

1    I want to talk to you about a specific part of

2  this schematic.  If you look, there's a diamond box that

3  says:  Need new claims, and a rectangular box needs --

4  next to it that says:  Apply for new claims.

5    What exactly is that referencing?  That's

6  describing the process of applying for new claims before

7  the Patent Office.  That happens all the time in the

8  patent world.  Rembrandt does it.  Samsung does it.

9  Inventors do it every day.  That process is called a

10  continuation.

11    And what is a continuation?  It's a new patent

12  application, based on an earlier disclosure.  Here is

13  the December 1997 one we saw earlier.

14    So you see, sometimes an invention is entitled

15  to more than one patent, and that's why -- why there are

16  continuations.  Both of the patents here are

17  continuations.

18    So let's think back to that example of the

19  real property I showed you with the yellow border.  A

20  continuation would be like if you went to a previously

21  unfenced part of that property, and you put up a fence

22  around it.

23    It's your property.  You didn't have a fence

24  there before, but now you do.  Now you've blocked off

25  that piece of property.  That's a lot like a

1    continuation.

2          Now that we've reviewed briefly two --

3    Rembrandt's two patents, let's discuss how we believe

4    Samsung infringes them.

5          First, we'll talk about the accused products.

6    And His Honor defined them earlier.  It's all of the

7    Samsung Bluetooth EDR devices.

8          And what does EDR mean?  You see on the screen

9    in front of you underlined in red, 2.0+EDR.  EDR stands

10   for enhanced data rates.

11         And we're going to get into the details of

12   that, but the most important thing that I want you to

13   remember for now about enhanced data rates is this:

14   Mr. Bremer's invention is at the heart of it.  Without

15   embedded modulation, enhanced data rates does not work.

16         What we're looking at is the official

17   specification for Bluetooth 2.0+EDR.  That's issued by

18   an entity called the Bluetooth SIG, special interest

19   group.  And they get to set the rules for anyone who

20   wants to label their products Bluetooth, like Samsung

21   does.

22         So if you are proud of the fact that you have

23   a Bluetooth product and you think consumers like it, you

24   can actually put that label on your products, like

25   Samsung does.  You're going to see evidence that even on

1      their boxes, they put Bluetooth labels next to other

2      important features of -- to consumers.

3           So the evidence will be that Samsung cannot

4      make a Bluetooth EDR device without infringing

5      Mr. Bremer's patent.  Why?  Because embedded modulation

6      is the heart of enhanced data rate.

7           The patents in this case have many claims in

8      them, but there are only three that are being asserted

9      here.  In the '580 patent, those are Claims 2 and 59;

10     and in the '228 patent, it's Claim 21.

11          At the end of the case, we expect the Judge

12     will ask you to determine whether Samsung has violated

13     or infringed these specific claims, and we believe the

14     answer to that question is yes.

15          Let's take a look at one of these claims that

16     we can see kind of what they look like.  This is

17     Claim 59 of the '580 patent.  It is what's called a

18     dependent claim.

19          In other words, it references another claim

20     here, Claim 58.  And that's why I have the language from

21     both on the screen in front of you.

22          Now, when you look at patent claims, they're

23     really an English teacher's worst nightmare.  It's like

24     a run-on sentence that never ends.  And so rather than

25     try now to go through every one of these limitations,

```
 1    I'm going to focus where I believe the dispute will be.
 2           Trust me, we're going to walk through every
 3    one of these limitations as we go through the trial and
 4    show you how Samsung, in fact -- in fact, practices
 5    every piece of -- of this claim.
 6           But for now, all of this dispute, I believe,
 7    at the end of the day is going to come down to one word,
 8    and that word is the word "indicate."  And the question
 9    is going to be whether Samsung's Bluetooth EDR devices
10    meet that term in this claim, "indicate."
11           So how are we going to resolve that dispute?
12    Well, in part, you're going to hear from expert
13    witnesses who will show you why this "indicate" issue is
14    really not an issue at all.
15           One of the people you're going to hear from
16    likely today is Dr. Bob Morrow.  Dr. Morrow is one of
17    the world's premiere experts on Bluetooth.  He literally
18    wrote the book on Bluetooth.
19           He's going to walk you through the claims and
20    the technology, and ultimately, he's going to tell you
21    that the way these patents work meets that limitation,
22    the indicates limitation in the patents.
23           You're also going to hear from another expert,
24    this one Dr. Chris Jones.  Dr. Jones has reviewed
25    certain very confidential source code.
```

1              What is source code?  It's software.  It's

2      instructions that are used, in this case, to create the

3      microchips that go into Samsung Bluetooth devices.  And

4      he's going to testify the same way, that after looking

5      at this source code and what the microchips do, that

6      claim limitation, that "indicate" language is satisfied.

7              Now, if you look at the quote attributed to

8      Dr. Jones, there are some terms that we have not

9      discussed today.

10             For example, there's the term packet header,

11     and then there's another term, payload.  So to

12     illustrate what we're talking about, let's -- let's

13     consider a very simple example.

14             The two boxes on the screen in front of you

15     are what's called a packet.  The blue box on the left is

16     the header, what I'm calling here the first sequence.

17     And the red box on the right is the payload, or what

18     we're calling here the second sequence.

19             And what's all of this "indicate" debate

20     about.  Well, the key point here is that the first

21     sequence on the left is going to indicate to the second

22     sequence on the right what type of modulation we're

23     using, what language are we going to speak, English or

24     Chinese?  And how does this work in this example?

25             Well, the first thing that happens is the

1    first sequence is going to communicate this using

2    English letters.  No matter whether we're going to

3    modulate in English or Chinese, whether we're going to

4    speak English or Chinese, we're going to communicate

5    that in English letters.  We're going to indicate that.

6    And so here we indicate that through ENG for English.

7              And so if you look to the second sequence, the

8    data is, in fact, in English.  What happens if we're

9    going to switch and we're going to modulate in Chinese?

10   Well, remember, it's always going to be transmitted in

11   English letters.

12             So CHN indicates what?  We're going to

13   modulate in Chinese.  And that's what happens in the

14   second sequence.

15             Now, these concepts are probably still a

16   little fuzzy, and they're going to be a little fuzzy for

17   a while, but it will get better as we walk through them

18   and you start to hear from the experts and look at

19   exactly what these patent claims talk about.

20             But for now, when we think about this

21   "indicate" issue, I want you to consider a very simple

22   example.  His Honor told us earlier that when claims are

23   not construed and they're not in your binder, and

24   "indicate" is one of those, that we're going to use

25   plain and ordinary meaning.  And when you think about

1   the plain and ordinary meaning of "indicate," I think

2   it's illustrative.

3            So, for example, what does this (indicating)

4   indicate?

5            I have a question.  I don't have to spell it

6   out for you.

7            What does this indicate (indicating)?

8            Sh-h-h, please be quiet.  Again, I don't have

9   to spell it out for you.

10           When I was driving to the courthouse today and

11  I turned on my signal indicator in my car and the right

12  light started blinking in the back of my car, what did

13  that indicate?

14           I'm going to turn right.  Again, I didn't have

15  to spell it out for you.

16           But we believe that that's actually going to

17  be Samsung's interpretation of "indicate."  They're

18  going to tell you, I believe, that "indicate" means you

19  have to spell it out, and you have to be a hundred

20  percent right.  You can't be off by even one letter.

21           So we'll see if at the end of the day that

22  makes sense in the way we experience the word

23  "indicate."

24           Let's talk briefly about the validity of the

25  patents.  Samsung is arguing that Mr. Bremer should have

1    never been awarded these patents in the first place, and

2    they're going to try to invalidate the patents.

3            The Court has instructed you already that

4    patents are presumed valid.

5            And what does that mean in this case?  That

6    means that there's a burden to have to overcome, because

7    the Patent and Trademark Office has already examined the

8    patents and determined that they were justified and

9    proper inventions.  And what does that burden look like?

10            His Honor did a better job than I could at

11    describing the differences between the burdens of proof.

12    Suffice it to say, I'll just review it now.

13            There are two burdens of proof in this case.

14    There's the burden on Rembrandt, which we gladly accept,

15    to show infringement of the patents.  That burden is

16    done by a preponderance of the evidence.  Remember, the

17    slightest tipping of the scale in one direction.

18            Samsung's burden, when trying to take away

19    Mr. Bremer's patents and hold them invalid, is through

20    clear and convincing evidence.  It's a heavier burden.

21    And we don't think they come close to meeting it here.

22            The prior art that they're going to try to

23    rely on to invalidate the patents is a patent known as

24    Boer.  We don't believe that's going to invalidate

25    Mr. Bremer's patents, because, remember, it's going to

1   have to disclose to you every element that Mr. Bremer

2   invented.

3        It doesn't disclose the master slave concept

4   that I discussed with you earlier, and it doesn't even

5   disclose different types of modulation methods.  So it's

6   not going to get there.

7        Finally, let's discuss the topic of damages.

8   If you conclude that Samsung infringes Rembrandt's

9   patents, then we expect that the Court will instruct you

10  that the law requires that Rembrandt be compensated for

11  that patent infringement.

12       You heard this morning -- or this afternoon,

13  rather, that those damages are in the form of a

14  reasonable royalty under the law in this country.

15       And what's a reasonable royalty?

16       Well, one way to think about it is it's kind

17  of like rent being paid to a landlord, because,

18  remember, patents are kind of like real property.  So

19  the owner of a patent is entitled to a reasonable

20  royalty from someone who uses the invention without

21  permission.

22       Now, the calculation of a reasonable royalty

23  is also governed by the law in this country, and it asks

24  that we imagine a hypothetical negotiation.  And on the

25  screen in front of us, we're here in 2015 trying this

1   case.   The lawsuit was filed in 2013.

2           But everyone agrees -- Samsung agrees and we

3   agree -- that the date of the hypothetical negotiation

4   where you would calculate this reasonable royalty is

5   back in 2011.

6           Why?  That's the date that the first patent

7   issued, the '580 patent.

8           THE COURT:  You have five minutes remaining,

9   Counsel.

10          MR. ANAIPAKOS:  Thank you, Your Honor.

11          So if you imagine the hypothetical negotiation

12  table, what's -- who's at the table?

13          Well, at the one side, you have Rembrandt.   On

14  the other side, you have representations of Samsung.

15  And we're back in September of 2011, the date of the

16  patent being issued.  But there are two important things

17  that the law says about this hypothetical negotiation.

18          Number one, the parties at the table agree

19  that the patents are valid; and number two, that Samsung

20  is going to infringe the patents.  They agree on both of

21  those things.

22          So the only question is the price.  When

23  considering what the appropriate price is, one of the

24  things that you should do is consider the benefits of

25  the invention; here the benefits of the enhanced data

1   rate, which cannot work -- again, cannot work without

2   the embedded modulation that Gordon Bremer developed.

3          Well, what are the benefits of EDR?  The

4   documents on the screen are taken from Samsung's own

5   files.

6          First, backwards-compatibility.  That's the

7   problem we discussed earlier, that without this embedded

8   modulation, when you bring in a new device and that old

9   device doesn't use the same kind of modulation, they're

10  antiquated; you've got to throw them out.  Mr. Bremer

11  solved that problem.

12         Second, improved battery life.  Enhanced data

13  rate lets you send a lot more data faster to the

14  batteries don't have to work as long.  You save power,

15  and it prolongs battery life.

16         When you're talking about something like a

17  phone, that matters to people like Samsung, again, taken

18  from Samsung's own documents, longer battery life for

19  existing Bluetooth applications.

20         And then we found this study in Samsung's file

21  that talked about battery life management being

22  important to users of the phone.

23         Makes perfect sense.  People use their phones

24  now for all kinds of applications.  Burns up battery.

25  If you have something like EDR that can prolong battery

1  life, it's very valuable for a company like Samsung.

2          And then finally, improved performance, a lot

3  of the things we've been talking about; faster, can move

4  more data.

5          The expert who will talk to you about the

6  reasonable royalty in this case is Roy Weinstein.  He

7  has a lot of experience and impeccable credentials, and

8  he's done a lot of work that he will walk you through to

9  talk about what the reasonable royalty should be.

10          At the end of the day, his calculation will be

11  that for every Bluetooth EDR device, the reasonable

12  royalty is in a range of 5 cents to 11 cents per unit.

13  That starts in September of 2011.

14          And when you look at the millions of units

15  that Samsung has sold, that number turns out to be

16  14-and-a-half million to $31.9 million.

17          So we expect, at the end of this case, to ask

18  you to award a reasonable royalty to Rembrandt of

19  $31.9 million.  And we don't ask that lightly.  We do so

20  because we think the evidence is going to justify it at

21  the end of the case.

22          And as I'm finishing, it strikes me, one more

23  example of "indicate."  My phone tells me that I spent

24  29 minutes talking.  I had 30.  That tells me, without

25  spelling it out, that I should sit down.

1          And so with that, I thank you on behalf of the

2    people at Rembrandt for your service and your time.  We

3    look forward to presenting our case to you.

4          THE COURT:  All right.  The Defendants may now

5    present their opening statement to the jury.

6          MR. SHERWOOD:  May I proceed, Your Honor?

7          THE COURT:  You may.

8          MR. SHERWOOD:  Good afternoon, ladies and

9    gentlemen.  My name is Jeff Sherwood, and I'm one of the

10   lawyers representing Samsung in this case.

11         I want to thank you on behalf of Samsung for

12   your service on this jury.  This is my opportunity to

13   talk to you now at the beginning of the trial about the

14   evidence.

15         Because Rembrandt presents its evidence first,

16   I must ask you to keep an open mind and give Samsung an

17   equal opportunity to present its evidence.  That is why

18   we specifically asked about keeping an open mind during

19   voir dire.  It's very important to Samsung.

20         You just heard an explanation as to why

21   Samsung infringes these patents and owes Rembrandt

22   money.  Samsung does not infringe these patents.

23         That is because every one of claims that's at

24   issue here requires that specific information be placed

25   in specific part of the messages that go between

1   Bluetooth devices.  The Bluetooth chips in Samsung's

2   products do not do that.

3           May I have the ELMO, please?

4           Here is one of those messages.  And what you

5   will learn from the evidence is that this Bluetooth

6   message does not contain the information that is

7   required by the Rembrandt patents for the simple reason

8   that when the Bluetooth Group designed this message for

9   a version of Bluetooth called 1.2 that you didn't hear

10  about during Rembrandt's opening, there was no need for

11  any information about a change in modulation method,

12  because there was only one modulation method.

13          This message has never changed, even though

14  EDR did introduce a second modulation method that was

15  optional.  It has stayed the same from the beginning of

16  Bluetooth until today.  And, therefore, it does not meet

17  the requirement of indicating any change in modulation.

18          I want to tell you two other things that are

19  important about keeping an open mind at the beginning of

20  this trial.

21          First, Mr. Bremer was not involved --

22  Rembrandt's inventor was not involved in developing any

23  part of Bluetooth, including EDR.

24          In fact, he testified he'd never even heard of

25  Bluetooth until 2007, long after the Bluetooth Group had

1    published the 2.0 update with EDR.  By the time that Mr.

2    Bremer first heard of Bluetooth, they'd -- Bluetooth had

3    actually already updated that standard with 2.1.

4          Similarly, the evidence -- and Mr. Ward, by

5    the way, did misspeak when he said that Mr. Bremer did

6    invent two modulation methods.  He also said another

7    part of the invention that was important was longer

8    battery life.

9          The evidence will show that these patents do

10   not discuss battery life at all.  In fact, they don't

11   even talk about mobile devices, which are the things

12   that need batteries.

13         Bluetooth -- the core feature of Bluetooth,

14   which is what is in all of Samsung's products, is the

15   ability for all of those devices to communicate with

16   each other.  EDR is a small feature in Bluetooth.

17         There are many other more important features,

18   much more important features besides EDR, such as new

19   data transmission, energy savings, better communication

20   connections between the devices and so forth.

21         So what is Bluetooth?  Bluetooth came from an

22   industry group called the Bluetooth Special Interest

23   Group, and I'm going to call it the Bluetooth Group.

24   And it created a standard in the late '90s.

25         Let me have the first slide, please.  Can you

1    switch back over?

2            This is a timeline I'm going to take you

3    through.  Created in the late '90s.  Samsung's products

4    comply with the Bluetooth standard, which, as I've

5    already told you, is different from what is required in

6    these patents.

7            You heard a little bit about Rembrandt.

8    Rembrandt has a different business model than Samsung.

9    As you saw, according to its own documents, Rembrandt

10   searches for and buys patent rights that it then tries

11   to expand.  It markets this approach to patent owners as

12   its secret sauce.

13           In this case, you're going to hear that

14   Rembrandt bought Mr. Bremer's patent rights and saw an

15   opportunity to take those rights and use its secret

16   sauce to expand them.  This was what Mr. Ward was

17   talking about when he asked if anybody would object to

18   that procedure during voir dire.

19           So now I want to take you through this

20   timeline, and I want to show you there are two separate

21   stories here.

22           On the top of the timeline, we see what's

23   going on with respect to Rembrandt's patent claims and

24   Mr. Bremer's patent rights.

25           And below, you will see what happened with

1  respect to the Bluetooth Group.  The important point

2  here is that until this lawsuit was filed, these two

3  stories had absolutely nothing to do with each other.

4        So starting on the bottom, first, you can see

5  that in the late 1990s, the Bluetooth Group was formed.

6        By 2002, the Bluetooth Group was working on an

7  update for its existing wireless standard, which became

8  2.0.  The Bluetooth Group wanted to improve that

9  original standard, but unlike Mr. Bremer, it wanted to

10  ensure that all Bluetooth devices would remain

11  compatible, able to communicate with each other.

12        In 2004, the Bluetooth Group published that

13  update called Bluetooth 2.0.  Bluetooth 2.0, as I've

14  said, included an option feature called EDR that could

15  increase data transmission speeds between Bluetooth

16  devices.  That's a tongue-twister, Bluetooth 2.0.

17        This EDR feature is what Rembrandt believes

18  infringes their patents.  Importantly, EDR -- 2.0,

19  rather, preserved all Bluetooth devices' ability to

20  communicate with each other.

