```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                    MARSHALL DIVISION

 3  REMBRANDT WIRELESS            *    Civil Docket No.
    TECHNOLOGIES, LP,            *    2:13-CV-213
 4                               *    Marshall, Texas
             Plaintiff,          *
 5  VS.                          *
                                 *
 6  SAMSUNG ELECTRONICS CO. LTD,;*
    SAMSUNG ELECTRONICS          *
 7  AMERICA, LLC; SAMSUNG        *
    TELECOMMUNICATIONS AMERICA,  *
 8  LLC; SAMSUNG AUSTIN          *
    SEMICONDUCTOR, LLC,          *
 9                               *    February 13, 2015
             Defendants.         *    8:40 a.m.
10

11                TRANSCRIPT OF JURY TRIAL
          BEFORE THE HONORABLE RODNEY GILSTRAP
12            UNITED STATES DISTRICT COURT

13

14  APPEARANCES:

15  FOR THE PLAINTIFF:       DEMETRIOS ANAIPAKOS
                             AMIR ALAVI
16                           JAMIE A. AYCOCK
                             Ahmad, Zavitsanos, Anaipakos,
17                           Alavi & Mensing, P.C.
                             1221 McKinney Street
18                           Suite 3460
                             Houston, TX  77010
19

20
    APPEARANCES CONTINUED ON THE NEXT PAGE:
21
    COURT REPORTER:          SHELLY HOLMES,CSR, TCRR
22                           Official Court Reporter
                             100 East Houston, Suite 125
23                           Marshall, TX  75670
                             (903) 923-7464
24
    (Proceedings recorded by mechanical stenography,
25  transcript produced on CAT system.)
```

```
 1   APPEARANCES CONTINUED:

 2   FOR THE PLAINTIFF:        MICHAEL F. HEIM
                               ERIC ENGER
 3                             MIRANDA Y. JONES
                               BLAINE A. LARSON
 4                             Heim, Payne & Chorush, LLP
                               600 Travis Street, Suite 6710
 5                             Houston, TX  77002-2912

 6                             T. JOHN WARD, JR.
                               Ward & Smith Law Firm
 7                             1127 Judson Road, Suite 220
                               Longview, TX  75601

 8

 9   FOR THE DEFENDANTS:       MICHAEL C. SMITH
                               Seibman, Burg, Phillips &
10                             Smith, LLP
                               113 E. Austin Street
11                             P.O. Box 1556
                               Marshall, TX  75673
12
                               JEFFREY K. SHERWOOD
13                             DANIEL G. CARDY
                               JI YOUNG PARK
14                             Dickstein Shapiro LLP
                               1825 Eye Street NW
15                             Washington, DC  20006-5403

16                             GERARD A. HADDAD
                               JENNIFER BIANROSA
17                             Dickstein Shapiro LLP
                               1633 Broadway
18                             New York, NY  10019

19                             JEFFREY A. MILLER
                               Dickstein Shapiro LLP
20                             1842 Page Mill Road, Suite 150
                               Palo Alto, CA  94304
21
                               JESSE J. JENNER
22                             BRIAN P. BIGGINGER
                               DEANNE K. CEVASCO
23                             VINCENT Y. LING
                               Ropes & Gray, LLP
24                             1211 Avenue of the Americas
                               New York, NY  10036
25
```

```
 1   APPEARANCES CONTINUED:

 2   FOR THE DEFENDANTS:        GABRIELLE E. HIGGINS
                                REBECCA R. HERMES
 3                              Ropes & Gray LLP
                                1900 University Avenue
 4                              6th Floor
                                East Palo Alto, CA  94303
 5

 6                     P R O C E E D I N G S

 7           (Jury out.)

 8           COURT SECURITY OFFICER:  All rise.

 9           THE COURT:  Be seated, please.

10           All right.  We'll now proceed with the formal

11   charge conference.  Yesterday evening, I met with

12   counsel for the parties in chambers, and we conducted a

13   lengthy and informal charge conference, reviewing the

14   joint submission from the parties and additional

15   redrafting from the Court.

16           Each side was given an opportunity to offer

17   any and all comments, observations, additions, deletions

18   that they thought was appropriate.  The Court considered

19   that fully and at length, and yesterday evening,

20   delivered electronically a copy of what is before the

21   parties on each side.

22           And at this time, we'll conduct a formal

23   charge conference, and I'll hear any objections for the

24   record from both sides as to the jury instructions --

25   final jury instructions and verdict form that they now
```

```
 1   have.
 2           If counsel who's going to speak for each of
 3   the parties would go collectively to the podium at this
 4   time, we'll start with the final jury instructions.
 5           And, counsel, as I indicated, we'll do this on
 6   a page-by-page basis.  Looking at the proposed jury
 7   instruction, the first page is just the style of the
 8   case.
 9           Page 2 begins the actual substance of the
10   instructions, and I'll ask:  Does either party have any
11   objection to any part set forth on Page 2?
12           MR. ENGER:  Eric Enger for the Plaintiff, Your
13   Honor.  No objection.
14           MR. BIDDINGER:  Brian Biddinger for the
15   Defendants, Your Honor.  And no objection.
16           THE COURT:  Objection to anything on Page 3?
17           MR. ENGER:  No objection from the Plaintiff.
18           MR. BIDDINGER:  No objection from the
19   Defendants.
20           THE COURT:  Page 4?
21           MR. ENGER:  No objection from the Plaintiffs.
22           MR. BIDDINGER:  No objection from Defendants.
23           THE COURT:  Page 5?
24           MR. ENGER:  No objection from the Plaintiff,
25   Your Honor.
```

```
 1              MR. BIDDINGER:  No objection from Defendants.

 2              THE COURT:  Page 6?

 3              MR. ENGER:  No objection from the Plaintiff.

 4              MR. BIDDINGER:  No objection from Defendants,

 5    Your Honor.

 6              THE COURT:  Page 7?

 7              MR. ENGER:  No objection from the Plaintiff.

 8              MR. BIDDINGER:  Your Honor, Defendants have an

 9    objection on Page 7 to the claim constructions that are

10    contained in the juror notebooks.

11              Those objections are set forth in our

12    objection to the report and recommendation on the claim

13    construction order from Magistrate Judge Payne and also

14    in the briefing submitted on claim construction in this

15    case.

16              THE COURT:  And, Counsel, I'm not asking you

17    to waive any objections you may have to the substance of

18    the claim construction.  I am asking if you have any

19    objection to me including those by reference in this

20    charge as opposed to setting those constructions out

21    verbatim in the instructions themselves.

22              MR. BIDDINGER:  No objection to that, Your

23    Honor.

24              THE COURT:  Okay.  Anything else on Page 7?

25              Turn to Page 8.  Any objection from either
```

```
1    party to anything on Page 8?
2              MR. ENGER:  No objection from the Plaintiff.
3              MR. BIDDINGER:  No objection from Defendants.
4              THE COURT:  Page 9?
5              MR. ENGER:  No objection from the Plaintiff.
6              MR. BIDDINGER:  No objection from Defendants,
7    Your Honor.
8              THE COURT:  Page 10?
9              MR. ENGER:  No objection from the Plaintiff.
10             MR. BIDDINGER:  No objection from Defendants.
11             THE COURT:  Page 11?
12             MR. ENGER:  No objection from the Plaintiff.
13             MR. BIDDINGER:  No objection from Defendants.
14             THE COURT:  Page 12?
15             MR. ENGER:  No objection from the Plaintiff.
16             MR. BIDDINGER:  No objection from Defendants.
17             THE COURT:  Page 13?
18             MR. ENGER:  No objection from the Plaintiff.
19             MR. BIDDINGER:  No objection from Defendants.
20             THE COURT:  Page 14?
21             MR. ENGER:  No objection from the Plaintiff.
22             MR. BIDDINGER:  No objection from Defendants.
23             THE COURT:  Page 15?
24             MR. ENGER:  No objection from the Plaintiff.
25             MR. BIDDINGER:  No objection from Defendants.
```

```
 1              THE COURT:  Page 16?

 2              MR. ENGER:  No objection from the Plaintiff.

 3              MR. BIDDINGER:  No objection from Defendants.

 4              THE COURT:  Page 17?

 5              MR. ENGER:  No objection from the Plaintiff.

 6              MR. BIDDINGER:  No objection from Defendants.

 7              THE COURT:  Page 18?

 8              MR. ENGER:  No objection from the Plaintiff.

 9              MR. BIDDINGER:  No objection from Defendants.

10              THE COURT:  Page 19?

11              MR. ENGER:  No objection from the Plaintiff.

12              MR. BIDDINGER:  No objection from Defendants.

13              THE COURT:  And the last page, Page 20?

14              MR. ENGER:  No objection from the Plaintiff.

15              MR. BIDDINGER:  No objection from Defendants.

16              THE COURT:  This morning in chambers, I

17      advised counsel that in addition to the jury

18      instructions that they received yesterday evening, there

19      was a very short addition of a couple of sentences that

20      I intended to include but overlooked.  I furnished that

21      to the parties this morning.

22              That addition, which will be asserted at the

23      bottom of Page 18 is as follows, and I'll read it:

24      Certain documents that were shown to you are

25      demonstratives.  Demonstratives are a party's
```

1    description, picture, or model to describe something

2    involved in the trial.

3              If your recollection of the evidence differs

4    from the demonstratives, rely on your recollection.

5    Demonstratives are not evidence.  However, a witness's

6    testimony that references the demonstrative is evidence.

7              Is there any objection to inclusion of that

8    language at the bottom of Page 18 from the Plaintiff?

9              MR. ENGER:  No, Your Honor.

10             THE COURT:  From the Defendants?

11             MR. BIDDINGER:  No, Your Honor.

12             THE COURT:  All right.  Then let's turn next

13   to the proposed verdict form.

14             Any objection to any matter on Page 1 of the

15   verdict form?

16             MR. ENGER:  Not from the Plaintiff.

17             MR. BIDDINGER:  No objection from Defendants.

18             THE COURT:  Page 2 of the verdict form, which

19   includes Question 1?

20             MR. ENGER:  No objection from the Plaintiff.

21             MR. BIDDINGER:  No objections from Defendants.

22             THE COURT:  Page 3 of the verdict form, which

23   includes Question 2 of the verdict?

24             MR. ENGER:  No objection from the Plaintiff.

25             MR. BIDDINGER:  Your Honor, Defendants object

```
1   to Question 2 as containing a single question on

2   invalidity as opposed to breaking that out into the two

3   issues of obviousness and written description.

4            THE COURT:  All right.  That -- that objection

5   is overruled.

6            We'll move to Page 4, which has Question 3 of

7   the verdict form on it.  Any objection there?

8            MR. ENGER:  None from the Plaintiff, Your

9   Honor.

10           MR. BIDDINGER:  Your Honor, Defendants object

11  to Question 3, specifically at the end of Question 3,

12  the statement "up to the time of trial."  This form of

13  verdict was not proposed by the parties and not

14  introduced until after the close of evidence.

15           It's Defendants' position that it forces the

16  jury to put in a number that may be inconsistent with

17  the evidence that was presented in the case.

18           THE COURT:  Well, Defendants' objection is

19  overruled.  It's the Court's opinion that this

20  adequately charges or seeks to inquire of the jury

21  consistent with the evidence produced during the trial.

22  And to leave it out would create uncertainty.

23           Therefore, the objection is overruled.

24           Any objection to Page 5, which is the final

25  page of the verdict form?
```

1          MR. ENGER:  None from the Plaintiff, Your

2    Honor.

3          MR. BIDDINGER:  No objection from Defendants,

4    Your Honor.

5          THE COURT:  All right.  Counsel, that

6    completes the formal charge conference.  The Court needs

7    a few moments to now produce copies of the instructions

8    so that I can furnish each member of the jury with their

9    own written copy of those instructions at the conclusion

10   of the final charge and closing arguments.

11         After those are produced, collated, and

12   stapled, it's the Court's intention to return, at which

13   time I'll bring in the jury and begin with the Court's

14   final instructions to the jury and proceed to then have

15   argument from counsel in the nature of closing

16   arguments.

17         I understand there may be an issue as to

18   whether or not the courtroom should be sealed during all

19   or a portion of closing arguments.  What's the parties'

20   position in that regard?

21         MR. ALAVI:  Your Honor, on behalf of the

22   Plaintiff, we have looked at our closing statements.

23   There is one issue involving talking about the 10-cent

24   royalty with respect to the BlackBerry license.

25         To educate the Court, the protective order

1    that applies is the party protective order.  Black --

2    BlackBerry was a party to this case.  I believe

3    Paragraph 19 provides that the protective order does not

4    govern the use of those documents at trial; that is, the

5    protections are for pretrial purposes.

6            BlackBerry, recognizing that, has filed a

7    motion to seal the courtroom for discussion of those

8    numbers.  That motion is pending.

9            THE COURT:  Does the Plaintiff urge the Court

10   to grant the motion, or does the Plaintiff take any

11   position on the motion?

12           MR. ALAVI:  Plaintiff takes no position on the

13   motion, Your Honor.

14           THE COURT:  Does Defendant -- do Defendants

15   have a response?

16           MR. HADDAD:  We have also no position on

17   BlackBerry's motion, Your Honor.

18           THE COURT:  All right.

19           MR. HADDAD:  We concur with the remaining

20   statements the Plaintiff made.  With respect to

21   third-party chip --

22           THE COURT:  You need to speak up or go to the

23   podium --

24           MR. HADDAD:  I'm sorry.

25           THE COURT:  -- Mr. Haddad.

1          MR. HADDAD:  With respect to the third-party

2    chip data, Your Honor, there is some third-party chip

3    data from Texas Instruments.  And I believe the date of

4    that data is in the 2006 timeframe, Your Honor, that's

5    subject to the third-party protective order.

