IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| **REMBRANDT WIRELESS TECHNOLOGIES, LP,** | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | CASE NO. 2:13-cv-213-JRG |
| **SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., AND SAMSUNG AUSTIN SEMICONDUCTOR, LLC,** | § § § § § § | |
| *Defendants.* | | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Samsung Defendants' ("Samsung") Rule 50(b) Renewed Motion for Judgment as a Matter of Law and/or Rule 59(a) Motion for New Trial on Damages Issues ("Mot.", Dkt. No. 328). The Court heard argument on November 3, 2015. For the reasons set forth below, Samsung's Rule 50(b) Renewed Motion for Judgment as a Matter of Law and/or Rule 59(a) Motion for New Trial on Damages Issues is **DENIED**[1].

### I. BACKGROUND

The Court held a jury trial in this case, and the jury entered a verdict on February 13, 2015. The asserted claims of U.S. Patent No. 8,023,580 ("the '580 Patent") and U.S. Patent No. 8,457,228 ("the '228 Patent"), the two patents-in-suit, involve a system in which devices can communicate with each other on the same network using different modulation methods. The jury returned a verdict that the asserted claims were infringed and not invalid, and it awarded $15.7

---

[1] The Court notes that Samsung has also filed a Motion for Judgment as a Matter of Law and/or Rule 59(a)Motion for a New Trial on Liability Issues such is still pending before this Court (Dkt. No. 329).

1

million in damages[2] to Plaintiff Rembrandt Wireless Technologies, LP ("Rembrandt"). ("Verdict", Dkt. No. 288.) Samsung now asserts that the jury did not have sufficient evidence for its findings.

Samsung offers two main arguments in support of its contention that Rembrandt did not present sufficient evidence to support the jury's damages award. First, Samsung argues that Mr. Roy Weinstein, Rembrandt's damages expert, analyzed the prices of chips unrelated to the accused Samsung products, improperly isolated chip price data, and failed to correctly apportion between patented and unpatented features of the Bluetooth technology at issue in this case. Second, Samsung argues that Mr. Weinstein relied on a license agreement provision that Rembrandt unilaterally created for litigation purposes. Additionally, Samsung alleges that the jury simply reached a compromise verdict.

In the alternative, Samsung contends that it is entitled to a new trial on damages because the Court made multiple erroneous evidentiary rulings. Having considered the parties' briefing, arguments, and the entire record, the Court is persuaded that Rembrandt introduced substantial evidence that is more than adequate to support the jury's damages verdict. The Court also concludes that Samsung is not entitled to a new trial on the issue of damages.

## II. LEGAL STANDARD

### A. Applicable Law Regarding FRCP 50

Upon a party's renewed motion for judgment as a matter of law following a jury verdict, the Court should properly ask whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." FRCP 50(b); *see also Am. Home Assur. Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004). "The grant or

---

[2] Samsung asserted at trial that, if damages were awarded, the proper amount of damages should not exceed $500,000.

denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirectTV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). "A JMOL may only be granted when, 'viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion.'" *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).

Under Fifth Circuit law, a court is to be "especially deferential" to a jury's verdict, and must not reverse the jury's findings unless they are not supported by substantial evidence. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A motion for judgment as a matter of law must be denied "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Baisden*, 693 F.3d at 498 (citation omitted). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 451 (5th Cir. 2013) (citation omitted). However, "[c]redibility determinations, the weighing

of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151 (citation omitted).

**B.     Applicable Law Regarding FRCP 59**

Under FRCP 59(a), a new trial can be granted to any party after a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FRCP 59(a). In considering a motion for a new trial, the Federal Circuit applies the law of the regional circuit. *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1347 (Fed. Cir. 2007). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985). "The decision to grant or deny a motion for a new trial is within the discretion of the trial court and will not be disturbed absent an abuse of discretion or a misapprehension of the law." *Prytania Park Hotel, Ltd. v. General Star Indem. Co.*, 179 F.3d 169, 173 (5th Cir. 1999).

**C.     Applicable Law Regarding Damages**

Upon a showing of infringement, a patentee is entitled to an award of damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. However, "[t]he burden of proving damages falls on the patentee." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). There are two alternative categories

of damages typically recovered in a patent case: the patentee's lost profits or the "reasonable royalty [the patentee] would have received through arms-length bargaining." *Id.* In this case, Rembrandt sought a reasonable royalty.