21        Since 2004, we have -- the next couple of

22  entries, please.  Yeah.

23        There have been additional updates:  3.0, 4.0,

24  and 4.1 most recently.

25        The next slide, please.

1          Here is an illustration of all the features of

2  Bluetooth as they have developed over time.  And, again,

3  I remind you, the really core feature, as you'll learn

4  from the evidence, is the one where the devices are able

5  to actually communicate with each other.

6          That is not what's at issue in this case.  EDR

7  is just one of the features, one of the many features in

8  Bluetooth.

9          So going back to the timeline now, you start

10  with Mr. -- Mr. Bremer telling the Patent Office he had

11  an invention.  And his invention arose in the context of

12  devices on a network that could not communicate with

13  each other.

14          Mr. Bremer was looking for a way to have those

15  devices communicate to operate on the same network

16  without having to replace them.  He called those devices

17  incompatible.

18          The next entry on our timeline is 2007.

19          Let me go on to 2007.  I guess I'm talking a

20  little bit ahead of you.

21          And in 2007, as you heard, Rembrandt bought

22  the rights to Mr. Bremer's 1997 filing.

23          And by the way, this was not a Rembrandt in

24  the attic upon closer inspection.  It's a Rembrandt that

25  has been created.  It's an attempt to make a Rembrandt

 1   out of something that is not a Rembrandt to use Mr.

 2   Anaipakos's analogy.

 3            Anyway, after buying these patent rights,

 4   Rembrandt went to work.  In 2009, two years after buying

 5   them, Rembrandt applied for new patent claims.  The new

 6   claims are the secret sauce that you already heard about

 7   that Rembrandt planned to use in this case.

 8            In its 2009 application, Rembrandt even

 9   changed Mr. Bremer's original words of tributary

10   transceiver to slave, matching the earlier Bluetooth 2.0

11   standard.

12            Two years later, as you can see on our

13   timeline, the Patent Office issued the '580 patent that

14   Rembrandt sued on in this court in 2013.

15            These two stories show different problems and

16   different solutions.  The difference is important,

17   because it means there's no infringement here and no

18   obligation to pay Rembrandt.  The evidence will show

19   that the facts, a healthy sense of fairness, and the law

20   all indicate that these claims must fail.

21            Now, as you probably knew before you came

22   here, Bluetooth is a wireless technology that allows

23   different devices to communicate with each other.

24            It was always meant to be a low-cost

25   technology, because all it was doing was replacing the

1   cheap wires, low-cost wires, that go between, for

2   example, a computer and a keyboard.  It's all done

3   through the use of a Bluetooth chip that is in all of

4   Samsung's products.

5            At the -- Bluetooth has no incompatibility

6   issue like Mr. Bremer described.  That has been the

7   hallmark of Bluetooth all along, to make sure that all

8   devices could always communicate.

9            At the risk of revealing my age, you may

10  remember the battle over video cassette formats, VHS

11  versus Sony.  You couldn't play a Betamax tape in a VHS

12  player and vice versa, because there were competing

13  standards and not a universal one.

14           And that was the problem.  But it wasn't an

15  issue for Bluetooth, because in the late '90s, the

16  company, Ericsson, developed Bluetooth and named it

17  after the Danish king Bluetooth and donated it to the

18  public.  The donation avoided the VHS/Betamax problem.

19           A small group of electronics companies then

20  formed the Bluetooth Group to create a common standard.

21  Thousands of companies, including Samsung and its

22  competitors like Apple and Motorola, joined the

23  organization that now has 24,000 members.

24           It's remarkable that all these companies came

25  together and contributed their very substantial

1   expertise to Bluetooth.

2          And money never got in their way, because

3   while the Bluetooth Group does charge a fee for products

4   to be certified, there is no fee to use it, and the

5   members exchange their patents -- their Bluetooth

6   patents for each other's use without charging a fee,

7   including Samsung.

8          It's so big I can hardly handle it.  This is

9   the Bluetooth 2.0 standard.  The evidence will show it's

10  over 1,200 pages long.  EDR is a very small part of this

11  standard.  It's not at the heart of Bluetooth.

12         Now, rather than use its R&D facilities in

13  Korea and Texas and elsewhere in the world, Samsung

14  actually buys Bluetooth chips from one of a few

15  companies who specialize in making these chips.

16         One of those companies is Broadcom.  Broadcom

17  is a major supplier of wireless chips to Samsung.

18         Samsung is a Defendant in this case because it

19  puts Broadcom and other company's chips in its products.

20  What's really accused here, ladies and gentlemen -- and

21  you saw that in the slides that Mr. Anaipakos showed

22  us -- is Bluetooth itself, a technology that's used by

23  thousands of companies to create seamless communication

24  between their devices.

25         So at the beginning of my opening, I told you

1    that the Bluetooth data messages in Samsung's products

2    do not have the information that Rembrandt's patent

3    claims require.

4            Rembrandt argues that that information is

5    there, if it helps to determine a change is coming.  But

6    the problem here is that the patent language requires

7    that it must indicate that there is a change.

8            Mr. Anaipakos told you that the whole dispute

9    resolved around one word, "indicate."  I'll submit to

10   you that there's more language in the claim than that,

11   and we have to look at that in the context of all of

12   that language, not just isolate the one word.

13           And when you look at all of that language, you

14   see that the Bluetooth message does not indicate, like

15   his turn signal does, whether you're turning right or

16   not.

17           As I said in Bluetooth 1.2, Bluetooth devices

18   could only communicate using one modulation method or

19   one language.

20           And just to explain what that means, a

21   modulation method uses radio waves to send information

22   in packets between devices.  Packets are small parts of

23   a larger message.  You can think of a packet as a

24   postcard.

25           In this slide -- can we have the next slide,

1    please?

2            In this slide, the simulator is quite

3    apparent.  On the right of the postcard is what we're

4    referring to as a header, and on the left is the payload

5    of the data message.

6            When we reverse them, just for illustration

7    purposes, we can now line up the header in the postcard

8    with the header in the Bluetooth data message.

9            Packets come in a stream.  You can think of it

10   as a long string of postcards that tell a story when

11   they're all assembled.  And to be understood, all those

12   packets have to have the same format.

13           In Bluetooth 1.2 and all prior versions, the

14   devices could only use the basic rate modulation method.

15   There was no choice.  There was no alternative.  As a

16   result, the part of the packet in the header never

17   indicated a change in modulation method because there

18   was no change to indicate.

19           As I told you before -- and if I could have

20   the ELMO again, please.

21           Here is -- there is the 1.2 message.  And --

22   and you can see, ladies and gentlemen, up at the top,

23   that's 1.2.

24           Now, if we take the 2.0 -- take the 2.0 header

25   and we put this on top, and let me just show you 2.0.

1    Now let's compare them.  You can see they are the same.

2    There's no difference between them.

3            In 1.2, there was no change in modulation

4    method.  When an optional method was added in 2.0, the

5    header didn't change.  It stayed the same, as I said.

6    As a result, the header does not indicate a change.

7            Simple logic tells us, because it is the same

8    as the 1.2 header, the 2.0 header also does not indicate

9    a change.

10           This is very important because every one of

11   Rembrandt's patent claims requires that that header

12   indicate a change in the modulation method, and none of

13   Samsung products using the Bluetooth 2.0 and later

14   versions of chips, none of them do it.

15           Mr. Anaipakos said the concepts here are

16   fuzzy.  Well, this is not the fuzzy concept, ladies and

17   gentlemen.  Every one of these patent claims requires

18   this header to tell you whether the car's turning left

19   or not.  And that header doesn't do it.  And that means

20   there's no infringement in this case.

21           I know this is technical.  You'll hear more

22   testimony about it during the trial.  When you listen to

23   that evidence, remember, Rembrandt has the burden of

24   proof on this issue.

25           And so when you get ready to decide this

1    issue, if Rembrandt has not proved more likely than not

2    that Bluetooth is literally the same, then there is no

3    infringement, and there can be no liability.

4         Now, one other thing I want to mention to you,

5    with respect to infringement, I suspect Judge Gilstrap

6    will instruct you, after the evidence is finished, that

7    Rembrandt can only meet its burden of proof on literal

8    infringement by showing that every requirement is

9    actually met.

10        In fact, he's already told you that.  In other

11   words, close enough is not going to satisfy their burden

12   of proof.  If Rembrandt doesn't satisfy that burden of

13   proof that the header, the only one Bluetooth has ever

14   used, shows a change in modulation method, then your

15   verdict must be for Samsung.

16        May I have the slides again, please?

17        It's like a spelling bee.  You cannot get any

18   letter wrong and still win.  And that is exactly what is

19   at issue in this case.

20        Now, let me turn to a second issue, whether

21   these three patent claims are valid.  In deciding this

22   issue, please understand your decision in this case will

23   only affect the three claims at issue.

24        Rembrandt has many other claims in these two

25   patents, as you've heard, and your decision will not

1 affect any of them.  You might ask yourself why you're

2 being asked to decide this issue.

3          Judge Gilstrap has already told you that the

4 way that our legal system is designed, it is ultimately

5 your responsibility to make the determination with

6 respect to validity.  And Samsung has the right to test

7 all aspects of the claims that have been made against it

8 here in this case.

9          If you as jurors just assumed that these

10 claims were valid simply because the Patent Office had

11 issued them, then the system wouldn't work as it's

12 designed to work.

13          So for all these reasons, you must fully and

14 carefully consider the issue of patent validity.  You

15 will get instructions on the law of validity.

16          And, you know, there would be no need for

17 those instructions and there'd be no need for evidence

18 on validity if your role was simply to adopt the Patent

19 Office's prior decision.

20          There are two validity issues at issue in this

21 case, and you've heard Judge Gilstrap introduce both of

22 them:  Written description and obviousness.

23          The first issue is whether the patents fully

24 describe the invention in Rembrandt's three patent

25 claims, as Rembrandt has -- I'm sorry; I misstated

1    that -- whether the patents fully describe the

2    invention, as Rembrandt has asserted them in these three

3    patent claims; and second, whether the invention in

4    these three patent claims is obvious.

5            You're asked to decide these issues because if

6    that written description is missing or is incomplete or

7    the invention is obvious, then the patent claims here

8    are not valid.

9            So turning first to the written description

10   issue -- if we could have the next slide -- I told you

11   Mr. Bremer submitted his invention to the Patent Office

12   in 1997 and that by 2002, the Bluetooth Group was

13   already working on the 2.0 update.

14           In 2003 -- next -- Mr. Bremer submitted new

15   information to the Patent Office for which he wanted

16   additional patent protection.

17           And in this, he submitted five new paragraphs

18   and a new drawing that actually describes what Rembrandt

19   is accusing here.  But as a result of that, the date for

20   that part of the invention moved from 1997 to 2003.

21           The next thing that happened, as you've

22   already heard, is Rembrandt bought the Bremer patent

23   rights four years later, in 2007.

24           Two years after that, in 2009, Rembrandt

25   applied for new claims based in part on the information

1    that Mr. Bremer had given to the Patent Office back in

2    2003.

3         On July 22nd, 2011, the Patent Office told

4    Rembrandt that it would allow the new claims.  But the

5    evidence will show that those claims only gave Rembrandt

6    rights dating back to 2003.

7         So before the claims actually issued,

8    Rembrandt made another filing, which was the last one

9    you see over on the right.  And in that filing,

10   Rembrandt deleted the information from the 2003

11   submission.

12        Next slide, please.

13        Here is what Rembrandt submitted to the Patent

14   Office.  And in it, it said that it was deleting that

15   2003 disclosure because it thought that the descriptive

16   subject matter that would remain would be in harmony

17   with the claims.

18        In fact, the evidence will show the deletion

19   had exactly the opposite effect.  It created a

20   disconnect between the inventor's description of the

21   invention and the patent claims, because after that

22   deletion, the scope of the claims, as they've asserted

23   here, was no longer supported by Mr. Bremer's 1997

24   description of the invention.

25        With respect to obviousness, let me start with

1      this simple example.  Suppose you made pens and pencils.

2      Lead pencils were well known in your industry for

3      purposes of writing in a non-permanent manner.  Erasers

4      were also well known for removing lead pencil writing.

5              As a skilled person in the field, you would

6      know -- it would be obvious to you to combine these two

7      well-known things into one product.  And the same logic

8      is why the patent claims here in this case are obvious.

9              And here's why:  In 1996, before Mr. Bremer's

10     first patent filing, the evidence will show that a

11     company called Lucent had already submitted a patent

12     application to the Patent Office.

13              Your Honor, how much time do I have left?

14              THE COURT:  You have about six minutes.

15              MR. SHERWOOD:  Thank you, Your Honor.

16              In fact, Mr. Bremer's company, Paradyne, was a

17     part of Lucent.  Samsung will show that the Lucent

18     patent, filed a year earlier, made the Rembrandt patent

19     claims at issue here obvious, because the Lucent patent,

20     taken with other public documents, already described all

21     elements of Rembrandt's claims, and it was obvious to

22     combine all of those elements.

23              Briefly -- and I'm not going to go into a lot

24     of detail here -- the Lucent patent described a network

25     with devices or tributaries, as Mr. Bremer originally

1   called them, operating at multiple modulation methods

2   and using different speeds, just like Mr. Bremer's later

3   patent.

4          And just like Mr. Bremer's patent, except a

5   year earlier, this Lucent system included information in

6   the header that actually did show a change in the

7   modulation method.

8          And by the way, unlike Mr. Bremer's patents at

9   issue here, Lucent did, in fact, invent new modulation

10  methods.

11         Here is the Lucent header on your screen, and

12  these fields that are in yellow, signal and service,

13  indicate -- they tell you what the upcoming modulation

14  method is.

15         Now, you heard reference also to something

16  called a master/slave network, which is what Rembrandt

17  claimed in these two patents.  Let me show you Figure 1

18  from the Lucent patent.

19         Next slide, please.

20         On the left is the Lucent patent disclosure,

21  which I told you came a year earlier.  And on the right

22  is the Bremer '580 disclosure, which you heard about --

23         THE COURT:  You now have five minutes.

24         MR. SHERWOOD:  Thank you, Your Honor.

25         In both documents, there is a controlling

1    device.  It is colored in green on both of these

2    drawings, so you can see that -- that they both have

3    that.

4              Both patents also have tributaries or slaves,

5    and those are colored in -- I guess that's some sort of

6    periwinkle/blue-type color.  These are the same features

7    here.  These green and blue or periwinkle features of a

8    master/slave network.

9              But even if that wasn't clear, in Mr. Bremer's

10   original patent filings, he admitted that in 1997, a

11   master/slave network was well known in the prior art.

12   You will see other documents during this trial that also

13   prove that point.

14             So for a skilled person in this field, it

15   would have been obvious to combine the Lucent patent

16   with these pre-existing master/slave networks.

17             And following this same approach, you will see

18   that all of the claims that Rembrandt has asserted here

19   are obvious.

20             You won't have to take my word for it, though,

21   because Dr. David Goodman, who is a very distinguished

22   professor and expert in this field, will come here and

23   testify and explain to you why these claims are obvious.

24             I want to just say in closing, you heard

25   testimony about -- or not testimony -- argument about

1    damages and Rembrandt's request for you to award

2    $30 million.

3           As I said, the evidence will show that

4    Rembrandt's claims are not infringed and are invalid.

5    If you agree that they're not infringed and are invalid,

6    then Rembrandt has no proper demand here, and the only

7    award that you could make is zero.

8           So Rembrandt will go first with its evidence,

9    before you hear from Samsung.  I ask only that you keep

10   an open mind and wait until you've heard all of the

11   evidence before coming to a conclusion.

12          When all the evidence is in, it will show you

13   that these patents are not infringed and that these

14   claims are invalid.

15          And I thank you for your attention.

16          THE COURT:  All right.  Ladies and gentlemen,

17   we've heard opening statements from both sides.  We've

18   been back from lunch close to two hours -- about an hour

19   and 45 minutes.

20          We're going to take a brief recess for about 5

21   to 10 minutes, and then we will begin with the evidence

22   from the Plaintiff's case.

23          You may leave your notebooks in your chairs

24   since this is a short recess.

25          Don't discuss the case or anything you've

1   heard so far among yourselves.  Take an opportunity to

2   stretch your legs, get a drink of water, and we'll have

3   you back in here shortly and continue.  But you're

4   excused for recess at this time.

5             COURT SECURITY OFFICER:  All rise for the

6   jury.

7             (Jury out.)

8             THE COURT:  The Court stands in recess.

9             (Recess.)

10            (Jury out.)

11            COURT SECURITY OFFICER:  All rise.

12            THE COURT:  Be seated, please.

13             Mr. Wolverton, please bring in the jury.

14            COURT SECURITY OFFICER:  All rise for the

15   jury.

16            (Jury in.)

17            THE COURT:  Please be seated.

18            All right.  Having heard opening statements

19   from both sides, the Court will call for announcements

20   on the record.

21            What says the Plaintiff?

22            MR. WARD:  The Plaintiff is ready, Your Honor.

23            THE COURT:  What says the Defendants?

24            MR. SMITH:  Defendants are ready, Your Honor.

25            THE COURT:  All right.  If you are in the

1    courtroom and you anticipate being a witness in this

2    trial, then I'm going to ask all witnesses to come

3    forward at this time and take the oath from the

4    courtroom deputy.

5              And, counsel, if during the course of the

6    trial we have witnesses who are not sworn, then we'll

7    swear them at that time.  But this will save us a lot of

8    time by swearing in everybody at once.

9              All right.  If all you witnesses will come

10   forward, please.

11             Whenever you're ready, Ms. Lockhart.

12             (Witnesses sworn.)

13             THE COURT:  All right.  You may return to your

14   places.

15             Does either side wish to invoke the Rule?

16             MR. WARD:  We do, Your Honor.

17             THE COURT:  Excluding experts?

18             MR. WARD:  Excluding experts.

19             THE COURT:  If you are fact witness, then you

20   must remain outside the courtroom until such time as you

21   are called to testify.