6          THE COURT:  Are Defendants, based thereon,

7    urging the Court to seal the courtroom during closings

8    in that regard?

9          MR. HADDAD:  We -- we take no position on

10   that, Your Honor.

11         THE COURT:  All right.  Well, the Court is

12   aware of these requests from former parties with regard

13   to sealing.  The Court, considering those requests and

14   balancing the need to maintain an open and public

15   proceeding wherever possible and including the fact that

16   these parties are no longer active parties in the

17   litigation, finds that it would not be best to seal the

18   courtroom during presentation of closing arguments.

19         And, therefore, BlackBerry and other

20   parties -- other persons' request to seal the courtroom

21   during closing, to the extent they exist, are denied.

22   The courtroom will not be sealed during closing

23   arguments.

24         The Court has serious concerns about not only

25   the public's right to know but the disruptive nature of

1    sealing and unsealing the courtroom during what the

2    Court views is the most focused and serious part of the

3    trial, and that is counsel's final arguments to the

4    jury.

5           So for those and other reasons, the courtroom

6    will remain open during closing arguments.

7           All right.  The Court will produce the copies

8    I've mentioned, and then we'll proceed to bring in the

9    jury and begin with the final instructions from the

10   Court and closing arguments from counsel.

11          Counsel, those of you that are going to be

12   presenting closing arguments, you understand the Court's

13   directive that the Plaintiff's first closing must cover

14   at least half of your 35 minutes.

15          And I understand that both Mr. Jenner and

16   Mr. Sherwood are going to be splitting the Defendants'

17   closing time.  That allocation is strictly up to you two

18   gentlemen.

19          Whoever argues during closings for either

20   side, if you want a warning from the Court on the time

21   that you have used or have left, simply ask for that

22   when you go to the podium, and I'll give you those

23   warnings.

24          Given the nature of the closings, if you don't

25   ask for them, I'm not going to try and anticipate what

```
 1   you want, so I won't give you closing warnings or won't
 2   give you warnings on your time unless you ask for them.
 3            All right.  Counsel, Court stands in recess.
 4            COURT SECURITY OFFICER:  All rise.
 5            (Recess.)
 6            (Jury out.)
 7            COURT SECURITY OFFICER:  All rise.
 8            THE COURT:  Be seated, please.
 9            Let's bring in the jury, Mr. Johnston.
10            COURT SECURITY OFFICER:  All rise for the
11   jury.
12            (Jury in.)
13            THE COURT:  Please be seated.
14            Ladies and gentlemen, you've now heard all the
15   evidence in this case.  I will now instruct you on the
16   law that you must apply.  Each of you will have your own
17   copy of these instructions for your review when you
18   retire to deliberate in a few minutes.
19            Accordingly, there's no need to take written
20   notes on these instructions unless you particularly want
21   to do so.
22            It's your duty to follow the law as I give it
23   to you.  On the other hand, as I've said previously,
24   you, the jury, are the sole judges of the facts.
25            Do not consider any statement that I've made
```

1    in the course of the trial or make in these instructions

2    as an indication that I have any opinion about the facts

3    of this case.

4         You are about to hear closing arguments of the

5    attorneys.  Statements and arguments of the attorneys

6    are not evidence and are not instructions on the law.

7    They're entitled -- they're intended only to assist the

8    jury in understanding the evidence and the parties'

9    contentions.

10        A verdict form has been prepared for you.

11   You'll take this verdict form to the jury room, and when

12   you have reached a unanimous agreement as to your

13   verdict, you will have your foreperson fill in the

14   blanks in that form, date it, and sign it.

15        Answer each question in the verdict form from

16   the facts as you find them.  Do not decide who you think

17   should win and then answer the questions accordingly.

18   Your answers and your verdict must be unanimous.

19        In determining whether any fact has been

20   proven in this case, there are two types of evidence

21   that you may consider in properly finding the truth as

22   to the facts in this case.

23        One is direct evidence, such as the testimony

24   of an eyewitness.  The other is indirect or

25   circumstantial evidence; that is, the proof of a chain

1  of circumstances that indicates the existence or

2  non-existence of certain other facts.

3          As a general rule, the law makes no

4  distinction between direct and circumstantial evidence

5  but simply requires that you find the facts based on the

6  evidence presented, both direct and circumstantial.

7          You may, unless otherwise instructed, consider

8  the testimony of all witnesses, regardless of who may

9  have called them, and of all the exhibits received into

10  evidence, regardless of who may have introduced them, in

11  answering any question.

12          By allowing testimony or other evidence to be

13  introduced over the objection of an attorney, the Court

14  did not indicate any opinion as to the weight or effect

15  of such evidence.

16          As stated before, you are the sole judges of

17  the credibility of all the witnesses and what weight and

18  effect to give to the evidence in this case.

19          When the Court sustained an objection to a

20  question addressed to a witness, you must disregard the

21  question entirely and may draw no inference from its

22  wording or speculate about what the witness would have

23  said if he or she had been permitted to answer.

24          At times during the trial, it was necessary

25  for the Court to talk with the lawyers here at the bench

1    or out of your hearing or by calling a recess and

2    talking to them while you were out of the courtroom.

3              This happened because often during a trial,

4    something comes up that does not involve the jury.  You

5    should not speculate on what was said during such

6    discussions that took place outside of your presence.

7              Certain testimony in this case has been

8    presented to you through depositions.  A deposition is

9    the sworn, recorded answers to questions asked to a

10   witness in advance of the trial.

11             If a witness cannot be present to testify in

12   person from the witness stand, the witness's testimony

13   may be presented under oath in the form of a deposition.

14             Before this trial, attorneys representing the

15   parties in the case questioned these witnesses through a

16   deposition, and the witnesses were each under oath.  A

17   court reporter was present and recorded the testimony.

18             Deposition testimony is entitled to the same

19   consideration as testimony given by a witness in person

20   from the witness stand.

21             Accordingly, you should judge the credibility

22   and weigh the importance of deposition testimony to the

23   best of your ability just as if the witness had

24   testified in open court and in person.

25             While you should consider only the evidence in

this case, you are permitted to draw such reasonable

inferences from the testimony and exhibits as you feel

are justified in the light of common experience.

In other words, ladies and gentlemen, you may

make deductions and reach conclusions that reason and

common sense lead you to draw from the facts that have

been established by the testimony and evidence in the

case.

Remember that the testimony of a single

witness may be sufficient to prove any fact, even if a

greater number of witnesses have testified to the

contrary, if, after considering all of the other

evidence, you believe that single witness.

When knowledge of a technical subject may be

helpful to the jury, a person who has special training

or experience in that technical field, called an expert

witness, is permitted to state his or her opinion on

those technical matters.

However, you're not required to accept that

opinion.  As with any other witness, it is solely up to

you to decide whether to rely upon it or not.

As I mentioned at the beginning of the trial,

there are two standards of proof that you will apply in

this case:  Preponderance of the evidence and clear and

convincing evidence.

1          A preponderance of the evidence means evidence

2    that persuades you that a claim is more probably true

3    than not true.   More probably true than not true.

4    Sometimes this is talked about as being the greater

5    weight and degree of credible testimony.

6          Clear and convincing evidence means evidence

7    that produces in your mind an abiding conviction that

8    the truth of the parties' factual contentions are highly

9    probable.

10          Although proof to an absolute certainty is not

11    required, the clear and convincing evidence standard

12    requires a greater degree of persuasion than is

13    necessary for the preponderance of the evidence

14    standard.

15          However, clear and convincing evidence is not

16    so high as the standard used in criminal law, which is

17    evidence beyond a reasonable doubt.   If the proof

18    establishes in your mind an abiding conviction of the

19    truth of a matter, then the clear and convincing

20    evidence standard has been met.

21          As I did at the start of this case, I'll first

22    give you a summary of each side's contentions in the

23    case, and I'll then provide you with detailed

24    instructions on what each side must prove to win on each

25    of its contentions.

1          As I previously told you, this case concerns

2    two United States patents, Patent No. 8,023,580,

3    referred to as the '580 patent or the '580 patent, and

4    Patent 8,47 -- 457,228, referred to as the '228 patent,

5    which I'll collectively refer to as the patents-in-suit.

6          Rembrandt, the Plaintiff, seeks money damages

7    from Samsung, the Defendants, for allegedly infringing

8    the patents-in-suit by making, using, selling, or

9    offering for sale products that Rembrandt argues are

10   covered by Claims 2 and 59 of the '580 patent and Claim

11   21 of the '228 patent.  These claims are the asserted

12   claims of the patents-in-suit.

13         The products that are alleged to infringe are

14   Samsung products that include Bluetooth enhanced data

15   rate or EDR.  Samsung denies that it has infringed the

16   asserted claims of the patents-in-suit and argues that,

17   in addition, the asserted claims are invalid.

18         Your job is to decide whether Samsung has

19   infringed the asserted claims of the patents-in-suit and

20   whether the asserted claims of the patents-in-suit are

21   invalid.

22         Infringement and invalidity are separate

23   questions and should be considered and answered

24   separately.  If you decide that any claim of the

25   patents-in-suit has been infringed and is not invalid,

1    you will then need to decide any money damages to be

2    awarded to Rembrandt to compensate it for such

3    infringement.

4            At the beginning of the trial, I gave you some

5    general information about patents and the patent system

6    and a brief overview of the patent laws relevant to this

7    case.  I'll now give you more detailed instructions

8    about the patent laws that relate to this case.

9            Before you can decide many of the issues in

10   this case, you will need to understand the role of

11   patent claims.  The patent claims are the numbered

12   sentences at the end of the patent.  The claims are

13   important because it is the words of the claims that

14   define what a patent covers.

15           The figures and text in the rest of the patent

16   provide a description and/or examples of the invention

17   and provide a context for the claims, but it is the

18   claims that define the breadth of the patent's coverage.

19           Each claim is effectively treated as if it

20   were a separate patent, and each claim may cover more or

21   less than another claim.  Therefore, what a patent

22   covers collectively depends upon what each of its claims

23   covers.

24           Each patent claim sets forth in words a set of

25   requirements in a single sentence.  The requirements of

1   a claim are usually divided into parts or steps called

2   limitations or elements.

3          If a device satisfies each of these

4   requirements in the claim's sentence, then it is said

5   that the device is covered by the claim, falls under the

6   claim, or infringes the claim.

7          For example, a claim that covers an invention

8   of a table may recite a tabletop, four legs, and the

9   glue that secures the legs to the tabletop.  In this

10  example, the tabletop, legs, and glue are each separate

11  limitations of the claim.

12         If a device is missing even one limitation or

13  element of a claim, it does not meet all the

14  requirements of a claim and is not covered by the claim.

15  If a device is not covered by the claim, it does not

16  infringe that claim.

17         You first need to understand each claim in

18  order to decide whether or not there is infringement of

19  a claim and to decide whether or not the claim is

20  invalid.

21         The first step to understand the meaning of

22  the words used in the patent claim -- the first --

23  excuse me.

24         The first step is to understand the meaning of

25  the words used in the patent claim.  The law says that

1    it's my role to define the terms of the claims, and it's

2    your role to apply my definitions to the issues that you

3    are asked to decide in this case.

4         Therefore, as I explained at the start of the

5    case, I have determined the meaning of certain claim

6    terms, and I have provided to you my definitions of

7    certain claim terms.  These definitions are in your

8    juror notebooks.  You must accept my definitions of

9    these words in the claims as being correct.

10        It is your job to take these definitions that

11   I have supplied and apply them to the issues that you

12   are asked to decide, including both the issues of

13   infringement and invalidity.

14        For the claim terms that I have not construed

15   or defined, you are to use the ordinary and accustomed

16   meaning of the terms as understood by one of ordinary

17   skill in the art, which is to say in the field of

18   technology of the patent at the time of the invention.

19        I'll now explain infringement in detail.  In

20   order to prove direct infringement by literal

21   infringement, Rembrandt, the Plaintiff, must prove by a

22   preponderance of the evidence that Samsung made,

23   imported, used, sold, or offered for sale a product or

24   process that meets all the requirements of at least one

25   of the asserted claims and did so without permission of

Rembrandt during the time the patents-in-suit were in force.

In order to prove infringement, Rembrandt must prove that each of the requirements for infringement is met by a preponderance of the evidence.  Infringement is assessed on a claim-by-claim basis.  Therefore, there may be infringement as to one claim but no infringement as to another.

You must compare each of the asserted claims to each of the accused Samsung products to determine whether all the requirements of any assert -- asserted claim are met.  In doing so, you should not compare the accused Samsung products to any specific example set out in the patents.

If you find that the accused product includes each element of the claim, then that product directly infringes that claim, even if such product contains additional elements that are not recited in the claim.

The only correct comparison is to compare the accused products with the language of the asserted claims themselves, using the meanings that I have given you.

Patent claims may exist in two forms referred to as independent claims and dependent claims.

An independent claim does not refer to any

1    other claim of the patent.  An independent claim sets

2    forth all the requirements that must be met in order to

3    be covered by that claim.  It is not necessary to look

4    to any other claim to determine what an independent

5    claim covers.

6          A dependent claim is a claim that refers to at

7    least one other claim of the patent.  A dependent claim

8    incorporates all of the elements of the claim to which

9    the dependent claim refers, as well as the elements

10   recited in the dependent claim itself.