To determine an appropriate reasonable royalty, patentees (and courts) commonly employ the hypothetical negotiation, or "willing licensor-willing licensee" model. *Id.* at 1324–25. The hypothetical negotiation "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began" with the assumption that the patent is valid, enforceable, and infringed. *Id.*; *see also Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n.13 (Fed. Cir. 1995) (en banc).

Such a reasonable royalty analysis "necessarily involves an element of approximation and uncertainty." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995). However, the Court must ensure that a jury's damages award is supported by substantial evidence. *Id.* Generally, the Court should uphold a jury's damages award "unless 'grossly excessive or monstrous,' clearly not supported by the evidence, or based only on speculation or guesswork." *Energy Transp. Group, Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1356 (Fed. Cir. 2012).

### III. ANALYSIS

At trial, Rembrandt based its damages analysis on the value of Enhanced Data Rate ("EDR") functionality in Bluetooth devices[3] and presented its damages theory through the testimony of Mr. Weinstein. Mr. Weinstein compared the prices of two Texas Instruments ("TI")

---

[3] Rembrandt asserted that the patented technology at issue consists of "embedded modulations," and "[w]ithout embedded modulation, [EDR] does not work." (2/9/2015 P.M. Trial Tr., Dkt. No. 290 at 37, 43.) Rembrandt further stated that "the evidence will be that Samsung cannot make a Bluetooth EDR device without infringing [the patents-in-suit]. Why? Because embedded modulation is the heart of enhanced data rate." (*Id.* at 178.)

5

chips over two fiscal quarters: one chip included EDR functionality, and the other did not. (2/10/2015 P.M. (Sealed) Trial Tr., Dkt. No. 294 at 3:16–18, 4:14–17.) He used such cost comparison to identify the incremental value associated with implementing the EDR functionality to fall between 8.5 and 18.9 percent. (*Id.* at 6:24–7:16.) Mr. Weinstein then took this percentage difference in the price of the TI chips and applied it to the price of chips that Samsung actually purchased for its devices. (*Id.* at 9:20–23.) Employing this formula, Mr. Weinstein arrived at a royalty rate of between 5 and 11 cents per device. (*Id.* at 11:24–12:5.) Mr. Weinstein's final step was to apply his royalty rate calculations to the total number of accused Samsung sales during the damages period. (2/10/2015 P.M. Trial Tr., Dkt. No. 293 at 133:21–24.) Specifically, he multiplied the 5-cent and 11-cent royalty rates by 290 million devices to arrive at a range of $14.5 to $31.9 million in total damages. (*Id.* at 134:8–11.)

Additionally, Mr. Weinstein incorporated a license agreement between Rembrandt and BlackBerry covering the patents-in-suit ("BlackBerry-Rembrandt Agreement") to confirm his damages analysis. (2/10/2015 P.M. (Sealed) Trial Tr., Dkt. No. 294 at 17:13–15.) Mr. Weinstein assessed the agreement's structure and determined that, during what he found to be the relevant time period, Rembrandt licensed its patent rights to BlackBerry at a per-unit rate that supported Mr. Weinstein's ultimate damages conclusions in the present case. (*Id.* at 19:3–7, 20:20–23.)

As discussed above, the jury awarded Rembrandt $15.7 million in damages. Samsung now argues that no reasonable jury could have found Samsung liable for that amount. Moreover, Samsung asserts that it is entitled to a new trial because of allegedly erroneous decisions made by the Court.

**A.      Rembrandt Introduced Sufficient Evidence to Support the Jury's Damages Award**

At the outset, the Court notes that many arguments raised in Samsung's Renewed Motion

6

for Judgment as a Matter of Law merely re-urge Samsung's previously-filed *Daubert* challenges. *See, e.g.*, (Dkt. No. 189.) In *Versata*, the Federal Circuit found such practice to be improper and rejected the defendant's JMOL arguments directed toward admissibility of expert testimony. *Versata Software Inc. v. SAP America Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013). The Federal Circuit held that a JMOL is not the appropriate context for renewing attacks on an expert's methodology:

> Under the guise of sufficiency of the evidence, [Defendant] questions the admissibility of [Plaintiff's] expert testimony and whether his damages model is properly tied to the facts of the case. Such questions should be resolved under the framework of the Federal Rules of Evidence and through a challenge under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