22             So unless you're an expert witness or a

23   corporate representative, if you are going to otherwise

24   testify, you should exit the courtroom and remain

25   outside until you're called.

```
 1                    (Excluded witnesses leave the courtroom.)

 2              THE COURT:  All right.  Then is the Plaintiff

 3     prepared to call their first witness?

 4              MR. ALAVI:  We are, Your Honor.

 5              THE COURT:  Proceed.

 6              MR. ALAVI:  Your Honor, the Plaintiffs call

 7     Gordon Bremer.

 8              THE COURT:  All right.  If you'll come

 9     forward, Mr. Bremer.  You've just been sworn.  Please

10     have a seat at the witness stand.

11              All right.  Counsel, you may proceed.

12              MR. ALAVI:  Thank you, Your Honor.

13              Your Honor, we have a copy of the exhibits for

14     the Court.  May I approach Ms. Lockhart and provide you

15     both with a copy?

16              THE COURT:  You may have leave to approach.

17              MR. ALAVI:  May it please the Court.

18       GORDON BREMER, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

19                         DIRECT EXAMINATION

20     BY MR. ALAVI:

21     Q.   Mr. Bremer, can you introduce yourself to the jury,

22     please.

23     A    Yes.  Excuse me.  My name is Gordon Bremer.  I'm

24     the inventor of the patents in this suit.

25     Q.   And, Mr. Bremer, there's a pitcher of water in
```

```
 1   front of you and glasses, if you need some water, that
 2   you can always fill up.
 3   A      Thank you.
 4   Q.     Where do you live?
 5   A      I live in Clearwater, Florida.
 6   Q.     Have you ever testified in trial before?
 7   A      No.  I've never even been in a trial before, much
 8   less be a witness.
 9   Q.     How are you feeling today?
10   A      I'm kind of nervous.
11   Q.     Well, it will be over before you know it.
12          Can you tell us briefly about your family.
13   A      Yes.  I said -- like I said, I live in Clearwater,
14   Florida, with my wife of 31 years, and I have twin
15   daughters that are 31 that live nearby.
16   Q.     What do you do for a living today?
17   A      I'm a retired electrical engineer, and I consult
18   from time to time.
19   Q.     Can you tell us how you ended up becoming an
20   electrical engineer?
21   A      Yes.  When I graduated from high school in
22   Sarasota, Florida, I really didn't know what I wanted to
23   do, and that summer some of my friends said they were
24   going to enter the local junior college and take up
25   electrical engineering.
```

1        So I thought, well, I'll join them, so that's what

2    I did.

3    Q.   How did those classes turn out for you?

4    A    Well, I really liked them.  I think I fell in love

5    with engineering, and I completed the first two years of

6    the junior college.

7    Q.   Did you go on to a four-year college?

8    A    Yes.  I was fortunate to receive a scholarship

9    which helped me pay for the University of Florida, so I

10   went up to the University of Florida.

11   Q.   Did you get a degree from the University of

12   Florida?

13   A    Yes, I did.  I received a Bachelor of Science in

14   engineering.

15   Q.   How did you do in your classes?

16   A    I was number one in my class.

17   Q.   Did you get any further degrees after you graduated

18   from Florida?

19   A.   Yes, I did.  Again, I was fortunate.  I received a

20   University of Florida fellowship, which allowed me to go

21   into the graduate school and complete graduate school.

22   Q.   What did you do after you finished your master's

23   degree?

24   A.   Immediately upon graduating, I was hired by

25   Honeywell Corporation in Clearwater, Florida.

1  Q.   Tell us a little bit about that first job at

2  Honeywell.

3  A.   Well, I was fortunate.  I was hired into a -- a

4  research and development group that was developing a --

5  a new type of modem technology.

6       After I got there, I found out that they had --

7  technology had really come to a stop because they had

8  a -- found a fatal flaw, and they didn't know how to fix

9  it.

10 Q.   Did you have involvement in the project after that

11 flaw was discovered?

12 A.   Yes.  They asked me to look into it with the other

13 engineers, and I did.  And I found the flaw, and I found

14 a corrective action.  I fixed it, basically.

15 Q.   And what ended up happening with that product?

16 A.   Well, I was really proud of that, because that

17 product became a modem used in our military throughout

18 the world, and also the United Nations communication arm

19 standardized that technology.

20 Q.   How did that initial experience at Honeywell affect

21 the rest of your career?

22 A.   Well, I learned that I was good at generating ideas

23 and solving problems.  And I guess after that, that's --

24 that would seem to be what I really liked to do, solve

25 problems.

```
 1   Q.    How long did you work at Honeywell?
 2   A.    I was there four years.
 3   Q.    And when -- where did you go after you left
 4   Honeywell?
 5   A.    I went to Paradyne Corporation, again, in
 6   Clearwater, Florida.
 7   Q.    What year was that?
 8   A.    That was 1974.
 9   Q.    How old were you at the time?
10   A.    I guess I was 29.
11   Q.    I hate to ask this.  How old are you now?
12   A.    69.
13   Q.    Tell us about your initial work when you joined
14   Paradyne in 1974.
15   A.    Well, it was -- it was very similar to what
16   happened at -- at Honeywell.  I joined -- again, it was
17   a small high-tech group.
18         And once again, they had a major modem development
19   that had been stopped because of a fatal flaw.  It was
20   a -- a problem.  They could not resolve it.  The modem
21   was not reliable, and they didn't know what to do.
22   Q.    Did you work on that project?
23   A.    Yes, I did.  And like at Honeywell, I analyzed the
24   problem, I found the problem, and I designed a -- a fix
25   for it.
```

```
 1   Q.   And what happened with that product after the fix
 2   was discovered?
 3   A.   Well, that product went on to ship.  In fact, I can
 4   still remember when -- we had a break room.  We were a
 5   small company, about 200 people.  And I remember in the
 6   break room one Saturday, I went in, and there was a big
 7   sign.  We had shipped our first 20 modems.
 8        But Paradyne then grew rapidly.  It was a very
 9   successful product.  And within about the next six
10   years, we grew to 4,000 people, and we were one of the
11   largest employers in the Tampa Bay area.
12   Q.   Now, my understanding is Paradyne has gone through
13   different name changes while you were employed at the
14   company.  Can you walk us through those different name
15   changes, please?
16   A.   Yes.  I apologize for my voice breaking up.  In --
17   when I joined in 1974, we were Paradyne Corporation.  In
18   1989, we were purchased by AT&T, and AT&T renamed us
19   AT&T Paradyne.  We remained AT&T Paradyne through 1996,
20   at which time AT&T spun us off to become a private
21   company again.
22        And then in 2005, we were purchased by a competitor
23   by the name of Zhone.  And, you know, today, what's left
24   of the company is Zhone.
25   Q.   When did you end up leaving Paradyne?
```

```
1   A.   I left -- it was actually Zhone by that time.   I
2   left in 2006.
3   Q.   How many years had you worked for the company when
4   you left?
5   A.   About 33.
6   Q.   Now, in addition to your responsibilities as an
7   engineer, did you have any responsibility -- other
8   responsibilities at Paradyne, AT&T Paradyne, Zhone?
9   A.   Yeah, it's a mouthful.
10       Yes.  In -- in 1980, I realized that Paradyne could
11  benefit from more innovation and wanted to encourage
12  innovation, so I developed an innovation program at
13  Paradyne.
14  Q.   What types of formal processes were part of that
15  innovation program that you developed?
16  A.   Well, the key process was a -- was a patenting
17  program, a process that encouraged patents and would
18  take inventions, if they were appropriate, and go
19  through the patenting process.
20  Q.   What was your role in that patent process?
21  A.   I was chairman.
22  Q.   At Paradyne, after you rolled out this innovation
23  program, what was -- what results did that have on
24  invention in the company?
25  A.   Over the next 25 years, until about 2005, Paradyne
```

1   had over 400 U.S. patents issued.

2   Q.   Now, you testified that you were the chairman of

3   the program.  How long did you hold that position?

4   A.   Until I left Zhone in 2006.

5   Q.   I'd like to show you on the screen, and if you'd

6   like to look at the book at the same time, if you can't

7   see it, Plaintiff's Exhibit 15.

8   A.   I see it on the screen.  Thank you.

9   Q.   Mr. Bremer, can you tell us what this first page of

10  Exhibit 15 is?

11  A.   Yeah.  This is a paragraph of an award that I won.

12  I believe it was in 1994.

13  Q.   And what was the award for?

14  A.   Well, it was issued by AT&T.  It was the Harold S.

15  Black trophy.  It was awarded to the most valuable

16  commercial patent in 1994.

17  Q.   Now, I'm going to skip the second page and go to

18  the third page.  Can you tell us what these awards are

19  on the third page?

20  A.   Yes.  The -- the center framed picture, that's

21  Popular Science magazine, and I believe, again, it was

22  for that year.

23       And Popular Science every year awards -- or makes

24  awards to the 100 top innovations in -- in technology,

25  and a product based on the patents that I invented won

1  that award.

2  Q.   Can you tell us what the other two awards on either

3  side of that are?

4  A.   Yes.   The -- on the right side, PC Magazine be --

5  bestowed its Editors' Choice Award on that same product

6  line.

7  Q.   And how about on the left side?

8  A.   At -- in Las Vegas, actually, the largest consumer

9  electronics show in the world, COMDEX, the -- the

10  product won Best of Show.

11  Q.   Have you received any other awards for your work at

12  Paradyne?

13  A.   Yes.   Before we left AT&T, I was nominated to be a

14  Bell Labs fellow, but we were spun off before that came

15  to fruition.

16       Also, these products that won those awards, they

17  were demonstrated in the pavilion at Epcot for a year.

18  Q.   Now, just to be clear, were any of these awards

19  that we've gone over for the patents that are in this

20  lawsuit?

21  A.   No, they're not.

22  Q.   Okay.   Can you tell us generally what your typical

23  day was like as an engineer at Paradyne?   What type of

24  work did you do?

25  A.   Sorry.   Sure.   I led a group of anywhere from 12 to

1   20 engineers in -- in research development and product

2   development, also.  Most of my -- my efforts were

3   technical.  I was a technical leader, more than just

4   a -- a manager, if you will.

5       So I spent a lot of my time developing my ideas and

6   helping other engineers develop their ideas.  We -- we

7   would document those.  I spent a lot of time in our

8   laboratories testing out ideas, debugging products, and

9   so forth.

10      I also went out to customer sites to help install

11  products and, again, find problems and fix problems.

12      At times, I even worked at night and -- and

13  weekends in our manufacturing plant.  I remember one

14  time actually placing components on boards in the

15  assembly line by hand.

16  Q.   Did you enjoy your 33 years at the company?

17  A.   Very much so.

18  Q.   What did you enjoy the most about the work you did?

19  A.   Well, looking back, obviously, to me, the number

20  one was I worked with a great team of engineers.  We

21  had -- there were -- they tended to be very smart,

22  industrious, self-driven.  That was really a pleasure.

23  In fact, I still meet with many of them once in a while.

24      The other thing, I was very appreciative of

25  our executive management at Paradyne.  So for 33 years,

1   they kept funding projects that -- that we worked on, so

2   I was very thankful for that.

3   Q.   Mr. Bremer, how many patents and patent

4   applications have you been awarded?

5   A   I have approximately 100 patents and applications

6   today.

7   Q.   Was that typical for engineers at Paradyne?

8   A   No.  Even though we had a lot of very sharp

9   engineers, some of whom had patents, the number of 100

10  was -- was unusually high.

11  Q.   I'm going to show you what's been introduced as

12  Plaintiff's Exhibit No. 1.  I'm going to put some of

13  this up for you.

14       Do you recognize this document?

15  A   Yes, I do.

16  Q.   What is it?

17  A   It's a patent.

18  Q.   And what patent is it?

19  A   The -- the number on this, let's call -- let's

20  shorten it to the '580 patent.

21  Q.   And who's the inventor on this patent?

22  A   I am.

23  Q.   And do you understand this is one of the

24  patents-in-suit in this case?

25  A   Yes, I do.

1   Q.   And I'm going to show you Exhibit 2.  Do you

2   recognize this document?

3   A    Yes.  It's another patent.

4   Q.   And what patent is this?

5   A    Let's refer to it as the '228.

6   Q.   And who's the inventor on this patent?

7   A    I am.

8   Q.   And do you understand this is one of the

9   patents-in-suit?

10   A    Yes, I do.

11   Q.   Before I get into the patents, I'd like to ask you

12   to help us understand a few terms.

13       Can you tell us what the term "modem" stands for?

14   A    Yes.  It means it's a contraction of two words:

15   Modulator and demodulator.

16   Q.   Can you tell us generally what a modem is?

17   A    Yeah.  Maybe there's some examples that we could

18   look at.

19   Q.   Okay.

20   A    Generally, though, a -- a modem takes information

21   and converts a signal based on that information so that

22   the information can be sent.

23   Q.   Okay.  Do you have a demonstrative that would help

24   you explain what a modem is?

25   A    Yes, please.

1    Q.    Let me get to that.

2          Okay.  This is a slide we put up.  Will this help

3    you describe what a modem is?

4    A    Yes, it will.

5          But before I draw your attention to the slide, many

6    of us remember modems as being, you know, relatively

7    large boxes that connect, for example, to a PC and maybe

8    connect to a cable or to a telephone plug.  But modems

9    are -- are much more than that and can be much smaller

10   than that.

11        In fact, really, any -- any electronic device that

12   communicates data has to have a modem in it.  That's --

13   a modem is essential for data communication over some

14   type of channel.

15   Q.   So why don't you tell us what this slide at this

16   point, this demonstrative is showing.

17   A    Okay.

18            THE WITNESS:  Thank you.

19   A    We see here two -- two cell phones, and every cell

20   phone has a modem in it, every one.  And that modem

21   is -- is necessary, and I'll show you why in a minute.

22            THE WITNESS:  So maybe you could click to the

23   next --

24   A    So we know that with a cellular modem -- or with a

25   cellular phone, rather, that we need to -- we want to

1    talk into it or text into it, and we want to be able to

2    send that information over the airwaves through a

3    cellular network probably to another cell phone.

4            THE WITNESS:  So if you could click.

5    A    So what happens, the voice or text goes into the

6    modem -- goes into the phone first and then into the

7    modem, which is part of the cell phone.  The modem

8    converts that voice or text into a signal.  The signal

9    is suitable for going over the airwaves and through the

10   network.

11           THE WITNESS:  So maybe you can click and --

12   A    So we see the signal going through the -- the

13   network, and the signal is received by a remote cell

14   phone, the one on the right, and it goes into the modem

15   that's inside that cell phone.

16        And what that modem does, it now demodulates the

17   signal.  It converts it back into either the text or the

18   voice.  And then the cell phone outputs that to the --

19   the other person.

20   Q.   (By Mr. Alavi) Was this concept of modems existing

21   in phones and not just these big boxes, was that true in

22   1997?

23   A    Oh, yes, uh-huh.

24   Q.   And what other types of devices, other than cell

25   phones and the boxes we connect in our computers,

1   contain modems inside them?

2   A    Well, as I mentioned before, basically, any -- any

3   electronic device that needs to communicate through the

4   air, through a wire, through a cable has to have a modem

5   in it.

6        And, for example, here we have cell phones, and

7   like I said, every cell phone has a modem device in it.

8   Every WiFi, whether it be a router or whether it be a

9   WiFi device in your home, has to have a modem in it.

10  Every Bluetooth device in your car, in your phone has to

11  have a modem in it.

12       So those are some of the -- some of the common

13  examples today.

14  Q.   You used a term when you were describing modems,

15  modulation.  Can you tell us or help describe for us

16  what modulation is?

17  A    Like I said, modulation is the concept of

18  converting information into a signal that can be sent.

19  Probably two examples that we'd all recognize with

20  radios are frequency modulation and amplitude

21  modulation.

22  Q.   And what are the differences between, for example,

23  frequency modulation, FM and AM?

24  A    Well, first of all, they're not compatible.  If you

25  have a radio that's only FM, you're not going to receive

1  AM.  And vice versa, if you have a radio that's AM only,

2  you're not going to receive FM.

3      And so why -- why have it?  Why not have just one?

4      And the reason is, is that each has its own

5  advantages but then also disadvantages.

6      With FM, if we're near a station, we get good

7  quality sound, top quality sound, but as we move away,

8  the range is limited and the signal drops off; whereas

9  with AM, we -- the sound quality isn't as good but the

10  range is much, much greater.  So there's a tradeoff.

11  Q.  Now, I'd like to talk about the invention that you

12  worked on at Paradyne.  What were you actually working

13  on?  What type of project when you came up with the

14  invention?

15  A   Well, in early 1997, my team was developing a new

16  technology that I'll -- I'll call burst technology.  It

17  was a communication technology.  We're bursting right

18  now back and forth.  That -- it was a -- perhaps a poor

19  way to describe it, but it was a burst technology.

20      And it was intended for Internet access.  So this

21  is technology that was at highest speed and complex as

22  possible.

23  Q.  And what type of actual physical product were you

24  working on?

25  A   It was a modem.

1   Q.   And while you were working on this modem, what was

2   it that led you to come up with your invention?

3   A    Well, during the time of that -- that development

4   that I just mentioned, I was reading in magazines and

5   hearing something on the TV about a new type of

6   communication service where an individual away from the

7   home could communicate into the -- into the home into

8   devices, such as power-monitoring power control,

9   controlling your TV, light switches, refrigerators,

10  things like that.  So I -- I realized that was an

11  opportunity.

12  Q.   And how did this opportunity about -- these devices

13  that might be going into the home, how did that lead you

14  to come up with your invention?

15  A    Well, first, I realized that the communication

16  that -- that we had under development and the

17  communication required for the power monitoring and

18  control required different types of modulation and

19  different modems.

20  Q.   Why -- why was it an issue that they needed

21  different types of modulations in these modems?  Why was

22  that a problem?

23  A    Well, they had -- they had very different

24  performance and size and power requirements.