11         To establish literal infringement of a

12   dependent claim, Rembrandt must show by a preponderance

13   of the evidence that Samsung's accused products include

14   each and every element of the dependent claim, as well

15   as the limitations of the independent claim from which

16   it depends.

17         If you find that the independent claim from

18   which the dependent claim depends is not literally

19   infringed, then you cannot find that the dependent claim

20   is literally infringed.

21         I'll now instruct you on the rules that you

22   must follow in deciding whether or not Samsung --

23   Samsung has proven that the asserted claims of the

24   patents-in-suit are invalid.

25         An issued patent is accorded a presumption of

1  validity based on the presumption that the United States

2  Patent and Trademark Office, called the PTO, acted

3  correctly in issuing the patent.

4      This presumption of validity extends to all

5  issued patents, including those that claim the benefit

6  of an earlier filed patent application, such as

7  so-called continuations or continuations-in-part.

8      To prove that any claim of a patent is

9  invalid, Samsung must persuade you by clear and

10  convincing evidence that the claim is invalid.

11     Like infringement, invalidity is determined on

12  a claim-by-claim basis.  You must determine separately

13  for each asserted claim if that claim is invalid.  If

14  one claim of a patent is invalid, this does not mean any

15  other claim is necessarily invalid.

16     Claims are construed the same way for

17  determining -- determining infringement as for

18  determining invalidity.

19     Samsung contends that the asserted claims are

20  invalid for failure of the patent to provide an adequate

21  written description of the full scope of the claims.

22  Samsung must prove by clear and convincing evidence that

23  the patents do not describe the full scope of the

24  claims.

25     The patent laws require that a patent must

1    contain an adequate written description of the claims of

2    the patent.  The written description requirement helps

3    to ensure that the patent applicant actually invented

4    what is claimed.

5            A claim is not invalid on written description

6    grounds simply because the embodiments of the

7    specification do not contain examples explicitly

8    covering the full scope of the claim language.

9            The written description requirement is

10   satisfied if persons of ordinary skill in the field of

11   the invention would recognize, from reading the patent

12   specification, which includes the originally filed

13   claims, that the inventor possessed the subject matter

14   contained in the issued claims of the patent.

15           Only enough must be included in the

16   specification to convince persons of ordinary skill in

17   the art that the inventor possessed the full scope of

18   the claims.

19           In evaluate -- evaluating whether the

20   specification has provided an adequate written

21   description, you may take into account such factors as:

22               (1) the nature and scope of the patent claims;

23               (2) the complexity, predictability, and

24   maturity of the technology at issue;

25               (3) the existing knowledge in the relevant

1    field; and

2                (4) the scope and content of the prior art.

3                In order to be patentable, the invention must

4    not have been obvious to a person of ordinary skill in

5    the field of technology of the patent at the time the

6    invention was made.

7                A patent claim is invalid if the claimed

8    invention would have been obvious to a person of

9    ordinary skill in the field of the invention at the time

10   the patent application was filed.

11               Samsung may establish that a patent claim is

12   invalid by showing by clear and convincing evidence that

13   the claimed invention as a whole would have been obvious

14   to persons having ordinary skill in the art at the time

15   the invention was made.

16               In determining whether a claimed invention is

17   obvious, you must consider the level of ordinary skill

18   in the field of technology of the patent that someone

19   would have had at the time the claimed invention was

20   made, the scope and content of the prior art, and any

21   differences between the prior art and the claimed

22   invention.

23               Prior art may include items that were publicly

24   known and -- and that would have been used or offered

25   for sale or references, such as publications or patents,

1  that disclose the claimed invention or elements of the

2  claimed invention.

3       Whether or not an item of prior art was not

4  before the PTO, the presumption of validity of the

5  patent remains intact, and the clear and convincing

6  evidence standard does not change.

7       To be prior art, the item or reference must

8  have been made, known, used, published, or patented

9  either before the invention was made or more than one

10  year before the filing date of the patent application.

11       However, prior art does not include a

12  publication that describes the inventor's own work and

13  was published less than a year before the date of the

14  invention.

15       Prior art includes:

16       (1) patents issued more than one year before

17  the filing of the patent or before the date of the

18  invention;

19       (2) publications, such as articles, having a

20  date more than one year before the filing date of the

21  patent or before the date of the invention;

22       (3) United States patents that have a filing

23  date prior to the date of the invention of the subject

24  matter in the patent;

25       (4) any product in public use or on sale in

the United States more than one year before the filing

date of the patent in issue;

(5) any product that was publicly known or

used by others in the country before the date of the

invention of the claimed subject matter in the patent;

And (6) any product that was made or built in

this country by another person before the date of the

invention of the claimed subject matter in the patent

and not abandoned, suppressed, or concealed.

You've heard me refer to what is called the

date of invention.  A patent's priority date or date of

invention is used to determine the pool of potential

prior art.  Only art that was made, known, used,

published, or patented before the invention can be

considered prior art.

The effective filing date of the

patents-in-suit is December the 5th, 1997.

The existence of each and every element of the

claimed invention in the prior art does not necessarily

prove obviousness.  Most, if not all, inventions rely on

the building blocks of prior art.

In considering whether a claimed invention is

obvious, you should consider whether, at the time of the

claimed invention, there was a reason that would have

prompted a person having ordinary skill in the field of

the technology of the patent to combine the known
elements in a way the claimed invention does, taking
into account such factors as:

(1) whether the claimed invention was merely
the predictable result of using prior art elements
according to their known functions;

(2) whether the claimed invention provides an
obvious solution to a known problem in the relevant
field;

(3) whether the prior art teaches or suggests
the desirability of combining elements claimed in the
invention;

(4) whether the prior art teaches away from
combining elements in the claimed invention;

(5) whether it would have been obvious to try
the combinations of elements such as when there is a
design need or market pressure to solve a problem, and
there are a finite number of identified, predictable
solutions;

And (6) whether the change resulted more from
design incentives or other market forces.

To find that prior art rendered the invention
obvious, you must find that the prior art provided a
reasonable expectation of success.

In determining whether the claimed invention

was obvious, do not use hindsight.

In other words, you should not consider what a person of ordinary skill in the art would know now or what has been learned from the teaching of the patents-in-suit.

Rembrandt contends that an ordinary person -- excuse me -- that a person of ordinary skill in the art of the Rembrandt patents, on December the 5th, 1997, when Provisional Patent Application No. 60/067,562 was filed and to which each of the Rembrandt patents claim priority, would have had a bachelor's degree in electrical engineering that included coursework in communication systems and networking and two years of work experience in electronic communications.

Samsung contends that a person of ordinary skill in the art -- in the art in the field of the patents-in-suit would have had a master's degree in electrical engineering that included coursework in communications systems and networking and at least five years of experience designing network communication systems.

The ultimate conclusion of whether a claim is obvious should be based on your determination of several factual issues:

(1) You must decide the level of ordinary

1   skill in the field of the invention that someone would

2   have had at the time the claimed invention was made.

3          (2) You must decide the scope and content of

4   the prior art.  In determining the scope and content of

5   the prior art, you must decide whether a reference is

6   pertinent or analogous to the claimed invention.

7          Pertinent or analogous prior art includes

8   prior art in the same field of the endeavor as the

9   claimed invention, regardless of the problems addressed

10  by the reference and prior art in different fields

11  reasonably pertinent to the particular problem with

12  which the claimed invention is concerned.

13         Remember that prior art is not limited to

14  patents and published materials but includes the general

15  knowledge that would have been available to one of

16  ordinary skill in the field of the invention.

17         You must decide what difference, if any,

18  existed between the claimed invention and the prior art.

19         In making these assessments, you should take

20  into account any objective evidence, sometimes called

21  secondary considerations, that may have existed at the

22  time of the invention that may shed light on the

23  obviousness or not of the claimed invention, such as:

24         (1) whether the invention was commercially

25  successful as a result of the merits of the claimed

invention, rather than the result of design needs or
market pressure advertising, or similar activities;

(2) whether the invention satisfies a
long-felt need;

(3) whether others had tried and failed to
make the invention;

(4) whether others invented the invention at
roughly the same time;

(5) whether others copied the invention;

(6) whether there were changes or related
technologies or market needs contemporaneous with the
invention;

(7) whether the invention achieved unexpected
results;

(8) whether others in the field praised the
invention;

(9) whether persons having ordinary skill in
the art of the invention expressed surprise or disbelief
regarding the invention;

(10) whether others sought or obtained rights
to the patent from the patent-holder;

And, (11), whether the inventor proceeded
contrary to accepted wisdom in the field.

If you find that Samsung infringed any claim
of the asserted patents, you must then consider what

1      amount of damages to award to Rembrandt.

2              I'll now instruct you about the measure of

3      damages.  By instructing you on damages, I'm not

4      suggesting which party should win this case on any

5      issue.

6              The damages you award must be adequate to

7      compensate Rembrandt for the infringement.  They are not

8      meant to punish an infringer.  Your damages award, if

9      you reach this issue, should put Rembrandt in

10     approximately the same financial position that it would

11     have been in had the infringement not occurred.

12             Rembrandt has the burden to establish the

13     amount of its damages by a preponderance of the

14     evidence.

15             In other words, you should award only those

16     damages that Rembrandt establishes that it more likely

17     than not suffered.

18             While the patent owner is not required to

19     prove damages with mathematical precision, it must

20     prove -- prove them with reasonable certainty.

21             The determination of a damage award is not an

22     exact science, and the amount need not be proven with

23     unerring precision.  You may approximate, if necessary,

24     the amount to which the patent owner is entitled.

25             In such a case, while the damages may not

1   be -- the damages -- while the damages may not be

2   determined by mere speculation or guess, it is proper to

3   award a damages amount if the evidence shows the extent

4   of the damages as a matter of just and reasonable

5   inference.

6          In this case, Rembrandt seeks a reasonable

7   royalty.  A reasonable royalty is defined as the amount

8   of money a willing patent owner and a willing

9   prospective licensee would have agreed upon right before

10  the infringement began for a license to make, use, or

11  sell the invention.

12         A lump-sum royalty is a royalty payment where

13  the patent owner receives a single, upfront payment.

14  You may award a fully-paid, lump-sum royalty for the

15  time period of the infringement.

16         A running royalty, on the other hand, is a

17  royalty where the patent owner collects an ongoing

18  per-unit or percentage payment over a period of time.

19         The patent laws specifically provide that

20  damages for infringement may not be less than a

21  reasonable royalty.  At the same time, your damages are

22  not meant to punish Samsung.

23         A royalty is a payment made to a patent-holder

24  in exchange for the right to make, use, or sell the

25  claimed invention.  A reasonable royalty is the amount

of royalty payment that a patent-holder and an infringer would have agreed to in a hypothetical negotiation taking place at a time period just prior to when the infringement first began.

In considering this hypothetical negotiation, you should focus on what the expectations of the patent-holder and the infringer would have been had they entered into an agreement at that time and had they acted reasonably in their negotiations.

In determining this, you must assume that both parties believed that the patent was valid and infringed and that the patent-holder and infringer were willing to enter into an agreement.

The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation and not simply a royalty that either party would have preferred.

Your focus should be on what the parties' expectations would have been had they entered into negotiations for royalties right before the infringing activities began.

The parties agree that the hypothetical negotiation date would have been in September of 2011.

Evidence of things that happened after the infringement first began may be considered in evaluating

1  the reasonable royalty only to the extent that the

2  evidence aids in assessing what royalty would have

3  resulted from a hypothetical negotiation.

4         Although evidence of the actual profits of an

5  accused infringe -- that an accused infringer made may

6  be used to determine the anticipated profits at the time

7  of the hypothetical negotiation, the royalty may not be

8  limited or increased based on the actual profits the

9  alleged infringer made.

10         In determining the reasonable royalty, you

11  should consider all of the facts known or available to

12  the parties at the time just before the infringement

13  began.

14         Some of the kinds of factors that you may

15  consider in making your determination are:

16         (1) the royalties received by the patentee for

17  licensing the patents-in-suit proving or tending to

18  prove an established royalty;

19         (2) royalties paid by the licensee for the use

20  of other patents comparable to the asserted patents;

21         (3) the nature and scope of the license as an

22  exclusive or not -- as exclusive or non-exclusive or as

23  restricted or non-restricted in terms of territory or

24  with respect to the parties to whom the manufactured

25  product may be sold;

1        (4) whether or not the licensor had an

2 established policy and marketing program to maintain its

3 patent exclusivity by not licensing others to use the

4 invention or by granting licenses under special

5 conditions designed to preserve that exclusivity;

6        (5) the commercial relationship between the

7 licensor and licensee, such as whether they are

8 competitors in the same territory or in the same line of

9 business or whether they are inventor and promoter;

10        (6) the effect of selling the patented product

11 in promoting sales of other products of the licensee,

12 the existing value of the invention to the licensor as a

13 generator of sales of its non-patented items, and the

14 extent -- the extent of such collateral sales;

15        (7) the -- the duration of the patent and the

16 term of the license;

17        (8) the profitability of the patented

18 invention and whether or not it is commercially

19 successful or popular;

20        (9) the utility and advantages of the patented

21 invention over the old modes or devices, if any, that

22 had been used for achieving similar results;

23        (10) the nature of the patented invention, the

24 character of the commercial embodiment of it as owned

25 and produced by the licensor, and the benefits to those

1  who have used the invention;

2          (11) the extent of the licensee's use of the

3  patented invention and any evidence probative of the

4  value of that use;

5          (12) the portion of the profit or of the

6  selling price that may be customary in the particular

7  business or in comparable businesses to allow for the

8  use of the invention or analogous inventions;

9          (13) the portion of the realizable profits

10  that is due to the patented invention as compared to the

11  portion of the profits due to other factors, such as

12  unpatented elements or unpatented manufacturing

13  processes or features or improvements developed by the

14  licensee;

15          (14) the opinion and testimony of qualified

16  experts;

17          (15) the amount that a licensor and licensee

18  would have agreed upon at the time the infringement

19  began, if both sides had been reasonably and voluntarily

20  trying to reach an agreement; that is, the amount that a

21  prudent licensee would have been willing to pay as a

22  royalty and yet be able to make a reasonable profit and

23  which amount would have been acceptable to a patent

24  owner, if it would have been willing to grant a license.