*Id.*

In the present case, Samsung's pre-trial *Daubert* challenge to exclude Mr. Weinstein's opinions included the following subject matter: the reliability of an allocation provision in the BlackBerry-Rembrandt Agreement; Mr. Weinstein's analysis of the two TI chips; Mr. Weinstein's comparison of the cost differences between the TI chips; Mr. Weinstein's selection of two fiscal quarters from which to evaluate TI chip price data; and Mr. Weinstein's method of apportionment. (Dkt. No. 189.) The Court denied Samsung's challenges. (Dkt. No. 265.) Samsung did not move for reconsideration of the Court's rulings. Instead, similarly to the defendant in *Versata*, Samsung has repeated these arguments in its current JMOL motion and argued at the post-trial hearing that Mr. Weinstein's testimony "shouldn't have been allowed in front of the jury in the first place." (11/3/2015 Tr., Dkt. No. 349 at 63:8–19.) Samsung has followed the same path that *Versata* teaches away from, and such disregard for the Federal Circuit's guidance should not be rewarded or overlooked.

Accordingly, to the extent that Samsung now merely re-urges its prior *Daubert* arguments, the Court rejects such as improper. To the extent, if any, that Samsung does not, the Court will address the merits of Samsung's current motion below.

**1. Rembrandt's TI Chip Price Analysis**

Samsung argues that no reasonable jury could rely on Rembrandt's TI chip price analysis because Mr. Weinstein's comparison of the two chips was "irrelevant and unreliable." (Mot. at 3.) Samsung first asserts that none of the Samsung products at issue in this case used the TI chips that Mr. Weinstein evaluated, and that, in fact, a price comparison of the chips that Samsung does use would demonstrate that EDR has zero incremental value. (*Id.* at 3–4.) Samsung further challenges Mr. Weinstein's selection of two fiscal quarters of TI price data to use as the basis for his price comparison. (*Id.* at 4.) Samsung notes that "[o]ver a period of 20 quarters, the two quarters selected by Mr. Weinstein were two of only four quarters in which the TI chip with EDR was more expensive than the TI chip without EDR" and alleges that Mr. Weinstein failed to account for a massive volume difference in the quantity of EDR and non-EDR chips sold during those quarters. (*Id.*)

Samsung also argues that Mr. Weinstein's methodology failed to correctly apportion between the patented and unpatented features of the TI Bluetooth chips. (*Id.* at 5.) Specifically, Samsung contends that Mr. Weinstein improperly attributed the entire price difference between the two TI chips to EDR functionality, overlooking various other reasons for differences in price. (*Id.*) Finally, Samsung asserts that Mr. Weinstein should have considered the incremental profit associated with including EDR functionality rather than simply the incremental cost of incorporating it. (*Id.* at 6.)

Rembrandt responds by arguing that "the Jury was entitled to rely on unrebutted testimony that the [TI] chips . . . provided the best comparison for isolating the patented technology." ("Resp.", Dkt. No. 336 at 1.) Rembrandt notes that, while Samsung heavily criticized the TI chips at trial, it failed to present alternative evidence that another pair of chips could provide a better comparison. (*Id.* at 5.)

Significantly, Rembrandt asserts that Mr. Weinstein properly relied upon the conclusion of Rembrandt's technical experts, Dr. Robert Morrow and Dr. Chris Jones, that the principal difference between the TI chips was the introduction of EDR functionality. (*Id.* at 6.) At trial, Mr. Weinstein testified as follows:

> QUESTION: How did you determine which chips to compare?
>
> ANSWER: I relied on the technical experts, Dr. Morrow and Dr. Jones. [. . .] I wanted . . . the best two chips that they could identify where we would have this information where essentially the only difference between the two was the inclusion of EDR functionality. And after discussing this with them and looking at documents, they said that these are the two chips where essentially the only difference is the inclusion of EDR functionality in one.