25  Q.   And so what would happen if you'd have these modems

```
 1   that required different modulations trying to work
 2   together?
 3   A     They were incompatible.  So you basically could --
 4   could not, at the same time, communicate with -- with
 5   both the high-speed Internet modems and these other
 6   power-monitoring modems.
 7   Q.    In addition to incompatibility, were there any
 8   other issues that arose from using different types of
 9   modulations?
10   A     Well, because they were incompatible, you
11   couldn't -- you couldn't communicate at all and you
12   couldn't communicate seamlessly.
13         I think I provided a -- a slide for this.
14   Q.    Well, before we get to that, I want to go through a
15   few documents with you --
16   A     Okay.
17   Q.    -- if that's okay.
18   A     Sure.
19   Q.    If we can take a look and I'll show you what's
20   Plaintiff's Exhibit 7 and blow this up.
21         Do you recognize this document, Mr. Bremer?
22   A     Yes.  This is what we referred to as a broadband
23   tech note.  In this case, it was Broadband Tech Note
24   No. 137.
25   Q.    And what were tech notes used for at Paradyne?
```

```
 1   A.    Well, it was a policy in Paradyne that when a -- an
 2   engineer or other individual either had a new idea or
 3   had a -- needed to explain an existing idea or explain
 4   something in detail technically, they would document
 5   their idea in -- in a tech note.
 6   Q.    And who's the author of this particular tech note?
 7   A.    Myself.
 8   Q.    And what topic does it deal with?
 9   A.    It's embedded modulations.
10   Q.    And what is that?
11   A.    That's the subject of the patents in front of us.
12   Q.    And what's the date that this document -- I'm going
13   to actually highlight the significance.  What's the
14   significance of this June 8th, 1997 date?
15   A.    June 8th, 1997, that was the date that I -- I
16   formally entered this -- this tech note into the system
17   at Paradyne, and -- and that -- that's when everyone had
18   access to it.
19   Q.    Is this the first date you came up with your
20   invention?
21   A.    No.  I came up with the concept in early 1997.
22   Q.    And I want to show you what's been marked as
23   Plaintiff's Exhibit 5.  I'll blow it up again.  Do you
24   know what this document is?
25   A.    Yes.  This is a provisional patent application.
```

1   Q.   Can you tell us what a provisional application is?

2   A.   Well, it's the -- when you have an invention that

3   you wish to -- to patent and it's -- you've documented

4   it, this is the -- the provisional application is the

5   first formal submittal to the U.S. Patent Office.

6   Q.   And who's the inventor on this provisional

7   application?

8   A.   I am.

9   Q.   And what's the date of this application?

10  A.   This was December 5th, 1997.

11  Q.   And what's the relationship between the tech note

12  we saw, which was Exhibit 7, and this 1997 provisional

13  application?

14  A.   All of the information that was in the tech note is

15  in this provisional application.

16  Q.   And I'd like to take a look at Page 7851.  It's at

17  the bottom of the page numbers, and I'll pull it up for

18  you, the provisional application.  And I'm pulling up

19  Paragraph 3.  Do you see that highlighted -- highlighted

20  language?

21  A.   Yes, I do.

22  Q.   What were you discussing in this highlighted --

23  highlighted language in the provisional application?

24  A.   Well, I was -- I was pointing out in this document

25  the -- the need for an application of power monitoring

1    and control.

2    Q.    And what does that mean?

3    A.    Well, it's what I discussed earlier.  It's -- it's

4    being able to, from a remote location, communicate into

5    your home and be able to turn power on and off, adjust

6    it, and monitor it.

7    Q.    Now, you talked earlier about this concept of

8    incompatibility.  Do we have a demonstrative that you

9    can use to describe that problem?

10   A.    Yes, I do.  Thank you.

11   Q.    Let me pull it up here.

12         Would you describe the issue of incompatibility

13   that you were dealing with and walk us through this --

14   this exhibit, please?

15   A.    Yes.  First, let me kind of describe what -- what's

16   on this -- on this graph.

17         We have a master.  That's a master modem.  That's

18   basically the controlling-communicating modem.  We have

19   four devices that that master wishes to communicate

20   with.  We have a television, an alarm system, a light

21   switch, and a thermostat.

22         And we're going to talk about modulations, and --

23   and rather than use some complicated term for different

24   modulations, I've chosen to relate a modulation to a --

25   a language.  And in this case, I've chosen the Chinese

```
 1   language.  So --
 2   Q.    So what does CHN mean, for example, on the master?
 3   A.    That means Chinese.
 4   Q.    And what -- if you look at the TV where it says
 5   ENG, backslash, Chinese, what does that mean?
 6   A.    Well, what I intend there is that the TV, it can
 7   communicate in Chinese, for example, very low speeds --
 8   speeds comparable to the -- the light switch, but it can
 9   also have the capability inside -- the modem inside can
10   speak in English.  And we'll get to English in a minute.
11   Q.    Okay.  So let's go to the next slide.  And tell us
12   what's happening here.
13   A.    Okay.  So I'm suggesting we want to be able to
14   communicate in English.  Perhaps the -- English or
15   actually the -- the modulation is perhaps much higher
16   speed, and now we can actually send a video signal to
17   the TV if we communicate in English.
18        So we've introduced a master that speaks English;
19   however, English is not compatible with Chinese.  So now
20   we've lost communication with the other devices.
21   Q.    So what does the -- the fact that there are Xs on
22   these flags mean?
23   A.    Well, that means that that communication is not
24   possible.
25   Q.    Is that what you just meant by incompatibility?
```

1   A.   Yes, it is.

2   Q.   Okay.  I'm going to take a look at your provisional

3   application again.  And, again, we're at Page 7850.  And

4   I'm pulling out the second and third paragraphs, and I'm

5   highlighting some language there.

6        What were you discussing in your provisional

7   application when you -- in this language that's

8   highlighted in these paragraphs?

9   A.   I was discussing what I just mentioned, the fact

10  that these -- these tribs, these lower speed tribs

11  are -- are not compatible with the higher speed.  So

12  lack of compatibility.

13  Q.   Now, you talked a little bit about losing the

14  communication on the network, the seamless

15  communication.

16       Do you remember that?

17  A.   Yes, I do.

18  Q.   Do you have a demonstrative that helps you explain

19  that concept?

20  A.   Yes, I do.

21  Q.   So let's pull that up.

22       So walk us through this concept of no seamless

23  operation, and tell us what's going on in the slide

24  here.

25  A.   Okay.  So we're back to where we started earlier.

1  We have a -- a modem -- a master modem talking Chinese

2  and is successfully talking to the -- the other

3  products, although the TV, you're just getting maybe

4  power control, for example.

5  Q.   Okay.

6  A.   Could you click?

7  Q.   Sure.

8  A.   Okay.  Now, this is prior -- we're still prior to

9  the invention that I came up with.

10      Now we've introduced a master that speaks English

11 and Chinese -- speaks both.  And what we've done here,

12 we've set it up in the English mode -- the English

13 modulation, and it's able to speak with the TV in

14 English, but it still can't speak with the Chinese

15 devices.

16      Could you click?

17 Q.   Sure.

18      And what's -- what's going on here now?

19 A.   Now, let's say we want to speak with the Chinese,

20 well, we can change -- we can swap over.  The trouble is

21 that in doing so, the communication goes down for quite

22 a -- often -- quite a period of time.

23      Maybe you can remember dial modems and fax modems

24 where you'd make a -- a connection and -- and you'd hear

25 this beep, beep, and the communication -- you couldn't

```
 1    communicate for a half a minute or even more.  So that
 2    would be -- that would be disruptive.  And that is
 3    what -- what I refer to as not seamless.
 4              So in this case, lo and behold, we can speech
 5    English to the TV and get video, but the other devices
 6    are out of service, which means that if you're trying to
 7    control them remotely, you couldn't do so.
 8    Q.   So now we've got another slide.  What's happening
 9    here?  Is this just showing going back and forth?
10    A.   Yeah.  It's just simply going back.  So now -- now
11    we're speaking -- we're speaking English.
12         I think we missed a slide in between there.
13    Q.   I think we've got it.
14         There's the English, the Chinese, and then back --
15    A.   Yes.  Right.  Right.
16         So now we're speaking English again.  And so you
17    can see the key problem here is lack of seam --
18    seamless.
19         We've -- we've kind of solved the compatibility
20    problem perhaps in a way, but you've got this -- this
21    large disruption, so the devices can communicate at the
22    same time.
23    Q.   Let's look at your provisional application again.
24    And I'm at still Page 7850, and I'm at Paragraph 1, and
25    I've highlighted this language.
```

1    Can you tell us, in 1997, what you're discussing in

2    this language of your provisional application?

3    A.   Yes.  The highlighted section is what I just

4    discussed.  The -- the -- in order to work in two

5    different modulations or two different languages, it

6    requires data disruption.

7    So what I was doing here was acknowledging the

8    compatibility, and in this case, the lack of seamless

9    operation in the provisional application.

10   Q.   Now, what was your solution?  How did you solve

11   this problem of incompatibility and lack of seamless

12   communication?

13   A.   I did solve it.  The -- you know, it occurred to me

14   that you see the two problems here.  The -- the two

15   languages and the two modulations weren't compatible.

16   And if you tried to make them work, you had this large

17   disruption.

18   So what -- what was needed was a seamless way, a

19   non-disruptive way, where you could communicate two

20   modulations or two languages really at the same time, so

21   you -- it appeared to be seamless.

22   Q.   And what's the solution to the problem?

23   A    Well, I kind of had an ah-ha moment, and I came up

24   with what I believe is a pretty elegant solution to

25   that.

1    And based on our burst technology that we were

2  developing, I realized that if -- to oversimplify

3  perhaps, but if I put an indicator at beginning of each

4  burst, each communication that said change the -- the

5  modulations, this -- this change could happen basically

6  instantly, and you could communicate with the different

7  types of devices without -- without major communication

8  disruption.

9  Q.   So do you have another demonstrative that shows how

10  the -- the solution works?

11  A    Yes, I do.

12  Q.   Okay.  Tell us -- I think we've seen this slide

13  before.

14  A    Yeah, we've seen it before.

15    So we're back to the original slide where the --

16  the modem is speaking only Chinese, in this case,

17  slow -- slow speed.

18       THE COURT:  Gentlemen, let's make sure you

19  both talk one at a time.

20       Continue, Counsel.

21       MR. ALAVI:  Apologize, Your Honor.

22       THE WITNESS:  Sorry.

23  Q.   (By Mr. Alavi)  Let's go to the next slide.  And

24  tell us what this represents.

25  A    Okay.  Now what we're doing, this slide represents

```
 1    the invention, and the invention overcomes the
 2    compatibility problem and overcomes the seamless
 3    problem.
 4         So the result is that the -- the master can
 5    communicate in -- can -- yes -- can communicate video in
 6    English, in this case to the TV, and at the same time,
 7    without any interruption, be communicating with the
 8    other devices.
 9    Q.    Now, Mr. Bremer, to be clear, we've been talking
10    about -- you talked about an example of communicating
11    video.  Were -- you're not suggesting that in 1997, that
12    houses were streaming video to TVs, were you, through
13    these devices?
14    A    Not yet, no.
15    Q.    Are you talking about what you anticipated coming
16    in the future based on reading articles and
17    understanding what was going on in the industry?
18    A    My -- my recollection, it was -- we were on the
19    verge of being able to do that.
20    Q.    Now, once you had your idea, what kind of work did
21    you put into it to get to -- get the invention
22    finalized?
23    A    Well, I did a couple of things.  One is I -- I put
24    the -- the invention into our patenting system for
25    review and consideration.
```

```
 1    Q.    Okay.  Let's take a look at Exhibit 9.  And I'm

 2    pulling this up.  Can you tell us what Exhibit 9 is,

 3    please?

 4    A     Yes.  This is a patent disclosure.

 5    Q.    And what is this for?

 6    A     This is for the -- the invention, the embedded

 7    modulations.

 8    Q.    And how is this part of the Paradyne patent

 9    process?

10    A     Well, this was really the -- the first step of the

11    formal process.  So the inventor, in this case,

12    myself -- the inventor's required to document the --

13    the -- the invention and answer certain questions so

14    that those -- those questions can be reviewed by others.

15    Q.    And what happens with the patent disclosure form,

16    how is it used in the process?

17    A     Well, we had -- the patent process had a group of

18    individuals that was -- that were referred to as the

19    patent review board.  It consisted of engineers in

20    different departments throughout the company, a patent

21    attorney, and certain business people.

22    Q.    And what would they do with these patent disclosure

23    forms?

24    A     Well, the disclosure form was circulated to the

25    patent review board and a date was set for that review
```

1   board to meet and consider the invention.

2   Q.   And what's your understanding of what the patent

3   committee mentioned?

4   A    The board approved proceeding, which is attempting

5   to receive a patent.

6   Q.   In addition to going through this patent review

7   process, what other kind of work did you do to your

8   invention until you came up with the idea?

9   A    Let the record reflect, of course, the real goal of

10  the invention is not necessarily the -- the patent.  So

11  we -- we wanted to get the invention in -- into our

12  product line.

13       So, you know, I worked with my time to incorporate

14  the -- the key parts of this into our burst technology

15  that I mentioned, and the remainder of that year, I

16  worked both on the patent -- the patent system, as well

17  as working with that team to implement the invention and

18  test it in our laboratory.

19  Q.   Now, did Paradyne ever sell a product that had your

20  invention in it?

21  A    No, it did not.

22  Q.   So let me ask you about the '580 patent, which is

23  Exhibit No. 1, do you know how that patent is related to

24  the 1997 provisional application?

25  A    Yes, I do.

1    Q.    And how is it related?

2    A    It's what's called a continuation of the original

3    patent.

4    Q.    Now, how about the '228 patent, which is Exhibit 2?

5    Do you know how that patent is related to your 1997

6    provisional application?

7    A    Yes, it is also a continuation of the original.

8    Q.    Now, as an inventor, what's your understanding of

9    what a continuation patent is?

10   A    Okay.  I'm not an attorney, but my understanding of

11   what a continuation is, it's a formal term in the Patent

12   Office.

13        And when -- when an application -- a patent

14   application is submitted, the inventor, along with the

15   patent attorneys, are -- you have to describe your

16   invention, and you have to describe at least one

17   implementation of it so that someone could build it.

18        So you describe it as well as possible.  However,

19   at the end of the patent, you need to write a number of

20   single-sentence -- single sentences that are called

21   claims.  And each claim is intended to describe a part

22   of your invention that you want to be able to protect.

23        So in the first patent, you know, you have your

24   description, and now you submit a number of claims with

25   it, and you describe those parts of the invention that

```
 1   you think are most important to protect.
 2   Q.   Have any of your other patents had continuations
 3   involved in them?
 4   A    Excuse me.  I really didn't finish about a
 5   continuation.
 6        So what happens -- the Patent Office recognizes
 7   that in that first patent, you may not have claimed
 8   everything that was -- was important to you.
 9        So the idea of a continuation is that it gives
10   you -- or gives the inventor an opportunity -- without
11   adding any new information, but it gives you the
12   opportunity to list new claims and actually get a new
13   patent, which is called a continuation.
14   Q.   Sorry for interrupting you earlier, Mr. Bremer.
15        On these continuations, have you had other patents
16   that have had continuations?
17   A    Yes.  In fact, about -- about 25 percent of my
18   patents are actually continuations.
19   Q.   Can you tell us what a trib is?
20   A    Yes.  A trib, it's a terminology common in modem
21   communication.  It's also called a slave.  They're
22   interchangeable.  And there's another modem called --
23   another terminology called a master.
24        And a master in communication is the -- the modem
25   that's really controlling communication between two or
```

1    more -- or one or more other -- other modems.  And the

2    trib or the slave are those other modems.

3    Q.   Do you know what a bilingual trib is?

4    A    Yes, I do.

5    Q.   What is a bilingual trib?

6    A    A bilingual would refer to a -- a trib modem that

7    can participate in -- in two modulations, two different

8    modulations.

9    Q.   Now, I'd like to look at your provisional

10   application again, which is Exhibit 5.  And we're again

11   at Paragraph 2 in the first paragraph, and I've

12   highlighted some language.

13        Do you see that, Mr. Bremer?

14   A    Yes.

15   Q.   It says:  Although the modem equipment may contain

16   several selectable modulations...

17        Can you tell us what you were describing in the

18   provisional application in 1997?

19   A    Yes.  This was what I just described, bilingual

20   tribs for one.

21   Q.   I'd like to show you Exhibit 6.  Do you know what

22   this document is?

23   A    Yes, I do.

24   Q.   And what is it?

25   A    It's the file history for the original patent.

1    Maybe I should describe what a file history is.

2    Q.   Let me get -- find out first what this is.

3    A    All right.

4    Q.   Which original patent is that, Mr. Bremer?

5    A    This was the -- the first patent that resulted from

6    the provisional application.

7    Q.   Okay.  And what's the number of that patent?

8    A    It's the '838.

9    Q.   And generally speaking, what is a file history?

10   A.   Once the -- once the inventor submits the

11   provisional application and then a -- a final

12   application to the Patent Office, there's correspondence

13   that goes back and forth between the -- the inventor and

14   the Patent Office to iron out details and define things

15   that perhaps were not clear.  And the file history is a

16   record of that correspondence.

17   Q.   Now, what I've pulled up as Page 7462 -- and I'm

18   going to blow up the bottom of that.  Can you see that,

19   Mr. Bremer?

20   A.   Yes, I -- yes, I do.

21   Q.   Can you tell us what this language in the file

22   history of the very first patent discloses?

23   A.   Yes.  Well, this was Claim 23 in the application.

24   And what this claim is describing is a bilingual master

25   and a bilingual trib.

1    Q.    Now, I want to talk to you a little bit about the

2    Plaintiff in this case, Rembrandt.  Can you tell us how

3    you first came to meet the people at Rembrandt?

4    A.    Yes.  In -- I believe it was 2004, Rembrandt

5    visited Paradyne Corporation and expressed an interest

6    in purchasing some patents.

7    Q.    And did you start to do some work for Rembrandt at

8    some point?

9    A.    Yes, I did.  I left Paradyne or Zhone, actually, at

10   that time in -- in 2006, and entered into a contract --

11   or better way is I -- I started consulting with -- with

12   Rembrandt.

13   Q.    And did you do that consulting through a contract,

14   or how did that work?

15   A.    There was a company -- a small company set up, and

16   I actually consulted with Rembrandt through that

17   company.

18   Q.    Let me pull up what's Defendants' Exhibit 11 -- I

19   mean, 1011, and blow this up.  Do you know what this

20   document is?