25          No one factor is dispositive, and you can and

1    should consider the evidence that has been presented to

2    you in this case on each of these factors.

3           In determining a reasonable royalty, you may

4    consider whether Samsung had acceptable non-infringing

5    alternatives that were available at the time of the

6    hypothetical negotiation and whether that would have

7    affected the reasonable royalty the parties would have

8    agreed upon.

9           You may also consider any other factors which,

10   in your mind, would have increased or decreased the

11   royalty the infringer would have been willing to pay and

12   the patent-holder would have been willing to accept,

13   acting as normally prudent business people.

14          The final factor establishes a framework which

15   you should use in determining a reasonable royalty; that

16   is, the pay that would have resulted from negotiation

17   between the patent-holder and the accused infringer

18   taking place at a time just before the infringement

19   began.

20          This now completes my instructions on the

21   applicable law in this case.  We will now hear closing

22   arguments from counsel for the parties.

23          The Plaintiff may present its first closing

24   argument at this time.

25          MR. ANAIPAKOS:  Thank you, Your Honor.

```
1              May I approach?
2              THE COURT:  You may.
3              MR. ANAIPAKOS:  May I also approach the easel,
4  Your Honor?
5              THE COURT:  Yes.
6              Would you like a warning on your time?
7              MR. ANAIPAKOS:  Yes, Your Honor.  If -- if --
8  first if I can save 10 minutes for rebuttal, and if I
9  could have a warning at 17 minutes, Your Honor.
10             THE COURT:  17 minutes and 10 minutes would be
11 at 25.
12             All right.  Proceed.
13             MR. ANAIPAKOS:  Thank you, Your Honor.
14             Good morning, everybody.  We're at the end of
15 a long road today.  And in a minute, I'm going to talk
16 to you about the evidence and why that evidence requires
17 a verdict in favor of Rembrandt, but for now, it's time
18 for a little perspective.
19             There's some lessons to be learned here.  You
20 know, it's not easy to file a patent case against the
21 biggest electronics company in the world.  It really
22 isn't.  And 18 months later and a lot of time, effort,
23 and expense, we're here today.
24             And although you haven't been with us for the
25 first 18 months, you've been here for the last 5 days.
```

1    And what you've seen in the last 5 days is what we've

2    had to go through for the last 15 months:  Samsung's

3    efforts to confuse and conceal the truth.

4            When I think back on the last 18 months,

5    Samsung's approach is really clear.  Don't believe your

6    lying eyes.  Don't believe the evidence that's in front

7    of you.  Believe the spin.  The examples are everywhere.

8            When we sued them for patent infringement,

9    they said:  We don't infringe your patent.  And if we

10   do, it's invalid, because it's anticipated and because

11   it's indefinite.

12           Those were two things we heard for 18 months

13   until -- until Wednesday when their expert, Dr. Goodman,

14   had to give that up.

15           We also heard about a license defense.

16   Remember that?  They gave that up yesterday, but not

17   without a fight.  For 18 months, we heard about that.

18           Think about who they chose as their corporate

19   representative, Dr. Benner.  A very nice guy.  A very

20   nice guy.  But you remember from the cross-examination,

21   he doesn't know anything about this case.  He can't

22   answer a single question about invalidity or

23   infringement.

24           Why is that?  Why does Samsung send someone

25   here to you to be the face and the voice of the company

1    who doesn't know anything about this case when they have

2    thousands of engineers?  They have teams of lawyers who

3    could answer these questions.

4            Why do they do that?  Because confusion is the

5    goal.  They don't want clarity here.  And that couldn't

6    be more obvious than when we talk about EDR.

7            What do they want you to believe in EDR?  Oh,

8    we could live without it.  Our customers don't need it.

9    It's not that important.

10           But what do we know?  It's in every single

11   Bluetooth device they sell.  It's in every single

12   Bluetooth device their competitors sell.  You cannot buy

13   a Bluetooth chip without it.

14           It is literally everywhere.  The Bluetooth SIG

15   that sets the Bluetooth rules has had that as a standard

16   for 11 years.  It's everywhere.

17           But what do they tell you?  It doesn't matter.

18   It's not important.  Don't believe your lying eyes.

19           Then they talk about damages.  It gets even

20   more obvious there, right?  You have Dr. Becker take the

21   stand.  And in order to live in his world, what do you

22   have to do?

23           You have to ignore the settlement agreement

24   that was entered with BlackBerry in this case with these

25   parties, with these patents, with these claims, in this

1    honorable court.

2             And what did they say?  Oh, that's not

3    comparable.  The settlement in this case isn't

4    comparable.  We want you to look at this Bandspeed case

5    that involved different parties, different technologies.

6    Had nothing to do with this case.

7             And in that case, as you've learned, Bandspeed

8    was a member of what?  The Bluetooth SIG.  They'd

9    already licensed Samsung.  That's the reality they want

10   you to live in, that that's the comparable case, not

11   this one.

12            You heard those voices on the videos, some

13   voices that you didn't recognize.  Those were

14   BlackBerry's lawyers.  They were in this case, and they

15   weren't cooperating with us.  They were -- they were

16   coming up to a trial date, so they settled.

17            But they don't want you to look at that,

18   because when you look at that settlement number,

19   Dr. Becker's analysis doesn't make any sense.  So all

20   the fiction and all the smoke goes away today.  I

21   couldn't be happier about it.

22            So I'm going to go through some of the

23   highlights of the testimony, and we're going to talk

24   about these topics:  Infringement, validity, and

25   damages.

1      Let's start with infringement.  The two key

2  experts for each side were Dr. Morrow and -- and

3  Dr. Goodman.  Dr. Morrow is here today.

4      I'll tell you, if there is a smarter, more

5  honest, direct, likeable expert than Dr. Morrow, I have

6  not met him yet.  And you watched as he detailed all of

7  the work that he's done in this case.

8      Both of the experts looked at the Bluetooth

9  specifications, but Dr. Morrow went a lot further than

10  that.  He looked at all those Bluetooth PICS.

11      Remember the seven boxes that they kept

12  hauling up for him to go through, each one of those

13  verifying that Samsung uses EDR, which practices our

14  patents?

15      He did that little device, the black box with

16  the antennas, the packet sniffers, and confirmed that

17  every single Bluetooth communication was using EDR.  He

18  looked at source code.  Dr. Goodman didn't do any of

19  that.

20      When you look at infringement and this debate

21  over the term "indicates," it's really not very close.

22  The -- the -- the witnesses are lined up here for you:

23  Dr. Morrow; Dr. Jones, who we'll discuss in a minute,

24  the engineer at Samsung whose testimony you heard by

25  deposition; Dr. Hall, who wrote the EDR standard; and

1    the Bluetooth SIG manual itself.

2            Ask for that when you're back deliberating.

3    Look through it.  When you get to the EDR section, it's

4    huge.  When you get to the EDR section, you're going to

5    see that it uses the word "indicates."  There is no real

6    debate here.

7            Dr. Morrow literally wrote the book on

8    Bluetooth.  And what did he tell us about how this

9    works?  He told us exactly how the LT_ADDR and the TYPE

10   fields indicate the modulation method of the Bluetooth

11   payload.

12           The LT_ADDR and TYPE field select a column and

13   row in Table 6.2, and once you have that information,

14   there is no doubt about what modulation method is for

15   the Bluetooth payload.

16           Remember this demonstrative that Dr. Morrow

17   walked us through?  Here's the packet, LT_ADDR is 7,

18   corresponds with the column.  Here's the TYPE, 0100,

19   corresponds with the row.

20           And there you go.  At the intersection, what

21   do we now know?

22           Well, we now know that this packet has two

23   different types of modulation methods, GFSK and DPSK.

24   And the second modulation method was indicated by the

25   first.

```
 1              That's what our patents do.  He walked you
 2    through it.  He spent two hours going
 3    claim-element-by-claim-element showing you how we had
 4    satisfied all of that.
 5              And then they call Dr. Hall.  And remember to
 6    ask for this document.  It is Plaintiff's Exhibit 126 at
 7    Page 9.  Dr. Hall is the guy -- poor guy, spent four
 8    years of his life writing this EDR standard -- this EDR
 9    standard.
10              And what did he say before lawyers were
11    involved?  Before there was a lawsuit, before there was
12    anyone watching or writing things down, what did he say?
13              He said that the payload modulation scheme is
14    indicated in the packet header AM_ADDR and TYPE field.
15    AM_ADDR is just the old way they used to refer to
16    LT_ADDR.  They're the same thing.  That's our
17    infringement case straight from the horse's mouth before
18    any lawyers were involved.
19              Then we call Dr. Jones.  You remember him.  I
20    call him Boy Wonder, but he's the guy who worked at
21    Broadcom for several years reviewing source code.
22    Remember the source code?  It had that big confidential
23    stamp.  You couldn't even see through it.  We had to
24    keep clearing the courtroom to look at it.
25              He reviewed all of it and saw how those chips
```

1    worked, and he showed you how there was a striking

2    similarity to the claims in the case.  This was the

3    chart he used.  He went line-by-line in the source code

4    comparing it to the claim elements in the case.

5            And in his cross-examination, did you hear one

6    syllable where they asked him about whether he had made

7    a mistake in his source code review?  Not one.  They

8    didn't ask him a single question.

9            Do you think there are people at Samsung who

10   know how to review source code?  Why don't they ask him

11   about it?  Because they don't want -- they don't like

12   the answer.

13           So how do they defend it?  They do this thing

14   in opening statement and with the witnesses, remember,

15   where they folded the papers and they put one on top of

16   the other, and they said here's 1.2, before there was

17   multiple types of modulations, and here's 2.0 and they

18   look the same, so there's no change?

19           Well, Dr. Hall explained that isn't true at

20   all.  He's the person who wrote all the differences

21   between 1.2 and 2.0, and there it is on the screen for

22   you.  That's what he said in this court.

23           Let's talk for a moment about validity.  His

24   Honor has instructed you that our patents have a

25   presumption of validity.  We had an expert on validity,

1    Dr. Akl.  You probably see his bio in your -- in your

2    binder.

3              He's not here.  You want to know why?  We sent

4    him home yesterday because the case on validity has

5    fallen apart and we didn't need him.

6              They gave up half of it when their expert was

7    cross-examined.  And let's look at what remains.  Your

8    instructions that the Court read on obviousness are very

9    clear.

10             They have to show by clear and convincing

11   evidence this burden is on Samsung, that the invention

12   was obvious.  And you can't use 20/20 hindsight.  It's

13   very clear from the instructions.

14             And you also can't take the patent and then

15   try to piece all of the prior art back together using

16   the patent, right?  You can't assume the invention to

17   try to find the invention.

18             But that's exactly what Samsung's trying to do

19   here.  They argue about this Boer patent, what we call

20   the Boer patent and they call the Lucent patent.  It's

21   the same thing.  This is the same patent that for

22   15 months they said invalidated our patent because it

23   anticipated it until Wednesday when that went away.

24             Now they have to acknowledge the holes in the

25   Boer patent, and they're on the screen there for you.

```
 1   No master/slave.  It doesn't use different types or
 2   families of modulations.  His Honor has instructed you
 3   on what that means.  There's no address information in
 4   the header.  Those are the gaps in Boer.
 5           So what do they have to do now to fill those
 6   gaps?  Well, they've got to try to combine other pieces
 7   of art from here and there, to try to get to a complete
 8   puzzle piece, but they can't do it.
 9           And one of the instructions I really want you
10   to think about is this No. 4, whether the prior art
11   teaches away from combining elements in the claimed
12   invention.  So keep that in mind.
13           And now we talk about the art that they want
14   to combine with Boer.  It's called Upender.  This is
15   Defendants' Exhibit 1190.  Please take a look at this.
16           What are we looking at here?  Master/slave,
17   M/S, that's what our patent teaches.  Down at the bottom
18   is Boer.  Upender is reviewing these two, right?  Up
19   arrow is good.  Down arrow, not so good.  And look at
20   Boer, all up arrows.  Look at master/slave, mostly down
21   arrows.
22           So what is Upender saying?  Is it saying use
23   master/slave?  No.  It's saying the opposite.  It's
24   saying we prefer the Boer approach.  So you can't go to
25   Upender to add that master/slave piece.
```

1          Why?  Because it doesn't like the master/slave

2     approach.  It prefers Boer.  It teaches away.  That's

3     the point.  It's not a close case on obviousness.

4          And when you think about obviousness, think

5     about this:  It's easy to think things are obvious once

6     someone comes up with the idea.  Remember Dr. Hall up

7     there?  Very smart guy.  He spent three-and-a-half years

8     of his life trying to write that EDR specification, and

9     they want you to believe this was obvious.