(2/10/2015 P.M. Trial Tr. (Weinstein), Dkt. No. 293 at 131:2–4, 14–21.) Rembrandt also argues that it provided sufficient evidence for the jury to conclude that the two quarters Mr. Weinstein relied on for TI chip price data were the two most relevant quarters for his analysis, and any volume differences between the two chips did not impact price. (Resp. at 6–7.) Specifically, Mr. Weinstein testified at trial that a comparison of the third and fourth quarters of 2006 provided the best comparison for evaluating an increase in chip price due to the introduction in EDR:

> ANSWER: I picked those two quarters because according to Texas Instruments . . . those are the first times that the [TI chip] with EDR was actually offered in what they call production level quantities, sufficient quantities— quantities to be meaningful.
>
> …

> QUESTION: Okay. Now, why didn't you use pricing for these TI chips in 2011, 2012, 2013? Why did you focus on when the product was first introduced in production volumes?
>
> ANSWER: Well, if I were to try and do this later on . . . there would have been a lot of other changes going on in the chips. And so it would not have been possible to separate out or apportion out for all of those other changes. It was only by looking at these chips when they were first introduced at production level quantities that I was able to specifically identify the incremental contribution associated with including EDR.

(2/10/2015 P.M. (Sealed) Trial Tr. (Weinstein), Dkt. No. 294 at 7:3–9, 8:8–19.)

Additionally, Rembrandt argues that Mr. Weinstein properly apportioned the value of the patented features by identifying the smallest saleable unit (the Bluetooth chip) and then further isolating only the incremental value of EDR. (Resp. at 8.) Rembrandt again points to Dr. Morrow and Dr. Jones' determination that the addition of EDR was the sole meaningful difference between the two TI chips. (*Id.* at 9.) Lastly, Rembrandt contends that Mr. Weinstein's testimony provided a sufficient basis for reasonable jurors to conclude that, in a hypothetical negotiation, Samsung would have been willing to pay Rembrandt the incremental cost of implementing the EDR functionality. (*Id.* at 10.)

The Court is not persuaded by Samsung's post-verdict attack on Rembrandt's damages theory. Challenges to methodology and reliability fall squarely into the purview of *Daubert*. Even if the Court ignores this glaring problem with Samsung's argument, it is clear that Mr. Weinstein was entitled to rely upon the technical analysis and conclusions of Dr. Morrow and Dr. Jones that the TI chips provided the best benchmark when constructing his damages model and presenting it to the jury. This remains true even if Samsung may not have used the two TI chips in its products at issue. *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1321 (Fed. Cir. 2014) (partly overruled on other grounds) ("Experts routinely rely upon other experts hired by the party they represent for expertise outside of their field."). Moreover, Mr. Weinstein

thoroughly explained the reasoning behind his election to use data from two fiscal quarters as the foundation for his chip price comparison. Samsung clearly disagreed with his reasoning and, in response, vigorously cross-examined Mr. Weinstein on these matters and presented rebuttal testimony to the jury from its own damages expert. The jury was free to judge the credibility of all of the experts and determine who had persuaded them when awarding damages. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1262 (Fed. Cir. 2012) (citation omitted). The Court concludes that Rembrandt's TI chip price analysis was appropriately tied to the facts of the case and supports the jury's verdict.

Further, the Court does not find that Mr. Weinstein failed to properly apportion between the patented and unpatented features of the Bluetooth chips. Mr. Weinstein repeatedly explained how his method of apportionment accounted for non-infringing features. (2/10/2015 P.M. (Sealed) Trial Tr., Dkt. No. 294 at 12:12–14:25.) As noted in the Court's Order denying Defendants' Motion to Exclude, "it appears Defendants' primary dispute with Mr. Weinstein's report and testimony lies in the underlying technical analysis performed by Dr. Morrow when comparing the [TI] chips—*i.e.*, whether the entire incremental cost difference of the two should be attributed solely to EDR, or if additional benefits should be discounted in the analysis." (Dkt. No. 243 at 6.) Samsung did not move to exclude Dr. Morrow's report during pre-trial, and it had (and exercised) the opportunity to thoroughly cross-examine both him and Dr. Jones at trial. The Court concludes that, contrary to Samsung's arguments, Rembrandt adequately estimated the "portion of the value" of the Bluetooth chips "attributable to the patented technology." *VirnetX, Inc. v. Cisco Sys. Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014).

Finally, the Court does not agree that Mr. Weinstein inappropriately inflated his damages calculations by using the incremental cost of incorporating EDR functionality to determine a

11

reasonable royalty amount. Mr. Weinstein explained how he used the chip price comparison to isolate the value of the patented technology as well as how he accounted for price changes over time. (2/10/2015 P.M. (Sealed) Trial Tr., Dkt. No. 294 at 11:2–12:5.) The Court does not find that no reasonable jury could have accepted his testimony that Samsung would have agreed to this measure of value in a hypothetical negotiation. Avoiding the double negative, the Court finds that a reasonable jury (and in this case—this jury) could have reasonably accepted Mr. Weinstein's testimony that Samsung would have agreed to this measure of value in a hypothetical negotiation. *See Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) ("When the accused infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by such features . . . [t]he essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product.").