21   A.    Yes.  This -- this is the consulting agreement with

22   a company that I -- I worked with Rembrandt through.

23   Q.    And what was the name of that company?

24   A.    It was called Attic -- Attic IP.

25   Q.    Are you still performing consulting services for

1  Rembrandt under this agreement?

2  A.   No, I am not.

3  Q.   When did you stop performing services under this

4  agreement?

5  A.   I believe it was September of 2009.

6  Q.   Can you tell us, excluding expense reimbursements,

7  rent reimbursements, how much you were directly or

8  indirectly paid by Rembrandt under this agreement?

9  A.   About -- over a three-year period, it was about

10  $500,000.

11  Q.   And over that three-year period, how much were you

12  working?  How many hours a week were you working on

13  these projects?

14  A.   It was 40 hours a week, all week.

15  Q.   Now, after this agreement expired, did you enter

16  into any other agreements with Rembrandt?

17  A.   Yes, I did.

18  Q.   So what I've pulled up for you is -- and before we

19  get into that, what I'd like to ask you is, under those

20  agreements, including the Attic agreement, can you tell

21  us in total, excluding expense reimbursements from --

22  that type of thing, how much you've been paid directly

23  and indirectly by Rembrandt?

24  A.   Over the last nine years, it's about $670,000.

25  Q.   Now, I've pulled up Defendants' Exhibit 1012.  Do

```
 1   you know what this document is?
 2   A.   Yes.  This is another consulting agreement, this
 3   time between myself, as -- as an individual, and
 4   Rembrandt.
 5   Q.   And what -- what type of work were you doing under
 6   this agreement?
 7   A.   I was consulting on an hourly basis.
 8   Q.   Now, what kind of consulting work were you doing?
 9   A.   I was -- patent work, re -- reviewing patents.
10   Q.   Now, is this -- does this agreement cover your
11   current working relationship with Rembrandt?
12   A.   No, it does not.
13   Q.   Okay.  Do you have a current working relationship
14   with Rembrandt?
15   A.   Yes, I do.
16   Q.   And are there contracts that cover that
17   relationship?
18   A.   Yes, there are.
19   Q.   Okay.  And tell us generally what types of
20   agreements you have with Rembrandt today.
21   A.   I have two.  I don't know if you can show them.
22   Q.   Sure.  Let's pull up the first one.  And this is
23   Defendants' Exhibit -- Exhibit 1013.  Do you know what
24   this document is?
25   A.   Yes, I do.
```

1   Q.   And what is it?

2   A.   Well, it's an agreement between myself and

3   Rembrandt where the objective is for me to continue to

4   come up with ideas and -- and make inventions and

5   receive patents.

6   Q.   Okay.  And have you actually performed work under

7   this agreement?

8   A.   Yes.  Recently, I -- we -- I'll say "we" -- filed a

9   new patent.

10   Q.   And when you say "we," who are the inventors on

11   that patent?

12   A.   Besides myself, Dr. Paul Schneck.

13   Q.   Now, how are you compensated under this agreement,

14   the inventor services agreement?

15   A.   I believe I receive 2-1/2 percent of the -- the

16   revenue that Rembrandt receives from the various patents

17   that I've invented.

18   Q.   Does that include the patents in this case?

19   A.   Yes, it does.

20   Q.   Now, do you have another agreement with Rembrandt?

21   A.   Yes, I do.

22   Q.   Okay.  Pull that up.  And this is Exhibit 1014.

23        Can you tell us what this agreement is?

24   A.   Yes.  This is a -- referred to as a consulting

25   agreement.

1   Q.   And what types of services do you provide under

2   this agreement?

3   A.   Under this agreement, I'm asked to assist Rembrandt

4   in the enforcement of patents.

5   Q.   What types of work does that include?

6   A.   I'm here today.

7   Q.   Does this cover the work you're doing, such as

8   being here to testify today?

9   A.   Yes, yes.

10  Q.   And let's go to Page 36409, and I'm going to pull

11  that up.

12       Can you tell us how you're paid under this

13  agreement?  And I'd like to walk -- walk through it.

14       Section 4.1.1 -- 4.1.2, I've highlighted it for

15  you.  Can you tell us how you're getting paid for the

16  work you do, including your time testifying?

17  A.   Yes.  The -- I was paid basically at signing

18  $50,000, and then later, by March 31st, or at the filing

19  of the patent infringement suit, I was paid another

20  $50,000.  And then basically a year later, I was paid

21  the final $50,000.

22  Q.   And I didn't highlight Section 4.1.4, but can you

23  tell us what that covers?

24  A.   Yeah.  After all -- all this is said and done,

25  if -- if I continue to consult after two years, I'll be

```
 1    paid $300 an hour.
 2    Q.    Now, at some time did you come to believe or
 3    suspect that Bluetooth products that had EDR in them
 4    might infringe your patents?
 5    A.    Yes, I did.
 6    Q.    And how did you find that out?
 7    A.    In 2007 -- or it might have been 2008, when I was
 8    consulting for Rembrandt, I -- I came across the -- the
 9    Bluetooth specification.  And in reading through that,
10    it appeared to me that my patents -- some of my patents
11    may read on that -- that Bluetooth standard.
12    Q.    And what did do you when you discovered that?
13    A.    I brought it to the attention of Rembrandt.
14    Q.    How do you feel about your relationship with
15    Rembrandt today?
16    A.    I'm very proud of working with them.
17    Q.    Why is that?
18    A.    Well, a couple of reasons.  Like I mentioned, they
19    give me an opportunity for -- for nine years now to --
20    to work with them and to pursue additional patents and
21    analyze patents.
22         And, you know, frankly -- you know, I -- I invented
23    these patents, and I'm -- I'm very proud of the patents.
24    And I'm not an owner of the patents, but it doesn't
25    matter that I'm -- I'm still very proud.
```

1          So I want to see those patent rights, which the

2     Patent Office bestows on patents, I want to see those

3     properly defended.

4          And I can -- I could never do that myself, and I --

5     I really appreciate the fact that -- that Rembrandt

6     has -- has taken that on and that I can help and team

7     with them to do that.

8               MR. ALAVI:   Your Honor, we pass the witness.

9               THE COURT:   All right.   Cross-examination by

10    the Defendants.

11              MR. SMITH:   Your Honor, may I approach the

12    witness with a notebook?

13              THE COURT:   You may.   If you'll hand it to the

14    CSO.

15              All right.   Counsel, you may proceed.

16              MR. HADDAD:   Thank you, Your Honor.

17              May it please the Court.   I need a step stool

18    here.

19                        CROSS-EXAMINATION

20    BY MR. HADDAD:

21    Q.   Good morning, Mr. Bremer.   My name is Gerard

22    Haddad.   I'm an attorney for Samsung.   I haven't met you

23    today.   Very nice to meet you.

24    A    I'm sorry.   I didn't catch your last name.

25    Q.   Gerard Haddad.   I'm with the attorneys for Samsung.

1        Mr. Bremer, you understand that Rembrandt in this

2    case is accusing Bluetooth, correct?

3    A     Yes, I do.

4    Q.    And you understand specifically that this case is

5    about a particular feature of Bluetooth, isn't that

6    right, called EDR?

7    A     I'm not sure of that.

8    Q.    Did you -- well, did you -- do you understand that

9    there's an organization called the Bluetooth Special

10   Interest Group that came up with the Bluetooth standard?

11   A     I believe I've heard of that, but I can't be sure

12   of the name.

13   Q.    So you didn't make any contributions yourself to

14   the standards body known as the Bluetooth Special

15   Interest Group?

16   A     No, I did not.

17   Q.    So are you aware that the Bluetooth Special

18   Interest Group is the organization that developed the

19   standard for Bluetooth?

20   A     No, I'm not aware of that.

21   Q.    And you are aware, aren't you, that the Bluetooth

22   standards body is the organization that actually

23   developed the particular feature of Bluetooth called EDR

24   that's asserted -- that Rembrandt asserts is covered by

25   the patents in this case?

1   A    No, I'm not aware of -- I'm not aware of that --

2   that particular group.

3   Q.   So --

4   A    So I can't be sure.

5   Q.   So you didn't participate in the Bluetooth

6   standards body group; is that correct?

7   A    Yes.

8   Q.   And you didn't attend their meetings when they were

9   developing the standard; is that right?

10  A    Yes.

11  Q.   And -- sorry.  And, in fact, Mr. Bremer, you didn't

12  contribute anything to the -- to the development of the

13  Bluetooth standard when those -- when that group was

14  meeting to develop that standard.  That's right,

15  correct?

16  A    I made no contributions to the standards body.

17  Q.   Okay.  And not even to be the EDR portion of --

18  that the standards body was developing; is that right?

19  A    I made -- I made no contributions to the standards

20  body.

21  Q.   And I believe you just mentioned that the first

22  time you ever -- well, I take that back.

23       Is -- the first time you ever heard of Bluetooth

24  was around 2007; is that right?

25  A    Yes.

```
 1   Q.   And is -- and it's true that that's the first time
 2   you ever even heard of the feature of Bluetooth called
 3   EDR, correct?
 4   A    I don't know.
 5             MR. HADDAD:   Can I bring up on the screen a
 6   transcript cite?
 7   Q.   (By Mr. Haddad) Mr. Bremer, did you have your
 8   deposition taken in this case back in October?
 9   A    Yes, I did.
10   Q.   And do you remember -- do you have a copy of the
11   transcript, sir?   I believe we handed one up.
12   A    Yes.
13   Q.   Okay.  I believe it's in two volumes.  If you can
14   turn to the one that's dated October 16th, please.
15        And if you turn to Page 61 of that transcript, sir,
16   do you see at Line 17 of Page 61, you were asked the
17   question:  When did you first learn of that -- that
18   enhanced data rate aspect of Bluetooth?
19        And you answered:  I believe -- I believe it was
20   2007.
21        Do you remember giving -- being asked that question
22   and giving that answer?
23   A    I'm sure I did.
24   Q.   So you believe that it was 2007 when you first
25   learned of Bluetooth EDR, correct?
```

```
 1  A    I presume you mean EDR means enhanced data rate?
 2  Q.   Yes.
 3  A    Okay.  Anyway, I stand by what I said in the
 4  deposition.
 5  Q.   And do you understand that Bluetooth with EDR came
 6  out three years earlier, in 2004?
 7  A    I don't know that.
 8  Q.   Do you understand that the application for the
 9  patent that's in suit here today, the '580 patent, was
10  filed in 2009?
11  A    I'll -- I'll have to -- I'll have to look at it.
12          THE COURT:  You'll need to speak up,
13  Mr. Bremer.
14  A    I'll have to look at that.  I don't recall.
15  Q.   (By Mr. Haddad) If you turn to DX-1001, the first
16  exhibit.
17  A    Yes, I see it.
18  Q.   So do you see the -- the part -- I don't know if
19  you can see on the monitor.
20  A    I can see it better on the monitor.  Thank you.
21  Q.   Okay.  Now that you have seen DX-1001, the '580
22  patent, would you agree that that patent was filed in
23  2009?
24  A    Yes, I would.
25  Q.   And that was Rembrandt that filed that application;
```

1    is that correct?  That wasn't you, correct?

2    A    Yes.  It must have been -- I presume it was Rem --

3    it was not me.

4    Q.   Okay.  Well, you never owned these patents; is that

5    right?

6    A    That's right.

7    Q.   So the people that were working on Bluetooth back

8    in 2 -- earlier than 2004, when they were working on the

9    EDR feature that came out in 2004, they couldn't have

10   seen this patent, the '580 patent; is that right?

11   A    I don't know.

12   Q.   Would you agree that if EDR came out in 2004 and

13   the '580 patent was filed in 2009 that the people who

14   had worked on EDR before 2004 couldn't have seen the

15   '580 patent?

16   A    Yes.

17   Q.   I'd like to turn now, sir, to your relationship

18   with Rembrandt.

19        So you've been hired as a consultant for Rembrandt

20   in this case; isn't that right?

21   A    Yes, it is.

22   Q.   And you've done consulting for Rembrandt before

23   this case, isn't that right, in other matters?

24   A    Yes.  Yes.

25   Q.   Yes.  Mr. Bremer, Rembrandt didn't buy the patents

1   in this case from you; is that right?

2   A.   Yes, that's right.

3   Q.   They bought them from a company called Zhone,

4   correctly -- correct?

5   A.   I don't know.

6   Q.   But was Zhone your former employer?

7   A.   As -- as I testified earlier, I worked for a

8   company called Paradyne and successors and other names,

9   and I can't be sure who or which of those companies sold

10  the patents.

11  Q.   Okay.  So you -- you weren't in -- you weren't an

12  inventor who owned a patent who then came to Rembrandt

13  looking for someone to help you assert your patent

14  rights; is that correct?

15  A.   I was not an owner.

16  Q.   And, in fact, Rembrandt acquired the patents first,

17  and then you -- you began the consulting arrangement

18  that you have with Rembrandt today for this case; isn't

19  that true?

20  A.   Would you repeat that, please?

21  Q.   Rembrandt acquired patents first, and then you

22  began your consulting arrangement for this case with

23  Rembrandt after that; isn't that right?

24  A.   Are you referring to the -- what -- what -- what

25  consulting agreement are you referring to?

```
 1   Q.   Well, you have had several consulting agreements.
 2   I'm talking about the consulting agreement in this case
 3   that relates to your work that's being done in this
 4   case?
 5   A.   Okay.  I understand.  Would you now repeat the
 6   question, please?
 7   Q.   So Rembrandt acquired the patents before the
 8   arrangement with you was worked out for your consulting
 9   arrangement in this case; isn't that true?
10   A.   Yes.
11   Q.   And so far in this case, you've received some
12   upfront payments with respect to your consulting work on
13   this case; is that right?
14   A.   Yes.
15   Q.   Okay.  We saw several payments.  I think it totaled
16   $150,000; is that right?
17   A.   Yes.
18   Q.   And in total, your work with Rembrandt -- you had
19   mentioned in all of your consulting work, you've made
20   about $675,000; is that correct?
21   A.   Yes.
22   Q.   And in addition to the $150,000 that you received
23   with respect to your consulting work in this case so
24   far, you also have an arrangement where you get
25   2-1/2 percent of whatever Rembrandt collects from this
```

1    litigation; isn't that right?

2    A.    Yes, it is.

3    Q.    And the reason you wanted a 2-1/2 percent interest

4    in the outcome of this case, that was because at the

5    time you were negotiating this, you didn't think your

6    billing rate was enough to get you to work with

7    Rembrandt; is that right?

8    A.    No.

9    Q.    You needed something more than just your hourly

10   rate to work on this case; isn't that true?

11   A.    I --

12   Q.    And you wouldn't cooperate with Rembrandt.  I

13   didn't mean to interrupt you.  I'm sorry.

14   A.    No.

15          THE COURT:  Let's move along.  Ask your next

16   question.

17          MR. HADDAD:  Yes, Your Honor.

18   Q.    (By Mr. Haddad) Can you turn to Column -- Page 216

19   in Volume -- let me see what volume it is.  That's

20   Page 216 in Volume 1 of your transcript.

21   A.    Is that the volume --

22   Q.    The thicker one.

23   A.    -- dated 2014/10/16?

24   Q.    Yes, Mr. Bremer.

25   A.    Okay.  What was the page, please?

```
 1   Q.    Page 216.

 2           MR. ALAVI:  Your Honor, I'm going to object to

 3   improper impeachment and ask that counsel not show the

 4   transcript until he's laid the foundation for showing

 5   the transcript to the witness on the ELMO which he's

 6   just put up.

 7           THE COURT:  Overruled.

 8           Let's proceed.

 9   Q.   (By Mr. Haddad) Mr. Bremer, were you asked at your

10   deposition at Page 216 -- Page 216, Line 11, the

11   question was:  So Rembrandt -- so Rembrandt paid you at

12   the beginning of this lawsuit because it wanted your

13   cooperation?

14           And you answered:  Yeah.  I mean, you know, I'm

15   basically retired, whereas I used to consult, as I

16   explained.  I don't have a lot of interest in just

17   getting consulting money anymore on an hourly basis.

18   So, you know, for me to dig in and to help, I needed

19   something more than that.

20           Do you remember that answer?

21   A.   Yes, I do.

22   Q.   So is that why you negotiated a percentage of the

23   outcome of this litigation in order to work with

24   Rembrandt?

25   A.   I had an attorney that negotiated.
```

1    Q.   And did you ask that attorney to negotiate the best

2    deal he could -- he could negotiate, strike the best

3    deal he could negotiate?

4    A.   Yes.

5          MR. ALAVI:  Objection, Your Honor, privilege.

6          MR. HADDAD:  Your Honor, it was the question

7    that was asked at a deposition.  No -- no -- no

8    objection was made.  I have the next question on the

9    same page, Your Honor.

10         THE COURT:  Well, you're not going to go into

11   their discussions.

12         MR. HADDAD:  No, Your Honor.  That's just the

13   question.

14         THE COURT:  All right.  Then I'll overrule the

15   objection.  Restate the question, and the witness will

16   answer it.

17   Q.   (By Mr. Haddad) Mr. Bremer, you hired an attorney

18   to negotiate with Rembrandt; is that correct?

19   A.   Yes, I did.

20   Q.   And you asked him to strike the best deal he could

21   get; isn't that true?

22   A.   Yes.

23   Q.   And, Mr. Bremer, you don't know whether the '580

24   patent covers Bluetooth; is that correct?

25   A.   I -- that's right.  I don't.  I don't know.

1   Q.   And you don't know whether the '228 patent, the

2   other patent in this case, covers Bluetooth; is that

3   correct?

4   A.   That's right.

5   Q.   And you also -- you don't know whether either the

6   '580 or the '228 patents -- you don't know whether they

7   cover the EDR feature of Bluetooth.  Isn't that a fact?

8   A.   I'm not a patent attorney to answer -- answer those

9   questions positively.

10   Q.   Okay.  So the answer is you don't know, correct?

11   A.   I don't know.

12   Q.   Okay.  And the earlier patents that were issued in

13   the chain of patents in this -- that relates to the two

14   patents in this case, the parent applications, you don't

15   know whether those ones -- the '838 patent and the '262

16   patent and the '965 patent, you don't know whether they

17   cover Bluetooth either, do you?