10         They also make a written description defense

11    to our patents.  Again, they've got the burden of proof

12    here with clear and convincing evidence.

13         Now, what's the test?  The test is that the

14    claims that we assert have to have support in the

15    original application, including the original claims.

16         And so what do I have on the screen in front

17    of you?  This is the patent from 1998.  It's in

18    evidence.  You can ask for it.  And you have Claims 23,

19    25, and 27.  Those are the key claims.

20         We talked about this with Dr. Goodman.  What

21    did he say about them?  Well, he said:  With respect to

22    Claim 23, it covers two multi-lingual transceivers.

23    With respect to 25, it covers a multi-lingual master

24    transceiver.  That's the master part.

25         And then 27 covers a multi-lingual remote

1   transceiver.  That's the slave part.  Game over.  That's

2   all we need.  That's all the disclosure we need for the

3   claims in this case.

4           So can I have the ELMO for a second, please?

5           We heard a lot about this deletion.  Remember,

6   we've heard all about these deletions that somehow

7   vanished out of our patent.  That's what they want you

8   to believe.

9           And speaking of smoke screens, it dawned on me

10  when I got a -- a look at this that was shown to you in

11  opening and with the witnesses, that there is a literal

12  smoke screen over this last sentence.

13          And if you look real closely at what they

14  didn't show you, it says:  Applicant has amended 22, 25,

15  and 27 to describe a new Figure 8.  So let's find out

16  what's going on here.

17          Can we go back, please?

18          Let's talk about this deletion.  There were

19  five paragraphs in the '626 patent.  What did they deal

20  with?  They dealt with test signals.  That's what's

21  underlined in red all over there.

22          Why did the '626 patent talk about test

23  signals?  Because that's what it claimed.  The claims

24  are on the screen in front of you.  It's all about test

25  signals.

```
 1              Our case is not about test signals.  The '580,
 2    Claim 59, which is at issue in this case, is on the
 3    screen.  You won't see test signal anywhere in it.
 4              So what happened?  We took the language that
 5    related to test signals, which we didn't need, and we
 6    took it out, and we took the claim language out.  And
 7    there was nothing suspicious or funny about it.  If we
 8    were trying to do something weird, it was a really bad
 9    idea because we were taking support out.  Why would we
10    do that?
11              And so what happens then?  We insert Figure 8
12    into the patent.  That's what was covered over, right?
13    And what is Figure 8 that gets put into the patent
14    before you?  It's exactly the same figure from the 1997
15    provisional application.  There was no monkey business
16    here.  It's exactly the same figure disclosed on day
17    one.
18              And if you thought there was a deletion, it
19    wasn't very good because what happened?  In the '580
20    patent, we incorporate everything by reference,
21    including the '626.  That's what's highlighted there.
22              So if we tried to delete it, we stuck it right
23    back in in the next sentence.  There was nothing here.
24    But that's what they've been talking to you about for
25    days in this trial.
```

1              Let's talk about damages for a minute.

2     Remember that the law that the Judge has instructed you

3     on requires you to consider a hypothetical negotiation.

4     And in that negotiation, the parties say two things to

5     each other:  These patents are valid, and Samsung wants

6     to infringe them.

7              Remember that there are these Georgia Pacific

8     factors that you've been instructed on, and we've talked

9     about a lot of them during the trial of this case.  For

10    now, I want to focus briefly on Nos. 9 and 10.

11             THE COURT:  Seventeen minutes have been used,

12    Counsel.

13             MR. ANAIPAKOS:  Thank you, Your Honor.

14             The advantages and benefits of the patented

15    invention.

16             And you've heard about this time and again.

17    This is straight out of Samsung's files, the advantages

18    of EDR.  The most important advantage, backwards

19    compatible, new stuff working with old stuff.

20             But there were battery life improvements,

21    power improvements, the ability to move more data so

22    things worked faster; you get better performance.

23    That's all undisputed and straight out of their files.

24             I told you in opening statement that the

25    invention in this case was at the heart of EDR and that

1    EDR would not work without multiple modulation systems.

2          And then you heard it from the horse's mouth

3    when Dr. Hall took the stand.  His testimony is on the

4    screen.

5          If Bluetooth EDR didn't have two types of

6    modulation methods, EDR wouldn't work either?

7          Answer:  That's correct.

8          And if you only had one type of modulation

9    method, EDR would not work?

10          And you see his answer.

11          So what do they do when they know that EDR is

12    at the heart of the -- that our invention is at the

13    heart of EDR?  They go hire this survey expert to come

14    in here and try to belittle the invention by saying:

15    Oh, no one knows what EDR is, so it's really not that

16    important.

17          I'll never forget this guy when he took the

18    stand, and you saw what he told me about the secret

19    survey he had and the like.  But what happened at the

20    end?

21          At the end, he had to concede that the survey

22    they had done has, quote, got nothing to do with

23    importance.  It has everything to do with awareness.

24          And that's not a surprise.  I'm sure most

25    people have never heard of EDR.  Just like those long

1  words I was writing on the butcher paper that no one

2  knew, including me, what they meant.

3          That didn't mean that Vitamin D wasn't

4  important or that the car parts you can't name aren't

5  important.

6          The BlackBerry licenses we've -- we've talked

7  about.  That's what they want you to ignore.  And I

8  would ask you please to look at this.  It's Plaintiff's

9  Exhibit 879.

10          Why is it important?  It's the only license to

11  the patents-in-suit.  It was an arms-length deal.  You

12  heard some question about a conspiracy between us and

13  BlackBerry.  There is zero evidence of that, other than

14  some lawyer's question.  There wasn't any witness who

15  even hinted at that.

16          It's not a fully paid-up license.  And when

17  you look at it, you learn that as the negotiations

18  between Rembrandt and BlackBerry continued, the amount

19  went up every day by how much?  10 cents a unit.

20          Every unit that BlackBerry sold, they paid 10

21  cents more.  What does that tell you about what they

22  were paying?

23          But Mr. Becker wants to tell you about the

24  Bandspeed settlement agreement.  And we've talked about

25  that case.  I really can't think of a worse case.

1          There's a company that's in the Bluetooth SIG.

2   They've already licensed to Samsung, and then they sued

3   them.  That's the case he wants you to focus on, not the

4   case in this courtroom.

5          How did we get to the chips?  We relied on

6   Dr. Morrow and Dr. Jones.  They looked at it.  Dr. Jones

7   used to work for Broadcom.  He's looking at the Broadcom

8   chips.  He says:  This is not the right comparable.

9          So what do we do?  We go into the market, and

10  we go to Texas Instruments.  And when EDR is released,

11  we look at the chip that has EDR and the chip that

12  doesn't have EDR, because it's the purest price

13  comparison.

14         What do they want us to do?  They want us to

15  go to some Broadcom chips that have other stuff built

16  into them.

17         And if we did that, what would they be saying

18  here today?  They would say:  Oh, it's a bowl of

19  spaghetti.  You can't tell how much EDR is driving

20  value.

21         Damned if you do; damned if you don't.  That's

22  why we went to the TI chips.  It's the best comparison.

23         So when you think about the hypothetical

24  negotiation, think about life with no EDR.  Here comes a

25  new device, and what happens?  All the other devices go

```
 1    into the garbage.  Without EDR, there's no backwards
 2    compatibility.
 3            So what does that mean about the negotiation?
 4    Think about this hypothetical negotiation.  You've got
 5    Samsung at one end of the table; you've got Rembrandt at
 6    the other.
 7            Samsung knows it needs a license to this
 8    technology.  If it doesn't get it, then every device it
 9    sells is not going to work with older devices back at
10    home.  So you sell a phone; it's not going to work with
11    the headpiece; it's not going to stream music.
12            So what are your options?  You take a license
13    or you don't.  If you -- if you don't take a license and
14    you have these problems, you're going to have customers
15    that are really unhappy.
16            And guess what?  There's an Apple store across
17    the street, right?  There's a -- there's an LG store
18    next door.  They don't have to buy from you.
19            So now you're a Samsung executive.  You can
20    solve all that problem by taking a license.  Would you
21    do that for 11 cents for every device?  Would you get
22    out of that business nightmare for 11 cents?
23            The Judge instructed you you can use your
24    common sense.  And I ask you please to do that.  When
25    you think about this issue, think about that.  Put
```

1   yourself in the Samsung person's shoes.  Would you pay

2   11 cents to avoid that and make your products backwards

3   compatible?

4        If the answer is yes and Samsung has put this

5   invention into hundreds of millions of devices, then at

6   11 cents, it's $31.9 million.  That's what the evidence

7   in this case has shown.

8        I'll be back to talk to you again in rebuttal.

9   I thank you for your time this morning.

10       Thank you, Your Honor.

11       THE COURT:  All right.  The Defendants may

12   present their closing argument.

13       MR. SHERWOOD:  Yes, Your Honor.

14       THE COURT:  Mr. Sherwood, would you like a

15   warning on your time?

16       MR. SHERWOOD:  Yes, Your Honor.  I would like

17   to be given notice when 20 minutes remain.

18       THE COURT:  Twenty minutes remain, when you've

19   used 15?

20       MR. SHERWOOD:  Yes, Your Honor.

21       THE COURT:  All right.  Proceed.

22       MR. SHERWOOD:  Thank you very much.

23       Good morning, ladies and gentlemen.  Thank you

24   very much for your service here and for keeping an open

25   mind during this trial.

1          I want to briefly review some of the evidence

2     and the proper way that I think you should consider that

3     evidence, and I want you to look at the evidence and not

4     be swayed by emotion or any rhetoric that you may hear

5     from the Plaintiff.

6          I will call out the exhibit numbers as I go

7     along during my closing.  And the rule of the Court is,

8     if you don't ask for those exhibits, they will not be

9     brought back to the jury room.  So please take a note of

10    them and ask for them in the jury room.

11         I told you in my opening that Samsung does not

12    infringe these patents, and now you've seen the

13    evidence, and it could not be clearer that Samsung does

14    not infringe.

15         Rembrandt failed to meet its burden of proving

16    more likely than not that Samsung infringes, because

17    every one of these claims requires the header of a

18    packet to notify of a change in the modulation method.

19         May we have the first slide?

20         And in fact, in 2003, when the 1.2 header came

21    out -- Mr. Hall testified about this -- there was only

22    one method of modulation.  And the header could not have

23    indicated a change in modulation method because there

24    was nothing to change to.

25         And, ladies and gentlemen, that header has

1   never changed.  The contents of that header are the same

2   up until today.  And the reason for that is so that all

3   Bluetooth devices can communicate with each other.

4           Next slide, please.

5           To use my analogy, Rembrandt has failed the

6   spelling bee, because they had to prove, as Dr. Morrow

7   agreed and as Dr. Goodman told you, that Samsung

8   literally meets every element of the claim.

9           And Judge Gilstrap repeated that in his

10  closing instructions to you a few minutes ago.  That

11  means there is no infringement, and that means there is

12  no liability.

13          Now, you will decide the issue of invalidity

14  as well, and because the Judge has instructed you to do

15  so and -- and also because, after having sat through

16  this trial and all the evidence, nobody should have to

17  pass this way again.

18          Remember, there are only three claims for you

19  to consider here.  And as you can see from your patents

20  in the juror notebooks, there are many more claims that

21  Rembrandt has.  Your decision will not affect any of

22  those other claims.

23          In my opening, I told you these claims are

24  invalid for two reasons.

25          The first is lack of written description.

1   That simply means that Rembrandt cannot have more than

2   Mr. Bremer described in writing when he submitted his

3   first application in 1997, not in 1998, which is what

4   Mr. Anaipakos was just talking about.

5          Check out PX-863 and look at the date.  That's

6   the Claim 23 that they talked about during

7   cross-examination of Dr. Goodman.  It's not dated 1997,

8   the date they want.  It's 1998.

9          The second reason for invalidity is

10  obviousness.  In 1997, Dr. -- Mr. Bremer's invention was

11  obvious, and it was obvious because a research group at

12  the Bell Labs part of Lucent had invented a wireless

13  system using two different modulation methods.

14         They got a patent for that invention, and

15  Dr. Goodman explained that when you combined that patent

16  submitted before the Bremer patent with the prior art,

17  Bremer's invention was obvious.

18         Slide 3, please.

19         Remember, this was part of Dr. Goodman's

20  analysis.  They look pretty similar, don't they?  As

21  Mr. Anaipakos told you, Rembrandt did have an invalidity

22  expert as well.  His name is Dr. Robert Akl.

23         And here's the page in your jury notebooks.

24  It's a blank page.  Some of you may have recognized him

25  sitting in the courtroom here.  He never made the walk

1   up to the witness stand, even though he was right over

2   there.  Only Dr. Goodman took an oath, walked the

3   30 feet to the witness stand and testified.  Dr. Akl, he

4   left town.

5           So what does that tell you about Rembrandt's

6   arguments here about invalidity?  If Dr. Akl's opinions

7   were so good as they want you to believe, why wouldn't

8   they have had Dr. Akl march right up here and tell you

9   about them?

10          Judge Gilstrap told you you can use your

11  common sense in deciding this case.  Well, here's a

12  great example of doing that.  When someone doesn't show

13  up, common sense tells you Dr. Akl had nothing good to

14  say about these three validity claims.

15          And I'll go into that further in a moment, but

16  let's spend a minute reviewing the evidence that you

17  heard this week.