### 2. The Allocation Clause in the BlackBerry-Rembrandt Settlement Agreement

Samsung also challenges the reliability of an allocation clause in the BlackBerry-Rembrandt Settlement Agreement that Mr. Weinstein used as evidence to support his damages analysis. (Mot. at 7.) Under the BlackBerry-Rembrandt Agreement, BlackBerry agreed to pay Rembrandt a settlement amount for a limited license covering the damages period prior to November 12, 2014, as well as for a five-year standstill period. (*Id.*) The Agreement includes a provision that allocates the payments Rembrandt received from BlackBerry into three different time periods: (1) sales prior to the date of the lawsuit during the infringement period; (2) sales after the lawsuit was filed until the date of the settlement agreement; and (3) a future five-year standstill agreement. (2/10/2015 P.M. (Sealed) Trial Tr., Dkt. No. 294 at 17:21–18:14.) Immediately following the allocation clause is the following sentence: "BlackBerry does not

agree to an allocation of the payment." (Mot. at 7.) Notwithstanding this sentence, Mr. Weinstein evaluated the second time period in the allocation clause to derive an effective royalty rate from the BlackBerry-Rembrandt license that supported his ultimate damages conclusions in the present case. (*Id.* at 19:1–7, 20:20–23.)

Samsung argues that the allocation provision "is not a reliable measure of the value of the patents-in-suit" because the Agreement states that BlackBerry did not agree to the provision. (Mot. at 7.) Samsung alleges that the per-unit royalty that Mr. Weinstein derived from the BlackBerry-Rembrandt Agreement was "an arbitrary number chosen by Rembrandt for litigation purposes." (*Id.* at 8.) Samsung also contends that Mr. Weinstein provided no basis for considering only the second allocated time period in calculating the per-unit royalty and offered no rationale for converting the Agreement's lump sum payment into a running royalty. (*Id.* at 9.)

Rembrandt responds by arguing that "BlackBerry implicitly affirmed the allocation by paying the amount that was due using the stated allocation, including increasing the settlement amount consistently with the allocation each day that the negotiations continued." (Resp. at 11.) Rembrandt notes that BlackBerry did not object to the inclusion of the allocation provision in the Agreement and states that BlackBerry only included the statement at issue to avoid implications in other litigation. (*Id.*) Further, Rembrandt asserts that the Blackberry-Rembrandt Agreement is the sole license specific to the patents-in-suit, therefore increasing its relevance to the current case. (*Id.* at 12.) At trial, Mr. Weinstein testified that he relied only upon the second allocated time period because BlackBerry had a live defense related to pre-litigation damages that would have impacted Rembrandt's ability to collect damages for that first allocated period. (2/10/2015 P.M. (Sealed) Trial Tr., Dkt. No. 294 at 20:25–21:5.)

Having considered the entire record, the Court disagrees with Samsung. Although

differences certainly exist in the structure of the BlackBerry-Rembrandt Agreement and Rembrandt's reasonable royalty damages model, the Court concludes that a reasonable basis for comparing the two frameworks exists and that Mr. Weinstein's analysis was relevant to the facts of this case. *See Lucent Techs.*, 580 F.3d at 1330.

At trial, Mr. Weinstein explained why he found the allocation provision in the BlackBerry-Rembrandt Agreement to be a reliable source of evidence and how he used that provision to derive a royalty rate supporting his independent damages calculations. (2/10/2015 P.M. (Sealed) Trial Tr., Dkt. No. 294 at 19:11–21:5.) Samsung strongly disputed the reliability of the allocation provision through lengthy cross-examination, rebuttal expert testimony and the presentation of alternative license agreements. The jury was entitled to weigh all of the evidence presented at trial and decide which evidence it found to be most relevant and credible. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212 (Fed. Cir. 2010) (citing *i4i Ltd. P'ship, Infrastructure for Info. Inc. v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010)). After such evaluation, the jury found for Rembrandt. The Court does not find that no reasonable jury could have relied upon Mr. Weinstein's per-unit royalty analysis derived from the BlackBerry-Rembrandt Agreement. Where a jury is presented with two conflicting positions at trial and there is reasonable evidence and argument to support both positions, the fact that the jury ultimately sided with one party over the other does not support entry of JMOL. Such is the position in which Samsung finds itself in this case.