18   A.   No.

19   Q.   All right.  You started in the area of selling

20   patents when you were working for Paradyne; is that

21   true?

22   A.   I analyzed Paradyne's patents and made

23   recommendations.

24   Q.   And then you would, on -- on Paradyne's behalf, you

25   would contact potential buyers of Paradyne's patents;

```
1    isn't that true?

2    A.    I don't recall.

3    Q.    At some point, the company you were working for,

4    Paradyne, it was acquired by Zhone, correct?

5    A.    Yes.

6    Q.    And eventually, you decided to -- to leave Zhone;

7    is that right?

8    A.    Yes.

9    Q.    And at that point, your work wasn't really in

10   technology anymore; your work was more involved with

11   patents; is that correct?

12   A.    Partially.

13   Q.    And --

14   A.    Perhaps you could -- could you divide that into two

15   questions, please?  I believe there were two questions

16   there.

17          THE COURT:  Mr. Bremer, if you don't

18   understand the question, say you don't understand the

19   question.  But you're there to answer questions, not to

20   ask Counsel questions.

21          THE WITNESS:  Okay.  Thank you.  Thank you.

22   A.    Yes, I don't understand the question.

23          THE COURT:  Let's move forward.

24   Q.    (By Mr. Haddad) And after you left Paradyne, you

25   worked for Rembrandt for several years, correct?
```

```
 1    A.    Yes.

 2    Q.    And during those years you were consulting with

 3    Rembrandt, you were investigating whether there were

 4    possible targets to assert patents against; is that

 5    right?

 6    A.    Yes.

 7    Q.    I'd like you to turn to in the -- in the binder,

 8    this -- this thicker white binder, Mr. Bremer, the

 9    document marked DX-1104.

10          MR. HADDAD:  I don't know if we can bring that

11    up on the screen, or should I use the ELMO?

12    Q.    (By Mr. Haddad) Okay.  Figure 8 of that patent,

13    which is several pages in.

14    A     I see it.  Yes.

15    Q.    Thank you, Mr. Bremer.

16          You're aware -- have you seen this patent before?

17    A     Yes, I have.

18    Q.    And this was the continuation-in-part patent where

19    this figure, Figure 8, was added to this -- to this

20    patent application, wasn't it?

21    A     Yes.  Yes, that's true.

22    Q.    And this figure was not in your original patent;

23    isn't that right?

24    A     I believe so.

25    Q.    Do you need to check?
```

```
1        The '838 patent, the first patent that issues,
2   Figure 8 was not in there?
3   A    Let me take a minute.
4   Q.   Sure.
5   A    I want to make sure that I'm correct.
6   Q.   That's in your binder, DX-1103.
7   A    Yes.  It's not in the original patent, you're
8   right.
9   Q.   So Figure 8 was added to this 2003 application,
10  right?
11  A    Yes.
12  Q.   And Figure 8 shows a system -- if you look at the
13  top of Figure 8, it shows a system with a master that
14  speaks both Type A and Type B modulation methods,
15  correct?
16  A    Yes, I see that.
17  Q.   And shows a -- what's labeled as a trib that speaks
18  both Type A and Type B, correct?
19  A    Yes.
20  Q.   And you understand that this figure, Figure 8, was
21  deleted from the '580 patent, the patent that's at issue
22  in this case.
23       You understand that, right?
24  A    I believe so.  My recollection was that it was
25  deleted.
```

```
 1   Q.    Do you need -- if you'd like to check it, it's in
 2   your book.
 3   A     That's not necessary.  I remember.
 4   Q.    Figure 8 was deleted, correct?
 5   A     Yes.
 6   Q.    Figure 8 was deleted, correct?
 7   A     Yes.
 8   Q.    Yes.  And -- and it was a surprise to you to learn
 9   that Figure 8 was -- was added to your patent
10   application back when the application was filed for the
11   '626 patent; isn't that right?
12   A     Would you repeat that question, please?
13   Q.    It was surprising for you to learn that Figure 8
14   was added to your 2003 patent application; isn't that
15   true?
16   A     I don't recall.
17   Q.    If you could turn to -- in your transcript from the
18   same date that we were looking at before, October 16th,
19   2014, Page 242.
20   A     Please -- would you repeat?
21   Q.    I'm sorry.  The bigger transcript.  There are two
22   transcripts, I know.  It's the bigger of the two.
23   October 16, 2014.
24   A     Okay.
25   Q.    I'm sorry.  I got the wrong transcript.  We'll move
```

```
 1   on.
 2        Now, Mr. Bremer, earlier today, we heard Mr. Ward
 3   say and tell the jury that battery life is an important
 4   part of your invention.  There's absolutely nothing in
 5   your patents about battery life, isn't that correct?
 6        The '580 patent or the '228 patent, they don't talk
 7   about battery life, correct?
 8   A    I would have to read -- reread the patents.  I -- I
 9   don't recall.
10   Q.   You don't remember, as you sit here today, whether
11   battery life is mentioned at all in the '580 patent or
12   the '228 patent?
13   A    I don't recall if the exact term "battery life" is
14   in those patents.
15   Q.   And in the slide that you used a little while ago
16   with the attorneys for Rembrandt, you were showing two
17   mobile devices communicating with each other when you
18   were describing modems.
19        Do you remember that?
20   A    Yes, I do.
21   Q.   And in your patents, the '580 patent or the -- and
22   the '228 patent, there's no disclosure of mobile devices
23   in there.
24        That's true, isn't it?
25   A    I don't recall.
```

```
 1   Q.    You don't remember.
 2         Were there any -- any disclosure of mobile phones,
 3   any kind of mobile device in either of your two patents?
 4   A     I don't recall.
 5   Q.    I'd like to just go back to when I asked you the
 6   question about Figure 8 being a surprise.
 7              THE COURT:  Mr. Haddad, don't tell him what
 8   you want to talk about.
 9              MR. HADDAD:  Okay.
10              THE COURT:  Just ask the question.
11   Q.    (By Mr. Haddad) Sir, I'd like you to turn to
12   Page 242 of your transcript from the October 17th
13   transcript of your deposition.
14   A     Please repeat the page.
15   Q.    Page 242.
16   A     I see the page.
17   Q.    Okay.  It's up on your screen now also.  You see
18   the question?
19         It says:  Would it surprise you to learn that
20   Figure 8 was first added -- Figure 8 we've been looking
21   at was first added in 2003?
22         And your answer on October 17th was that:  Yes, I
23   guess it would.
24   A     Well, I need to read the whole thing in context
25   here.
```

1   Q.   Please go ahead.

2   A    Yeah.  So...

3        THE COURT:  Gentlemen, we need to move on.

4   We're not going to wait here all afternoon while you

5   reread the deposition.  Ask your question again and

6   let's give the -- the best answer you can give and let's

7   move on.

8        Counsel, reask your question.

9   Q.   (By Mr. Haddad) Mr. Bremer, were you surprised that

10  Figure 8 was added to your patent application in 2003?

11  A    Well, I'll go from what I said in the deposition

12  was that, yes, I guess it would.

13  Q.   Thank you.

14       I want to go back to some of the testimony you gave

15  a little earlier when counsel for Rembrandt was asking

16  you a few questions.

17       You mentioned --

18       THE COURT:  Mr. Haddad, I just told you don't

19  tell him what you're going to ask him.  Just ask the

20  questions.  You're making sidebar comments in the

21  presence of the jury, and that's not permissible.

22       MR. HADDAD:  I'm sorry, Your Honor.

23       THE COURT:  Okay.  Ask your question.

24  Q.   (By Mr. Haddad) The -- the work that you mentioned

25  earlier today that you did at Honeywell that resulted in

1  a product that was used in the Army, I believe you said,

2  that has nothing to do with the -- with the patents that

3  are at suit today; is that correct?

4  A    Yes.

5  Q.   And the work you did at Paradyne in 1974 that you

6  mentioned in your testimony earlier today, that has

7  nothing to do with the patents-in-suit today; is that

8  correct?

9  A    Yes.

10  Q.   And --

11       THE COURT:  Yes, it does, or yes, it doesn't.

12  What's --

13       MR. HADDAD:  I'm sorry?

14       THE COURT:  What's the answer, Mr. Bremer?

15  A    Please ask the question.

16  Q.   (By Mr. Haddad) Okay.  It's -- isn't it true that

17  the work you did at Paradyne in 1974 that you mentioned

18  earlier today, that work has nothing to do with the

19  patents-in-suit in this case?

20  A    It has nothing to do with the patents-in-suit.

21  Q.   And that patent -- that -- that product that you

22  worked on at Paradyne in 1974, that turned into a

23  product, didn't it?

24  A    Yes, it did.

25  Q.   And the work you did at Honeywell, that turned into

1    a product, didn't it?

2    A    Yes, it did.

3    Q.   But the work you did at Paradyne that led to the

4    patents-in-suit here today, that never led to an actual

5    product that Paradyne put into production; isn't that

6    true?

7    A    Yes, that's true.

8    Q.   So I just want to point out -- if you can turn to

9    the binder at Exhibit PX-007, the binder that your

10   attorneys gave you.

11        This was your tech note that you mentioned earlier

12   today, correct?

13   A    Yes, it is.

14   Q.   All right.  And I highlighted a sentence, you can

15   see in yellow on the screen.  It says:  If patentable,

16   this may offer Paradyne a strong competitive advantage.

17        Do you see that?

18   A    Yes, I do.

19   Q.   And this patent never resulted in a product, so it

20   never resulted in a strong competitive advantage to

21   Paradyne; isn't that true?

22   A    Yes, that's true.

23   Q.   And earlier today, there were a whole list of

24   awards that were put up on the screen that you've

25   received.  Those awards have nothing to do with the

1    patents-in-suit; isn't that right?

2    A    That's right.

3    Q.   And you had mentioned -- you were describing modems

4    to the jury.  You did not invent modems, correct?

5    A    Yes, that's correct.

6    Q.   And there were a few pieces of technology that are

7    mentioned in your patent that you didn't invent.

8         For example, you didn't invent master/slave

9    communications; isn't that true?

10   A    I believe that's true.

11   Q.   And you didn't invent polling, correct?

12   A    That's true.

13   Q.   And you didn't invent multipoint communications;

14   isn't that true?

15   A    That's true.

16   Q.   And you didn't invent any of the modulation methods

17   that are mentioned in your patents, correct?

18   A    I --

19   Q.   I can --

20   A    I guess I'd have to --

21   Q.   I can list them for you.  I'll make it easier.

22   Just to be clear, you didn't invent the QAM modulation

23   method, Q-A-M, correct?

24   A    That's right.

25   Q.   And you didn't invent the FSK modulation method,

```
1    correct?

2    A     Correct.

3    Q.    And you didn't invent DMT modulation; is that

4    correct?

5    A     Yes.

6    Q.    And you didn't invent the other modulations, like

7    PAM modulation, PSK, or PPM; isn't that true?

8    A     Yes.

9              MR. HADDAD:  Thank you, Mr. Bremer.

10             THE COURT:  Do you pass the witness, Counsel?

11             MR. HADDAD:  (No response.)

12             MR. HADDAD:  Do you pass the witness, Counsel?

13             MR. HADDAD:  Yes, Your Honor.

14             THE COURT:  Redirect by the Plaintiff?

15             MR. ALAVI:  No redirect, Your Honor.

16             THE COURT:  All right.  Mr. Bremer, you may

17   step down.

18             THE WITNESS:  Thank you.

19             MR. ALAVI:  And, Your Honor, I believe the

20   witness should leave the exhibits; is that correct?

21   Some of them may be confidential.

22             THE COURT:  He didn't bring them with him, did

23   he?

24             MR. ALAVI:  No, he didn't, Your Honor.

25             THE COURT:  Okay.  Turn them back over to your
```

```
 1    counsel.
 2              THE WITNESS:  I have to leave now, right?
 3              THE COURT:  Does this witness wish to be
 4    excused, or is he to be retained?
 5              MR. ALAVI:  He may be retained in the event
 6    that the other side wants to call him in their case.
 7              THE COURT:  All right.  Then -- then he has
 8    not been excused.
 9              MR. ALAVI:  Thank you, Your Honor.
10              MR. SHERWOOD:  Your Honor, we're not going to
11    call him.
12              MR. ALAVI:  Okay.  Then he can be excused,
13    Your Honor.
14              THE COURT:  Does Defendant object to this
15    witness being excused?
16              MR. SHERWOOD:  No, Your Honor.
17              THE COURT:  Okay.  Mr. Bremer, you have been
18    excused.  You may stay and observe or you may leave.
19    It's up to you.
20              THE WITNESS:  Thank you.
21              THE COURT:  All right.  Counsel, we're going
22    to take a short recess.
23              Ladies and gentlemen, you may leave your
24    notebooks in your chairs.
25              Don't discuss anything about the case.  Take a
```

1   minute to stretch your legs and get a drink of water,

2   and then we'll have you back in here and continue with

3   the next witness.

4              You're excused for recess at this time.

5              COURT SECURITY OFFICER:  All rise for the

6   jury.

7              (Jury out.)

8              THE COURT:  All right.  We stand in recess.

9              I want to see Mr. Smith and Mr. Ward in

10  chambers, please.

11             COURT SECURITY OFFICER:  All rise.

12             (Recess.)

13             COURT SECURITY OFFICER:  All rise.

14             THE COURT:  Be seated, please.

15             MR. SHERWOOD:   Your Honor, may I ask one

16  question?

17             THE COURT:  What's that, Mr. Sherwood?

18             MR. SHERWOOD:  Is it the rule of the Court

19  that while a witness's testimony is pending, nobody

20  speaks to the witness with respect to the testimony?  Is

21  that the rule of this Court, is what I'm asking.

22             THE COURT:  No, that's not the rule of the

23  Court.

24             MR. SHERWOOD:  I see.  Okay.

25             THE COURT:  Can you give me a specific context

```
 1    you're concerned about?
 2            MR. SHERWOOD:  Well, I'm not concerned about
 3    anything.  I just want to understand the practice.  So
 4    if the witness's testimony starts on day one but doesn't
 5    conclude and --
 6            THE COURT:  He's not sequestered overnight.
 7            MR. SHERWOOD:  I see.  Thank you, Your Honor.
 8            THE COURT:  All right.  All right.  Let's
 9    bring in the jury, please.
10            COURT SECURITY OFFICER:  All rise for the
11    jury.
12            (Jury in.)
13            THE COURT:  Please be seated.
14            Plaintiffs, call your next witness.
15            MR. ENGER:  Your Honor, the Plaintiffs call
16    Dr. Robert Morrow.
17            THE COURT:  All right.  Dr. Morrow, you've
18    been sworn?
19            THE WITNESS:  Yes, sir, I have.
20            THE COURT:  Please come around and have a
21    seat.
22            All right.  Counsel, you may proceed.
23    ROBERT "BOB" MORROW, JR., Ph.D., PLAINTIFF'S WITNESS,
24                    PREVIOUSLY SWORN
25                  DIRECT EXAMINATION
```

 1   <u>BY MR. ENGER</u>:

 2   Q.   Good afternoon.

 3        Could you please tell the jury your name?

 4   A.   My name is Dr. Robert Kendall Morrow, Jr., but I go

 5   by Bob.

 6   Q.   Dr. Morrow, have you been hired by Rembrandt to be

 7   an expert in this case?

 8   A.   I have.

 9   Q.   And have you prepared a presentation to assist you

10   with your testimony today?

11   A.   Yes, I have.  I've prepared a number of slides to

12   help me testify.

13   Q.   Dr. Morrow, what technologies does this -- does

14   this case involve?

15   A.   This case involves Bluetooth technology.

16   Q.   And what experience do you have with Bluetooth?

17   A.   Well, as you can see on the slide, I've got over

18   15 years' experience with it.  I was actually working

19   with it just after it came out in 1999.

20        I've written two books.  One is called <u>Bluetooth:</u>

21   <u>Operation and Use</u>, so it's devoted exclusively to

22   Bluetooth.  And then a second book, <u>Wireless Network</u>

23   <u>Coexistence</u>, which has major sections of Bluetooth in

24   it.

25   Q.   Dr. Morrow --

```
 1              MR. ENGER:  Permission to approach the -- the
 2   witness, Your Honor?
 3              THE COURT:  Yes.
 4   Q.  (By Mr. Enger) Are those the two books that you've
 5   written on Bluetooth, Dr. Morrow?
 6   A.   Yes, they are.  These are the two books.
 7   Q.   And what's the title of the first one?
 8   A.   The title of the first one is Bluetooth:  Operation
 9   and Use.
10   Q.   And how many pages are in that book?
11   A.   There's 567 pages in this one.
12   Q.   And your other book also deals with Bluetooth?
13   A.   The other book has Bluetooth in it -- it's called
14   Wireless Network Coexistence.
15   Q.   Dr. Morrow, tell us about some of the other
16   Bluetooth experience that you have.
17   A.   Well, some of the other experience I have, I've
18   taught courses on Bluetooth to commercial and government
19   clients over the years.
20        You know, engineers really need to understand the
21   latest technology, so I have some classes that are two
22   to five days in length and teach these people the newest
23   and latest and greatest that's out there.
24        I also consult for companies like Broadcom, IBM,
25   Ford, Motorola, and Toyota.
```

1    Q.    Dr. Morrow, with that background in mind, tell us a

2    little bit about where you're from.

3    A.    Well, I -- I grew up in Southern California right

4    near Disneyland.  I actually watched it being built.

5    During the years, I've lived all over the United States,

6    including Lubbock and San Antonio, and I've lived in

7    Indiana, back to California, Colorado, and Mississippi.

8    Q.    And where do you live now, sir?

9    A.    I live now on a small farm in East Central Indiana.

10   Q.    Are you married?

11   A.    I am.

12   Q.    How long have you been married?

13   A.    Almost 35 years.

14   Q.    Do you have any children?

15   A.    I have one daughter, who's now grown.

16   Q.    What education have you had since high school?

17   A.    Well, since high school, I -- I graduated with a

18   bachelor's in electrical engineering from the U.S. Air

19   Force Academy with honors in 1974.

20        1982, I graduated from Stanford University with a

21   master's degree in electrical engineering.