18          Remember that Dr. Bremer was the first

19  witness -- Mr. Bremer.  He worked for a company called

20  Paradyne, which like Lucent, was part of AT&T.  He won a

21  bunch of awards.  You even saw pictures of them.

22          But none of them had anything to do with the

23  issues in this case, which he admitted on

24  cross-examination.  I can't imagine why we had to look

25  at those pictures unless it was to be distracted from

1    the truth here.

2         You heard Rembrandt's lawyers say in opening

3    that Mr. Bremer's invention is at the heart of EDR.

4    Mr. Bremer testified he didn't even know about Bluetooth

5    until 2007, three years after Bluetooth with EDR was out

6    in the marketplace.  Mr. Bremer most clearly did not

7    invent EDR.

8         And by the way -- Slide 5, please.

9         Here's a list of other things that Mr. Bremer

10   admitted he did not invent, including master/slave.

11        On direct, Mr. Bremer said he's proud of his

12   patents and glad to be here, but on cross, he admitted

13   he hired a lawyer to get the best deal out of Rembrandt

14   because he couldn't otherwise be bothered to be here.

15        And what did he do after he got on the witness

16   stand?  He's not in the courtroom now.  He left town,

17   too.  Mr. Bremer wrote a memo saying his patents offered

18   a real competitive advantage.  I don't know if you

19   remember that, but that's DX-7.  Not so.  Not even his

20   company took him up on that.

21        Slide 7, please.

22        No products for any of his inventions.

23        Mr. Ward, another Rembrandt lawyer, told you

24   in voir dire that battery life was a part of

25   Mr. Bremer's invention.

1            But when Mr. Bremer testified -- and remember,

2    his testimony is evidence; what the lawyers say is

3    not -- he couldn't even remember -- next slide,

4    please -- whether his patents mention battery life.

5            And guess what?  Battery life is never

6    mentioned in these patents because there's no discussion

7    about any device that needs a battery.

8            Remember, Mr. Bremer tried to sell the

9    patents.  No one wanted them.  And these patents were

10   eventually bought by Rembrandt as a big group of 74

11   patents and patent applications.  By then, Mr. Bremer

12   was working for Rembrandt.

13           You'll remember Paul Schneck testified, the

14   chairman of Rembrandt, sitting here at counsel table.

15   He told you he looks for Rembrandts in the attics.

16           Slide 9, please.

17           To coin a phrase from a famous Texas Senator,

18   Lloyd Benson, we know what Rembrandts look like, and

19   these, sir, are not Rembrandts.

20           But that's where Dr. Schneck's secret sauce

21   comes into play, because he is a touch-up artist.

22   Remember this document.

23           Slide 10.  Next slide, please.  Yeah.

24           This is the secret sauce document.  After he

25   buys these patents, Rembrandt goes to work on them, just

like a touch-up artist, to pass it off as a famous
master's painting after touching it up to make it look
that way.

So as Dr. Bremer -- as Dr. Schneck told you,
they got a committee of people at Rembrandt together,
and they started working on their secret sauce.  The
plan was to go after Bluetooth, the voluntary industry
organization that you heard about from Mr. Hall, the
group that shares Bluetooth technology for free.

And so Dr. Schneck's company filed a new
patent application that grew into two patents at issue
here that they call the Bluetooth patents.

Ask the Court for DX-1117.  That's the
document.  And, yes, just as Rembrandt planned, the two
patents are now being asserted against Bluetooth chips,
a product that Samsung buys from other companies.

Another witness you heard from was Stephen
Hall, a senior engineer at Broadcom.  Mr. Hall is the
father of EDR.  He was the chairman of the committee
that developed it.  When it comes to EDR, he is the man.

He never heard of Mr. Bremer, knew nothing
about these patents.  And that makes sense, because
Mr. Bremer and Rembrandt admitted they contributed
nothing to the Bluetooth Group's efforts, as you see
here from his testimony.

1          By the way, Rembrandt made a big fuss, both

2     during the trial and this morning, about Samsung's

3     corporate representative not knowing about the

4     technology in Broadcom's chips.

5          Remember that?

6          Dr. Benner, sitting here at counsel table, has

7     a Ph.D. in anthropology.  He is a highly educated man

8     who has a specific job at Samsung.  Samsung is full of

9     people like that, Dr. Benner, who are specialists in

10    their respective fields.

11         If we had brought somebody who was a

12    specialist in some other field, don't you think

13    Rembrandt would have complained about that as well?

14         What is that complaint about?  It's another

15    effort to avoid the facts, I submit to you.  Dr. Benner

16    took the stand, testified about the surveys he knew

17    about, which were relevant to the issues in this case.

18    That's more than we can say about Dr. Akl.

19         Dr. Benner, by the way, has a real job at

20    Samsung, but it was important for him to be here every

21    day.  And every minute that you were in this jury box,

22    he was at that table.

23         Let's look at the merits of the evidence now,

24    and let's start with infringement.

25         Slide 12.

1          You'll recall that every claim that's asserted

2     here requires a change -- a notification of a change in

3     the modulation method.  This requirement is repeated --

4     repeated over and over and over again.

5          Bluetooth does not do that, pure and simple.

6     Why not?

7          Slide 13.

8          Because they never changed the header back

9     from the days when they only had one modulation method.

10    As Mr. Hall told you at the end of this exchange, we

11    deliberately didn't change the structure because they

12    wanted all Bluetooth devices to communicate with each

13    other.  Dr. Hall explained that the header is not what

14    indicates the modulation method.

15         What was the rest of the testimony on this

16    issue?

17         Slide 14, please.

18         Well, they played Mr. Lim's testimony.  This

19    is something I showed you in opening.  Look at the

20    highlighted portion at the bottom that is referring to

21    TYPE code, which is the only thing that's in the header

22    with respect to this.  It does not indicate whether it's

23    basic rate or EDR.

24         What does that mean?  It doesn't tell you

25    whether there's going to be a change in the modulation

1    method.

2           When I asked Dr. Morrow if Mr. Lim could be

3    saying here that you can't make the determination except

4    by consulting a table that's not in the header, he

5    agreed.

6           What did Dr. Morrow say about the information

7    needed?  Let's look at Slide 15, which shows what has to

8    happen before you know the packet type.  Three steps,

9    and I went through that with him.

10          The first step, what's the logical transport?

11   Not in the header.

12          Second step, is EDR enabled?  Not in the

13   header.  Therefore, it doesn't tell you whether there's

14   a change in modulation.

15          And by the way, you just heard that Dr. Morrow

16   wrote the book on Bluetooth.  Well, he told us in this

17   jury -- in -- in the witness stand, the book he wrote

18   came out before EDR came out.

19          He didn't write a book about EDR.  Dr. Hall,

20   who spent all that time, three-and-a-half years, as Mr.

21   Anaipakos told you, he did write the book.  He is the

22   expert.

23          And Dr. Jones, by the way, he gave no opinion

24   at all.

25          This slide, misleading.  The testimony is not

1   as you just heard it.  In fact, the testimony is, from

2   all of the witnesses, there is no notification of the

3   change in modulation method in the header.  Never has

4   been; never will be.

5           Okay.  What did -- let -- let's have the next

6   slide, please.

7           Here is Dr. Morrow's testimony, and he's

8   asked:  What's in the header and what's not?

9           So if you look part way down the page, I said:

10  And that's not in the header either, is it?

11          And he said:  That's right.

12          And then I asked him:  What do you need to

13  know to know what packet type, to know what modulation

14  method is coming?

15          And he said:  These two pieces of information,

16  plus the TYPE code.

17          And those first two pieces, the first two

18  parts of that three-step process are not in the header.

19          Next slide, please.

20          Dr. Goodman said the same thing.  Look at his

21  testimony over here on the right.  It tells you what

22  they might be, what might be coming, but it doesn't tell

23  you which packet type is coming.  That's what all these

24  claims require.

25          Next slide, please.

1          Mr. Hall asked the same thing.

2          Is there any information not in the header

3     that Bluetooth needs to determine the modulation method?

4          Answer:  Yes, there is.

5          Question:  What is that?

6          That is actually which logical transport to

7     use.

8          Question:  Any other information?

9          Answer:  And there's a packet type table.

10          And then the question is:  Are they in the

11    header?

12          Answer:  No.

13          Page 84 of the transcript.

14          So here's what the testimony is, ladies and

15    gentlemen, from the witnesses who know.  This table at

16    the right, which is not in the header, is all the

17    information that you need.

18          If you only know TYPE code, if you only know

19    what's in that column -- could we have the animation?

20          When you go down, let's say your TYPE code is

21    0100, that's all you know from the header.  You don't

22    know, looking across to the right, what packet is

23    coming, because the information in the column headings,

24    that's not in the header.

25          THE COURT:  Fifteen minutes have been used,

1    Counsel.

2            MR. SHERWOOD:  Thank you, Your Honor.

3            So, remember, for literal infringement, an

4    element is missing.

5            Let's turn to invalidity.  First of all,

6    there's no issue on who is a person of ordinary skill,

7    because there was only one witness to testify.  So when

8    you think about it, remember, it's a person with a

9    master's degree in the relevant field, someone who is

10   highly skilled.

11           Mr. Bremer never showed in his 1997 filing

12   that there were tribs that used two modulation methods.

13   He had a Figure 3 that only showed one.  In the jury

14   room, look at Figure 3 in DX-1233.

15           But that didn't slow Rembrandt down.  They

16   started working their secret sauce to see what they

17   could do to shuck and jibe in front of the Patent Office

18   and get the invention date and take Mr. Bremer's later

19   disclosure out of the patent.

20           In 2009, two years after they bought the

21   patent, they applied for the '580, and they relied on a

22   2003 disclosure that made an incorporation by reference.

23           The Patent Office told Rembrandt it would

24   allow those claims.  And after getting that news,

25   Rembrandt did something really strange.  It took

1    something out of the patent application.  It took

2    something out, because they wanted that earlier

3    invention date.  They wanted the 1997 date.

4         So look here.  The argument they're making now

5    is:  In 2009, we incorporated this by reference.  And in

6    2011, we deleted it, but we didn't really delete it.

7    It's still there.

8         In other words, Rembrandt is saying:  You

9    cannot take us at our word when we told the United

10   States Government in 2011 that we were taking this

11   Figure 8 out of our original submission.

12        Again, use your common sense.  Hold them to

13   what they told the United States Government when they

14   applied for this patent.  And by the way, you heard

15   about Claim 23 from Rembrandt's lawyers, but not from

16   the Rembrandt expert.

17        That claim was filed in 1998, not 1997.  It's

18   irrelevant when you're claiming priority to a 1997

19   invention date.  Maybe that's why Dr. Akl didn't come

20   into the courtroom, take an oath, and testify.

21        Finally, you heard evidence about obviousness.

22   Remember my pencil slide?  It would be obvious for a

23   pencil-maker to combine a lead pencil and an eraser.

24        That's what Dr. Goodman explained to you when

25   he took you through his analysis of the Lucent patent,

1    the prior art, including master/slave, which Mr. Bremer

2    admitted was in the prior art and the other things.

3           What did Rembrandt offer in response?  A blank

4    page.

5           You heard Rembrandt's lawyers argue that

6    there's no master/slave relationship, but Judge Gilstrap

7    told you attorney argument is not evidence.  They have

8    no evidence.  Just a blank page.  And Mr. Bremer

9    admitted master/slave was in the prior art.  It's right

10   there in the patent.

11          Dr. Goodman compared the drawings in Lucent to

12   the Bremer patents, and he said that the access point --

13          Can I have Slide 24, please?

14          -- suggested to him that Access Point 12 here

15   in the Lucent patent suggested a master, and the mobile

16   station suggested slaves.

17          But he didn't stop there.  He showed you the

18   Upender article.  He showed you other pieces of prior

19   art that he said, he, as a person of skill, in 1997,

20   would have combined.

21          You heard Mr. Anaipakos say that Upender

22   teaches away.  There was no testimony about teaching

23   away.  None whatsoever.

24          The only testimony was that there are

25   tradeoffs in different choices you make depending on

1    what you want in your network.  And Dr. Goodman said

2    simplicity and determinacy are things you might very

3    well ask for.

4         You heard Rembrandt argue also, but not prove

5    with the witness, that Lucent showed only one modulation

6    method.  You remember all those wave patterns?

7         Dr. Goodman said those show different families

8    of modulation methods, just like Judge Gilstrap's

9    rulings call for.  Rembrandt offered no proof whatsoever

10   on that.

11        Dr. Goodman said the Lucent patent shows

12   varying different characteristics of a carrier wave,

13   including pulse.  It's called pulse position modulation.

14        No one came to court under oath to tell you

15   that a method called pulse position modulation is not a

16   type of modulation, which brings me to the issue of the

17   burden of proof.

18        Samsung does have a burden on invalidity, but

19   let's break that down a little bit.

20        First of all, the documents, like DX-1231

21   where Rembrandt said it was deleting something, they're

22   all in evidence.  There's no issue about the words on

23   those pages.  We all know what the word "delete" means.

24   That means out.  And that is a hundred percent proved.

25        Is there anything left to prove?  Well, there

1    might be a little bit.  Some matter of interpretation.

2    But here you only heard one interpretation from

3    Dr. Goodman.

4              So if he said pulse position modulation is a

5    type of modulation, that's all that's in the record.

6    And that means that the Lucent patent shows two

7    different types of modulation.  And with only one expert

8    here speaking for you, that means these claims are

9    obvious for all the reasons Dr. Goodman told you.

10             Now, can I have the ELMO, please?

11             When you go back in the jury room, you'll be

12   asked -- you'll be asked to complete this form.