### 3. The Jury's Damages Award

Samsung alleges that the jury simply "split the difference" between Rembrandt and Samsung's competing damages calculations to arrive at an "arbitrary" award. (Mot. at 10–11.) Samsung alleges that Mr. Weinstein provided the jury with no evidence or guidance in selecting

an amount within his proposed damages range and that the speed with which the jury returned its verdict implies that the jury rendered a quick compromise decision.[4] (*Id.* at 11.) Samsung asserts that a reasonable jury could not have awarded damages exceeding the $500,000 amount proposed by their damages expert, Dr. Stephen Becker. (*Id.* at 12–13.) In response, Rembrandt argues that there is no indication that the jury applied an inappropriate method in arriving at a damages amount and that, in fact, it was reasonable for the jury to award damages within the range presented by Mr. Weinstein. (Resp. at 16 (quoting *Versata Software*, 717 F.3d at 1268 ("While the jury awarded less than the $170 million calculated by SAP's expert, the jury is not bound to accept the maximum proffered award and may choose an intermediate rate.")).) Additionally, Rembrandt disputes the reliability of Dr. Becker's testimony, primarily because he "failed to consider the only license limited to the patents-in-suit . . . ." (*Id.* at 19–20.)

Mr. Weinstein concluded that an appropriate damages amount would be between $14.5 and $31.9 million. (2/10/2015 P.M. Trial Tr., Dkt. No. 293 at 139:10–14.) The jury ultimately awarded $15.7 million in damages—a number near the low end of Rembrandt's request. As discussed above, the Court finds that substantial evidence supports the jury's verdict. Having considered all of the record evidence, the Court concludes that the jury reached a reasoned and supportable decision and declines to disturb the jury's judgment. Consequently, Samsung's motion for judgment as a matter of law or, alternatively, a new trial as to damages based upon any of the above arguments should be denied.

**B.** **Samsung is Not Entitled to a New Trial**

In addition to the arguments discussed above, Samsung alternatively asserts that "the Court's *sua sponte* actions and exclusion of evidence" warrant a new trial on damages.

---

[4] The jury deliberated for about an hour before returning the verdict. (Mot. at 11.)

### 1. The BlackBerry-Rembrandt Agreement

Samsung repeats its contentions that the allocation clause in the BlackBerry-Rembrandt Agreement is unreliable and that the Agreement itself is irrelevant to the facts of this case. (Mot. at 13.) Samsung further contends that the Court's ruling allowing introduction of the Agreement without the specific payment and allocation terms was "clearly erroneous." (*Id.*) Samsung argues that, without the dollar amounts, the Agreement has no relevance. (*Id.* at 14.) Samsung also claims that redacting the payment terms prejudiced its ability to cross-examine Mr. Weinstein because the amount of the lump-sum payment would have served as a check on the reasonableness of Rembrandt's requested damages amount. (*Id.*)

In response, Rembrandt reiterates that the BlackBerry-Rembrandt Agreement is the only license that specifically focuses on the patented technology at issue in this case and does not cover an entire portfolio. (Resp. at 20–21.) Rembrandt notes that the Court did not redact the payment terms *sua sponte* but instead did so in response to BlackBerry's motion "requesting to protect against disclosure of the payment amount and Rembrandt's allocation in the agreement." (*Id.* at 22.) Finally, Rembrandt argues that including the dollar amounts would have served no purpose but to prejudice Rembrandt by unfairly anchoring the jury. (*Id.*)

The Court finds that the most relevant aspect of the BlackBerry-Rembrandt Agreement to the present case is the Agreement's structure and not the amount that BlackBerry, a company in a significantly different situation than Samsung, paid to license the patented technology for a limited time period. Moreover, the Court does not find that its ruling on this matter prejudiced Samsung's ability to cross-examine Mr. Weinstein. Mr. Weinstein's testimony relied on the Agreement's structure to calculate a royalty amount, and his damages conclusions did not depend upon the total amount paid by BlackBerry. Thus, the Court concludes that admitting the

BlackBerry-Rembrandt Agreement with the specific dollar amounts redacted does not warrant a new trial on damages.