22        And in 1988, I graduated from Purdue University

23   with a Ph.D. degree in electrical engineering.

24   Q.    What was the technical focus of your studies?

25   A.    My studies focused technically on wireless

1    communications.

2    Q.    And when did you first express interest in these

3    wireless communications?

4    A.    Oh, just about as long as I can remember.  I think

5    my interest really started to solidify when I was in Boy

6    Scouts.  We used to use those little walkie-talkies.

7    You probably remember those.  Oh, I loved those things.

8    Q.    Dr. Morrow, what do we see here?

9    A.    Oh, in the upper left, that gray box you see with

10   that big telephone hanging out of it, that's a wireless

11   transceiver, a transmitter/receiver that I built when I

12   was about 15.

13          In the box on the lower right, that's a little

14   thing.  You can see the pencil and put it in

15   perspective.  That thing has two wireless transmitters

16   in it.  I also built that when I was about 15.

17   Q.    Dr. Morrow, what did you do after college?

18   A.    Well, after I graduated from the United States Air

19   Force Academy, I entered the Air Force as an officer,

20   and I was an instructor pilot and an electrical

21   engineering professor and administrator.

22   Q.    And what do we see here?

23   A.    Yeah.  That -- that brings back some memories.

24   That is one of the Air Force airplanes I flew at the

25   Air Force Academy.

```
 1        I had the best of both worlds there.  I could fly
 2   that airplane -- that happy guy was me, by the way.  I
 3   could fly that airplane in the morning, and then in the
 4   afternoon, I could go up and teach electrical
 5   engineering at the university level.
 6   Q.    Well, tell us about that work that you did as an
 7   electrical engineering professor.
 8   A.    Well, as an electrical engineering professor, I
 9   first started at the U.S. Air Force Academy in 1982,
10   shortly after getting a master's degree.
11        I was promoted to chief of the Computer Engineering
12   Division in the Department of Electrical Engineering at
13   the academy in 1988.
14        I was promoted again to be the Director of Research
15   in 1990.  As Director of Research, I managed the
16   research programs of about 700 students and faculty at
17   the Air Force Academy.
18        And then I was promoted to be the Deputy Head of
19   the Electrical Engineering Department at the Air Force
20   Institute of Technology in 1992.  That was the largest
21   department at the Air Force graduate school at the time.
22   Q.    Have you been awarded any patents for the work that
23   you did while in the military?
24   A.    Well, I have.  I've been awarded a patent in
25   spread-spectrum packet radio, which is similar to the
```

1  technology in Bluetooth.

2  Q.   Have you received any other awards for your

3  service?

4  A.   Well, one award I received -- I guess it's

5  multiple -- is three meritorious service medals,

6  specialized Air Force medal for performance of duty, and

7  two commendations medals at the United States Air Force.

8  And finally, I was -- I was selected as officer of the

9  year.

10 Q.   Dr. Morrow, are you still in the military today?

11 A.   I'm not.  I actually retired in 1994.

12 Q.   And what was your rank at the time?

13 A.   My rank was lieutenant colonel.

14 Q.   What do you do now?

15 A.   Well, now I'm president of a company called Morrow

16 Technical Services that I started right after I retired

17 from the Air Force.

18 Q.   Give us a preview of some of the work that you do

19 at Morrow Technical Services.

20 A.   Well, I would say probably the most prominent work

21 I do is I teach those wireless courses I talked about in

22 the past, those two- to five-day courses that bring

23 engineers up to speed on the latest technology.

24      I also write books, papers, and articles.  A little

25 bit of an odd thing, I'm a manufacturer, designer, and

1    seller of optical collimation tools for astronomy

2    telescopes.  Sort of been a hobby of mine for years.

3         And then finally, I also participate as an expert

4    witness in cases like this today.

5    Q.   Dr. Morrow, back to the first point, the teacher of

6    the wireless courses.  You mentioned that some of those

7    relate to Bluetooth.  Do any of them relate to Bluetooth

8    EDR?

9    A.   Well, absolutely.  Ever since Bluetooth EDR came

10   out in 2004, I've put that important technology into my

11   classes.

12   Q.   And how many papers and articles have you written?

13   A.   About 40 altogether.  Some of them have been

14   published in the Institute of Electrical and Electronics

15   Engineers, which is a -- a rather prestigious society.

16   They're called IEEE, for short, IEEE.

17   Q.   Are you a member of any professional organizations?

18   A.   Well, I am.  I'm a senior member of the IEEE.

19        I'm also life members of the Armed Forces

20   Communications and Electronics Association.  Military

21   always has abbreviations for everything.  That's called

22   AFCEA.

23        And I'm also a lifetime member of Air Force

24   Association.

25   Q.   Dr. Morrow, are you an expert in electrical

1  engineering field of communication networks, and in

2  particular, Bluetooth?

3  A.   Yes, I am.

4       MR. ENGER:  Your Honor, I offer Dr. Morrow as

5  an expert in the areas of communication networks and

6  Bluetooth.

7       THE COURT:  Is there objection?

8       MR. SHERWOOD:  No, Your Honor.

9       THE COURT:  All right.  He'll be accepted as

10  an expert witness.

11      Proceed, Counsel.

12  Q.   (By Mr. Enger) Dr. Morrow, what has been the scope

13  of your activities as an expert in this case?

14  A.   Well, I was asked to analyze the asserted patent

15  claims and then take Samsung products and analyze the

16  products with respect to the claims and then determine

17  whether or not I thought there was infringement.

18  Q.   And what conclusion did you reach about

19  infringement?

20  A.   The conclusion I reached is that Samsung, indeed,

21  infringes upon the patents-in-suit.

22  Q.   What are the asserted claims for Mr. Bremer's

23  patents in this lawsuit?

24  A.   Well, the '580 patent, which we've already seen,

25  the asserted claims are Claims 2 and 59.  In the '228

1    patent, the asserted claim is Claim 21.

2    Q.    And what are the model numbers of Samsung's

3    infringing products?

4    A.    I apologize for how busy this slide is.  There are

5    a lot of products on the slide, over 400 altogether.

6    They range from computers to televisions to tablets to

7    cell phones to wireless speakers, cameras, and headsets.

8    Q.    Dr. Morrow, where did you get this listing of

9    infringing products?

10   A.    This list was actually provided by Samsung in

11   response to questions asked by the attorneys.

12   Q.    And that was Plaintiff's Exhibit 69?

13   A    Yes, it is.

14   Q.    What evidence did you look at to determine that

15   Samsung's products infringe?

16   A    I looked at quite a bit of evidence.  The first on

17   the list is I looked at the Bluetooth specification.

18   Q.    Dr. Morrow, what is a Bluetooth specification?

19   A    A Bluetooth specification is a big document.  I

20   think someone's already held one up.  It's a big thick

21   thing, over 1200 pages in one of the specifications, and

22   that explains precisely how Bluetooth works.

23   Q.    Dr. Morrow --

24        MR. ENGER:  I'm sorry.  Your Honor, permission

25   to approach the witness with the first exhibits, the

1   Bluetooth specifications?

2          THE COURT:  You may approach the witness.

3          MR. ENGER:  Mr. Larson, please, Box 1.

4          MR. LARSON:  Your Honor, may I approach?

5          THE COURT:  You may.

6   Q.   (By Mr. Enger) Dr. Morrow, could you please look in

7   that first box and tell us if you see any of the

8   Bluetooth specifications that you just discussed?

9   A    Sure.

10         Yes.  In this box, I see four of the Bluetooth

11  specifications that we just discussed.

12  Q.   And with respect to your infringement analysis, do

13  any of those Bluetooth specifications differ in any

14  material way?

15  A    With respect to infringement analysis, no, they

16  don't.

17  Q.   All right.

18         MR. ENGER:  Permission to approach and bring

19  up the second box, Your Honor?

20         MR. SHERWOOD:  Your Honor, may we know what

21  exhibit numbers these are?

22         MR. ENGER:  Plaintiff's Exhibits 1 through 2,

23  23 through 24, I believe.

24         THE COURT:  All right.  Bring the second box

25  forward.

```
 1                Counsel, approach the bench.
 2                (Bench conference.)
 3                MR. ENGER:  Yes, Your Honor.
 4                THE COURT:  Wait until both sides get here.
 5                All right.  Do y'all have questions about what
 6      we're doing?  We don't need to be asking questions in
 7      front of the jury.  Can you identify what's in each box
 8      with specificity?
 9                MR. ENGER:  I will, yes, Your Honor.  Is this
10      the approach you want me to follow getting these into
11      evidence?
12                THE COURT:  Well, I wanted to -- I don't want
13      Mr. Sherwood to stand up and ask.
14                MR. SHERWOOD:  He said they were all the same,
15      and I don't know what he's talking about.
16                THE COURT:  The purpose of this exercise is to
17      get the record clear, so try to be as specific as you
18      can.
19                MR. ENGER:  I understand.  Thank you, Your
20      Honor.
21                THE COURT:  All right.  Let's proceed.
22                (Bench conference concluded.)
23                THE COURT:  All right.  Mr. Enger, you may
24      proceed.
25                MR. ENGER:  Do we have the second box
```

1   available?

2   Q.   (By Mr. Enger) Dr. Morrow, what do you see in the

3   second box of documents?

4   A    The second box are additional Bluetooth

5   specifications, plus some of the documents called PICS.

6   Q.   And what are the Plaintiff's exhibits of that box,

7   please?

8   A    Looks like we have Plaintiff's Exhibit 26, Parts --

9   Q.   Part 2, and in Plaintiff's Exhibit 27, Part 1 and

10  2?

11  A    That's correct.

12  Q.   Okay.  Thank you, Dr. Morrow.

13       I'd like to ask you now about the next piece --

14  pieces of evidence that you considered in forming your

15  opinions.  What other evidence did you consider?

16  A    Well, another piece of evidence I considered were

17  called Bluetooth Protocol Implementation Conformance

18  Statements, long word.  We just call it PICS for short.

19  You've heard that term before as well.

20       Those are documents that Samsung fills out on every

21  product they make that conforms to Bluetooth, and they

22  assert that various parts of the Bluetooth

23  specifications have been upheld by the products.

24  Q.   Dr. Morrow, do you see any of the Bluetooth

25  Protocol Implementation Conformance Statements in Box 2?

```
 1   A     I do.
 2   Q.    And what are those Plaintiff's Exhibits?  350
 3   through 357, correct?
 4   A     Let's see.  We have some interrogatories here.  Let
 5   me just check.
 6         We start with Plaintiff's Exhibit 42.
 7   Q.    Dr. Morrow, do you see Plaintiff's Exhibit 350 to
 8   357?
 9   A     Here we go.  Yes.  Yes, I do.
10   Q.    All right.  Are there any other -- besides 350 to
11   357, are there Bluetooth PICS that you looked at?
12   A     Yes.  In fact, the Plaintiff's exhibits go all the
13   way up to 664.  That's a lot of documentation.
14   Q.    You looked at all the Bluetooth Protocol
15   Implementation Conformance Statements, PICS, from
16   Plaintiff's Exhibit 350 to 664?
17   A     I did.
18   Q.    And was there any material differences with respect
19   to your infringement opinions with respect to those
20   exhibits?
21   A     No.
22   Q.    All right.  Dr. Morrow, what other evidence did you
23   consider?
24   A     I also considered the evidence from my Bluetooth
25   test results.
```

```
 1   Q.    Explain to us what your Bluetooth test results are.
 2   A     Well, this is something I always enjoyed where you
 3   actually get to get in the lab and make things happen.
 4         I worked with a Bluetooth test facility, and we set
 5   up testing to see if the Samsung products actually did
 6   by turning them on and making them work, if they
 7   actually did what they were supposed to do regarding
 8   Bluetooth.
 9   Q.    What other categories of evidence did you consider,
10   Dr. Morrow?
11   A     I also looked at something called source code.
12   Q.    What is source code?
13   A     Source code is the computer instructions that
14   actually run that little Bluetooth chip inside the
15   Samsung product.
16   Q.    And tell us about other evidence that you
17   considered.
18   A     Well, I looked at product documentation.  This
19   documentation comes from various -- various products
20   that have instruction manuals, how they work, and I
21   looked at several of those as well.
22   Q.    And is the source code and product documentation
23   that you considered Plaintiff's Exhibits 665 through
24   751, 756 through -77, 779 through 806, 809 through 813,
25   815 through 819, and 822 through 825?
```

1    A    That is correct.

2    Q.    What other kind of evidence did you consider?

3    A    I also considered deposition testimony.  You've

4    heard some of that testimony already, but I read

5    deposition testimony from some Samsung employees that

6    were asked questions about how their products

7    implemented Bluetooth.

8    Q.    What other evidence did you consider?

9    A    I also looked at Samsung's discovery responses.

10   Those are responses to written questions that the

11   attorneys provided to Samsung.  Samsung responds to

12   those also in writing, and I read those.

13        And I also looked at Samsung's internal documents.

14   Those are documents within the company that they

15   generate lots and lots of documentation about these

16   products.

17   Q.    And was the discovery responses you reviewed and --

18   and relied upon Plaintiff's Exhibits 42 through 43, 45,

19   63, 68 through 69, and 72?

20   A    That's correct.

21   Q.    And the internal documents you relied upon are

22   Plaintiff's Exhibits 73, 78 through 79, and 238?

23   A    Correct.

24   Q.    Dr. Morrow, was -- this evidence that you

25   considered, was it enough to show you that Samsung's

1    products infringe?

2    A      It was more than enough.  Actually, I had

3    everything I needed to -- to come to that conclusion.

4    Q.     Do you have any unanswered questions today about

5    whether Samsung's products infringe?

6    A      Not at all.

7    Q.     Generally speaking, what are Mr. Bremer's patents

8    about?

9    A      Well, Mr. Bremer's patents, the '580 and the '228,

10   are there to make communication devices work better,

11   faster, and cheaper.

12   Q.     And how do Mr. Bremer's patents do that?

13   A      They do it by seamless communication using

14   different types of modulation.

15   Q.     Now, you just used some words that I expect are

16   foreign to us.  What are communication devices?

17   A      Well, communication devices are just devices that

18   send or receive information.  That's all it is.

19   Q.     What do we see here, Dr. Morrow?

20   A      So what we see here is the phone on the left is

21   sending information across some kind of communication

22   path to the headset on the right.

23   Q.     How do communication devices send and receive

24   information?

25   A      Well, you've heard the term "modem" before.

1    Remember, that was modulator/demodulator.  So these

2    communication devices all have these little modems

3    inside that perform that communication that make it

4    happen.

5    Q.    And tell us what we see here, Dr. Morrow.

6    A    Well, what I see is some information coming from

7    the cell phone on the left, entering a modem.  The modem

8    turns that into a modulated wave that then goes into the

9    modem on the right.  The modem on the right demodulates

10   that information and in it goes to the headset.

11   Q.    Is there just one type of modulation?

12   A    No.  There are actually several different types of

13   modulation.

14   Q.    Do you have any analogies that would help us better

15   understand the types of modulation?

16   A.    Well, you've seen this before, and that's the

17   language analogy.  Types of modulation are like speaking

18   different types of language.

19        For example, here are two people speaking English.

20   How are you?  I am fine.

21        So what we do is we take a type of language and

22   kind of match it.  It's sort of a matching game, just

23   for an analogy, to a type of modulation.

24        So in this case, if you look underneath, you'll see

25   there are some blue squiggly lines.  That's one type of

1   modulation that we'll just call English by analogy.

2   Q.   What do we see here, Dr. Morrow?

3   A.   Well, here we see two people speaking Chinese, a

4   different type of language, which we represent by the

5   Chinese flag.  At the bottom, you'll see a different

6   type of modulation represented also by the Chinese flag,

7   holding up our language analogy.

8   Q.   And what are some examples of different types of

9   modulation that we may be familiar with?

10  A.   You've heard this before, the AM and FM radio.

11  Well, an AM radio, for example, takes a wave, and

12  depending upon the information, it changes the amplitude

13  of the wave, which is just the height.

14       So, for example, if the information is low, which

15  is 000, the wave is sort of short.  And if the

16  information is high, 111, the wave is tall.  So the wave

17  changes with respect to the information.

18       FM works differently.  If you notice here, the

19  waves all stay the same height, but instead, we're

20  changing the frequency, which is the distance between

21  the peaks of the signal.

22       So we see when the information is low, the peaks

23  kind of spread out, the frequency drops.  As the

24  information is high, the wave gets squished together, so

25  the frequency is higher.

1   Q.   Well, why do we have different types of modulation?

2   A.   Well, the different types of modulation give an

3   engineer a chance to pick a type that works best in the

4   application that that engineer is working on.  So, for

5   example, using our AM/FM analogy, you can see the

6   balance going.

7        An engineer might pick AM because it's cheap, but

8   you probably remember, if you turn your AM radio on,

9   it's sort of noisy sometimes.  So that's why you hear

10  voice on AM radio a lot more than music.

11       On the other hand, FM is a little more expensive,

12  but FM is much clearer when it comes to music and why

13  most of the music is on the FM band.

14            THE COURT:  Dr. Morrow, could you slow down

15  just a little bit?

16            THE WITNESS:  Yes, Your Honor.

17            THE COURT:  You're speaking a little bit fast.

18            THE WITNESS:  I'm excited.

19            THE COURT:  Well, try to slow down.

20            Go ahead, Counsel.

21            THE WITNESS:  I will.

22  Q.   (By Mr. Enger) Before Mr. Bremer'S patents, how did

23  communication devices use modulation to send and receive

24  information on a network?

25  A.   Before Mr. Bremer's patents came along, devices

1  used only one type of modulation, as shown in the slide.

2  Q.    And what do we see here, Dr. Morrow?  Is this

3  Figure 1 from the patents?

4  A.    Yes.  This is Figure 1 prior art.  This is how

5  things had been done.  We see a master transceiver on

6  the left connected to three tributary transceivers on

7  the network.

8  Q.    What types of modulation did they use?

9  A.    Well, here, by analogy, we're showing only AM,

10  amplitude modulation, on this network, which we pick as

11  our one type of modulation.

12  Q.    What were the drawbacks to these early

13  communication systems that could only use one type of

14  modulation?

15  A.    There were three major drawbacks here.  The first

16  is that one type of modulation is inefficient.

17      For example, if a new modulation type came along

18  that was better and the device could talk in that

19  modulation type, it couldn't enter this network because

20  this network only used one type of modulation.

21      The second problem is that the network is costly to

22  upgrade.  So if a device had a new type of modulation

23  that worked better, all of the devices on the network

24  had to be replaced in order to make the network operate

25  properly.

```
1              And then third, this network was not backwards

2     compatible, and that meant that a new device with a new

3     type of modulation couldn't just enter the network and

4     begin speaking the language that the network had to use.

5              MR. SHERWOOD:  Your Honor, I -- I just would

6     like to say I think this witness is testifying on to the

7     validity issues of the case, and it's fine up to this

8     point, but we need to focus on infringement.

9              THE COURT:  Well, Counsel, if you have an

10    objection to make, make an objection, but observations

11    from counsel table aren't appropriate or welcome.  If

12    you're -- if you're objecting to his testimony, give me

13    a legal basis.  If not --

14              MR. SHERWOOD:  I am objecting to the witness

15    testifying about prior art because he's been proffered

16    as an infringement expert, not as a validity expert.

17              MR. ENGER:  Your Honor, he's an infringement

18    expert.  We're just talking about the backgrounds of the

19    invention.  We're moving on.

20              THE COURT:  All right.  I'll overrule the

21    objection.  Let's move on.

22              Counsel, lodge your objections in the form

23    of -- of an objection based on a legal theory, not a

24    statement from counsel table.

25              MR. SHERWOOD:  Thank you, Your Honor.
```

```
 1              THE COURT:  All right.  Proceed, counsel.
 2   Q.   (By Mr. Enger) How did Mr. Bremer's patents improve
 3   on those early communication systems that used only a
 4   single common type of modulation?
 5   A.   Well, Mr. Bremer's patents, as you can see on the
 6   screen --
 7              MR. SHERWOOD:  Your Honor, I object.  It's the
 8   same question.  It's the same subject matter that I just
 9   objected to, an improvement over the prior art.  That's
10   what the question is.
11              MR. ENGER:  Your Honor, I respectfully
12   disagree.  This is setting the context of the invention,
13   and we're about to explain exactly what the invention
14   is.
15              THE COURT:  Well, I'm going to overrule the
16   objection.  The witness can answer the question.
17   A.   Okay.  Would you please repeat the question?
18   Q.   (By Mr. Enger) The question was how do Mr. Bremer's
19   patents improve on the early communication systems that
20   used only a single common type of modulation?
21   A.   Mr. Bremer's invention improves upon that single
22   common type of modulation by providing seamless
23   communications using different types of modulation.
24   Q.   And what does Figure 4 of Mr. Bremer's patent show?
25   A.   Figure 4 looks a lot like Figure 1.  It shows a
```

1  master transceiver on the left and three tributary

2  transceivers connected to a network.

3  Q.   Why are some of the figures labeled Type A and

4  others Type B?

5  A.   This is the difference.  Some tributary

6  transceivers, the two at the top with a blue

7  highlighting, speak primarily Type A modulation.  The

8  tributary transceiver at the bottom with the red

9  highlighting speaks primarily Type B modulation.

10  Q.   What do we see here, Dr. Morrow?

11  A.   What we see is our different types of modulations

12  shown here as AM and FM, both existing together on this

13  network.

14  Q.   And what are the advantages to Mr. Bremer's

15  invention?

16  A.   Well, the advantages actually address each one of

17  the disadvantages we saw earlier.  For example, this is

18  an efficient way of connecting devices.

19       Now, if a new modulation method or a new modulation

20  type comes along that's better and more efficient, a

21  device can begin using that right away.

22       It's less costly because the new device can enter

23  the network and begin operating on the network without

24  having to upgrade all the old devices.  And likewise,

25  it's backwards compatible because the new device can

```
 1   talk with all the old devices immediately.
 2   Q.    How did Dr. -- did Mr. Bremer's patents teach to
 3   achieve this seamless communication using different
 4   types of modulation?
 5   A.    Well, Mr. Bremer's patents teach that there are two
 6   types of messages on this network, and we label those
 7   Message 170 and Message 172.
 8   Q.    Dr. Morrow, what figure is this from?
 9   A.    This is Figure 8 from Mr. Bremer's patents.
10   Q.    What are messages?
11   A.    Messages are just pieces of information that are
12   sent from one device to another.  For example, here we
13   see Message 170 proceeding from the phone to the
14   headphones, and we see Message 172 proceeding from the
15   phone to the headset.
16   Q.    Returning back to Figure 8, why are there lines
17   drawn within these messages?
18   A.    Those lines designate different parts of a message.
19         For example, the green box is around something
20   called a first sequence.  We just name it something, the
21   first sequence.  The blue box is around the second
22   sequence of the message.  And then something called the
23   trailing sequence is surrounded by the red box.
24   Q.    And why are some of the different parts of the
25   sequences labeled Type A modulation and Type B
```

1    modulation?

2    A.    You can see at the top, Message 170 uses only

3    Type A modulation throughout, but at the bottom,

4    Message 172 begins with Type A modulation and then

5    proceeds with Type B modulation.

6    Q.    And are these the same types of modulations we

7    discussed earlier like, for example, with AM and FM

8    radio?

9    A.    Yes.   In fact, I show AM at the top and FM at the

10   bottom as examples of different types.

11   Q.    Now, Dr. Morrow, whenever a device receives one of

12   these messages, how does it know whether it's a message

13   like the top one or a message like the bottom one?

14   A.    That's an important problem because if a receiver

15   makes a wrong choice, then it won't receive the second

16   sequence.

17        So what happens is something in the first sequence

18   has to indicate a modulation change from Type A to

19   Type B in the second sequence.

20   Q.    And what do we see here in Figure 8?

21   A.    Well, we see in Figure 8 a notification of change

22   to Type B modulation exists in the first sequence of

23   Message 172.

24   Q.    Dr. Morrow, what do we see here?

25   A     We see a lot of words on the left.   This is

1   actually Claim 59.  It says 58 at the top, but we'll

2   talk about that later.  This is Claim 59 of the '580

3   patent.

4        And then on the right, we see our figure we just

5   examined, and one thing we can do is play a matching

6   game.  We can match the words in the claim with the

7   pieces of the figure.

8   Q.   What do we see here?

9   A    So, for example, a communication device is aimed at

10  the master transceiver.  That's the one we focus on.

11       Second, the master transceiver is capable of

12  transmitting at least two types of modulation methods,

13  and those are labeled Type A and Type B in the figure.

14       Third, the messages can be transmitted, and there's

15  our messages again, 170 and 172.  And each message has,

16  like the words say, a first sequence and a second

17  sequence.

18       And then there's -- there is at least an indication

19  of which of the first modulation method and the second

20  modulation method is used for modulating the second

21  sequence.

22       A lot of words, but the picture shows something in

23  the first sequence indicates a notification of a change

24  to Type B modulation.

25  Q.   Dr. Morrow, what does a person of ordinary skill in

1   the art look like in 1997 at the time of Mr. Bremer's

2   invention?

3   A    Well, in 1997, I felt a person of ordinary skill in

4   the art had a bachelor's degree in electrical

5   engineering, including communication and networking

6   classes, and had two years of work experience in

7   communication.

8   Q.   1997, were you such a person of ordinary skill?

9   A    Yes.  In 1997, I had a doctorate degree in

10  electrical engineering and several years' experience in

11  communications.

12  Q.   Dr. Morrow, let's talk about Samsung's products.

13  What is it about them that makes them infringe?

14  A    The thing about Samsung's products that makes them

15  infringe is they have Bluetooth inside them,

16  specifically Bluetooth Enhanced Data Rate, or EDR.

17  Q.   And what is Bluetooth?

18  A    Bluetooth is just a short-range wireless

19  communication technology in which two devices, two

20  communicating devices, can talk to each other.

21  Q.   What is Bluetooth used for?  What are some common

22  applications?

23  A    Probably the most common application that many of

24  you are familiar with, you've probably seen someone

25  walking along that looked like he was talking to

1    himself.  Well, it turns out that person probably had a

2    Bluetooth headset on and was actually on the phone.  It

3    shocked me the first time I saw it.

4         Anyway, that's -- a major application of Bluetooth

5    is connecting a cell phone to something called a headset

6    or earpiece.

7         Another application is hands-free.  Many states are

8    passing hands-free laws now.  Connecting your cell phone

9    into your car audio system is also done over Bluetooth.

10   Q.   Well, how does Bluetooth communicate data?

11   A    Well, Bluetooth devices have inside tiny modems,

12   modulator/demodulators.

13   Q.   Dr. Morrow, when was Bluetooth first introduced?

14   A    As seen on this chart, Bluetooth was first

15   introduced with specification 1.0 in 1999.

16   Q.   Were there subsequent versions of Bluetooth after

17   Version 1.0?

18   A    There were actually.  Subsequent versions were

19   released every couple of years all the way up to 4.2,

20   which came out just last year.

21   Q.   And which have these Bluetooth versions relate to

22   Mr. Bremer's invention?

23   A    Mr. Bremer's invention is Version 2.0 and later.

24   Q.   And remind us of when Mr. Bremer invented his

25   invention.

1    A      His invention was invented in 1997.

2    Q.     Now, how has EDR changed between when it was first

3    introduced in 2004 until the present?

4    A      There are no changes.  EDR's implemented the same

5    way all the way throughout.

6    Q.     And how does EDR change, if it's used by different

7    products, for example, cell phones or tablets or

8    computers?

9    A      EDR is used the same way or implemented the same

10   way in all the products.

11   Q.     Well, tell us what is enhanced data rate?

12   A      Well, at the top, we have a Bluetooth device with

13   no EDR.  That little B in the -- in the circle, that's

14   equivalent to the family sedan.  It's sort of a slow

15   vehicle.

16          But when EDR came along, which is our lower

17   diagram, that's equivalent to a race car.  So EDR simply

18   increased the speed in which Bluetooth could

19   communicate.

20   Q.     And why does EDR transfer data so much faster?

21   A      It does so by using two different types of

22   modulations.

23   Q.     What are those two types?

24   A      The two types of modulations are called GFSK.  The

25   F stands for frequency, so that's a frequency

1   modulation.  And there's a DPSK modulation method, and

2   that is -- with a P in it that stands for phase; that's

3   phase modulation.  We'll sort of talk about what those

4   are later.

5   Q.   Dr. Morrow, let me show you Defendants'

6   Exhibit 1043.  What is this document?

7   A    This document was released by the Bluetooth Special

8   Interest Group, and it's called the Bluetooth Technology

9   Roadmap.

10  Q.   What are the advantages of Bluetooth EDR?

11  A    Well, according to this document, devices

12  implementing the EDR features take advantage of several

13  things.

14       First is the data rate is increased up to three

15  times the previous level.  Reduced power consumption

16  resulting in increased battery life is another example.

17  Improved Bluetooth experience by running multiple

18  Bluetooth devices simultaneously and transferring large

19  files a lot quicker.

20       And then there are improved use cases.  That's you

21  and I that use -- or you and me that use these Bluetooth

22  devices, including streaming audio, digital image

23  transfer, laser printing -- a lot more convenient for

24  us.

25       And then very important is Bluetooth 2.0+EDR allows

the devices to be backwards-compatible.  They'll still

work with the older Bluetooth devices.

Q.   Let me show you Plaintiff's Exhibit 238,

Dr. Morrow.  What is this exhibit?

A    This is one of the Samsung internal documents

that's called Enhanced Data Rate Applications.

Q.   What did Samsung say were the three key advantages

of EDR?

A    Well, these actually mirror a little bit what we

saw before.  They say there's a 3X increase, 3 times

increase in usable payload data rate.  They said for a

given amount of data transfer, the radio needs to be on

for less time.  There's your key for using less power.

     And then additional bandwidth enables multiple-use

scenarios.  So there's more flexibility here.

Q.   Samsung did not implement EDR.  Would its customers

get all those same key advantages?

A    No.  Those are EDR advantages as listed.

Q.   Dr. Morrow, let me show you Plaintiff's Exhibit 23.

What do we see here?

A    Now, this is the specification of the Bluetooth

system, at least the cover page.  The specification

itself is 1200 pages.  This is the core version for

2.0+EDR.

Q.   What do we see here on the page labeled SAM 99669?

```
 1   A     These are the two main packets used in Bluetooth.
 2   Q.    And let me blow them up for you.
 3         Dr. Morrow, tell us about these two messages.
 4   A     There are two messages that you can see.  At the
 5   top, there's a message called the basic rate packet.
 6   And at the bottom, we see a message called the enhanced
 7   data rate, or EDR, packet.
 8   Q.    Tell us about the structures of these messages.
 9   A     Well, we can see in each of the two messages
10   there's a first sequence that contains the access code
11   and the header followed by a payload, which is called
12   the second sequence.
13   Q.    And what types of modulation methods do the first
14   sequences use?
15   A     The first sequence in both packets, both messages,
16   use GFSK.  That's frequency modulation, and we
17   designated that with -- with the English flag.
18   Q.    What types of modulation do the second sequences
19   use?
20   A     Well, that depends upon the message.  At the top,
21   the second sequence also uses GFSK, our English analogy.
22   So both modulation methods are the same there.
23         At the bottom, we have a change in modulation to
24   DPSK, or phase modulation, for the second sequence.
25   Q.    Well, how do these Bluetooth messages compare to
```

1    the messages from Mr. Bremer's patents?

2    A    Well, they're -- they're very similar as you can

3    see on the screen.  What I've done is I've put message

4    170 for Mr. Bremer's patent alongside the Bluetooth

5    basic rate packet, and message 172 from Mr. Bremer's

6    patent alongside the Bluetooth EDR packet.

7    Q.   And how do the structures and modulation methods

8    compare?

9    A    Well, we can see, for example, that each of the

10   messages has a first sequence and a second sequence.  At

11   the top, all the messages use only one type of

12   modulation.

13        And at the bottom, we find out that in Mr. Bremer's

14   packet -- patent, the second sequence is modulated using

15   a different type, Type B modulation.

16        And likewise in the Bluetooth EDR packet, we also

17   see the second sequence as modulated using a different

18   type of modulation.

19        So here's our flag analogy.  We've got English, the

20   GFSK, frequency modulation, shown; and we have Chinese,

21   the DPSK, phase modulation, shown in the various places.

22   Q.   Dr. Morrow, let's return to the slide with the

23   accused Samsung products.  How many of these products

24   include Bluetooth EDR?

25   A    Now all of these products do.

```
 1   Q.    And what do you call these products?

 2   A     These products I call the Samsung Bluetooth EDR

 3   products.

 4   Q.    For purposes of your infringement analysis, do all

 5   of the accused Samsung Bluetooth EDR products infringe

 6   in the same way?

 7   A     In the same way, yes.

 8   Q.    Are there any material differences with respect to

 9   these products for your infringement analysis?

10   A     No.

11   Q.    Dr. Morrow, what claim of the '580 -- claims of the

12   '580 patent did you conclude that Samsung infringed?

13   A.    Well, I believed that Samsung products infringed at

14   least Claims 2 and 59.

15   Q.    Well, we'll address each of those individually.

16   Let's start a little bit out of order with Claim 59.

17            THE COURT:  Let's break right here, Counsel.

18   Approach the bench, please.

19            (Bench conference.)

20            THE COURT:  I assume you're going to get into

21   the specifics of your claims --

22            MR. ENGER:  We're ready to --

23            THE COURT:  -- and this is a good place to

24   break for the evening?

25            MR. ENGER:  This is a good spot.
```

1          MR. SHERWOOD:  Thank you, Your Honor.

2          (Bench conference concluded.)

3          THE COURT:  Ladies and gentlemen, based on

4     what counsel have told me, they're about to begin a

5     segment of testimony that will take some time, so we're

6     going to use this as a juncture to break for the

7     evening.

8              I'm going to ask you to take your notebooks

9     and leave them on the table in the jury room as you exit

10    the courthouse for the evening.

11             I'm going to ask you to be in the jury room by

12    about 8:20 so that we can start as close to 8:30 as we

13    can in the morning.

14             And I'm going to remind you again not to

15    discuss the case among yourselves and particularly not

16    to discuss the case with anyone else, especially when

17    you get home tonight.

18             This is that first real point of temptation

19    where somebody's going to ask you what you've done all

20    day.  And just make sure you don't answer that question

21    and tell them that I've told you not to.

22             I've instructed you not to.  Blame it on me.

23    But it's critical that you not talk about your jury

24    service or anything that you've heard or anything that's

25    been presented to you.

```
 1              So don't discuss the case with anyone.  Don't
 2    attempt to do any research about any of the concepts or
 3    ideas you've heard about.  Follow all the same
 4    instructions that I gave you earlier today.
 5              With that, I wish you travels safely to your
 6    homes, and I'll see you in the morning at 8:30.  You're
 7    excused until that time.
 8              COURT SECURITY OFFICER:  All rise for the
 9    jury.
10              (Jury out.)
11              THE COURT:  All right.  Counsel, I'll be in
12    chambers by 7:30 in the morning.
13              Also, I remind you that before we bring the
14    jury in, I want a representative of each side to read
15    into the record the exhibits that were used during
16    today's portion of the evidence.
17              With that, we stand in recess.
18              COURT SECURITY OFFICER:  All rise.
19              (Court adjourned.)
20              * * * * * * * * * * * * * * * * * * * * *
21
22
23
24
25
```

```
1

2                        CERTIFICATION

3

4          I HEREBY CERTIFY that the foregoing is a

5   correct transcript from the stenographic notes of the

6   proceedings in the above-entitled matter to the best of

7   my ability.

8

9

10

11  /s/Shelly Holmes                2/9/15
    SHELLY HOLMES, CSR, TCRR        Date
12  Official Court Reporter
    State of Texas No. 7804
13  Expiration Date:  12/31/16

14

15

16

17

18

19

20

21

22

23

24

25
```