13             First, did Rembrandt prove by a preponderance

14   of the evidence that Samsung infringed any of the

15   following asserted claims?

16             I submit to you the answer to that question is

17   no.

18             Second, you'll be asked:  Did Samsung prove by

19   clear and convincing evidence that any of the following

20   claims of the '580 and the '228 are invalid?

21             And the answer to those questions are yes.

22             And you do not have to complete the rest of

23   the form, ladies and gentlemen.

24             Mr. Jenner, my colleague will finish the

25   presentation for Samsung, Your Honor.

1          THE COURT:  Would you like a warning on the

2    expiration of your time, Mr. Jenner?

3          MR. JENNER:  Yes, sir.  Five, please.

4          THE COURT:  All right.  Proceed.

5          MR. JENNER:  Thank you, Mr. Sherwood.

6          And thank you, ladies and gentlemen, for your

7    attention throughout this trial.

8          First, a caution.  You might think that

9    because I'm going to talk about damages, Samsung is

10   admitting that it infringes and there are damages.  That

11   logic might be true outside this courtroom, but in here,

12   things are different.

13         Even though we think Samsung owes Rembrandt

14   nothing, I have to address damages, because Rembrandt

15   wants $30 million.  We can't ignore that.

16         So you need to understand that even though I

17   am addressing damages, this is no admission on my part

18   or Samsung's part that there should be any damages.

19         Now, let me discuss with you what I think is

20   right.

21         No infringement or invalidity; there's no

22   liability; there's no damages.  That's pretty

23   straightforward.

24         So let's go on to the part that matters.  What

25   if you think there is liability?  Then we have to go

through a comparison of the evidence on the damages.

Basically, you heard Samsung's position, primarily articulated by Dr. Becker, is that the damages are on the order of $500,000.  You also heard Mr. -- Mr. Weinstein primarily articulate Rembrandt's position. They want somewhere between 14 and $31 million.

So, first, before I start going through this, in light of those widely divergent claims, I'd like you to keep in mind as I review this evidence, three things: Reliability, credibility, and fairness.

Consider what testimony on damages was reliable and incredible, and what result is fair and not overreaching.

Let's start with Dr. Becker's analysis.  He relied primarily on four data points for his view of how the Georgia Pacific hypothetical negotiation be -- should be conducted, and here they are.  Let me talk about them.

The first one was the Bluetooth SIG agreement. This is Exhibit DX-1255, if you ask for it.  This is the agreement in which 24,000 companies have agreed that Bluetooth technology should be shared royalty free, that each of them believed the development of Bluetooth would be enhanced by allowing others who agree to share for free the Bluetooth patents.

1    Obviously, Rembrandt didn't agree to that.

2    They're not a part of it.  They're taking advantage of

3    the fact that they're not a part of it to demand

4    $30 million.  They have the right to do that, but take

5    into account as Data Point 1, the Bluetooth SIG

6    agreement that 24,000 companies have signed up to.

7    Data Point 2 was the 2007 Rembrandt/Zhone sale

8    agreement.  That's a situation where Rembrandt paid

9    $5 million, and it got 74 patents and applications,

10   including Bremer.

11   The only point I'll ask you to consider here

12   is there's nothing -- there's nothing about this

13   exhibit, DX-1052, if you ask to see it, that shows

14   anything of enormous value on the part of the Bremer

15   patent.

16   Data Point No. 3 was a 2009 agreement where

17   Rembrandt licensed ARRIS after litigation.  The license

18   was $3 million in payment in return for a license under

19   something like 210 or so patents.  One of these was the

20   Bremer property.

21   Once again, you can't derive too much from

22   that, other than the fact that nothing about this

23   suggests that the Bremer patent is worth millions.

24   Comes to Data Point No. 4, and that's where

25   the dispute in this case is.  Data Point 4, which you

1    should pay particular attention to -- it's DX-1254, if

2    you ask for it -- is the Bandspeed agreement which I

3    submit is the significant agreement in this case.

4            Bandspeed is most important because it

5    occurred in the same time period as the hypothetical

6    negotiation.  That's September of 2011.  This agreement

7    is June 2011.

8            It accused the same Samsung products.  It

9    involved the same Bluetooth chips.  It involved the same

10   number of patents:  Two.  And it was for comparable

11   technology that you've heard about, the adaptive

12   frequency hopping of Bluetooth.

13           This is what you will see as a Factor 2

14   agreement.  It relates to similar patents, not the same

15   patents.  I readily acknowledge that.  But the only

16   other agreement that had the same patents, which is

17   where Rembrandt bases its case, is the BlackBerry

18   agreement.

19           And as you heard during the trial and as I'll

20   recap in a while, the BlackBerry agreement is worthless.

21   You can't rely on it because there was no price that the

22   parties ever agreed on.  You can't compare anything to a

23   priceless agreement.

24           So here's what Dr. Becker said.  Take the

25   950,000-dollar lump-sum payment and make these so-called

1  Georgia Pacific factor adjustments.  He thought three of

2  them would lower the value.  The license was shorter.

3  It was only in the United States and so on.

4        One of them would raise the value because the

5  patent's presumed valid at the hypothetical negotiation.

6  He got to $500,000.

7        He was criticized because he didn't put a

8  value on each of these factors, but if you think back,

9  Mr. Weinstein didn't put a value on the factors he

10 relied on either.

11        And Dr. Becker explained they don't normally,

12 these damages experts, put the value on these factors.

13 They look at them as a whole, and they decide how they

14 affect the price.  He thought it affected the price down

15 to 500,000.

16        You, the jurors, get to consider these factors

17 and are the ultimate arbiters.  You may decide

18 Dr. Becker is right and the price should be $500,000.

19 You may decide that the factors should not move down the

20 value that much.  For all I know, you may think that the

21 right price is the $950,000 of the Bandspeed agreement.

22        What that actually does, interestingly, is it

23 gives you a range between $500,000 and $950,000.  You

24 can decide maybe that there's a number in there that's

25 right.  But keep in mind, that's a lot more credible and

```
 1   rational and fair than the 15 to $30 million that Dr. --
 2   that Mr. Weinstein thinks.
 3            Now, I want to touch just briefly on value.
 4   We heard a lot of talk about the value of EDR.  We don't
 5   dispute that there's some value to EDR.
 6            Dr. Benner acknowledged value, just like
 7   there's value in other features in a smartphone.  Think
 8   about the zoom feature in a camera.  There's value in
 9   features, but they just aren't worth $30 million.
10   That's not fair.
11            It's overreaching for Rembrandt to suggest
12   that EDR is the solution to battery life when the survey
13   reports you -- you saw show that Samsung's phones all
14   had EDR for years, but EDR didn't solve the customer
15   complaints about battery life.  It wasn't the cure-all.
16            The bottom line is, if you find infringement,
17   these patents are worth around $500,000.  It's
18   irrational to think that they're worth 30 million when
19   virtually nobody knows about EDR.
20            And remember, the only way that Rembrandt gets
21   to $30 million is through Mr. Weinstein's chip price
22   analysis.  So let's look at that now and see if that's
23   reliable and credible.
24            Here's the methodologies.  One of them is the
25   chip price analysis on the left.  The other one I'll
```

1    come to is the BlackBerry agreement.  The chip price

2    comparison, I submit to you, was unreliable methodology

3    using cherrypicked data and not applicable to Samsung's

4    actual products, among other problems.

5            THE COURT:  Five minutes remaining.

6            MR. JENNER:  Here's the chart that I showed

7    you of the TI data.  You can see the two rows that

8    Mr. Weinstein relied on where he cherrypicked the

9    occasions where the prices went up a bunch for EDR

10   chips.

11           He didn't bother with the first quarter of

12   2007 where, as things stabilized, it's a 1-cent

13   difference, which we talked about.  I'll come back to

14   that.

15           There were questions raised about, well, he

16   didn't have the later data.  Samsung didn't give him the

17   later data.  He could have requested it.  They could

18   have gone and gotten it from TI.

19           But the fact is he did get the later data.  He

20   had all this data.  He acknowledged that.  He could have

21   changed his opinion in light of the rest of it, and he

22   didn't do that.

23           Look at the later data from the second quarter

24   of 2007 onward, every single quarter, after things had

25   obviously stabilized, the price of the EDR chip is

```
1   lower, not higher.
2          And Dr. Benner -- Dr. Becker even showed you
3   two quarters in 2008 where about the same quantities of
4   units, several million, of the old chip, several million
5   of the new chip, were sold.  And in those two quarters,
6   the price of EDR was lower.
7          The only justification that you were offered
8   for this is that in the quarters chosen by
9   Mr. Weinstein, there is supposedly a peer comparison.
10  The only thing that changed was EDR.
11         Not so.  He admitted on my -- my
12  cross-examination that there were other things that went
13  into the chips.  Smaller process technology that made
14  lower line size transistors, a more sensitive receiver,
15  lower -- lower transmit power.
16         So you have to take the price into account of
17  the process change, the new receiver, and the
18  transmitter, and he didn't use any of those in -- in
19  acknowledging that those were factors that could have
20  changed the price of the chip, even if this analysis was
21  the right way to go about it.
22         To go back to the first quarter of 2007, you
23  may remember this chart that I showed him, which was to
24  take the 1-cent difference in the first quarter of 2007
25  and walk through his entire analysis.  And when you do
```

1    that, you come to a payment, if you believe in this
2    process, of $916,000.
3            And what do you think about that?  That's
4    right in Dr. Becker's sweet spot between $500,000 and
5    $950,000 for the Bandspeed agreement.  This is what's
6    sensible if you even think that this methodology makes
7    sense.
8            Now, let's look at the BlackBerry agreement,
9    which is the other agreement you're supposed to consider
10   instead of Bandspeed.  That was wrong from start to
11   finish, because the whole analysis you heard was
12   completely fabricated for litigation.
13           Here is Paragraph 4.1, the payment provision
14   where the payment X is plainly a lump sum.  It's not
15   some running royalty they want you to believe of
16   10 cents that became applicable here.
17           Here's the paragraph where they tried to
18   concoct the 10-cent royalty.  And you can see from the
19   paragraph, even in the part where Rembrandt's
20   calculation is stated, they admit it's a lump sum, and
21   they end by saying:  BlackBerry does not agree to an
22   allocation of the payment.
23           No matter what anybody says about what they
24   think BlackBerry thought or maybe some allocation was
25   okay, this is the agreement.  This is the contract.

1    BlackBerry does not agree to this allocation.  It's a

2    single lump sum.

3            It's an allocation concocted by Rembrandt.

4    BlackBerry rejected the allocation.  There was no

5    agreement on the price for the license components, so

6    you don't have a Factor 1 agreement that you can make

7    comparisons with.

8            There was no agreement on a running royalty.

9    There was no agreement on this allocation whatsoever.

10           More, you heard the cross-examination where I

11   showed this email to Mr. Weinstein.  When I asked him

12   whether it wasn't the fact that the parties, Rembrandt

13   and BlackBerry, were actually colluding, and I read the

14   highlighted section where counsel for BlackBerry asked

15   if Weinstein could determine if the amount they were

16   talking about could help him with his purposes going

17   forward.

18           What were the purposes going forward?  The

19   only purpose left was to stick Samsung with a

20   30-million-dollar payment.  That's collusion, ladies and

21   gentlemen.  That's what was going on here, not a valid

22   Factor 1 agreement.

23           And when I asked him about the 10-cent royalty

24   that they want you to buy into, he admitted when I

25   showed him his deposition, he didn't even calculate that

```
 1    10-cent royalty.
 2              THE COURT:  Thirty seconds.
 3              MR. JENNER:  It was given to him by Rembrandt.
 4    He didn't do the work himself.  He wasn't even acting as
 5    an independent expert.
 6              So at the end of the day, that analysis
 7    doesn't get you to 30 million.  None of it is reliable.
 8    The right answer is something on the order of $500,000.
 9              The last thing I want to say to you, ladies
10    and gentlemen, is remember that you're now going to hear
11    more from Rembrandt for 15 minutes.  We don't get to
12    reply.
13              That's the rules of the game, but bear in
14    mind, this gives Rembrandt 15 minutes to say anything
15    they want to about the facts, arguments, sound bites,
16    hyperbole --
17              THE COURT:  Your time is up, Counsel.
18              MR. JENNER:  I'm sorry, Your Honor?
19              THE COURT:  Your time is up.
20              MR. JENNER:  Take it with a grain of salt.
21              Thank you very much, ladies and gentlemen.  I
22    appreciate your attention.
23              Thank you, Your Honor.
24              THE COURT:  Thank you, Counsel.
25              MR. ANAIPAKOS:  Your Honor, may I ask of the
```

```
 1   Court --
 2              THE COURT:  You have 12 minutes.
 3              MR. ANAIPAKOS:  Thank you, Your Honor.
 4              May I proceed?
 5              THE COURT:  Would you like a warning on this
 6   remaining time?
 7              MR. ANAIPAKOS:  Please, Your Honor, at three
 8   minutes.
 9              THE COURT:  Three minutes.
10              Proceed.
11              MR. ANAIPAKOS:  Thank you, Your Honor.
12              Can we have Rebuttal Slide 8, please?
13              I told you when I started that this was about
14   hiding the truth and smoke screens.  They just put this
15   document up on the screen before you, and they're trying
16   to use it to invalidate my client's patents.  They try
17   to say:  Oh, don't worry.  It's just a couple of the
18   claims.  They know that we're bringing the best claims
19   in this case.
20              If you invalidate these claims, these patents
21   are gone.  And they put this on the screen in front of
22   you, and they say to you with a straight face that this
23   is out of the Lucent patent.  That is not true.
24              And I will ask you, please, to look at it when
25   you go back there.  These boxes that they've colored in,
```

1    they have colored in to make it look like our invention.

2            That's not even the way this -- this scheme,

3    Figure 1, shows up in the Lucent patent.  These lawyers

4    turned it to make it more -- look more like ours.  But

5    what's the worst thing?

6            You see that master/slave, master/slave

7    language on there.  They're trying to say, this

8    discloses master/slave.  I would agree if that was in

9    the document.  That is lawyer graffiti.  It's not

10   anywhere in the documents.  It's not in there.  Look at

11   it.

12           They wrote that in there and told you with a

13   straight face that this invalidates our patent.  That is

14   shameful.  Shameful.  And they did that in open court.

15           Can you please put up Exhibit -- I guess it's

16   Slide No. 2.

17           Let's talk briefly about written description.

18   Dr. Goodman made it clear that the claims that you're

19   actually looking at in this case are about a master

20   transceiver.  That's it.  He made that very clear.

21           Go to the next slide, please.

22           And if you look at our claim language, that's

23   what we claim.  So there really isn't any dispute about

24   that.

25           Provisional applications, you'll look at that,

```
 1    the one from 1997.  Those don't have claims in them.
 2    That's why it's a 1998 filing that you look at.  That's
 3    when you first start adding claims.  The provisionals
 4    don't have claims in them.  That's the way the law
 5    works.
 6              In 1998 is the first time you're going to see
 7    the claims.  That's why I was telling you to look at the
 8    1998 patent application.  That's where the claims are.
 9              Can we turn, please, to Slide No. 4?
10              You saw this in -- in opposing counsel's
11    argument where they were trying to say that somehow we
12    actually didn't incorporate stuff by reference because
13    it was removed in March of 2011.
14              Turn to the next one, please, No. 5.
15              But our patent issues in September of 2011,
16    and that language is still in there, okay?  There was
17    nothing deleted.  We've walked through that.  It's more
18    smoke and mirrors, more lawyer graffiti.
19              Let's look at Slide No. 6, please, on
20    infringement.
21              What does Dr. Goodman acknowledge?
22              He acknowledges that not only that Hall wrote
23    that the header indicates the modulation method, but
24    what does he say there?
25              He testified that this describes what's
```

```
 1   happening in EDR.  That's the document that Dr. Hall
 2   wrote before lawyers were involved, when no one else was
 3   watching, and it describes what our patents do.  Look at
 4   that document.
 5           There's a suggestion that we've been
 6   cherrypicking prices.  Let's look at that.
 7           Slide 17, please.
 8           The truth is, we didn't cherrypick anything.
 9   Mr. Weinstein got this information from Texas
10   Instruments.  He didn't pick it.  They were the ones who
11   told him which two chip prices -- to which two chips to
12   use.
13           They had the EDR chip and the non-EDR chip.
14   And it's real simple.  We picked it, because that's the
15   chip that isolates the difference between the two.  It's
16   that simple.  This wasn't Roy Weinstein cherrypicking.
17           Go to the next slide, please.
18           The next one.  I'm sorry.  Slide 10, please.
19   Slide 10.
20           There -- thank you.
21           As I mentioned to you, Dr. Morrow testified
22   that the TI chips were the best that he could find.
23           And Slide 11, please.
24           And Dr. Jones testified the same way.
25           Can you go to Slide 42, please?  Slide 42,
```

 1   please, of the original presentation.

 2           The next one, please, Slide 42, Question 1 of

 3   the verdict form.

 4           Slide 39.

 5           Let me just turn on the ELMO, if you would,

 6   please.

 7           Thank you.

 8           All right.  The questions that you've been

 9   asked, infringement of the three patents, the answer to

10   Question No. 1 is yes as to all three.  Those are

11   Claim 2 of the '580, Claim 59 of the '580, and Claim 21

12   of the '228 patent.

13           As to whether they have carried their burden

14   to show that these are invalid by clear and convincing

15   evidence, the answer is no as to Question 2 for all

16   three of them.

17           Then I showed you before on damages, the

18   answer is $31.9 million.

19           Now, I want to talk to you -- I talked to you

20   earlier about the hypothetical negotiation and what it

21   would look like from Samsung's perspective.

22           Now, I want to talk to you about what it would

23   look like from Rembrandt's perspective.  Remember what

24   Dr. -- what Dr. Becker said the royalty rate would be

25   for Rembrandt, 8/100 of one penny.

1          So here's the hypothetical negotiation.

2    Dr. Schneck is there for Rembrandt.  Dr. Schneck has a

3    Ph.D. from NYU in computer science.  He was on the Board

4    of Advisors to our country's National Security Agency.

5    He's a smart man.

6          He's at the table with Samsung.  They're

7    talking about backwards compatibility.  And the Samsung

8    executives tell him:  Dr. Schneck, we want a license,

9    and I've got a deal for you.

10          That's what we're going to pay you,

11   Dr. Schneck.  You're going to give me a penny for every

12   device.  Not exactly, 8/100 of one penny.  That's what

13   we're going to pay you.  So that when we sell about 1200

14   devices, we'll give you a dollar.

15          And they want you to believe that in the

16   hypothetical negotiation, Dr. Schneck would agree to

17   that.  Does that make any sense, that Dr. Schneck would

18   agree to something like that?

19          That's what I want you to think about, this

20   hypothetical negotiation and who's motivated to agree to

21   what.

22          Does it make more sense that Dr. Schneck would

23   agree to one, whatever it is, some tiny fraction of a

24   penny, or that Samsung, to get out of this backwards

25   compatibility nightmare that it would be in, would pay

```
 1   11 cents per device?  Which makes more sense to you?
 2           Let's talk about this BlackBerry license
 3   quickly.
 4           Slide 26, please, of the rebuttal.
 5           If you think that there is a -- there we go.
 6   Thank you.
 7           Mr. Weinstein testified that BlackBerry was
 8   reluctant to agree to an allocation because it would be
 9   used against it in other lawsuits.  That makes sense.
10           And if you think that there is a collusion
11   between us and BlackBerry, I just -- that makes so
12   little sense.  We -- we had sued BlackBerry, and we had
13   been in this court duking it out for a year-and-a-half,
14   and then they suddenly want to jump in bed with us.
15           Does that make any sense?  I understand their
16   lawyer wants to believe it, but there isn't a witness in
17   the world who took this stand that said anything like
18   that.  BlackBerry is a huge company located up in
19   Dallas.
20           THE COURT:  Three minutes remaining.
21           MR. ANAIPAKOS:  It makes absolutely no sense.
22           But what do you know?  We were colluding with
23   our buddies at BlackBerry, and all the time that we're
24   negotiating an agreement with them, the price is going
25   up.  Strange to do that with someone you're colluding
```

1   with, isn't it?  And the price is going up by 10 cents a

2   unit.  What does that tell you about what BlackBerry was

3   willing to do in a negotiation?

4          But Dr. Becker doesn't want to talk about

5   BlackBerry that was in this case with these lawyers on

6   these patents before this Judge.  They don't want to

7   talk about that because that's not comparable to this

8   case.

9          They want to talk about the Bandspeed case,

10  the bogus lawsuit that didn't involve these patents or

11  this technology.  In order to buy off on Dr. Becker's

12  numbers, you have to agree that that's the comparable

13  license.

14         How are you going to do that?  It makes no

15  sense.  What is comparable?  What's before you right in

16  front of your eyes or something somewhere else?  That's

17  what this lawsuit has been about from day one.  Smoke

18  screens.  Lawyer graffiti, half truths.  That's what

19  this is about from their perspective.

20         From our perspective, my client has important

21  inventions.  Gordon Bremer, yeah, he wasn't a member of

22  the SIG, but he has a hundred patents.  He's not going

23  to win a popularity contest, but he's a smart guy, a

24  creative guy.

25         And that's what matters in this court of law.

1    We're not here deciding who the most popular person is.

2            My client has important property rights.

3    We -- we know that you're going to take a long hard look

4    and serious look at the evidence, and we welcome that.

5    Because it's time for all the smoke to vanish and for

6    justice to be done.

7            Thank you.

8            Thank you, Your Honor.

9            THE COURT:  All right.  Ladies and gentlemen,

10   I'd now like to provide you with just a few final

11   instructions before you retire and begin your

12   deliberations.

13           Again, you must perform your duties as jurors

14   without bias or prejudice to any party.  The law does

15   not permit you to be controlled by sympathy, prejudice,

16   or public opinion.

17           All parties expect that you will carefully and

18   impartially consider all the evidence, follow the law as

19   I have given it to you, and reach a just verdict,

20   regardless of the consequences.

21           Answer each question in the verdict form from

22   the facts as you find them to be.  Do not decide who you

23   think should win and then answer the questions

24   accordingly.  Your answers and your verdict must be

25   unanimous.

1          You should consider and decide this case as a

2     dispute between persons of equal standing in the

3     community, of equal worth, and holding the same or

4     similar stations in life.  This is true in patent cases

5     between corporations, partnerships, and individuals.

6          A patent owner is entitled to protect its

7     patent rights under the United States Constitution.

8     This includes bringing a suit in a United States

9     District Court for money damages for infringement.

10          The law recognizes no distinction among types

11     of parties.  All corporations, partnerships, and other

12     organizations stand equal before the law, regardless of

13     size or who owns them, and they are to be treated as

14     equals.

15          When you retire to the jury room to deliberate

16     on your verdict, you will each have a copy of this

17     charge to take with you.

18          If you desire to review any of the exhibits

19     which the Court has admitted into evidence, you should

20     advise me by a written note delivered to the court

21     security officer, and I will then send you that exhibit

22     or those exhibits which you've requested.

23          Certain documents that you were shown during

24     the trial are demonstratives.  Demonstratives are a

25     party's description, picture, or model to describe

1    something involved in the trial.

2           If your recollection of the evidence differs

3    from the demonstrative, rely on your recollection.

4    Demonstratives are not evidence.  However, a witness's

5    testimony that references the demonstrative is evidence.

6           Once you retire, you should first select your

7    foreperson and then conduct your deliberations.  If you

8    recess during your deliberations, follow all of the

9    instructions that the Court has given you about your

10   conduct during the trial.

11          After you have reached your verdict, your

12   foreperson will fill in the blanks on the verdict form,

13   reflecting your unanimous answers to the questions that

14   are found therein.  The foreperson will then date the

15   verdict form and sign it and then deliver it to the

16   court security officer.

17          Contrary to my earlier instructions, which I

18   gave you repeatedly during the trial, it is now your

19   sworn duty to discuss the case with one another in an

20   effort to reach an agreement, if you can do so.

21          Each of you must decide the case for yourself,

22   but only after full consideration of all the evidence

23   with the other members of the jury.

24          While you are discussing the case among

25   yourselves, don't hesitate to re-examine your own

1   opinions or change your mind if you become convinced

2   that you were wrong.  However, don't give up your honest

3   beliefs solely because others might think differently or

4   to finish the case.

5           Do not reveal your answer until such time as

6   you are discharged, unless otherwise directed by me.

7   And you must never disclose to anyone, not even me,

8   your -- your numerical division on any question.

9           Any notes that you've taken during the trial

10  are aids to memory only.  If your memory should differ

11  from your notes, then you should rely on your memory and

12  not your notes.  The notes are not evidence.

13          A juror who has not taken notes should rely on

14  his or her own independent recollection of the evidence

15  and should not be unduly influenced by the notes of

16  other jurors.  Notes are not entitled to any greater

17  weight than the recollection or impression of each juror

18  about the testimony.

19          If you want to communicate with me at any time

20  during your deliberations, please give a written message

21  or question to the court security officer who will bring

22  it to me.  I will then respond as promptly as possible

23  in writing or by having you brought back into the

24  courtroom so that I can address you orally.

25          I will always first disclose to the attorneys

```
 1   in the case your question and my response before I
 2   answer your question.
 3           After you have reached a verdict and I have
 4   discharged you, you are not required to talk with anyone
 5   about the issues in this case unless I order otherwise.
 6           However, you will then be free to discuss the
 7   case with anyone, if you choose to do so.  Whether or
 8   not you discuss your service as jurors after you have
 9   been discharged is strictly up to you and no one else.
10           I'll now hand eight copies of these final jury
11   instructions and one clean copy of the verdict form to
12   the court security officer to deliver to you once you
13   retire to deliberate.
14           Ladies and gentlemen of the jury, you may now
15   retire to deliberate.  We await your verdict.
16           COURT SECURITY OFFICER:  All rise for the
17   jury.
18           (Jury out.)
19           THE COURT:  The Court stands in recess
20   awaiting the jury's verdict or a question from the jury.
21           COURT SECURITY OFFICER:  All rise.
22               (Jury deliberations.)
23           * * * * * * * * * * * * * * * * * * * * *
24
25
```

1

2                         CERTIFICATION

3

4          I HEREBY CERTIFY that the foregoing is a

5    correct transcript from the stenographic notes of the

6    proceedings in the above-entitled matter to the best of

7    my ability.

8

9

10   /s/Shelly Holmes                2/13/15
     SHELLY HOLMES, CSR, TCRR        Date
11   Official Court Reporter
     State of Texas No. 7804
12   Expiration Date:  12/31/16

13

14

15

16

17

18

19

20

21

22

23

24

25