### 2. The Zhone-Rembrandt Agreement

The 2007 Patent-Sale Agreement between Zhone and Summit, a Rembrandt entity, covers a 74-patent sale that included the '580 Patent and the '228 Patent ("Zhone-Rembrandt Agreement"). (Mot. at 15.) The Court admitted the Zhone-Rembrandt Agreement but excluded a provision within it that allocated the payment amount "pro-rata among all Assigned Patents." (*Id.*) Samsung argues that it was prejudicial error for the Court to exclude this provision because it was "probative evidence about the value of the patents-in-suit" that Samsung would have relied on "to establish the value of a license to those patents." (*Id.* at 15–16.) In response, Rembrandt contends that the allocation clause was not probative of the value of the patents-in-suit because Rembrandt's corporate representative testified that no valuation was done when the patents were purchased, and "the allocation was made only to ensure consistent reporting to the IRS for purposes such as reporting capital gains." (Resp. at 23.) Additionally, Rembrandt argues that "mere patent counting and dividing" to come up with a purported value for each patent is highly improper and the Court correctly avoided such impropriety by excluding such provision. (*Id.*)

As discussed at the pre-trial hearing on this matter, Rembrandt related testimony from its corporate representative that the allocation clause was included solely for business purposes. (1/20/2015 Tr., Dkt. No. 225 at 65:25–66:5.) Samsung did not persuade the Court then, and does not persuade the Court now, that the allocation clause was included as a legitimate valuation of all 74 patents rather than merely for business purposes; such purposes being far removed from a

proper hypothetical negotiation. Accordingly, the Court holds that a new trial is not warranted based on exclusion of the allocation clause in the Zhone-Rembrandt Agreement.

### 3. The BlackBerry-Bandspeed Agreement

The BlackBerry-Bandspeed Agreement is a 2013 license agreement between BlackBerry and Bandspeed that licensed two patents covering another Bluetooth feature. (2/2/2015 Tr., Dkt. No. 259 at 67, 74.) Samsung argues that the Court's exclusion of such agreement was erroneous because it would have provided another relevant data point for the jury to consider in determining a damages amount. (Mot. at 16.) Samsung also asserts that the agreement was timely produced. (*Id.* at 17.) Rembrandt disputes the relevance of the agreement because it covers different Bluetooth technology, and neither of the parties to the agreement is a party in the current case. (Resp. at 24–25.) Rembrandt further contends that Samsung produced the BlackBerry-Bandspeed Agreement "well beyond the discovery deadline," and it was not considered in Samsung's expert report. (*Id.* at 25.)

The Court finds that the BlackBerry-Bandspeed Agreement was not timely produced. (2/2/2015 Tr., Dkt. No. 259 at 74:21–25, 76:17–77:13.) Moreover, the Court is not persuaded as to its relevance. To have admitted it would have openly invited Samsung's expert to opine on matters outside his reports. Thus, the Court concludes that it was not erroneous to exclude the BlackBerry-Bandspeed Agreement and declines to grant a new trial on this basis.

### 4. The Jury Verdict Form

Finally, Samsung argues that it was unfair for the Court to *sua sponte* add the phrase "up to the time of trial" to Question Three of the verdict form. (Mot. at 18.) Samsung contends that the jury could have interpreted the phrase to mean that "Rembrandt's running royalty was the only form of damages that the Court deemed proper." (*Id.* at 19.) The Court disagrees. Leaving

out "up to the time of trial" on Question Three of the verdict form would have created substantial juror confusion, as the jury would have had no temporal parameter to guide its damages determinations. Moreover, the Court specifically instructed the jury: "You may award a fully-paid, lump-sum royalty for the time period of the infringement." (2/13/2015 A.M. Trial Tr., Dkt. No. 300 at 36:14–15.) Therefore, the Court concludes that Samsung is not entitled to a new trial based on the verdict form.

## VI. CONCLUSION

For the reasons set forth above, the Court finds that the jury's verdict with regard to damages should not be disturbed. The jury's verdict in this respect is supported by substantial evidence and should stand. Further, the Court finds that Samsung is not entitled to a new trial on damages. Accordingly, Samsung's Rule 50(b) Renewed Motion for Judgment as a Matter of Law and/or Rule 59(a) Motion for New Trial on Damages Issues (Dkt. No. 328) is **DENIED**.

**So ORDERED and SIGNED this 29th day of January, 2016.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE